*The ~~Eighth~~ Motion Office*

At a ~~Special Term Part~~ 7 of the
Supreme Court of the State of New
York, 60 Centre Street, New York,
County, this 29th day of August, 2017.

BEFORE:          **HON. GERALD LEBOVITS**
                                    **J.S.C.**
                          J.S.C.

-----------------------------------------------------------X

In the Matter of

MALIKAH SHABAZZ, as President of the LEFRAK
CITY TENANTS ASSOCIATION; JAMES
GALLOWAY, as Coordinator of the LEFRAK CITY          Index No. 157686/2017
TENANTS LEAGUE; RUBI MUHAMMAD;
DURRIYAH HAKAM; REAVER CHERRY; ROSALIND          **ORDER TO SHOW CAUSE**
ANTOINE; and the BLACK LEADERSHIP ACTION
COALITION, INC.,

                                    Petitioners,

For an Order Pursuant to Article 78 of the Civil Practice
Law and Rules,

                          -against-

NEW YORK CITY BOARD OF ELECTIONS,

                                    Respondent.

-----------------------------------------------------------

          Upon the Affirmation of Arthur Z. Schwartz dated August 28, 2017, and the Affidavits of

Malikah Shabazz (sworn to on August 26, 2018), James Galloway (sworn to on August 28,

2017), Durriyah Hakam (sworn to on August 26, 2017), Reaver Cherry (sworn to on August 25,

2017), Rosalind Antoine (sworn to on August 26, 2017), the Affidavit of Ruby Muhammad,

(sworn to on August 28, 2017), and the Verified Petition, verified on August 28, 2017, and good

cause appearing therein, the Respondent, New York City Board of Elections ("NYCBOE"),
*or counsel*
is hereby

          ORDERED TO SHOW CAUSE, on ~~August~~ *appear and September* 1, 2017, at 9:30 ____ o'clock in the
                          *AT THE EX PARTE MOTION OFFICE ~~RM 315~~*
*~~true~~* ~~noon,~~ at the Supreme Court, New York County, ~~Part 50~~ Room ~~127~~ 315, 60 Centre
*60 Centre 111 Centre*
Street, New York, New York, why this Court should not direct the NYCBOE to
*60 Centre*

(a) restore the voting location for the 15th, 16th, 17th, 18th, 25th, and 54th Election Districts to the Continental Room in LeFrak City where they had been placed during the General Election of 2016; to

(b) work with the management of LeFrak City to make temporary adjustments to the aforesaid voting location so as to accommodate disabled voters; and to

(c) give appropriate notice to registered voters in those districts, including notice by mail, by public posting, by public meetings, and by other manners designed to give immediate notice to all registered voters; and it is further

ORDERED that personal service ~~of a copy~~ of this Order and its supporting papers upon the NYCBOE, ~~or email service on Counsel to the NYCBOE~~, on ~~or before~~ August 29, 2017, shall be deemed sufficient.

ORAL ARGUMENT REQUIRED

ENTER:

_____
J.S.C.

_____
JUSTICE

At a Special Term Part _____ of the Supreme Court of the State of New York, 60 Centre Street, New York County, this ___ day of August, 2017.

BEFORE: _____
                        J.S.C.

------------------------------------------------------------------- X

In the Matter of

MALIKAH SHABAZZ, as President of the LEFRAK CITY TENANTS ASSOCIATION; JAMES GALLOWAY, as Coordinator of the LEFRAK CITY TENANTS LEAGUE; RUBI MUHAMMAD; DURRIYAH HAKAM; REAVER CHERRY; ROSALIND ANTOINE; and the BLACK LEADERSHIP ACTION COALITION, INC.,

Index No. 157686/2017

**ORDER TO SHOW CAUSE**

                    Petitioners,

For an Order Pursuant to Article 78 of the Civil Practice Law and Rules,

                -against-

NEW YORK CITY BOARD OF ELECTIONS,

                    Respondent.

-------------------------------------------------------------------

Upon the Affirmation of Arthur Z. Schwartz dated August 28, 2017, and the Affidavits of Malikah Shabazz (sworn to on August 26, 2018), James Galloway (sworn to on August 28, 2017),Durriyah Hakam (sworn to on August 26, 2017), Reaver Cherry (sworn to on August 25, 2017), Rosalind Antoine (sworn to on August 26, 2017), the Affidavit of Ruby Muhammad, (sworn to on August 28, 2017), and the Verified Petition, verified on August 28, 2017, and good cause appearing therein, the Respondent, New York City Board of Elections ("NYCBOE"), is hereby

ORDERED TO SHOW CAUSE, on August _____, 2017, at _____ o'clock in the _____noon, at the Supreme Court, New York County, Part _____, Room _____, 60 Centre Street, New York, New York, why this Court should not direct the NYCBOE to

(a) restore the voting location for the 15th, 16th, 17th, 18th, 25th, and 54th Election Districts to the Continental Room in LeFrak City where they had been placed during the General Election of 2016; to

(b) work with the management of LeFrak City to make temporary adjustments to the aforesaid voting location so as to accommodate disabled voters; and to

(c) give appropriate notice to registered voters in those districts, including notice by mail, by public posting, by public meetings, and by other manners designed to give immediate notice to all registered voters; and it is further

ORDERED that personal service of this Order and its supporting papers upon the NYCBOE, or email service on Counsel to the NYCBOE, on or before August _____, 2017, shall be deemed sufficient.


                                                          _____

                                                                     JUSTICE

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 5 of 348

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------- X

In the Matter of

MALIKAH SHABAZZ, as President of the LEFRAK CITY
TENANTS ASSOCIATION; JAMES GALLOWAY, as
Coordinator of the LEFRAK CITY TENANTS LEAGUE;
RUBI MUHAMMAD; DURRIYAH HAKAM; REAVER
CHERRY; ROSALIND ANTOINE; and the BLACK
LEADERSHIP ACTION COALITION, INC.,

                                       Petitioners,

For an Order Pursuant to Article 78 of the Civil Practice
Law and Rules,

                  -against-

NEW YORK CITY BOARD OF ELECTIONS,

                        Respondent.

------------------------------------------------------------------------- X

Index No. 157686/2017

**AFFIRMATION OF
ARTHUR Z.
SCHWARTZ IN
SUPPORT OF ORDER
TO SHOW CAUSE**

Arthur Z. Schwartz, attorney for Petitioners, affirms under penalty of perjury as follows:

1.      Petitioners, who are disabled registered voters, all of whom are Black and/or

Hispanic, and organizations whose members includes thousands of disabled and/or Black and/or

Hispanic voters, have initiated this action to redress diminution, by the New York City Board of

Elections ("NYCBOE"), of their right, and their members' rights, to vote, in violation of Article

I Section 1 and Article II Section 1 of the New York State Constitution, their Right to Equal

Protection under Article I, Section 11 of the New York State Constitution, their right to be free

from racial, national origin, and disability-based discrimination under Section 296(2) of the New

York State Human Rights Law and Section 8-107(4) of the New York City Human Rights Law,

and to address generally arbitrary and capricious actions by the NYCBOE utilizing Article 78 of

the Civil Practice Laws and Rules.  Petitioners allege that the NYCBOE, in response to an

assessment of relatively minor, and correctable, problems with one voting site at LeFrak City under the Americans with Disabilities Act ("ADA"), has moved the voting locations of five (5) Election Districts, serving thousands of voters, rather than repairing the problems, making it more difficult for people of color and people with disabilities to vote, without an effort at a reasonable accommodation.  Petitioners also allege that the movement of LeFrak City voting locations to the High School for Arts and Businesses (three-quarters of a mile away) and/or PS 13 (a third of a mile away), after LeFrak City management made an offer to make repairs to the on-site voting location, was an arbitrary and capricious action.

2.      Petitioners Rubi Muhammad, Durriyah Hakam, Reaver Cherry, and Rosalind Antoine are registered voters of the LeFrak City, Queens affordable housing apartment complex ("LeFrak City") located in the City of New York and are either voters with disabilities, voters of Black or Hispanic national origin, or both.  Petitioners LeFrak City Tenants Association, LeFrak City Tenants League, and the Black Leadership Action Coalition are organizations whose members include voters with disabilities, voters of Black or Hispanic national origin, or both.

3.      LeFrak City is located in the thirty-fifth Assembly District, comprising Election Districts ("ED") fifteen, sixteen, seventeen, eighteen, and twenty-five.

4.      For approximately fifty years prior to July 2017, the LeFrak City polling location was in LeFrak City's Continental Room (hereinafter the "Continental Room").  LeFrak City voters could walk to vote, right within their complex.

5.      On or about July 26, 2017, and for the most capricious of reasons, Respondent decided to move the Continental Room polling place out of LeFrak City to two locations, one of which is three-quarters of a mile away and the other of which is a third of a mile away, rather than take advantage of offers by LeFrak City management to do repairs which would remove the

2

accessibility problems, or to find another appropriate polling location for LeFrak City voters. The most minimal of notice was given to LeFrak City voters, approximately 30 days before the September 12, 2017 Democratic Primary election, in which a significant turnout is expected because of the candidates running.

6.      Respondent's unyielding, yet unreasonable decision will result in the denial or abridgement of the right to vote on account of disability, race, color, or national origin.  After unsuccessfully attempting redress with the Board of Elections, Petitioners seek judicial intervention to protect their right to vote, and to right an unconscionable wrong.

7.      We will not repeat the detailed allegations of the Petition; they show, however, that five years after being ordered to address ADA-related problems in thousands of polling sites (see Exhibit B), and after having been directed to repair existing polling locations, and move them only as a last resort, the NYCBOE, here, has swooped in and in short order, without public notice, and without consultation with non-partisan representatives of the voters, told the residents of LeFrak City that they must ambulate to two new polling locations, one a third of a mile away, and one three-quarters of a mile away.  They have offered no accommodation for voters with disabilities, such as the individual petitioners, who utilize walkers and wheelchairs, and they have to know that the distance to be traveled will depress voter participation among LeFrak City voters, the vast majority of whom are Black or Hispanic.  Rather than reconsider, or even explain their decision, the Board of Elections has ignored all requests for meetings and requests for an explanation of why they are proceeding as they are in the face of the potential for voter suppression.

8.      Petitioners present an extremely strong case on the merits.

3

9.      **State Constitutional Claims.** The New York State Constitution provides, in relevant part:

> **Article I § 1.** [Rights, privileges and franchise secured; uncontested primary elections]
>
> No member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his or her peers, except that the legislature may provide that there shall be no primary election held to nominate candidates for public office or to elect persons to party positions for any political party or parties in any unit of representation of the state from which such candidates or persons are nominated or elected whenever there is no contest or contests for such nominations or election as may be prescribed by general law.
>
> **Article I § 2.** Every citizen shall be entitled to vote at every election for all officers elected by the people and upon all questions submitted to the vote of the people provided that such citizen is eighteen years of age or over and shall have been a resident of this state, and of the county, city, or village for thirty days next preceding an election.
>
> **Article I § 11.** [Equal protection of laws; discrimination in civil rights prohibited]
>
> No person shall be denied the equal protection of the laws of this state or any subdivision thereof.  No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state.

10.      By its actions Respondent has burdened the registered voters of LeFrak City with such an onerous requirement that they have been constructively denied their right to vote as guaranteed by Article I Section 1 and Article II Section 2 of the New York State Constitution, and have been denied the equal protection of the law as guaranteed by Article I Section 11 of the New York State Constitution.

11.      In *Callaghan v. Voorhis*, 252 NY 14, 17 (1929), the Court of Appeals held that "The whole purpose of the Election Law, and the Constitution under which it is enacted, is that,

4

within reasonable bounds and regulations, all voters shall have equal, easy and unrestricted opportunities to declare their choice for each office"; and see *Hopper v. Britt*, 203 NY 144, 150 (1911) ("any system of election which unnecessarily prevents the elector from voting for the candidate of his choice violates the Constitution;" … "Inequality in the facilities afforded the electors in casting their votes may defeat the will of the people as thoroughly as restrictions which the Courts would hold to operate as disenfranchisement of voters.") Id at 153.

12.     More recently, Chief Judge Wachtler, after holding that the State Constitution's right to vote provisions "insures that whatever voting rights an individual possesses may not be taken away of diminished except under certain extraordinary circumstances," also used the State Constitution's Equal Protection Clause to find a voting limitation unconstitutional. *Esler v Walters*, 56 NY2d 306 (1982). See also *McMinn v Town of Oyster Bay*, 66 NY2d 544 (1985), affirming a Second Department decision declaring a voting restriction unconstitutional. *See* 105 AD2d 46 (2d Dept. 1984).

13.     **The NY State Human Rights Law Claim.** The New York State Human Rights Law ("NYSHRL"), at Section 292(9), provides, in relevant part:

> 9.     The term "place of public accommodation, resort or amusement" shall include, regardless of whether the owner or operator of such place is a state or local government entity or a private individual or entity, except as hereinafter specified, all places included in the meaning of such terms as: inns, taverns, road houses, hotels, motels, whether conducted for the entertainment of transient guests or for the accommodation of those seeking health, recreation or rest, or restaurants, or eating houses, or any place where food is sold for consumption on the premises; buffets, saloons, barrooms, or any store, park or enclosure where spirituous or malt liquors are sold; ice cream parlors, confectionaries, soda fountains, and all stores where ice cream, ice and fruit preparations or their derivatives, or where beverages of any kind are retailed for consumption on the premises; wholesale and retail stores and establishments dealing with goods or services of any kind, dispensaries, clinics, hospitals, bath-houses, swimming pools,

5

laundries and all other cleaning establishments, barber shops, beauty parlors, theatres, motion picture houses, airdromes, roof gardens, music halls, race courses, skating rinks, amusement and recreation parks, trailer camps, resort camps, fairs, bowling alleys, golf courses, gymnasiums, shooting galleries, billiard and pool parlors; garages, all public conveyances operated on land or water or in the air, as well as the stations and terminals thereof; travel or tour advisory services, agencies or bureaus; public halls, public rooms, public elevators, and any public areas of any building or structure

14. A voting location is, by this definition, a place of public accommodation.

15. NYSHRL Section 296(2) provides:

2. (a) It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, creed, color, national origin, sexual orientation, military status, sex, or disability or marital status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof, including the extension of credit, or, directly or indirectly, to publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement, to the effect that any of the accommodations, advantages, facilities and privileges of any such place shall be refused, withheld from or denied to any person on account of race, creed, color, national origin, sexual orientation, military status, sex, or disability or marital status, or that the patronage or custom thereat of any person of or purporting to be of any particular race, creed, color, national origin, sexual orientation, military status, sex or marital status, or having a disability is unwelcome, objectionable or not acceptable, desired or solicited…

(c) For the purposes of paragraph (a) of this subdivision, "discriminatory practice" includes:

(i) a refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities, unless such person can demonstrate that making such modifications would fundamentally alter the nature of such facilities, privileges, advantages or accommodations;

6

Case 1:17-cv-06637-VSB Document 1-1 Filed 08/31/17 Page 11 of 348

(ii) a refusal to take such steps as may be necessary to ensure that no individual with a disability is excluded or denied services because of the absence of auxiliary aids and services, unless such person can demonstrate that taking such steps would fundamentally alter the nature of the facility, privilege, advantage or accommodation being offered or would result in an undue burden;

(iii) a refusal to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, and transportation barriers in existing vehicles and rail passenger cars used by an establishment for transporting individuals (not including barriers that can only be removed through the retrofitting of vehicles or rail passenger cars by the installation of a hydraulic or other lift), where such removal is readily achievable…

(d) For the purposes of this subdivision:

(i) "Readily achievable" means easily accomplishable and able to be carried out without much difficulty or expense. In determining whether an action is readily achievable, factors to be considered include:

(A) the nature and cost of the action needed under this subdivision;

(B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources or the impact otherwise of such action upon the operation of the facility;

(C) the overall financial resources of the place of public accommodation, resort or amusement; the overall size of the business of such a place with respect to the number of its employees; the number, type and location of its facilities; and

(D) the type of operation or operations of the place of public accommodation, resort or amusement, including the composition, structure and functions of the workforce of such place; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to such place.

7

16.     Respondent is a lessee both of the Continental Room at LeFrak City, and of the spaces at the two schools where LeFrak City voting locations have been moved, and is therefore subject to limitations and requirements of Section 296(2) of the NYSHRL.

17.     Respondent in no way has provided a reasonable accommodation for persons with disabilities, such as Petitioners, and the class they represent, *i.e.*, disabled residents of LeFrak City, to vote in the September 12 primary election; they are not providing van services, and even if they did, they would be burdening such voters with long waits and a need to take longer than non-disabled voters to get to their place of voting.  Furthermore, they have displaced a large population of voters of color, and are requiring them to vote not where they live, but a considerable distance from their residences.

18.     By its actions Respondent has violated the rights of Petitioners, and the class of voters they represent, under Section 296(2)(a), and in the case of disabled residents, Section 296(2)(c) of the NYSHRL.

19.     **NYC Human Rights Law Claim**.  The New York City Human Rights Law ("NYCHRL"), at Section 8-102(9), provides, in relevant part:

> 9.  The term "place or provider of public accommodation" shall include providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold, or otherwise made available.

20.     NYCHRL Section 8-107(4) provides:

> 4.  Public accommodations.
>
>     a.  It shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation:

8

1.  Because of any person's actual or perceived race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status, directly or indirectly:

   (a)  To refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation; or

21.  NYCHRL Section 8-107(15) provides:

   15.  Applicability; persons with disabilities.

   (a)  Requirement to make reasonable accommodation to the needs of persons with disabilities.  Except as provided in paragraph (b), any person prohibited by the provisions of this section from discriminating on the basis of disability shall make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity.

   (b)  Affirmative defense in disability cases.  In any case where the need for reasonable accommodation is placed in issue, it shall be an affirmative defense that the person aggrieved by the alleged discriminatory practice could not, with reasonable accommodation, satisfy the essential requisites of the job or enjoy the right or rights in question.

22.  NYCHRL Section 8-107(17) provides:

   17.  Disparate impact.

   a.  An unlawful discriminatory practice based upon disparate impact is established when:

   (1)  the commission or a person who may bring an action under chapter four or five of this title demonstrates that a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter; and

   (2)  the covered entity fails to plead and prove as an affirmative defense that each such policy or practice bears a significant relationship to a significant business objective of the

9

covered entity or does not contribute to the disparate impact; provided, however, that if the commission or such person who may bring an action demonstrates that a group of policies or practices results in a disparate impact, the commission or such person shall not be required to demonstrate which specific policies or practices within the group results in such disparate impact; provided further, that a policy or practice or group of policies or practices demonstrated to result in a disparate impact shall be unlawful where the commission or such person who may bring an action produces substantial evidence that an alternative policy or practice with less disparate impact is available to the covered entity and the covered entity fails to prove that such alternative policy or practice would not serve the covered entity as well. "Significant business objective" shall include, but not be limited to, successful performance of the job.

23.     Respondent is a lessee both of the Continental Room at LeFrak City, and of the spaces at the two schools where LeFrak City voting locations have been moved, and are therefore subject to limitations and requirements of Section 8-107(4) and (15) of the NYCHRL.

24.     Respondent in no way has provided a reasonable accommodation for persons with disabilities, such as Petitioners, and the class they represent, *i.e.*, disabled residents of LeFrak City, to vote in the September 12 primary election; they are not providing van services, and even if they did, they would be burdening such voters with long waits and a need to take longer than non-disabled voters to get to their place of voting.  Furthermore, they have displaced a large population of voters of color, and are requiring them to vote not where they live, but a considerable distance from their residences

25.     By its actions, Respondent has violated the rights of Petitioners, and the class of voters they represent, under Section 8-107(4) and, in the case of disabled residents, Section 8-107(15) of the NYCHRL.

26.     **Arbitrary and Capricious Action**.  By acting as it has, particularly in its late and vague notice to voters (Exhibit O), its refusal to allow LeFrak City management to make temporary modifications so as to allow barrier free voting on September 12, 2107, and its refusal

10

to consider the impact of disabled voters and voters of color being forced to travel either one-third of a mile or a three-quarters of a mile in order to vote, after decades of voting within their apartment complex, the NYCBOE has acted arbitrarily and capriciously.

27.    **Notice**.  The undersigned gave notice of this action to the NYCBOE's General Counsel at around 3:30 pm on August 28, 2017, and advised him that we would present the Order to Show Cause to the Court on August 29, 2017 in the morning.

28.    **Reason for Moving by Order Cause**.  Petitioners have brought this motion on by Order to Show Cause because the affected Primary Election is on September 12, and a motion brought on in the normal course would be untimely.

29.    **Irreparable Injury**.  Should the Court not grant the relief requested, Petitioners and the class of voters they represent would suffer irreparable injury.

30.    **No prior application** for the relief requested has been made of this or any other court.

**Dated: August 28, 2017**

_____
                    /s/
**Arthur Z.  Schwartz**

11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
LEFRAK CITY TENANTS' ASSOCIATION, INC.

                                   Petitioners,

           -against-

NEW YORK CITY BOARD OF ELECTIONS,

                                 Respondent.
-------------------------------------------------------------------X

Index No. 157686-2017

**AFFIDAVIT OF**
**MALIKAH K. SHABAZZ**

STATE OF NEW YORK    )
                         ) ss.:
COUNTY OF NEW YORK  )

       MALIKAH SHABAZZ, being duly sworn, deposes and says:

      1.    I am a registered voter at Lefrak City, Queens. I reside at <u>98-17 Horace Harding</u>

<u>Expressway Apt 4-E, Corona, New York 11368</u>                            .

      2.    I am the President of Lefrak City Tenants' Association, Inc.

      3.    I am     62     years of age.

      4.    Lefrak City Residents has been voting in the Continental Room at Lefrak City,

located at 96-10 57 Avenue Corona, New York 11368 for over     40     years.

      5.    The relocation of two polling sites (new location) <u>P.S.13 Clement C. Moore</u>

<u>School 55-01 94th Street, Flushing, New York 11373 and High School for Arts and Business</u>

<u>105-25 Horace Harding Expressway North, Corona, New York 11368</u>

will substantially burden thousands of registered voters, because it would cause an unnecessary

inconvenience which would put seniors and tenants' with disabilities in danger who do not have

to cross any streets to get to the polling site that is safe and convenient.

                                          Malikah K. Shabazz,
                                          President Lefrak City Tenants Association, Inc

Sworn to before me this 26
day of August, 2017

NOTARY PUBLIC

RUBY K. MUHAMMAD
Commissioner of Deeds
City of New York
No. 4-5100
Qualified in New York City
Commission Expires July 9, 19— 2018

My Voter Detail Release Version 2.20.0

https://voterlookup.elections.state.ny.us/VoterDetailscreen.aspx?rxt...



## NYSVoter Public Information - Voter Registration Search Results   Close

County BOE Contact Information

## Regular Polling Place Information

**Please click on the following link to find your polling place**

**http://nyc.pollsitelocator.com/Search.aspx**

### Voter Information

| | |
|---|---|
| **Name** | : MALIKAH K SHABAZZ |
| **Residential Address** | : 98-17 HORACE HARDING EXPRESSWAY 4E, CORONA, NY 11368 |
| **Mailing Address (if any)** | : |
| **Political Party** | : Independence |
| **Voter Status** | : Active |

### Voter District Information

| | | | |
|---|---|---|---|
| **Election District** | : 17 | **County Legislative District** | : 0 |
| **Senate District** | : 13 | **Assembly District** | : 35 |
| **Congressional District** | : 14 | **Town** | : CORONA |
| **Ward** | : | | |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------X
MALIKAH SHABAZZ, etc., *et al.*,

                                        Index No.    157686-2017

                          Petitioners,

                                        **AFFIDAVIT OF JAMES
            -against-                   GALLOWAY, JR.**

NEW YORK CITY BOARD OF ELECTIONS,

                          Respondent.
--------------------------------------------------------------------X

STATE OF NEW YORK    )
                     ) *ss.*:
COUNTY OF NEW YORK   )

     JAMES GALLOWAY, JR., being duly sworn, deposes and says:

     1.    I am a registered voter at Lefrak City, Queens. I reside at 96-02 57th Avenue; Suite #14-M, Corona, Queens, in the State of New York.

     2.    I am African-American.

     3.    I am 68 years of age.

     4.    I have been voting in the Continental Room (my poling site), located at 96-10 57th Avenue, Corona, N. Y. for over *30* years.

     5.    The relocation of my polling location to (new location) would be substantially a burden on my ability to vote, because I have been diagnosed with kidney failure and am unable to walk long distances. Plus, I am personally upset that the Board of Elections gave me less than *30* days to inform me at to my *"new"* poling site. Furthermore, I am still not satisfied about the *"why"* my poling site has been changed.

                             _____
                             James Galloway, Jr.

Sworn to before me this 28
day of August, 2017

_____
NOTARY PUBLIC

FRANZ POPPE
Notary Public - State of New York
NO. 01PO4693438
Qualified in Queens County
My Commission Expires May 31, 2019

My Voter Detail Release Version 2.20.0
https://voterlookup.elections.state.ny.us/VoterDetailscreen.aspx?rxt...



## NYSVoter Public Information - Voter Registration Search Results   Close

County BOE Contact Information

## Regular Polling Place Information

Please click on the following link to find your polling place

**http://nyc.pollsitelocator.com/Search.aspx**

## Voter Information

| | |
|---|---|
| **Name** | : JAMES E GALLOWAY |
| **Residential Address** | : 96-02 57 AVENUE 14M, CORONA, NY 11368 |
| **Mailing Address (if any)** | : |
| **Political Party** | : Democratic |
| **Voter Status** | : Active |

## Voter District Information

| | | | |
|---|---|---|---|
| **Election District** | : 15 | **County Legislative District** | : |
| **Senate District** | : 13 | **Assembly District** | : 35 |
| **Congressional District** | : 14 | **Town** | : QUEENS |
| **Ward** | : | | |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------X

MALIKAH SHABAZZ, etc., *et al.*,

                              Petitioners,                      Index No.    157686-2017

                -against-                                       **AFFIDAVIT OF RUBY
                                                                MUHAMMAD**

NEW YORK CITY BOARD OF ELECTIONS,

                              Respondent.
--------------------------------------------------------------------X

STATE OF NEW YORK    )
                     ) *ss.*:
COUNTY OF NEW YORK   )

        RUBY MUHAMMAD, being duly sworn, deposes and says:

1.    I am a registered voter at Lefrak City, Queens. I reside at _98-38
_57 Ave Corona, NY 11368_.

2.    I am African-American.

3.    I am _79_ years of age.

4.    I have been voting in the Continental Room at Lefrak City, located at

5.    96-10 57 Avenue Corona, New York 11368 for over _35 years_

6.    The relocation of my polling location to (new location) _100-25 Horace Harding Expy_
_It would_ will substantially burden my ability to vote, because
_it is over a mile from where I_
_live_.

                                        _Ruby K. Muhammad_
                                        Ruby Muhammad

Sworn to before me this _28th_
day of August, 2017.

_____
NOTARY PUBLIC

                                        **Aliya J. Nelson**
                                        Notary Public, State of New York
                                        No. 02NE6297979
                                        Qualified in New York County
                                        Commission Expires 03/03/2018

1 of 2



NYSVoter Public Information - Voter Registration Search Results

County BOE Contact Information

Regular Polling Place Information

### Please click on the following link to find your polling place

http://nyc.pollsitelocator.com/Search.aspx

Voter Information

| | |
|---|---|
| **Name** | : RUBY K MUHAMMAD |
| **Residential Address** | : 98-38 57 AVENUE 14O, CORONA, NY 11368 |
| **Mailing Address (if any)** | : |
| **Political Party** | : Republican |
| **Voter Status** | : Active |

Voter District Information

| | | | |
|---|---|---|---|
| **Election District** | : 18 | **County Legislative District** | : 0 |
| **Senate District** | : 13 | **Assembly District** | : 35 |
| **Congressional District** | : 14 | **Town** | : CORONA |
| **Ward** | : | | |

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 22 of 348

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No.  157686-2017

AFFIDAVIT OF
DURRIYAH HAKAM

-------------------------------------------------------------------X

MALIKAH SHABAZZ, etc., *et al.*,

Petitioners,

-against-

NEW YORK CITY BOARD OF ELECTIONS,

Respondent.

-------------------------------------------------------------------X

STATE OF NEW YORK )
) *ss.*:
COUNTY OF NEW YORK )

   DURRIYAH A. HAKAM , being duly sworn, deposes and says:

1. I am a registered voter at Lefrak City, Queens. I reside at *97-22*

*D 57th AVENUE APT. 11C, CORONA, NewYork 11368*

2. I am *70* years of age.

3. I am physically disabled and require use of a walker.

4. I have been voting in the Continental Room at Lefrak City, located at 96-10 57

5. Avenue Corona, New York 11368

6. The relocation of my polling location to (new location) *P.S.13- CLEMENT C. MOORE 55-01 94th ST,*

_____ will substantially burden my ability to vote, because

*IT IS INCONVENIENT FOR ME AND CREATES A HARDSHIP IN THAT IT IS DIFFICULT FOR ME TO WALK WITHOUT PAIN IN MY LOWER BACK. MY GATE IS OFF, I CAN'T EVEN WALK A FULL BLOCK.*

*Durriyah A. Hak*
[signature]

1 of 3

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 23 of 348

Sworn to before me this 26
day of August, 2017

NOTARY PUBLIC

RUBY K. MUHAMMAD
Commissioner of Deeds
City of New York
No. 4-5100
Qualified in New York City
Commission Expires July 9, 18_____ 2018



## Voter Registration Search Results

County BOE Contact Information

Regular Polling Place Information

### Please click on the following link to find your polling place

http://nyc.pollsitelocator.com/Search.aspx

Voter Information

| | |
|---|---|
| **Name** | : DURRIYAH A HAKAM |
| **Residential Address** | : 97-22 57 AVENUE 11C, CORONA, NY 11368 |
| **Mailing Address (if any)** | : |
| **Political Party** | : Democratic |
| **Voter Status** | : Active |

Voter District Information

| | | | |
|---|---|---|---|
| **Election District** | : 25 | **County Legislative District** | : 0 |
| **Senate District** | : 13 | **Assembly District** | : 35 |
| **Congressional District** | : 14 | **Town** | : CORONA |
| **Ward** | : | | |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------- X
MALIKAH SHABAZZ, etc., *et al.*,

                                 Petitioners,

             -against-

NEW YORK CITY BOARD OF ELECTIONS,

                                Respondent.
--------------------------------------------------------------------- X

Index No. 157686-2017

**AFFIDAVIT OF REAVER CHERRY**

STATE OF NEW YORK    )
                         ) *ss.*:
COUNTY OF NEW YORK  )

      Reaver Cherry, being duly sworn, deposes and says:

1.    I am a registered voter at Lefrak City, Queens. I reside at 98-38 57 Ave Corona, NY 11368.

2.    I am 69 years of age.

3.    I am physically disabled and require use of a walker.

4.    I have been voting in the Continental Room at Lefrak City, located at 59-17 Junction Boulevard, Elmhurst, for over 30 years.

5.    The relocation of my polling location to (new location) School of Art 105-25 Horace Harding will substantially burden my ability to vote, because Expressway. I'm disable and I use a walker to get around. I'm not able to walk that far

                                     Reaver Cherry
                                      [signature]

Sworn to before me this 25
day of August, 2017

RUBY K. MUHAMMAD
Commissioner of Deeds
City of New York
No. 4-5100
Qualified in New York City
Commission Expires July 9, 2018



## Voter Registration Search Results

County BOE Contact Information

Regular Polling Place Information

### Please click on the following link to find your polling place

http://nyc.pollsitelocator.com/Search.aspx

### Voter Information

| | |
|---|---|
| **Name** | : REAVER L CHERRY |
| **Residential Address** | : 98-38 57 AVENUE 15D, CORONA, NY 11368-1136 |
| **Mailing Address (if any)** | : |
| **Political Party** | : Democratic |
| **Voter Status** | : Active |

### Voter District Information

| | | | |
|---|---|---|---|
| **Election District** | : 18 | **County Legislative District** | : 0 |
| **Senate District** | : 13 | **Assembly District** | : 35 |
| **Congressional District** | : 14 | **Town** | : CORONA |
| **Ward** | : | | |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------- X

MALIKAH SHABAZZ, etc., *et al.*,

Petitioners,

-against-

NEW YORK CITY BOARD OF ELECTIONS,

Respondent.

-------------------------------------------------------------------- X

Index No. 157686-2017

**AFFIDAVIT OF
ROSALINA ANTOINE**

STATE OF NEW YORK )
) *ss.*:
COUNTY OF NEW YORK )

Rosalind E. Antoine, being duly sworn, deposes and says:

1. I am a registered voter at Lefrak City, Queens. I reside at 96-08-57 Avenue Corona, N.Y. 11368.

2. I am 60 years of age.

3. I am physically disabled and require use of a wheelchair.

4. I have been voting in the Continental Room at Lefrak City, located at 59-17 Junction Boulevard, Elmhurst, for over 25 years.

5. The relocation of my polling location to (new location) P.S 13 55-01 94st L, M will substantially burden my ability to vote, because in a wheel chair it is very hard for me to travel to P.S 13.

Rosalind E Antoine
[signature]

Sworn to before me this 26
day of August, 2017

Ruly K. Muhammad
NOTARY PUBLIC

RUBY K. MUHAMMAD
Commissioner of Deeds
City of New York
No. 4-5100
Qualified in New York City
Commission Expires July 9, 18 2018

1 of 2



## Voter Registration Search Results

County BOE Contact Information

### Please click on the following link to find your polling place

http://nyc.pollsitelocator.com/Search.aspx

| | |
|---|---|
| **Name** | : ROSALIND E ANTOINE |
| **Residential Address** | : 96-08 57 AVENUE 15 M, CORONA, NY 11368 |
| **Mailing Address (if any)** | : |
| **Political Party** | : Democratic |
| **Voter Status** | : Active |

| | | | |
|---|---|---|---|
| **Election District** | : 15 | **County Legislative District** | : |
| **Senate District** | : 13 | **Assembly District** | : 35 |
| **Congressional District** | : 14 | **Town** | : QUEENS |
| **Ward** | : | | |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------------------------------------- X
In the Matter of

MALIKAH SHABAZZ, as President of the LEFRAK CITY              Index No.
TENANTS ASSOCIATION; JAMES GALLOWAY, as
Coordinator of the LEFRAK CITY TENANTS LEAGUE;
RUBI MUHAMMAD; DURRIYAH HAKAM; REAVER                         **VERIFIED PETITION**
CHERRY; ROSALIND ANTOINE; and the BLACK
LEADERSHIP ACTION COALITION, INC.,

                                        Petitioners,

For an Order Pursuant to Article 78 of the Civil Practice
Law and Rules,

                        -against-

NEW YORK CITY BOARD OF ELECTIONS,

                                        Respondent.
----------------------------------------------------------------------- X

     Petitioners Malikah Shabazz, as President of the LeFrak City Tenants Association, James

Galloway, as Coordinator of the LeFrak City Tenants League, Rubi Muhammad, Durriyah

Hakam, Reaver Cherry, Rosalind Antoine, and the Black Leadership Action Coalition, Inc.,

individually, in their representative capacity and on behalf of others similarly situated, hereby

complain as follows against the Respondent New York City Board of Elections ("NYCBOE"):

## INTRODUCTION

    1.    Petitioners have initiated this action to redress diminution, by the NYCBOE, of

their right, and their members' rights, to vote, in violation of  Article I Section 1 and Article II

Section 1 of the New York State Constitution, their Right to Equal Protection under Article I,

Section 11 of the New York State Constitution, their right to be free from racial, national origin,

and disability based discrimination under Section 296(2) of the New York State Human Rights

Law and  Section 8-107(4) of the New York City Human Rights Law, and to address generally

arbitrary and capricious actions by the NYCBOE utilizing Article 78 of the Civil Practice Laws

and Rules.  Petitioners allege that the NYCBOE, in response to an assessment of relatively minor, and correctable, problems with one voting site at LeFrak City under the Americans with Disabilities Act ("ADA"), has moved the voting locations of five (5) Election Districts, serving thousands of voters, rather than repairing the problems, making it more difficult for people of color and people with disabilities to vote, without an effort at a reasonable accommodation. Petitioners also allege that the movement of LeFrak City voting locations to the High School for Arts and Businesses (three-quarters of a mile away) and/or PS 13 (a third of a mile away), after LeFrak City management made an offer to make repairs to the on-site voting location, was an arbitrary and capricious action.

2.        Petitioners Rubi Muhammad, Durriyah Hakam, Reaver Cherry, and Rosalind Antoine are registered voters of the LeFrak City, Queens affordable housing apartment complex ("LeFrak City") located in the City of New York and are either voters with disabilities, voters of Black or Hispanic national origin (or both).  Petitioners LeFrak City Tenants Association, LeFrak City Tenants League, and the Black Leadership Action Coalition are organizations whose members include voters with disabilities, voters of Black or Hispanic national origin, or both.

3.        LeFrak City is located in the thirty-fifth Assembly District, comprising Election Districts ("ED") fifteen, sixteen, seventeen, eighteen, and twenty-five.

4.        For approximately fifty years prior to July 2017, the LeFrak City polling location was in LeFrak City's Continental Room (hereinafter the "Continental Room").  LeFrak City voters could walk to vote, right within their complex.

5.        On or about July 26, 2017, and for the most self-defeating of reasons, Respondent decided to move the Continental Room polling place out of LeFrak City to two locations, one of which is three-quarters of a mile away and the other of which is a third of a mile away.

2

6.      Respondent's decision will result in the denial or abridgement of the right to vote on account of disability, race, color, or national origin.  After unsuccessfully attempting redress with the Board of Elections, Petitioners seek judicial intervention to protect their right to vote, and to right an unconscionable wrong.

7.      The great shame of this all is that Respondent is aware that the consequences of its decision will be the disenfranchisement of those among us who have been systematically denied the right to vote, yet persevere in their decision.  Even more unfortunate is that despite the Board's pretext for the move—to remedy access issues under the guise of the American with Disabilities Act—the NYCBOE has adopted a solution which will prevent many disabled plaintiffs in LeFrak City from accessing the franchise.

## PARTIES

8.      Petitioner Malikah Shabazz sues as President of the LeFrak City Tenants Association, which includes numerous voters with disabilities, Black voters, and voters of Hispanic national origin.

9.      Petitioner James Galloway sues as Coordinator of the LeFrak City Tenants League, which includes numerous voters with disabilities, Black voters, and voters of Hispanic national origin.

10.      Petitioner Rubi Muhammad lives in the LeFrak City, is a registered Democratic voter, and, due to a disability, uses a wheelchair in order to ambulate.  Petitioner Muhammad is African American.

11.      Petitioner Durriyah Hakam lives in the LeFrak City apartment complex, is a registered Democratic voter, and, due to a disability, uses a walker in order to ambulate. Petitioner Hakam is African American.

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 32 of 348

12.     Petitioner Reaver Cherry lives in the LeFrak City apartment complex, is a registered Democratic voter, and, due to a disability, uses a walker in order to ambulate. Petitioner Cherry is African American.

13.     Petitioner Rosalind Antoine lives in the LeFrak City apartment complex, is a registered Democratic voter, and, due to a disability, uses a wheelchair in order to ambulate. Petitioner Antoine is African American.

14.     Petitioner Black Leadership Action Coalition, Inc. ("BLAC") is a not-for-profit membership corporation, recognized as tax exempt under Section 501(c)(4) of the Internal Revenue Code.  It exists for the purpose of advancing the rights of the Black community, whether they be African Americans or African Caribbean immigrants.  Its address is 39 Broadway, New York, New York.

15.     Plaintiffs fairly represent a class of all registered disabled, Black, and Hispanic voters residing at LeFrak City.

16.     Defendant New York City Board of Elections administers Municipal, State, and Federal elections in the City of New York.  The Board of Elections is comprised of an Executive Director, President and two commissioners in each borough in the City of New York.  Its offices are located at 32 Broadway, New York, New York.

## FACTUAL BACKGROUND

17.     LeFrak City is a large and long-standing affordable housing complex housing around twenty thousand mostly Black and Hispanic residents, many of whom are elderly and disabled.  The complex comprises five election districts in the thirty-fifth assembly district (the fifteenth, sixteenth, seventeenth, eighteenth, and twenty-fifth) totaling approximately 4,500 registered voters.

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 33 of 348

18.     According to the 2010 Census, Black and Hispanic voters make up a majority of the voting population in LeFrak City.

19.     For approximately fifty years, the Continental Room within LeFrak City, located at 96-10 57th Avenue, Corona, New York, has been the location of the polling place for all of LeFrak City's voters.

20.     In 2010 a group of organizations advocating for the disabled filed a lawsuit titled *Disabled in Action vs Board of Election in the City of New York* in the United States District Court for the Southern District of New York.  On August 8, 2012, the District Court entered an order (Exhibit A) granting the plaintiffs' summary judgment motion.  The District Court held that the undisputed evidence demonstrated that the BOE violated the ADA and the Rehabilitation Act by maintaining a voting program with inaccessible polling places and failing to offer reasonable remedies to address the barriers to access.  To support this holding, the District Court pointed to the surveys that identified "pervasive and recurring barriers to accessibility on election days at poll sites designated by the BOE." The District Court determined that the BOE failed to present evidence challenging the existence of these barriers to access.  The District Court rejected the BOE's argument that it accommodated voters with disabilities by offering to transfer them to a nearby accessible polling place and by addressing barriers as the BOE become aware of them.  The District Court also rejected the BOE's argument that the ADA and Rehabilitation Act claims must be dismissed because the plaintiffs failed to identify voters with disabilities who were actually deprived of the right to cast a ballot.

21.     The District Court's October 18, 2012, Order.  (Exhibit B).  After it entered the Summary Judgment Order, the District Court held three conferences with the parties concerning the appropriate remedy.  After the third conference, the District Court entered 11 an order dated October 18, 2012 (the "Remedial Order") that provides relief for the violations it recognized in the Summary Judgment Order. In addition to requiring the BOE to ensure the accessibility of polling places in New York City, the Remedial Order contains three key components.  First, the Remedial Order requires the BOE to designate

5

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 34 of 348

a poll worker at each polling site as the on-site ADA coordinator responsible for monitoring and documenting accessibility complaints received at that site.  Second, the BOE must contract with a third-party expert to conduct accessibility surveys of polling sites.  The third-party expert must also issue recommendations noting whether and how a polling site can be modified to be accessible on election days.  The BOE must implement the third-party expert's recommendations unless it successfully challenges them in the district court.  For polling sites at non-public locations that cannot be modified temporarily, the BOE must recommend a site to which the polling place can be relocated.  Third, the Remedial Order requires Assembly District Monitors ("AD Monitors"), who are responsible for reviewing the accessibility of polling places, to visit every poll site at least twice each election day to assess its accessibility.  The AD Monitors must also document the results of their visits, including whether any temporary modifications recommended by the third-party expert were implemented.

22.     That order was affirmed, on appeal, by the United States Court of Appeals for the Second Circuit on March 14, 2014.  A copy of that decision is annexed as Exhibit C

23.     On or about September 25, 2015, the NYC Board of Elections, as part of a general review of voting locations as per the Remedial Order in *Disabled in Action vs Board of Election in the City of New York,* did a survey (utilizing a consultant) of the impediments of disabled voters voting at the Continental Room.  Subsequently the Continental Room was used for the General Election of November 2015, the Presidential Primary Election of April 2016 (which saw a heavy turnout), the Congressional Primary of June 2016, and the Primary Election of September 2016.

24.     On around September 22, 2016 the contractor issued a report, annexed as Exhibit D, outlining seven problems with voting at the Continental Room, two of which involved access for vehicles carrying the disabled to the poll site.  For the convenience of the Court, Petitioners outline, in Exhibit E, what each of those problems involved, AND the solutions to each problem recommended by the contractor.  None of the problems they found was difficult to resolve.

6

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 35 of 348

25.     Subsequent to the issuance of the report the Continental Room was used for the 2016 Presidential Election, which saw a 50% plus turnout; no one complained about being unable to vote due to the "problems" flagged by the contractor.  In fact, those findings were not relayed to LeFrak City management so that they could rectify the problems.

26.     On or about May 8, 2017, LeFrak City Management Company received a renewal licensing agreement for the use of the Continental Room as a poll location for the period ending June 30, 2018.  The licensing agreement was similar in form to Exhibit F, which had been signed for the prior year.

27.     On May 8, 2017, LeFrak management sent the form back because some necessary language was not included.  See email annexed as Exhibit G, and the letter from LeFrak City management to the Board of Elections annexed as Exhibit H.

28.     On or about May 15, 2017, Defendant advised LeFrak City would no longer be used as a poll site.

29.     In an effort to retain the poll site at LeFrak City, LeFrak management contacted the NYCBOE General Counsel's office on May 30, 2017.  During that conversation LeFrak offered to rectify all ADA issues, and asked the NYCBOE to reconsider moving voting back to the Continental Room, or some other suitable location in the LeFrak complex.  See Exhibit H.

30.     The NYCBOE's response to LeFrak was that they would reconsider the poll site in 2018 if the ADA issues were resolved, and for the first time forwarded the contractor's report (Exhibit A) to LeFrak management.  (See Exhibit H).

31.     On or about June 14, 2017, representatives of LeFrak City Management Company identified another location in LeFrak City and emailed the address for consideration to Defendant.  LeFrak City representatives were informed that the registered voters of LeFrak City

7

INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

had already been re-assigned to two poll sites, EDs 16, 17 and 18 to High School of the Arts,

nearly three-quarters of a mile away at 105-25 Horace Harding Expressway, and EDs 15 and 25

to PS 13, a third of a mile away, at 55-01 94th Street.  Defendant declined any further

consideration of suggested alternatives or attempts to mitigate the impact of the polling site

change.  (See Exhibit H).

32.     LeFrak City management and the Petitioner LeFrak City Tenant's Association have

suggested several alternatives, including the lobby and nearby houses of worship, to no avail.

33.     Defendant made this unilateral decision without any community consultation,

public hearings, or even a press release to alert voters of LeFrak City of this change, despite

requests that they do so.

34.     On July 26, 2017, BLAC, representing its members who are LeFrak City voters,

wrote to the NYCBOE, complaining that Respondent's actions were making it harder for people

to vote, and demanding that the polling location not be changed before the end of the 2017

voting cycle, and then hold public hearings about where the polling locations should be moved,

if at all.  That letter is annexed as Exhibit I.  A similar letter was sent on July 26, 2017 to the NY

State Board of Elections, asking them to intervene.  See Exhibit J.

35.     As a result of the July 26, 2017 letter, NYCBOE scheduled a meeting with BLAC

for August 7, 2017.  However, Respondent cancelled the meeting.  BLAC wrote again on

August 7, 2017 (Exhibit K) asking for information supporting the Respondent's decision to move

the LeFrak City polling locations, documents which would demonstrate a reasoned, carefully

considered decision to move a polling location a considerable distance which affected thousands

of voters.  Besides asking for a showing of public notice (which had not yet occurred), the letter

asked a key question to which Respondent has not responded:  "Given that many of the voting

stations in NYC have been found out-of-compliance with the ADA compliance at least since

2008—and given that the decision in *Disabled in Action v. Board of Elections in the City of New

York* …was rendered in [October 2012]—why was the decision to move the LeFrak City voting

stations made now and without lead-time to find a suitable alternative?" Like LeFrak City

management, BLAC also asked why the site movement could not be delayed until March 2018

so that proper efforts either to make repairs of to find a nearby alternative location was

undertaken. Respondent has not responded. A similar letter was sent to the Queens

Commissioners of the Respondent on August 7, 2017. (See Exhibit L).

36.     On August 18, 2017, LeFrak City management wrote to Respondent (Exhibit H)

detailing its interactions with Respondent and reminding the Respondent that it had identified

alternative polling locations within LeFrak City as early as June 14, 2017, and that their proposal

was rejected out of hand.

37.     On August 18, 2017, BLAC wrote to Respondent again (Exhibit M) and proposed

three potential solutions to resolve any ADA compliance issue with the Continental Room,

including (1) one or two more polling locations within LeFrak City to serve as auxiliary polling

sites, (2) building out the area adjacent to the Continental Room, and (3) locating a temporary

mobile trailer on an appropriate ADA-compliant location and assigning enough voters to use that

as their polling locations so that the Continental Room would have fewer polling machines and

then become ADA-compliant. The Respondent again rejected all alternative locations out of hand.

38.     In early August Respondent sent notice of the poll site change to the affected

4500 voters as part of a 16-page, multi-language publication, advising them about the

September 12 primary. See Exhibit O. The change was not highlighted, and in fact was not

labeled as a change. There was simply a little box with a peel-off card inside the publication

stating the voting location.  Respondent has posted no notices, made no public announcement, has done no public education, and has made no arrangements to transport voters to the new voting sites, the principal one of which is .7 miles away if one follows a path along the Long Island Expressway.  Maps showing the two new locations are annexed as Exhibit N.

39.     Respondent has been unresponsive, dismissive, and unwilling to mitigate the impact of its unilateral decision to relocate the polling site at LeFrak City, or allow temporary measures to be undertaken to make the voting locations accessible to persons with disabilities. Any defense which Respondent has, *i.e.*, that it is simply complying with the *Disabled in Action* order, is undercut by the fact that that order, as described by the U.S. Court of Appeals, was supposed to see the Respondent proceed as follows:  "The Third-Party Expert report is to include recommendations as to how specific poll sites may be temporarily modified to make them accessible.  If the Third Party Expert concludes that a poll site cannot be reasonably modified, BOE must report to plaintiffs and the Third Party Expert whether the polling site can be relocated or made temporarily accessible."

40.     The remedial order mandates that BOE implement the Third-Party Expert's recommendations unless BOE concludes "it cannot reasonably implement a recommendation," "relocation of the polling site to an alternate location is a more appropriate response to the recommendation," or "a polling site cannot be relocated."  The Respondent has not, and cannot represent to this Court that the new polling locations are more appropriate.

41.     Aside from consisting of a high population of minority and language-assisted voters, LeFrak City is home to Section 8 residents, the elderly and the infirm—many of whom do not have a car and are unable to use public transportation.

INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

Case 1:17-cv-06637-VSB Document 1-1 Filed 08/31/17 Page 39 of 348

42.     Based on the totality of the circumstances Respondent's decision to move LeFrak City's polling place prevents people with disabilities from participating effectively in the political process or electing candidates of their choice, and severely undercuts the rights of the largely Black and Hispanic population of LeFrak City to vote in a convenient manner.

43.     There is currently a contested New York City Council race in District 21 comprising LeFrak City.  Defendant's arbitrary and ulterior decision to relocate the polling location denies supporters of both candidates from exercising their right to vote in a New York City-wide election on September 12, 2017.

44.     The foregoing paragraphs are incorporated into the causes of action below in their entirety as if set forth in full.

### AS AND FOR A FIRST CAUSE OF ACTION
### <u>VIOLATION OF THE NY STATE CONSTITUTION</u>

45.     The New York State Constitution provides, in relevant part:

> **Article I § 1.**    [Rights, privileges and franchise secured; uncontested primary elections]
>
> No member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his or her peers, except that the legislature may provide that there shall be no primary election held to nominate candidates for public office or to elect persons to party positions for any political party or parties in any unit of representation of the state from which such candidates or persons are nominated or elected whenever there is no contest or contests for such nominations or election as may be prescribed by general law.
>
> **Article I § 2.**  Every citizen shall be entitled to vote at every election for all officers elected by the people and upon all questions submitted to the vote of the people provided that such citizen is eighteen years of age or over and shall have been a resident of this state, and of the county, city, or village for thirty days next preceding an election.

11

**Article I § 11.** [Equal protection of laws; discrimination in civil rights prohibited]

No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state.

46.     By its actions Respondent has burdened the registered voters of LeFrak City with such an onerous requirement that they have been constructively denied their right to vote as guaranteed by Article I Section 1 and Article II Section 2 of the New York State Constitution, and have been denied the equal protection of the law as guaranteed by Article I Section 11 of the New York State Constitution.

## AS AND FOR A SECOND CAUSE OF ACTION
## NEW YORK STATE HUMAN RIGHTS LAW

47.     The New York State Human Rights Law ("NYSHRL"), at Section 292(9), provides, in relevant part:

9.     The term "place of public accommodation, resort or amusement" shall include, regardless of whether the owner or operator of such place is a state or local government entity or a private individual or entity, except as hereinafter specified, all places included in the meaning of such terms as: inns, taverns, road houses, hotels, motels, whether conducted for the entertainment of transient guests or for the accommodation of those seeking health, recreation or rest, or restaurants, or eating houses, or any place where food is sold for consumption on the premises; buffets, saloons, barrooms, or any store, park or enclosure where spirituous or malt liquors are sold; ice cream parlors, confectionaries, soda fountains, and all stores where ice cream, ice and fruit preparations or their derivatives, or where beverages of any kind are retailed for consumption on the premises; wholesale and retail stores and establishments dealing with goods or services of any kind, dispensaries, clinics, hospitals, bath-houses, swimming pools, laundries and all other cleaning establishments, barber shops, beauty parlors, theatres, motion picture houses, airdromes, roof gardens, music halls, race courses, skating rinks, amusement and recreation parks, trailer camps, resort camps, fairs, bowling alleys,

12

golf courses, gymnasiums, shooting galleries, billiard and pool parlors; garages, all public conveyances operated on land or water or in the air, as well as the stations and terminals thereof; travel or tour advisory services, agencies or bureaus; public halls, public rooms, public elevators, and any public areas of any building or structure

48.     A voting location is, by this definition, a place of public accommodation.

49.     NYSHRL Section 296(2) provides:

2.   (a) It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, creed, color, national origin, sexual orientation, military status, sex, or disability or marital status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof, including the extension of credit, or, directly or indirectly, to publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement, to the effect that any of the accommodations, advantages, facilities and privileges of any such place shall be refused, withheld from or denied to any person on account of race, creed, color, national origin, sexual orientation, military status, sex, or disability or marital status, or that the patronage or custom thereat of any person of or purporting to be of any particular race, creed, color, national origin, sexual orientation, military status, sex or marital status, or having a disability is unwelcome, objectionable or not acceptable, desired or solicited…

(c) For the purposes of paragraph (a) of this subdivision, "discriminatory practice" includes:

(i) a refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities, unless such person can demonstrate that making such modifications would fundamentally alter the nature of such facilities, privileges, advantages or accommodations;

(ii) a refusal to take such steps as may be necessary to ensure that no individual with a disability is excluded or denied services because of the absence of auxiliary aids and services, unless such person can demonstrate that taking such steps would fundamentally alter the nature of the facility, privilege, advantage

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 42 of 348

or accommodation being offered or would result in an undue burden;

(iii) a refusal to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, and transportation barriers in existing vehicles and rail passenger cars used by an establishment for transporting individuals (not including barriers that can only be removed through the retrofitting of vehicles or rail passenger cars by the installation of a hydraulic or other lift), where such removal is readily achievable…

(d) For the purposes of this subdivision:

(i) "Readily achievable" means easily accomplishable and able to be carried out without much difficulty or expense. In determining whether an action is readily achievable, factors to be considered include:

(A) the nature and cost of the action needed under this subdivision;

(B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources or the impact otherwise of such action upon the operation of the facility;

(C) the overall financial resources of the place of public accommodation, resort or amusement; the overall size of the business of such a place with respect to the number of its employees; the number, type and location of its facilities; and

(D) the type of operation or operations of the place of public accommodation, resort or amusement, including the composition, structure and functions of the workforce of such place; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to such place.

50.     Respondent is a lessee both of the Continental Room at LeFrak City, and of the spaces at the two schools where LeFrak City voting locations have been moved, and are therefore subject to limitations and requirements of Section 296(2) of the NY State Human Rights Law.

14

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 43 of 348

51.     Respondent in no way has provided a reasonable accommodation for persons with disabilities, such as Petitioners, and the class they represent, *i.e.*, disabled residents of LeFrak City, to vote in the September 12 primary election; they are not providing van services, and even if they did, they would be burdening such voters with long waits and a need to take longer than non-disabled voters to get to their place of voting.  Furthermore, they have displaced a large population of voters of color, and are requiring them to vote not where they live, but a considerable distance from their residences.

52.     By its actions Respondent has violated the rights of Petitioners, and the class of voters they represent, under Section 296(2)(a), and in the case of disabled residents, Section 296(2)(c) of the NYSHRL.

<div align="center">

**AS AND FOR A THIRD CAUSE OF ACTION**
**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW**

</div>

53.     The New York City Human Rights Law ("NYCHRL"), at Section 8-102(9), provides, in relevant part:

> 9.  The term "place or provider of public accommodation" shall include providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold, or otherwise made available.

54.     NYCHRL Section 8-107(4) provides:

> 4.  Public accommodations.
>
>     a.  It shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation:
>
>         1.  Because of any person's actual or perceived race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status, directly or indirectly:

<div align="center">

15

</div>

(a)  To refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation; or

55.    NYCHRL Section 8-107(15) provides:

15.  Applicability; persons with disabilities.

(a)  Requirement to make reasonable accommodation to the needs of persons with disabilities.  Except as provided in paragraph (b), any person prohibited by the provisions of this section from discriminating on the basis of disability shall make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity.

(b)  Affirmative defense in disability cases.  In any case where the need for reasonable accommodation is placed in issue, it shall be an affirmative defense that the person aggrieved by the alleged discriminatory practice could not, with reasonable accommodation, satisfy the essential requisites of the job or enjoy the right or rights in question.

56.    NYCHRL Section 8-107(17) provides:

17.  Disparate impact.

a.  An unlawful discriminatory practice based upon disparate impact is established when:

(1)  the commission or a person who may bring an action under chapter four or five of this title demonstrates that a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter; and

(2)  the covered entity fails to plead and prove as an affirmative defense that each such policy or practice bears a significant relationship to a significant business objective of the covered entity or does not contribute to the disparate impact; provided, however, that if the commission or such person who may bring an action demonstrates that a group of policies or practices results in a disparate impact, the commission or such person shall

16

not be required to demonstrate which specific policies or practices within the group results in such disparate impact; provided further, that a policy or practice or group of policies or practices demonstrated to result in a disparate impact shall be unlawful where the commission or such person who may bring an action produces substantial evidence that an alternative policy or practice with less disparate impact is available to the covered entity and the covered entity fails to prove that such alternative policy or practice would not serve the covered entity as well.   "Significant business objective" shall include, but not be limited to, successful performance of the job.

57.    Respondent is a lessee both of the Continental Room at LeFrak City, and of the spaces at the two schools where LeFrak City voting locations have been moved, and are therefore subject to limitations and requirements of Section 8-107(4) and (15) of the NYCHRL.

58.    Respondent in no way has provided a reasonable accommodation for persons with disabilities, such as Petitioners, and the class they represent, *i.e.*, disabled residents of LeFrak City, to vote in the September 12 primary election; they are not providing van services, and even if they did, they would be burdening such voters with long waits and a need to take longer than non-disabled voters to get to their place of voting.  Furthermore, they have displaced a large population of voters of color, and are requiring them to vote not where they live, but a considerable distance from their residences

59.    By its actions, Respondent has violated the rights of Petitioners, and the class of voters they represent, under Section 8-107(4) and, in the case of disabled residents, Section 8-107(15) of the NYCHRL.

### AS AND FOR A FOURTH CAUSE OF ACTION
### ARBITRARY AND CAPRICIOUS DECISION MAKING

60.    By acting as it has, particularly in its late and vague notice to voters (see Exhibit O) , its refusal to allow LeFrak City management to make temporary modifications so as to allow barrier free voting on September 12, 2107, and its refusal to consider the impact of disabled

INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

voters and voters of color being forced to travel either one-third of a mile or a three-quarters of a mile in order to vote, after decades of voting within their apartment complex, and by giving voters inadequate notice, the NYCBOE has acted arbitrarily and capriciously.

### PRAYER FOR RELIEF

WHEREFORE, Petitioners pray that this Court:

a.      Order Respondent to move the polling location for the voters of LeFrak City back to the Continental Room in time for the September 12, 2017 New York City primary election, and provide immediate notice to voters by mail and by postings throughout the LeFrak City development.

b.      Grant Petitioners such other equitable and legal relief as the Court deems just, proper, and appropriate.

c.      Award Petitioners the costs and expenses of this action and a reasonable attorney's fee.

Dated: August 28, 2017

ADVOCATES FOR JUSTICE
*Attorneys for Petitioners*


By:_____/s/_____
                Arthur Z.  Schwartz
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400
aschwartz@afjlaw.com

INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 47 of 348

## **VERIFICATION**

ARTHUR Z. SCHWARTZ, an attorney for Petitioners, affirms under penalty of perjury that the foregoing is true.  This affirmation is made by counsel because all Petitioners reside outside of New York County.  Your affiant's knowledge is based upon documents kept by Petitioners and Respondent and court records.

Dated: New York, New York
      August 28, 2017

 

                                      /s/
                            ARTHUR Z. SCHWARTZ

EXHIBIT A

United Spinal Ass'n v. Board of Elections in City of New York, 882 F.Supp.2d 615 (2012)
45 NDLR P 205

882 F.Supp.2d 615
United States District Court,
S.D. New York.

UNITED SPINAL ASSOCIATION, a
nonprofit organization, Disabled In
Action, a nonprofit organization, Plaintiffs,

v.

BOARD OF ELECTIONS IN THE CITY
OF NEW YORK and Julie Dent, in her
official capacity as President of the Board of
Elections in the City of New York, Defendants.

No. 10 Civ. 5653(DAB).
|
Aug. 8, 2012.

**Synopsis**
**Background:** Nonprofit membership organizations
consisting of persons with mobility and/or vision
impairments brought action against city board of elections
(BOE) and BOE's president, seeking declaratory and
injunctive relief remedying alleged access barriers at poll
sites operated by BOE under Americans with Disabilities
Act (ADA) and Rehabilitation Act (RA). Parties cross-
moved for summary judgment.

**[Holding:]** The District Court, Deborah A. Batts, J.,
held that organizations' members were denied meaningful
opportunity to participate in or benefit from city BOE's
voting program by reason of their disabilities under ADA
and RA.

Plaintiffs' motion granted, defendants' motion denied.

West Headnotes (4)

**[1]    Civil Rights**
        Discrimination by reason of handicap,
        disability, or illness
        Plaintiffs establish a prima facie violation
        of Title II of ADA when they show that:
        (1) plaintiffs are qualified individuals with

a disability; (2) defendants are subject to
the ADA; and (3) plaintiffs were denied the
opportunity either to participate in or to
benefit from defendants' services, programs,
or activities, or were otherwise discriminated
against by defendants, by reason of plaintiffs'
disabilities. Americans with Disabilities Act of
1990, § 202, 42 U.S.C.A. § 12132.

7 Cases that cite this headnote

**[2]    Civil Rights**
        Physical access and mobility;carriers
        Voters with vision and mobility-related
        impairments were denied meaningful
        opportunity to participate in or benefit from
        city board of election's (BOE) voting program
        by reason of their disabilities under Title II of
        Americans with Disabilities Act (ADA) and
        Rehabilitation Act (RA); recurring barriers
        to accessibility had existed on election days
        at poll sites designated by BOE, including
        unsafe or missing ramps, missing signage,
        and improper placement of voting equipment
        and furniture in voting areas, BOE itself had
        admitted that more than two poll sites had
        not met accessibility standards, and BOE
        had failed to undertake feasible measures
        to improve accessibility. Rehabilitation Act
        of 1973, § 504(a), 29 U.S.C.A. § 794(a);
        Americans with Disabilities Act of 1990, § 202,
        42 U.S.C.A. § 12132; 28 C.F.R. § 35.150.

6 Cases that cite this headnote

**[3]    Civil Rights**
        Discrimination by reason of handicap,
        disability, or illness
        Although the ADA and its implementing
        regulations do not require equal access or
        equal results for individuals with disabilities,
        those individuals must be provided with
        meaningful access to a public entity's
        programs and activities. Americans with
        Disabilities Act of 1990, § 202, 42 U.S.C.A. §
        12132; 28 C.F.R. § 35.150.

4 Cases that cite this headnote

United Spinal Ass'n v. Board of Elections in City of New York, 882 F.Supp.2d 615 (2012)
45 NDLR P 205

[4]     **Civil Rights**
        Physical access and mobility;carriers

To demonstrate that individuals were deprived of an opportunity or benefit or discriminated against by reason of their disabilities under ADA or Rehabilitation Act, plaintiff must demonstrate that defendant failed to undertake some feasible measure to improve accessibility or, in other words, that defendant failed to provide disabled voters with reasonable accommodations. Rehabilitation Act of 1973, § 504(a), 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132; 28 C.F.R. § 35.150.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*616** Julia Miriam Pinover, Ronald Elsberry, Sid Wolinsky, Stuart John Seaborn, Disability Rights Advocates, Kevin Todd Mintzer, Kevin Mintzer, P.C., Mariann Meier Wang, Cuti Hecker Wang LLP., New York, NY, for Plaintiffs.

Stephen Edward Kitzinger, New York, NY, for Defendants.

*MEMORANDUM & ORDER*

DEBORAH A. BATTS, District Judge.

Plaintiffs United Spinal Association and Disabled in Action bring this action for **\*617** declaratory and injunctive relief pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, et seq. and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, et seq., to remedy what they allege are pervasive and persistent access barriers at poll sites operated by the Board of Elections in the City of New York (the "BOE"). On October 28, 2010, after finding that Plaintiffs could not meet the stringent standard of showing a substantial likelihood of success on the merits required for a mandatory injunction, this Court denied Plaintiffs' Motion for a Preliminary Injunction.

Plaintiffs now move for summary judgment on the issue of Defendants' liability for violations of Title II of the ADA and Section 504. Defendants cross-move for summary judgment on Plaintiffs' claims. For the reasons set forth herein, Plaintiffs' Motion for Summary Judgment is GRANTED, and Defendants' Motion for Summary Judgment is DENIED.

I. BACKGROUND

Unless otherwise noted, the following facts are undisputed.

The United States Census Bureau's 2010 American Community Survey 1–Year estimates that, among the non-institutionalized people in New York City ages 18–64, 67,000 persons have vision difficulties and 222,469 persons have ambulatory difficulties. (Pls.' 56.1 Stmt., ¶ 132.) Among the non-institutionalized population in New York City ages 65 and over, 78,502 persons have a vision difficulty and 267,563 persons have an ambulatory difficulty. (*Id.,* ¶ 133.)

*A. The Parties*

Organizational Plaintiffs United Spinal Association ("United Spinal") and Disabled In Action ("DIA") are membership organizations that consist of people with mobility and/or vision disabilities who reside in New York City and are registered to vote. (Pls.' 56.1 Stmt., ¶ 134.) United Spinal is a nonprofit disability rights and veterans service organization whose mission is to provide expertise, create access to resources, and strengthen hope, thereby enabling people with spinal cord injuries and disorders to fulfill their potential as active members of their communities. (*Id.,* ¶ 135.) United Spinal engages in voting advocacy on behalf of its members, including advocacy campaigns for accessible polling places, participating in legislative processes regarding voting issues, and educating its members on their voting rights. (*Id.,* ¶ 136.) Almost 1,000 members of United Spinal reside in New York City. Many members are registered voters with disabilities who have encountered obstacles, or are at risk of encountering obstacles, at their polling places in New York City. (*Id.,* ¶ 137.)

DIA is a nonprofit civil rights organization committed to ending discrimination against people with disabilities, which consists primarily of, and is directed by, people with disabilities. (*Id.,* ¶ 140.) The majority of DIA members are wheelchair users or those who have mobility disabilities. DIA has approximately 200 members in the metropolitan New York region, many of whom are registered voters with disabilities who have encountered obstacles, or are at risk of encountering obstacles, at their polling places in New York City. (*Id.,* ¶ 141.)

The BOE is responsible for identifying and designating poll sites that are accessible to voters with disabilities throughout New York City. (Pls.' 56.1 Stmt., ¶ 2.) Pursuant to the Help America Vote Act ("HAVA"), the BOE received federal funds from which it was authorized to make, and did make, expenditures. The federal ***618** grant was approximately $1.6 million. (*Id.,* ¶ 3.)

### B. CIDNY and Poll–Site Accessibility Surveys

Under HAVA, the Protection and Advocacy for Voter Access ("PAVA") program was established by the New York State Commission on Quality of Care and Advocacy for Persons with Disabilities to ensure the full participation of individuals with disabilities in the electoral process. The Center for Independence of the Disabled, New York ("CIDNY") is the downstate regional PAVA office. (*Id.,* ¶ 5.) Rima McCoy, who served as Voting Rights Coordinator for CIDNY from July 2008 until December 16, 2011, states that

> [w]hat appears to be a small barrier to the untrained eye, may actually be prohibitively embarrassing, uncomfortable, or arduous for a person with a disability to overcome. For example, where there is no signage to an accessible entrance, a person in a wheelchair may find themselves stranded and wandering down back alleys, searching for an accessible way inside. If there is rain, this situation is uncomfortable. If it is night time, this may not be safe. If the person's disability causes them to be fatigued quickly, this may be arduous at best. When a person is forced to cast a ballot on the sidewalk, it is humiliating and deeply alienating. These barriers not only impede access in the moment someone is voting, but also cast a chill on people with disabilities' willingness to participate in future elections and confront the same kind of discriminatory and humiliating treatment.

(McCoy Decl., ¶ 19.)

The Department of Justice ("DOJ") has created an ADA Checklist for Polling Places for poll-site accessibility. (Pls.' 56.1 Stmt., ¶ 11.) CIDNY has been inspecting poll sites for accessibility since at least 2008. Inspections have been conducted by CIDNY staff and volunteers using a form checklist based on the DOJ ADA Checklist for Polling Places. (*Id.,* ¶ 12; Defs.' Resp. Pls.' 56.1 Stmt., ¶ 12.) The DOJ Checklist "is designed to help voting officials determine whether a polling place has basic accessible features needed by most voters with disabilities." (McCoy Decl. Ex. A, p. 4.) The Checklist states that "[i]ndividuals completing the checklist do not necessarily need to be experienced in evaluating buildings and facilities for accessibility." (*Id.*) In fact, the only special equipment necessary for completion of the checklist is a metal tape measure at least 15–feet long and a level with a bubble measure or digital measure at least twenty-four inches long. (*Id.,* p. 5.) The DOJ Checklist prompts the user to check that sidewalks and walkways are free from objects that could impede blind or mobility-impaired voters, that ramps are wide-enough and do not have excessive slope, that accessible entrances are marked with appropriate signage when the main entrance to the poll site is not accessible, that doors at the accessible entrance provide sufficient clearance and are propped open if they cannot be opened easily, and that the route through the voting area is sufficiently wide. (*See generally, id.*)

CIDNY inspectors were trained on how to use levels and measuring tapes to identify the existence and severity of barriers at polling sites. Trainees practiced using a level to take slope measurements and viewed illustrations, photos, and props to simulate barriers. (McCoy Decl., ¶ 23.) CIDNY generally selects poll sites to inspect based on complaints from consumers or availability of inspectors. For the September 2010 and November 2011 elections, CIDNY surveyed a random sample of poll ***619** sites identified by an expert statistician for Disability Rights Advocates. (*Id.,* ¶ 25.)

CIDNY has summarized the data from poll-site accessibility checklists and created summary spreadsheets for at least the 2008 through 2011 elections. (Pls.' 56.1 Stmt., ¶ 25.) CIDNY submits these summary spreadsheets to the BOE every year. (*Id.*) In its 2011 Poll Worker's Manual on Disability Awareness, the BOE stated that

"Each year, CIDNY ... finds large objects obstructing pathways at Poll Sites." (Seaborn Decl. Ex. E, p. 33.)

*C. November 2011 Surveys*

CIDNY surveyed poll sites during the General Election held on November 8, 2011. (Pls.' 56.1 Stmt., ¶ 33.) At P.S. 51, located at 87–45 117th Street in Queens, the ramp was only 33 inches wide and did not comply with DOJ Guidelines. (*Id.,* ¶ 36.) Defendants admit that the ramp is less than 3 6 inches wide, but state that the ramp is a permanent ramp and that Plaintiffs have not provided evidence that there is an alternative accessible site. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 36.) Plaintiffs also state that there was no sign at the inaccessible main entrance to P.S. 51 indicating the location of the accessible entrance. (Pls.' 56.1 Stmt., ¶ 37.) Defendants state that they have a policy of placing appropriate signage, and if there was a problem with the signage at P.S. 51, Defendants were not notified of it. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 37.) Plaintiffs also state that the Ballot Marking Device ("BMD") was positioned too close to the wall so that there was not enough space for a wheelchair user to access it. (Pls.' 56.1 Stmt., ¶ 38.) Defendants state that they have a policy of placing voting equipment so that it is accessible, and if the equipment was improperly placed, Defendants were never notified of it. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 38.)

At P.S. 175, located at 64–35 102nd Street in Queens, the BMD was placed facing towards the interior of the room, which meant that users would not have privacy. (Pls.' 56.1. Stmt., ¶ 39.) Defendants state that they have a policy of placing BMDs to allow for privacy, and if the machine was placed improperly, they were not made aware of it. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 39.)

At P.S. 99, located at 82–37 Kew Gardens Road in Queens, CIDNY surveyors found that the voting area did not have the 36 inch pathway needed for wheelchair users in many places and that the ADA privacy booth was improperly placed. (Pls.' 56.1 Stmt., ¶ 40.) Defendants state that the BOE has a policy of placing voting equipment in an accessible manner, and if the equipment was improperly placed, they were not notified of it. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 40.)

At P.S. 190, located at 68–17 Austin Street in Queens, CIDNY surveyors noted a door that was "very heavy" and an automatic door opener that did not work, along with an improperly placed BMD. (Pls.' 56.1 Stmt., ¶¶ 41–42.) Defendants state that they were not made aware that the automatic door opener did not work and that the BMD was repositioned once a poll worker was made aware of the inaccessible placement. (Defs.' Resp. Pls.' 56.1 Stmt., ¶¶ 41–42.)

CIDNY surveyors recorded similar problems at several other poll sites during the November 2011 General Election, at Los Tres Unidos HUD residence, located at 22 East 112th Street in Manhattan (inadequate signage, door saddle/lip higher than 1 inch, objects obstructing pathways in the voting area), 1199 HUD residence located at 420 East 111th Street in Manhattan (doorway too small, inaccessible buzzer at entrance), P.S. 19, located at 40–32 99th Street in Queens (no **\*620** sign and locked door at accessible entrance, furniture blocking interior pathway), P.S. 127, located at 98–01 25th Avenue in Queens (furniture blocking access at top of ramp), Taiwan Center, located at 137–44 Northern Boulevard in Queens (steep ramp without landing or handrails, BMD improperly placed), and Flushing House, located at 3820 Borne Street in Queens (BMD and ADA privacy booth improperly placed). (Pls.' 56.1 Stmt., ¶¶ 45–56.) Defendants contend that with these sites, as with the others, that Plaintiffs have failed to suggest alternative sites and that Defendants were not told about problems that could have been corrected during voting. (Defs.' Resp. Pls.' 56.1 Stmt., ¶¶ 45–56.)

*D. September 2010 Surveys*

During the September 2010 Primary Election, CIDNY surveyors inspected 53 poll sites out of the 628 poll sites in Manhattan and Queens used in that election. (Pls.' 56.1. Stmt., ¶¶ 62–63.) At P.S. 196, located at 71–25 113th Street in Queens, the accessible entrance was around a long block from the inaccessible entrance, and inside the voting area, a table obstructed the pathway to the BMD. (*Id.* ¶ 64.) At P.S. 13, located at 55–01 94th Street, there was no sign at the inaccessible main entrance to direct voters to the accessible entrance. The door to the accessible entrance was locked and the bell did not work. Once inside, there was no signage to direct voters to take the elevator up to the voting area or to inform voters of which floor the voting area was located on. Once inside the voting area, the ADA privacy booth was placed so that it was inaccessible. (*Id.,* ¶ 66.)

At VFW Post 2477, located at 89–07 Astoria Boulevard in Queens, the ramp was actually "two ramps put together"

United Spinal Ass'n v. Board of Elections in City of New York, 882 F.Supp.2d 615 (2012)

45 NDLR P 205

and was so steep that the CIDNY surveyor, Ramon Santos, "almost fell backward." (Pls.' 56.1 Stmt., ¶ 68.)

During the September 2010 election, Denise McQuade, who uses a wheelchair, went to vote at her polling place located at P.S. 102 in Bay Ridge, Brooklyn. (*Id.*, ¶ 69.) When Ms. McQuade and her husband arrived at P.S. 102, they went to the rear of the building to enter the polling place through the accessible entrance. Upon opening a door, they saw "an extremely steep ramp-like a ski slope" that "appeared to be made of concrete and to be a permanent part of the building." Ms. McQuade was "very frightened to use the ramp because there was no landing at the top of the ramp and this would make [it] impossible for us to exit safely without assistance." (*Id.*, ¶ 70.) To enter P.S. 102, Ms. McQuade's husband had to push her wheelchair against the door, which opened inward, to enter. Immediately upon crossing the threshold of the entrance, her husband had to pull back on the handles of her wheelchair to keep her wheelchair "from plunging down the ramp at break-neck speed." (*Id.*, ¶ 71.) After voting, Ms. McQuade had to ask a policeman on duty for assistance in opening the door, because the door opened inward and there was no landing. It would have been impossible for her husband to hold her wheelchair in place on the ramp and open the door. There was no poll monitor to assist Ms. McQuade. (*Id.*, ¶ 72.) After this experience at P.S. 102, Ms. McQuade was afraid to go back to vote during subsequent elections and "decided it would be safer for [her] to use an absentee ballot, than to try to enter the polling place again" even though she prefers to vote alongside her neighbors and community. (*Id.*, ¶ 73.) Ms. McQuade used an absentee ballot during the November 2011 election because of the barriers encountered in September 2010. (*Id.*, ¶ 74.)

**\*621** The ramp at P.S. 102 is located at the only accessible entrance to the facility. Ms. McCoy measured the slope of the ramp and found that it was "significantly steeper than 1:12, which is what is required by the ADA." (Pls.' 56.1 Stmt., ¶ 75.) Ms. McCoy suggested two alternative poll sites to replace P.S. 102, namely, Xaverian High School and the Bay Ridge Public Library. (*Id.*, ¶ 76.) Despite the BOE having knowledge regarding the ramp that was not ADA compliant at P.S. 102, that site was used again as a polling place during the November 2011 election. (Pls.' 56.1 Stmt., ¶ 77.) Defendants admit as much, but state that the facility is scheduled to be made accessible in the near future and that no other facility has been determined to

meet the BOE's needs. In the interim, the BOE has notified all voters who are assigned to that poll site and offered to transfer their registration to an accessible poll site. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 77.) Defendants do not state when they expect P.S. 102 will be made accessible or what efforts they have made to find an alternative poll site.

*E. November 2010 Surveys*

During the November 2010 General Election, CIDNY inspected 53 polling places. (Pls.' 56.1 Stmt., ¶ 78.) At P.S. 146, located at 98–01 159th Avenue in Queens, the slope of the ramp was steeper than the maximum 1:12 allowed. (*Id.*, ¶ 79.) At Sarasota Gold, located at 711 Seagirt Avenue, the BMD was placed four feet from the wall, making it extremely difficult for someone using a wheelchair or scooter to access the machine. (*Id.*, ¶ 80.)

*F. BOE Surveys of Poll Sites, Site Selection, and Monitoring*

The BOE currently employs 25 full-time surveyors, each of whom is trained and certified as competent to conduct poll site surveys by CIDNY. (Defs.' 56.1 Stmt., ¶ 4.) The BOE previously determined that two poll sites were fully inaccessible. Those sites are P.S. 119 in Brooklyn and P.S. 2 in Queens. Further surveying has revealed other sites that do not fully meet accessibility standards. (Defs.' 56.1 Stmt., ¶ 6.) Poll sites in the Bronx at 1591 Metropolitan Store Room and 2051 St. Raymonds Avenue were used in the November 2011 election. (Pls.' 56.1 Stmt., ¶ 57.) The BOE's surveyors at 1591 Metropolitan Store Room determined that the ramp was not ADA compliant because it had no handrails on the second ramp and a dangerous wood platform. (*Id.*, ¶ 59.) The BOE's surveyors at 2051 St. Raymonds Avenue determined that the ramp at that site was not ADA compliant because it had no landings or top platform. (*Id.*, ¶ 60.)

The Board of Elections does not have an ADA coordinator or person designated as having primary responsibility for ensuring compliance with the ADA, as required by 28 C.F.R. 35.107. (Pls.' 56.1 Stmt., ¶ 85.) The BOE does not have an Accessibility Transition Plan or Written Plan pursuant to 28 C.F.R. 35.150(d). (*Id.*, ¶ 86.)

A number of Board of Education sites (i.e., public schools) that are used as poll sites are not architecturally and structurally fully compliant with the ADA. (*Id.*, ¶ 88.) Defendants contend that such sites are made compliant

United Spinal Ass'n v. Board of Elections in City of New York, 882 F.Supp.2d 615 (2012)
45 NDLR P 205

to the greatest extent possible using temporary measures, and Plaintiffs have not suggested alternative sites to replace the inaccessible ones. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 88.) The BOE is not precluded from using private sites for polling places. Private sites receive a $70 stipend and can enter into lease agreements with the BOE to allow use as polling sites. (Pls.' 56.1 Stmt., ¶ 93.) The BOE has a surveyor team that is responsible for searching for fully accessible voting sites as substitutes for sites *622 that are inaccessible. (*Id.,* ¶ 95.) The State Board of Elections designated CIDNY as the entity to provide training and to certify BOE site surveyors as qualified. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 98.)

On Election Day, the BOE is notified of some access barriers that arise at polling places and keeps track of these complaints. Examples of recent complaints in the November 2010 election include the absence of temporary ramps or ramp parts and the general inaccessibility of a site. (Pls.' 56.1 Stmt., ¶ 104.) Defendants' Call Incident Logs often fail to indicate that any action was taken in response to a complaint. In November 2010, Defendants received a complaint that P.S. 164 in Queens needed a ramp. The Call Incident Log does not indicate that Defendants ever responded to this complaint. (Pls.' 56.1 Stmt., ¶ 106.) That same election, P.S. 153 in Manhattan was reported as "no ramp, no access." Again, Defendants Call Incident Log does not indicate that any action was taken. (*Id.,* ¶ 108.)

During the November 2011 election, two complaints regarding the BMD machines were made to the BOE regarding the Selis Manor poll site located at 135 West 23rd Street in Manhattan. (*Id.,* ¶ 115.) Selis Manor is a HUD building which consists of around 200 apartments and over 300 residents. Around 90% of the residents are blind and 10% are mobility impaired. Selis Manor should have two BMD machines. (*Id.,* ¶ 116.)

Paula Wolff, President of Plaintiff DIA, votes at Selis Manor. When Ms. Wolff voted in 2011, at around 7:00 p.m., there was only one BMD machine at the site, the machine was not functioning, and poll workers were not trained properly on how to work the machine. (*Id.,* ¶ 117.) BOE reports indicate that a call complaining about the BMD machine came in at 2:46 p.m., but that no one from BOE was dispatched and the machine was never repaired. (*Id.,* ¶ 119.) The poll worker had to read the ballots to residents voting at Selis Manor and the voters told the poll worker who they were voting for, thereby denying voters with vision impairments the opportunity to vote independently. (Pls.' 56.1 Stmt., ¶ 120.)

## II. DISCUSSION

### A. Summary Judgment Standard

A district court should grant summary judgment when there is "no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *see also Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005). Genuine issues of material fact cannot be created by mere conclusory allegations. *Victor v. Milicevic,* 361 Fed.Appx. 212, 214 (2d Cir.2010). Summary judgment is appropriate only when, after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party. *Melendez v. Mitchell,* 394 Fed.Appx. 739, 740 (2d Cir.2010).

In assessing when summary judgment should be granted, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (citing *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005)). The non-movant may not rely upon speculation and/or conjecture to overcome a motion for summary judgment. *Burgess v. Fairport Cent. Sch. Dist.,* 371 Fed.Appx. 140, 141 (2d Cir.2010). Instead, when the moving party has documented particular facts in the record, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *FDIC v. Great Am. Ins.* *623 *Co.,* 607 F.3d 288, 292 (2d Cir.2010) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Establishing such evidence requires going beyond the allegations of the pleadings, as the moment has arrived "to put up or shut up." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000). Thus, unsupported allegations in the pleadings cannot create a material issue of fact. *Id.*

A court faced with cross-motions for summary judgment need not "grant judgment as a matter of law for one side or the other," but " 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.' " *Heublein, Inc. v. United States,* 996

F.2d 1455, 1461 (2d Cir.1993) (*quoting Schwabenbauer v. Bd. of Educ. of Olean,* 667 F.2d 305, 313–14 (2d Cir.1981)).

### B. ADA and Section 504 Claims

**[1]** Under Subtitle A of Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). In this Circuit, plaintiffs establish a *prima facie* violation of Title II when they show that; (1) plaintiffs are "qualified individuals" with a disability; (2) defendants are subject to the ADA; and (3) plaintiffs were denied the opportunity either to participate in or to benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities. *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir.2003). For purposes of Section 504, Plaintiffs must also establish that Defendants are recipients of federal funds. *Id.* at 272. The only element at issue here is element three, namely, whether Plaintiffs have shown sufficiently that they were denied the opportunity to participate in or benefit from Defendants' voting program by reason of their disabilities.

**[2]** Defendants first argue that Plaintiffs' claims must fail as there is no evidence that any voter has actually been deprived of the right to participate in an election. (Defs.' Mem. L. Supp. Mot. Dismiss, p. 10.) This interpretation, which would demand that an individual was actually deprived of the right to cast a ballot, is overly broad and unsupported by any precedent. It is abundantly clear that Defendants are obligated to provide a level of access to their voting program beyond the simple assurance that voters with disabilities are able to cast a ballot in some way, shape, or form.

**[3]** Regulations promulgated by the DOJ to implement the ADA provide that "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."

28 C.F.R. § 35.150. It is well-established in this Circuit that although the ADA and its implementing regulations do not require "equal access" or "equal results" for individuals with disabilities, those individuals must be provided with "meaningful access" to a public entities programs and activities. *See Civic Ass'n of the Deaf of New York* ***624*** *City, Inc. v. City of New York,* No. 95 Civ. 8591, 2011 WL 5995182, at *9 (S.D.N.Y. Nov. 29, 2011) (finding that a "meaningful access" rather than an "equal access" or "equal results" standard applied to ADA and Section 504 claims); *see also Henrietta D.,* 331 F.3d at 275 (finding that the measure is "whether the plaintiffs with disabilities could achieve meaningful access, and not whether the access the plaintiffs had (absent a remedy) was *less* meaningful than what was enjoyed by others.") (emphasis in original).

In the voting context, another court in this District has found that "[f]ailing to ensure that disabled individuals are able to vote in person and at their assigned polling places—presumably the most commonly used method of voting—could not reasonably be construed as consistent with providing 'meaningful access' to the voting process." *Westchester Disabled on the Move, Inc. v. County of Westchester,* 346 F.Supp.2d 473, 478 (S.D.N.Y.2004); *see also Kerrigan v. Philadelphia Board of Election,* No. 07 Civ. 687, 2008 WL 3562521, at *17–*18 (E.D.Pa. Aug. 14, 2008) (finding voting by absentee ballot or by emergency ballot at city hall an inadequate substitute for mobility-impaired voters who encountered barriers at their assigned polling places on election day). It is no excuse that the BOE does not own the locations used as poll sites on election days, as the ADA Title II Technical Assistance Manual also provides guidance on leased spaces:

> Public entities are encouraged, but not required, to lease accessible space. The availability of accessible private commercial space will steadily increase over time as the title III requirements for new construction and alterations take effect. Although a public entity is not required to lease accessible space, once it occupies a facility, it must provide access to all of the programs conducted in that space.... Thus, the more accessible a space is to begin with, the easier and less

United Spinal Ass'n v. Board of Elections in City of New York, 882 F.Supp.2d 615 (2012)

45 NDLR P 205

costly it will be later on to make programs available to individuals with disabilities and to provide reasonable accommodations for employees who may need them.

The Americans with Disabilities Act Title II Technical Assistance Manual, § II–6.4000 (available at http://www.ada.gov/taman2.html) (last visited July 2, 2012).

This Court finds that there is no genuine dispute of material fact as to the existence of pervasive and recurring barriers to accessibility on election days at poll sites designated by the BOE. Plaintiffs, through the use of CIDNY surveys, have provided copious documentation of barriers at poll sites, ranging from ramps that are unsafe or missing to missing signage and improper placement of voting equipment and furniture in voting areas. Defendants themselves admit that more than two poll sites do not meet accessibility standards. (Defs.' Mem. L. Supp. Mot. Dismiss, p. 4.)

Nevertheless, the ADA does not, as Plaintiffs seem to suggest, require perfection. *See, e.g., Westchester Disabled on the Move,* 346 F.Supp.2d at 480 (denying a motion for a preliminary injunction where the court found it unlikely that enough accessible structures existed and where modifications to existing structures would be "difficult, if not impossible" for the defendant board of elections to make alone); *New York v. County of Delaware,* 82 F.Supp.2d 12, 18 (N.D.N.Y.2000) (recognizing that certain changes necessary to make poll sites fully accessible were not "feasible"); *Hill v. New York State Board of Elections,* 120 A.D.2d 55, 57, 507 N.Y.S.2d 674 (N.Y.2d Dep't 1986) (recognizing that the extent to which polling places must be made accessible involves "matters of administrative judgment, discretion **\*625** and allocation of resources and priorities"). The ADA'S implementing regulations themselves contemplate some flexibility. 28 C.F.R. § 35.150, which governs existing facilities, states:

(a) General. A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. This paragraph does not—

(1) Necessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities;

(2) Require a public entity to take any action that would threaten or destroy the historic significance of an historic property; or

(3) Require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with § 35.150(a) of this part would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity.

(b) Methods—

(1) General. A public entity may comply with the requirements of this section through such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities. A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section. A public entity, in making alterations to existing buildings, shall meet the accessibility requirements of § 35.151. In choosing among available

methods for meeting the requirements of this section, a public entity shall give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate.

28 C.F.R. § 35.150.

Likewise, the Rehabilitation Act's implementing regulations also provide:

> (a) A recipient shall operate each program or activity so that the program or activity, when viewed in its entirety, is readily accessible to and usable by handicapped persons. This paragraph does not necessarily require a recipient to make each of its existing facilities or every part of an existing facility accessible **\*626** to and usable by handicapped persons.

**[4]** Accordingly, it is not self-evident, as Plaintiffs claim, that a violation of Title II or Section 504 of the Rehabilitation Act necessarily follows when the BOE designates a poll site that is less than ideally accessible, or when, over the course of an election day, conditions arise that may render an otherwise accessible poll site inaccessible in some way. Rather, to demonstrate that individuals were deprived of an opportunity or benefit or discriminated against *by reason* of their disabilities, Plaintiffs must demonstrate that Defendants failed to undertake some feasible measure to improve accessibility or, in other words, that Defendants failed to provide disabled voters with reasonable accommodations. *See Henrietta D. v. Bloomberg,* 331 F.3d at 279 ("In so interpreting the 'by reason of ... disability' requirement, we are mindful of the fact that Title II seeks principally to ensure that disabilities do not prevent access to public service where the disabilities can reasonably be accommodated."); *see also Kerrigan,* 2008 WL 3562521, at \*10 ("If Plaintiffs are able to make a prima facie showing of discrimination in violation of the ADA and RA, they have the additional burden 'of articulating reasonable accommodations that the defendant can make in order to comply with the ADA and the RA.' ") (citing *Liberty Res. Inc. v. Philadelphia Hous. Auth.,* 528 F.Supp.2d 553, 565 (E.D.Pa.2007)).

This burden, however, is hardly insurmountable. "It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits and that once the plaintiff has done this, she has made out a prima facie showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant." *Henrietta D.,* 331 F.3d at 280; *C.D. v. New York City Dept. of Educ.,* No. 05 Civ. 7945, 2009 WL 400382, at \*7 (S.D.N.Y. Feb. 11, 2009) ("A reasonable accommodation is one that does not 'impose an undue hardship on the operation of [a] program or activity.' ") (quoting 45 C.F.R. § 84.12(a)).

Accordingly, summary judgment would be inappropriate at this stage if there were a genuine dispute of material fact as to whether Defendants accommodate voters with vision and mobility-related impairments. This Court finds that there is none.

Defendants allege that they accommodate voters with disabilities in essentially two ways; by offering voters assigned to inaccessible poll sites the opportunity to have their registration transferred to a nearby accessible poll site; and by addressing other barriers, such as inadequate signage or inappropriately-placed furniture, as they are made aware of those barriers, either through complaints or through their own monitoring process. The evidence shows, however, that both of these methods fall short.

Defendants claim that voters assigned to P.S. 119 in Brooklyn and P.S. 2 in Queens are given the opportunity to have their registration transferred to a nearby accessible site. (Defs.' Mem. L. Supp. Mot. Dismiss, p. 4.) By Defendants' own admission, however, P.S. 119 and P.S. 2 are not the only sites that are fully inaccessible due to aspects of building construction that cannot be remedied by temporary measures on election days. (*See, id.*) The BOE fails to identify which other sites its surveys have revealed to be inaccessible, and does not make any representation that voters at those sites have been notified and offered the opportunity to have their registration transferred. Furthermore, Defendants have presented no evidence regarding **\*627** their attempts to locate alternative poll sites to replace sites that are inaccessible.

Defendants concede that Rima McCoy suggested two alternative poll sites to replace P.S. 102 in Brooklyn, namely, Xaverian High School and Bay Ridge Public Library. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 76.) Nevertheless,

United Spinal Ass'n v. Board of Elections in City of New York, 882 F.Supp.2d 615 (2012)

45 NDLR P 205

they present no evidence that they ever evaluated these or any other sites as potential replacements. Instead, they claim that this suggestion is irrelevant in the absence of a representation from Ms. McCoy that her proposed sites are appropriate and available for use on election days. This Court declines to place such a burden on Plaintiffs in light of Defendants' utter failure to produce even a scintilla of evidence that they have evaluated these or any other sites in any way as potential replacements.

Defendants claim that poll workers are trained on accessibility issues, and that on election days, teams of monitors known as "AD Monitors" visit and inspect each poll site at least twice during the election day to check for accessibility issues, among other things. (Defs.' Mem. L. Supp. Mot. Dismiss, pp. 5–6.) It is clear, however, that no reasonable jury could find for Defendants on this point.

Plaintiffs have produced ample evidence of misplaced equipment and inadequate signage by poll workers that have reportedly been trained on accessibility issues, along with numerous reports from AD Monitors indicating that poll sites were not visited on election days, (see, Seaborn Decl. Ex. N), and calls to the BOE regarding accessibility issues with no resolution noted, (see Seaborn Decl. Ex. K). Defendants ask this Court to infer that if one AD Monitoring Team did not visit a poll site on election day, the poll site was visited by a different team, and that accessibility complaints were remedied even though no resolution was noted in the Call Incident Report. Even viewing the evidence in the light most favorable to Defendants, however, this Court simply cannot draw the inference Defendants advocate without a shred of evidence to support it. Defendants' evidence consists of mere unsupported assertions and conjecture that training is adequate and inspections are taking place. These bare assertions are insufficient to create a genuine dispute of material fact on this point. The only conclusion

that may be drawn from the evidence submitted in the Parties' respective Motions for Summary Judgment is that the Defendants have failed to accommodate reasonably voters with disabilities.

Plaintiffs, as an accommodation, have suggested that Defendants identify one individual among on-site poll workers at each location to monitor poll-site accessibility. Furthermore, Plaintiffs suggest that the BOE partner with a third party, such as CIDNY, to assess and identify accessibility needs and possible solutions prior to the 2012 Presidential Election in November. (Pls.' Mem. L. Supp. Mot. Summ. J., pp. 24–25.) The costs of these accommodations, on their face, do not clearly exceed the benefits in light of the significant evidence of Defendants' failures to provide poll sites that are as accessible as reasonably feasible. Accordingly, summary judgment is granted for Plaintiffs as to liability for their Title II and Section 504 Rehabilitation Act claims.

### III. CONCLUSION

Plaintiffs' Motion for Summary Judgment is GRANTED;

Defendants' Motion for Summary Judgment is DENIED; and

The case is referred to the Honorable Henry Pitman, Magistrate Judge, for the *628 determination of remedy consistent with this Order.

SO ORDERED.

**All Citations**

882 F.Supp.2d 615, 45 NDLR P 205

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
UNITED SPINAL ASSOCIATION, a nonprofit
organization, DISABLED IN ACTION, a
nonprofit organization,

                    Plaintiffs,

          -v.-                                    10 Civ. 5653 (DAB)
                                                  ORDER

BOARD OF ELECTIONS IN THE CITY OF
NEW YORK and JULIE DENT, in her
official capacity as President of the
Board of Elections in the City of New
York,

                    Defendants.
--------------------------------------X
DEBORAH A. BATTS, United States District Judge.

        On March 16, 2012, Plaintiffs United Spinal Association and

Disabled In Action (collectively, "Plaintiffs") and Defendants

Board of Elections in the City of New York ("BOE") and Julie

Dent, in her official capacity as President of the BOE

(collectively, "Defendants"), filed Motions for Summary Judgment

in the above-referenced matter.  On August 8, 2012, this Court

entered a Memorandum and Order (the "August 8th Order"), which

granted Plaintiffs' Motion and denied Defendants' Motion.  Since

its issuance of the August 8th Order, the Court has held three

hearings focused solely on the question of appropriate remedy.

By letter dated October 11, 2012, the Department of Justice,

pursuant to 28 U.S.C. § 517, appeared and submitted a proposed



Order for a remedial plan.  Plaintiffs and Defendants
(collectively, "parties"), and the Department of Justice, were
instructed to meet and confer to develop and propose a joint plan
for the Court to consider before it entered a remedial Order in
this matter.  Having considered the parties' proposals and
concerns, the Court hereby ORDERS that:

1. Accessible polling sites are and shall be the cornerstone
of the voting accessibility program of the BOE.  The BOE has an
obligation to provide an accessible voting program under federal
law.

2. The BOE shall maintain in operable working condition, on
the day of any election, those features of facilities and
equipment that are required to be provided by the BOE to make
polling sites temporarily accessible to and usable by persons
with disabilities.

3. Beginning with the November 6, 2012 General Election, and
in all primary, special, and general elections held thereafter,
the BOE shall designate one of the BOE's existing poll-site
workers at every polling site in New York City as the on-site
Americans with Disabilities Act Coordinator on Election Day ("On-
Site Accessibility Coordinator").  The BOE shall contract with
the Center for the Independence of the Disabled, New York
("CIDNY"), the downstate regional Protection and Advocacy for

2

Voter Access office, to train each of the On-Site Accessibility
Coordinators on poll-site accessibility prior to the November 6,
2012 General Election.  After the November 6, 2012 General
Election, the BOE may contract with a third-party, mutually
agreed upon by the parties, to develop training for each of the
On-Site Accessibility Coordinators on poll-site accessibility.
The BOE shall contract with CIDNY to develop an Election Day
poll-site accessibility checklist to be used by On-Site
Accessibility Coordinators on the date of any election.

(a) The BOE shall compensate CIDNY for the services it
provides pursuant to this Order at a rate determined by this
Court.

(b) This paragraph does not require the BOE to hire any
additional staff at its poll sites.

4. The BOE's On-Site Accessibility Coordinators shall
document any accessibility complaints received on the date of any
election.  Plaintiffs shall provide forms for this documentation
to the BOE.  The BOE shall submit a report detailing
accessibility complaints received by On-Site Accessibility
Coordinators to Plaintiffs within 45 days of any primary,
special, or general election held during the term of this Order,
with the exception of Primary Elections occurring in September.
For Primary Elections occurring in September, the BOE shall

provide reports detailing accessibility complaints for a sample
35 randomly selected poll-sites within 45 days of such primary
elections.  The parties shall communicate in writing regarding
which sites shall be sampled at least 30 days prior to each
September Primary Election.

5. This matter is referred to Magistrate Judge Henry B.
Pitman, who is designated by this Court to oversee the
implementation of this Order, including <u>inter alia</u> any and all
disputes among the parties concerning payments, selection of
Third Party Experts, and the poll-site surveys to be conducted
pursuant to this Order.

6. Attachment A to this Order contains a list of poll-sites,
including those with accessibility barriers, which the parties
identified in advance of the hearing on remedies held on
September 10, 2012.  Following each Election Day, parties shall
meet and confer, and make a joint submission to Judge Pitman of
an updated version of Attachment A, which shall incorporate:

(a) any additional barriers at the BOE's poll sites;

(b) the removal of any poll-sites identified from the
BOE's list of active poll-sites; and

(c) the removal of any poll-site barriers from the list
where the parties agree that such barriers no longer exist
at the identified poll-site.

4

The BOE shall ensure that the sites identified in the most
updated version of Attachment A receive appropriate and
sufficient temporary access features (such as portable ramps and
sufficient signage) on the day of the election. For the November
6, 2012 General Election, the BOE shall, to the extent possible,
ensure that the sites identified in Attachment A receive
appropriate and sufficient temporary access features (such as
portable ramps and sufficient signage) on that date.

7. Beginning with the November 6, 2012 General Election, and
in all primary, special, and general elections held thereafter
and during the term of this Order, Assembly District ("AD")
Monitors employed by the BOE shall visit each polling site twice
on the date of any such election to assess the accessibility of
the poll site. The first visit to each site shall occur at least
four hours prior to the second, and the AD Monitors shall, during
said visits, take immediate steps to assist on-site poll workers
to remedy any access barriers at the site, including, but not
limited to, missing ramps, missing signage, and paths to voting
machines that cannot accommodate persons with disabilities due to
insufficient width.

(a) The AD Monitors shall complete CIDNY's poll-site
accessibility training prior to November 6, 2012.

(b) Prior to each election held during the term of

this Order, the BOE shall communicate in writing to each AD
Monitor visiting a polling site at which the BOE agreed to
or was required by Court Order to implement a temporary
modification, pursuant to Paragraph 15 of this Order.  The
communication shall identify the temporary modifications
that are necessary to implement at that site.

(c)  The AD Monitors shall document the results of
their visits.  The report shall state whether each
temporary modification to which the BOE agreed pursuant to
Paragraph 15, or was ordered to implement, was in fact
implemented when the AD Monitors arrived at the polling
site.  If one or more of the temporary modifications was not
implemented when the AD Monitors arrived at the polling
site, the AD Monitors' report shall also state:

(1) the time the AD Monitor informed an on-site
poll worker of the failure to implement the temporary
modification;

(2) the name of the on-site poll worker with whom
the AD Monitors spoke regarding the failure to
implement the temporary modification; and

(3) whether the temporary modification was
implemented before the AD Monitors left the polling
site.

6

(d)  Within 45 days of the date of any election,

Defendants shall submit a report to Plaintiffs

detailing:

(1) all access barriers found by the AD Monitors;

and

(2) any temporary modifications that the BOE

failed to implement.

A sample form for this report is attached to this Order as

Attachment B.

8. Defendants shall contract with, and provide reasonable

compensation to, an independent third-party with expertise in

voting accessibility ("Third Party Expert") to conduct poll-site

accessibility surveys of the polling sites in New York City.  The

parties shall attempt to come to an agreement regarding the

selection of the Third Party Expert.  If the Parties cannot agree

on the Third Party Expert by January 10, 2013, however, the

parties shall, in writing, brief Judge Pitman as to their

respective recommendations for the Third Party Expert.  Judge

Pitman shall designate the Third Party Expert.

9. The BOE will cooperate fully with the Third Party Expert

as it conducts its survey work including, but not limited to,

providing the Third Party Expert with assistance in accessing

polling sites on non-election days and providing access to

7

election district maps and other reasonably requested
information, including the identification of the voting area at
each polling site, in a timely manner.

10. Beginning January 2013, the Third Party Expert will
conduct surveys of as many polling sites as practicable, with a
goal of no fewer than 120 polling sites every two months (the
"Survey Period").

11. The Third Party Expert shall use the survey instrument,
attached hereto as Attachment C, to evaluate polling sites
pursuant to Paragraph 10 of this Order.  In addition, the Third
Party Expert will include photographs of relevant features at
each polling site to accompany the survey instrument.

12. Within 20 days of the end of each Survey Period, the
Third Party Expert shall provide to the BOE and the Plaintiffs,
copies of all survey instruments completed and photographs
compiled during the previous Survey Period.

13. Within 30 days of the end of each Survey Period, the
Third Party Expert will report to Judge Pitman, the BOE, and the
Plaintiffs, in writing, with the results of the surveys completed
pursuant to Paragraph 10 of this Order and its recommendations
regarding polling place locations that are not accessible (the
"Report").  Each Report shall state:

(a) Whether each surveyed polling site can reasonably

8

be modified temporarily to be accessible on the day of any
election after November 6, 2012, and, if so,

> (i) what temporary modifications can be made, and

> (ii) how such modifications can be accomplished;

(b) If the polling site is located in a publicly-owned
building, whether it is reasonable to modify permanently any
accessible polling site to make it accessible and how such
modifications would be made; and

(c) Whether a temporary sign should be posted to direct
voters with disabilities to an alternate accessible
entrance, and where the sign should be posted.

14. If the Report concludes that a surveyed polling site
cannot reasonably be modified temporarily, the BOE shall report
to the Plaintiff and the Third Party Expert, within 60 days of
receipt of the Report, in writing, whether that polling site can
be relocated to a building that is accessible or can reasonably
be made temporarily accessible, and the specific location(s) it
recommends as the relocation site.  In determining whether a
polling site can reasonably be relocated, the BOE shall consider
the following criteria:

(a) Whether the proposed relocation site is in the same
election division that the polling site serves or an
election division adjacent to the election division that the

polling site serves;

(b) Whether there are any significant dangers or obstacles that would preclude pedestrians from traveling safely to the proposed location, such as a park or major road or highway that cannot be safely traversed;

(c) Whether the building in which the polling site is proposed to be relocated is of sufficient size to accommodate a polling site or, if a polling site is already located there, whether the building is of sufficient size to accommodate an additional polling site; and

(d) Whether the location is unable to accommodate a polling site for mechanical or other physical or operational reasons.

If the BOE recommends a relocation site that is not accessible but can reasonably be made temporarily accessible, the BOE also will identify what temporary modifications can be made and how such modifications can be made.

15. As set forth under subsections (a) and (b) of this Paragraph, the BOE will implement recommendations made by the Third Party Expert Pursuant to Paragraph 13 of this Order, subject to its ability to challenge the recommendation under subsection (c) of this Paragraph.

10

(a) Other than the when excepted pursuant to subsection (c) of this Paragraph, during the term of this Order, the BOE shall implement all recommendations of the Third Party Expert to which it has agreed, beginning in the elections immediately subsequent to their agreement, unless

(i) the BOE's agreement was made within 45 days before the next election; and

(ii) the BOE determines that it is in its best interest to implement the recommendation in the next subsequent election, in which case the recommendation will be implemented in the next subsequent election.

(b) During the term of this Order, other than when excepted pursuant to subsection (c) of this Paragraph, the BOE will, in the next election subsequent to any additional Order issued by the Judge Pitman, implement said Orders, unless the Orders are appealed to this Court.

(c) If the BOE concludes that

(i) it cannot reasonably implement a recommendation;

(ii) relocation of the polling site to an alternate location is a more appropriate response to the recommendation; or

(iii) a polling site cannot be relocated;

11

then the BOE shall notify the Third Party Expert and the
Plaintiffs and meet and confer with the Third Party Expert
and the Plaintiffs (or their representatives). If the BOE
and the Third Party Expert or the Plaintiffs are unable to
agree as to the implementation of a recommendation, the BOE
may petition the Judge Pitman for relief from the applicable
recommendation pursuant to Rule 60 of the Federal Rules of
Civil Procedure, subject to appeal.  The BOE does not have
to implement any recommendation from which it is seeking
relief unless and until the Judge Pitman, or if appealed, a
Final Order on Appeal, orders the BOE to implement the
recommendation.

16. Attached to this Order is a survey instrument,
Attachment C, which the BOE shall use to assess the accessibility
of all future proposed polling site locations.  The BOE shall
continue to make accessibility a major criterion when it selects
new locations for polling sites.  The BOE shall continue its
policy and practice of reviewing each newly proposed polling site
location to determine whether it is accessible to persons with
disabilities or could be made temporarily accessible before
selecting a location as a polling site.

17. After the November 6, 2012 General Election, the Third
Party Expert shall train employees of the BOE on using the survey

instrument and determining whether a polling site location is or can be made accessible.  No later than 60 days before beginning the training, the Third Party Expert shall provide the BOE with a copy of the training materials that the Third Party Expert intends to use, and shall provide the BOE with a list of equipment and/or supplies the BOE inspectors will need to assess accurately the accessibility of the BOE's polling sites.  During the term of this Order, the BOE may request additional training on a reasonable basis.

18. If at any time one of the parties desires to petition this Court to modify this Order, the party will promptly notify the other parties in writing, setting forth the facts and circumstances thought to justify modification, as well as the substance of the proposed modification.  In such an instance, an in-person meeting between the parties shall be held prior to the petition to attempt resolution without Court intervention. Parties receiving notice of another party's intent to petition for modification of this Order shall notify the requesting party in a timely manner as to whether it will consent to the proposed modification.

19. The Court shall maintain jurisdiction over compliance with this Order through December 31, 2016.  30 days before the expiration of this period, the parties shall submit briefing to

the Court on the BOE's compliance with the Order, and make

recommendations as to whether the Court should retain

jurisdiction over the matter.

SO ORDERED.

New York, New York
October 18, 2012

_Deborah A. Batts_
THE HONORABLE DEBORAH A. BATTS
UNITED STATES DISTRICT JUDGE

ATTACHMENT A

POLLING SITES DESIGNATED AS INACCESSIBLE TO BE UPDATED WITH
POLLING PLACE ACCESS SURVEY DATA FROM THE SEPTEMBER 2012 PRIMARY
AND THE NOVEMBER 2012 GENERAL ELECTION

| Borough | Poll Site | 2009 | 2010 | 2011 | |
|---------|-----------|------|------|------|---|
| BRONX | PS 67 2924 Mohegan Ave | | | | |
| | PS 6 100 East Tremont Ave | | | | |
| | School Gym 1684 White Plains Road | | | | |
| | PS 102, 1827 Archer St. | | | | |
| | Basement 1920 McGraw Ave | | | | |
| | Basement 1595 Unionport Road | | | | |
| | Basement 2059 McGraw Ave | | | | |
| | Basement 2051 St. Raymonds Ave | | | | |
| | Store Room 1591 Metropolitan Ave | | | | |
| | Basement 9 Metropolitan Oval | | | | |
| | Parkchester Complex 1594 Unionport Road | | | | |
| | JHS 127 1560 Purdy St | | | | |
| | PS 12 255 Tratman Ave | | | | |
| | Glebe Ctr 2125 Glebe Ave | | | | |
| | PS 119 1075 Pugsley Ave | | (1) No Accessible Entrance (BOE 350) | | |
| | PS 47 1794 East 172 St. | | | | |
| | James Monroe HS Annex 1551 East 172 St. | | | | |
| | Holy Family Church 1971 Castle Hill Ave | | | | |

| | | | | |
|---|---|---|---|---|
| | IS 131<br>885 Bolton Ave | | | |
| | PS 138<br>2060 Lafayette Ave | | (1) Portable ramp not set up properly (BOE 4103) | |
| | PS 69<br>560 Thieriot Ave | | | |
| | Comm Room<br>2050 Seward Ave | | | |
| | IS 174<br>456 White Plains Road | | (1) Signage not posted outside (BOE 3741) | |
| | Bronx CTR for Rehab<br>1010 Underhill Ave | | | |
| | Grand Manor H.R.F.<br>700 White Plains Road | | | |
| | Hostos Comm College<br>120 East 149th St. | | (1) Elevator at accessible entrance out of order (BOE 4273)<br>(2) Signage not properly posted outside (BOE 4624) | |
| | PS 73<br>1020 Anderson Ave | | | |
| | PS 11<br>1257 Ogden Ave | | (1) Signage not properly posted outside (BOE 4740) | |
| | Apartment Bldg<br>1600 Sedgwick Ave | | | |
| | PS 229 CES<br>275 Harlem Riv Pk Bridge | | | |
| | Heights Sr. Citizen Ctr<br>200 West Tremont Ave | | | |
| | Craftroom #1<br>1771 Popham Ave | | | |
| | Antonia Diaz Houses<br>1454 Shakespeare Ave | | | |
| | IS 306<br>40 West Tremont Ave | | Voting booths set up in a public hallway: "Due to | |

| | | | | | |
|---|---|---|---|---|---|
| | | | being placed in public hallway, there was a lot of traffic." (BOE 5106) | | |
| | IS 117 1865 Morris Ave | | | | |
| | PS 64 1425 Walton Ave | | | | |
| | PS 70 1691 Weeks Ave | | | | |
| | WM H Taft HS 240 East 172nd St. | | | | |
| | PS 53 – Annex 360 East 168th St. | | | | |
| | Church Hall 120 East 169th St | | | | |
| | JHS 145 1000 Teller Ave | | (1) Signage not properly posted outside (BOE 3973, 4337) | | |
| | County BLDG 851 Grand Concourse | | | | |
| | Daughters of Jacobs 1160 Teller Ave | | | | |
| | Comm Ctr 1155 University Ave | | | | |
| | Craftroom #1 1553 University Ave | | | | |
| | Dodge HS 2474 Crotona Ave | | | | |
| | PS 32 690 East 183 St | | | | |
| | JHS 45 2502 Lorillard Place | | | | |
| | PS 23 Cafeteria 2151 Washington Ave | | | | |
| | PS 85 2400 Marion Ave | | | | |
| | PS 46 279 East 196th St | | | | |
| | PS 9 3010 Briggs Ave | | (1) BMD keys never arrived and the machine wasn't in use. No remedy. | | |

| | | | Unable to reach Board of Elections. (BOE 108) | | |
|---|---|---|---|---|---|
| | Glad Tidings Assem 2 Van Cortlandt Ave E | | | | |
| | MS 80 149 E. Mosholu Pkwy | | "All outside signage" missing. (BOE 5004)  "BMD not opened – keys not located." (BOE 5006) | | |
| | PS 33 2424 Jerome Ave | | | | |
| | PS 86 2756 Reservoir Ave | | | | |
| | Fordham Hill Complex 2455 Sedgwick Ave | | | | |
| | PS 310 260 West Kingsbridge Rd | | | | |
| | MS 143 120 West 231 St | | | | |
| | Church of the Mediator 260 West 231 St | | | | |
| | Grace Dodge Vocational HS 2474 Crotona Ave | | | | |
| | Comm Room 555 Kappock St | | | | |
| | Jewish Home & Hospital 100 W. Kingsbridge Rd | | | | |
| | Comm Room 1880 Valentine ave | | | | |
| | PS 57 2111 Crotona Ave | | | | |
| | PS 92 700 East 179 St. | | | | |
| | PS 44 1825 Prospect Ave | | (1) Signage for accessible entrance not properly | | |

| | | | posted (BOE 3825) | | |
|---|---|---|---|---|---|
| | PS 4<br>1701 Fulton Ave | | | | |
| | PS 50<br>1550 VYSE Ave | | | | |
| | PS 61<br>1550 Crotona Park East | | | | |
| | PS 66<br>1001 Jennings St | | | | |
| | PS 55<br>450 St. Pauls Place | | | | |
| | PS 132<br>450 St Pauls Place | | | | |
| | PS 63<br>1260 Franklin Ave | | | | |
| | C.I.S. 148<br>3630 3 Ave | | | | |
| | Morris HS<br>100 Jackson Ave, Ent. 2 | | | | |
| | PS 120<br>890 Cauldwell Ave | | | | |
| | PS 146<br>968 Cauldwell Ave | | | | |
| | BX Regional HS<br>1010 Stebbins Ave | | | | |
| | IS 166<br>250 East 164 St | | | | |
| | Community Room<br>3131 Park Ave | | (1) Signage:<br>Directional arrows not posted outside (BOE 3871) | | |
| | Comm Room<br>595 Trinity Ave | | | | |
| | PS 130<br>750 Prospect Ave | | (1) Signage for accessible entrance not posted (BOE 4612) | | |
| | PS 29<br>758 Courtlandt Ave | | | | |
| | PS 186<br>750 Jennings St | | | | |
| | Comm Room<br>777 Concourse Village East | | (1) Signage not posted outside at first visit (BOE | | |

| | | | 3868) | | |
|---|---|---|---|---|---|
| | Lebanon Spec Care 1265 Fulton Ave | | | | |
| | Comm Center 1950 Hutchinson River Pkwy | | | | |
| | Apt House 1720 Mayflower Ave | | | | |
| | Bronx House 990 Pelham Parkway South | | | | |
| | Bronx Psych Center 1500 Waters Place | | | | |
| | PS 108 1166 Neill Ave | | (1) Signage for accessible entrance not properly posted (BOE 4126) | | |
| | PS 83 Annex 1840 Bogart Ave | | | | |
| | School Gym PS 105 725 Brady Ave | | | | |
| | PS 96 650 Waring Ave | | | | |
| | Chris Columbus HS 925 Astor Ave | | | | |
| | Carriage Room 785 Pelham Pky No | | | | |
| | PS 89 980 Mace Ave | | | | |
| | PS 97 1375 Mace Ave | | | | |
| | IS 144 2545 Gunther Ave | | | | |
| | JHS 135 2441 Wallace Ave | | | | |
| | PS 76 900 Adee Ave | | (1) Signage not properly posted outside (BOE 4451) | | |
| | Parkside Senior CT 644 Adee Ave | | | | |
| | Social Center 2968 Bronx Park Est | | | | |
| | PS 121 2750 Throop Ave | | | | |
| | Immaculate | | | | |

|   | | | | |
|---|---|---|---|---|
| | Conception<br>754 East Gun Hill Road | | | | |
| | PS 41<br>3352 Olinville Ave | | (1) Signage not properly posted outside (BOE 3857) | | |
| | St Brendans School<br>268 East 207 St | | | | |
| | PS 8<br>3010 Briggs Ave | | | | |
| | Vladeck Hall<br>74 Van Cortlandt Park South | | (1) Most signage never arrived (BOE 4171) | | |
| | Comm Room<br>40 West Mosholu Pkwy S | | | | |
| | Lobby<br>3410 Paul Ave | | | | |
| | Kingsbridge Man Hgts<br>3422 Cannon Place | | | | |
| | Beth Abraham<br>612 Allerton Ave | | | | |
| | St. Patrick's Home<br>66 Van Cortlandt Park South | | | | |
| | PS 94<br>3530 Kings College Place | | (1) Signs for Accessible entrance not properly posted (BOE 3707)<br><br>Second AD Team:<br>(2)"No signage outside." (BOE 5002) | | |
| | Comm Center<br>3450 Dekalb Ave | | | | |
| | PS 103<br>4125 Carpenter Ave | | | | |
| | PS 16<br>4550 Carpenter Ave | | (1) Accessible entrance closed, no door clerk present (BOE 4234) | | |
| | PS 19 | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | 4318 Katonah Ave | | | | |
| | Manhattan College<br>3840 Corlear Ave | | | | |
| | Fort Independence<br>Houses<br>3350 Bailey Ave | | (1) No door clerk<br>present (BOE 4220) | | |
| | Hebrew Inst of<br>Riverdale<br>3700 Henry Hudson<br>Pkwy | | | | |
| | Draddy Hall<br>4513 Manhattan<br>College Pkwy | | | | |
| | PS 81<br>5550 Riverdale Ave | | | | |
| | YM YWHA<br>5625 Arlington Ave | | | | |
| | MS/HS 141<br>660 West 237 St | | | | |
| | The Arbor<br>West 235 St &<br>Arlington Ave | | | | |
| | Auditorium<br>2995 Independence<br>Ave | | | | |
| | Basement<br>25 Knolls Crescent | | | | |
| | Mt Hebon Bap<br>Church<br>732 East 233 St | | | | |
| | Hebrew Home<br>5901 Palisade Ave | | No indication<br>signage is present<br>but note from AD<br>Monitor: "Signage<br>not needed. All we<br>on premises." (BOE<br>4958) | | |
| | St. Francis<br>Dechantal<br>190 Hollywood Ave | | | | |
| | Civic Hall<br>3300 Locust Pt Dr &<br>Tierney Pl | | | | |
| | Vol Fire House<br>Edgwater Pk | | | | |
| | PS 72<br>2951 Dewey Ave | | | | |

| | | | | |
|---|---|---|---|---|
| | Preston High School<br>2780 Schurz Ave | | | |
| | Senior Center<br>Lounge<br>2705 Schley Ave | | | |
| | IS 192<br>650 Hollywood Ave | | | |
| | PS 101<br>2750 Lafayette Ave | | | |
| | PS 14<br>3041 Bruckner<br>Boulevard | | | |
| | Presbyterian Church<br>3051 East Tremont<br>Ave | | | |
| | PS 194<br>2365 Waterbury Ave | | (1) Signage not<br>properly posted<br>outside (BOE 4483) | |
| | PS 71<br>3040 Roberts Ave | | | |
| | Hall<br>3243 Ampere Ave | | | |
| | Church Hall<br>3573 Bruckner<br>Boulevard | | | |
| | PS 175<br>200 City Island Ave | | (1)Exterior<br>accessible entrance<br>doors closed.<br>"Outer doors were<br>closed because of<br>school children."<br>(BOE 5029)<br><br>(2)Pre-cleared<br>accessible poll site<br>schematic appears<br>to not be followed:<br>"Things moved<br>around because of<br>safety for<br>children." (BOE<br>5030) | |
| | Community Center<br>#2<br>2049 Bartow Ave | | (1) Signage not<br>properly posted<br>outside (BOE 4503) | |
| | Community Center | | | |

| | | | | | |
|---|---|---|---|---|---|
| | #3<br>135 Einstein Loop | | | | |
| | Comm Cent AUD<br>177 Dreiser Loop | | | | |
| | Olivett Gospel Asbly<br>3900 Dyre Ave | | | | |
| | Holy Rosary Church<br>2950 Eastchester Road | | (1) Signage for accessible entrance not posted properly (BOE 4465) | | |
| | PS 78<br>1400 Needham Ave | | | | |
| | Apartment Building<br>3410 Dereimer Ave | | | | |
| | Community Center<br>3016 Yates Ave | | | | |
| | Comm Room<br>745 Magenta St | | | | |
| | St Luke's Church<br>777 East 222 St | | (1) Signage not posted properly outside (BOE 4457) | | |
| | PS 113<br>3710 Barnes Ave | | | | |
| | Comm Room<br>3856 Bronx Boulevard | | | | |
| | Baychester Youth Center<br>1220 East 229th St | | | | |
| | Edenwald Comm Center<br>1150 East 229 St | | | | |
| | PS 68<br>4011 Monticello Ave | | | | |
| | Boston Secor /<br>Comm Center<br>3540 Bivona St | | | | |
| | Mount St. Michael<br>4300 Murdock Ave | | (1) Signage for accessible entrance not posted properly, no directional arrows (BOE 4433) | | |
| | Laconia Nursing Home | | | | |

| | 1050 East 230 St | | | | |
|---|---|---|---|---|---|
| | Walker Memorial Church 120 East 169th St | | | | |
| | IS 183 Gymnasium 339 Morris Ave | | | | |
| | PS 154 333 East 135 St | | | | |
| | Millbrook Comm Ctr 201 St. Anns Ave | | | | |
| | PS 220 468 East 140 St | | | | |
| | Borinquen Ct. Houses 285 138 St | | | | |
| | Comm Room 375 East 143 St | | | | |
| | Comm Room 225 East 149th St | | (1) Signage for accessible entrance not posted properly (BOE 4572) | | |
| | Craftroom 277 East 153 St | | | | |
| | Carmen Parsons Sr Ctr 441 East 155th St | | | | |
| | Apt. Building 372 East 152 St | | | | |
| | Trinity Comm Ctr 595 Trinity Ave | | (1) Accessible entrance door closed, no door clerk present (BOE 4533) | | |
| | PS 1 335 East 152 St | | (1) Signage not properly posted outside (BOE 4560) | | |
| | PS 227 519 St Anns Ave | | | | |
| | Community Room 401 St Anns Ave | | | | |
| | Gilbert Ramirez Hses 455 East 138 St | | | | |
| | PS 65 677 E 141 St | | | | |

| | PS 5 564 Jackson Ave | | | | |
|---|---|---|---|---|---|
| | S Gompers HS 455 Southern Boulevard | | | | |
| | Maria Isabel Housing 787 East 149 St | | | | |
| | PS 62 660 Fox Street | | | | |
| | PS 48 1290 Spofford Ave | | | | |
| | IS 183 / MS 203 339 Morris Ave | | | | |
| | Harding Pk Comm Ctr 1820 Harding Park | | | | |
| | PS 107 1695 Seward Ave | | | | |
| | Comm Center 1000 Rosedale Ave | | | | |
| | PS 77 1250 Ward Ave | | | | |
| | PS 152 1007 Evergreen Ave | | | | |
| | PS 123 1025 Morrison Ave | | | | |
| | PS 93 1535 Story Ave | | | | |
| | PS 150 920 East 167 Street | | | | |
| | PS 75 984 Faile Street | | | | |
| | IS 116 977 Fox Street | | | | |
| | PS 60 888 Stebbins Ave | | | | |
| | IS 74 730 Bryant Ave | | (1) AD Comment "room is too far from entrance, and too small!" (BOE 1400) (2)Second AD Monitoring Team: 5:40 pm "The old ramp (handicap) | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | was not used. New ramp was harder to use and was a larger distance to travel." (BOE 2742)<br><br>Exterior doors not easily opened frm the outside and no door clerk present. "Used front walkway and rap. Door locked at old ramp." *Id.* | | |
| | PS 109<br>1771 Popham Ave | | | | |
| | PS 26<br>1930 Andrews Ave | | | | |
| | Sr Citizen HSE<br>228 West Tremont Ave | | | | |
| | PS 15<br>2195 Andrews Ave | | | | |
| | IS 206<br>2280 Aqueduct Ave | | | | |
| | PS 91<br>2200 Aqueduct Ave | | | | |
| | PS 79<br>125 East 181 St | | (1) No Signage posted outside (BOE 4421) | | |
| | Apt House<br>230 East 179 St | | | | |
| | PS 163<br>2075 Webster Ave | | (1) No signage posted outside (BOE 4389) | | |
| | PS 28<br>1861 Anthony Ave | | (1)Handicap sign missing. (BOE 720) | | |
| Brooklyn | ██████████████████████████████████████ | | | | |
| | PS 631<br>76 Riverdale Ave | | | | |
| | PS 184<br>273 Newport Street | | | | |
| | PS 328<br>330 Alabama Ave | | | | |
| | NYCHA Comm | | | | |

| | Center<br>576 Blake Ave | | | | |
| | PS 149<br>700 Sutter Ave | | (1)Ramp not set up properly (BOE 1039) | | |
| | PS 13<br>557 Pennsylvania Ave | | | | |
| | PS 158<br>400 Ashford Street | | | | |
| | PS 72<br>605 Shepherd Ave | | | | |
| | Ps 159<br>2781 Pitkin Ave | | | | |
| | Manta Rosa Sports Club<br>3386 Atlantic Ave | | | | |
| | PS 218 IS<br>370 Fountain Ave | | | | |
| | Linden PLZ Assoc<br>735 Lincoln Ave | | | | |
| | Linden Plaza Building<br>675 Lincoln Ave | | | | |
| | Apartment Building<br>760 Eldert Lane | | | | |
| | PS 190<br>590 Sheffield Ave | | | | |
| | PS 202<br>Hegeman Ave | | | | |
| | PS 260<br>875 Williams Ave | | | | |
| | PS 213 Mini School<br>1965 Linden Boulevard | | | | |
| | PS 36<br>2045 Linden Boulevard | | | | |
| | L.H. Pink C.C.<br>2702 Linden Boulevard | | | | |
| | PS 224<br>755 Wortman Ave | | | | |
| | Bldg 13<br>12399 Flatlands Ave | | | | |
| | PS 273<br>923 Jerome St | | | | |

| | Blvd Comm Ctr<br>726 Stanley Ave | | | | |
|---|---|---|---|---|---|
| | PS 306<br>970 Vermont St | | 1)Ramp not set up properly and problem was not corrected<br><br>2) Not compliant with pre-cleared accessible schematic. "Principal moved schematics". (BOE 1057) | | |
| | Bldg 8<br>200 Cozine Ave | | | | |
| | PS 279<br>1070 East 104 St | | | | |
| | Breukelen's Project<br>715 East 105 Street | | | | |
| | Vandalia Ctr<br>47 Vandalia Ave | | | | |
| | PS 346<br>1400 Pennsylvania Ave | | | | |
| | IS 364 Annex<br>1461 Geneva Loop | | | | |
| | IS 364<br>1426 Freeport Loop | | | | |
| | Ruby Weston Manor<br>2237 Linden Bvd | | (1)Missing BMD Pedal and headphones (BOE 1022) | | |
| | Bklyn United Methodist<br>1485 Dumont Ave | | | | |
| | Adult Home<br>2830 Pitkin Ave | | | | |
| | Tilden HS<br>5800 Tilden Ave | | | | |
| | PS 251<br>1037 East 54 St | | | | |
| | PS 208<br>4801 Avenue D | | | | |
| | PS 68 JHS<br>956 East 82 Street | | (1) Directional signage to accessible entrance | | |

| | | | | | |
|---|---|---|---|---|---|
| , | | | missing, not rectified. (BOE 373) | | |
| | Basement 5816 Farragut Road | | | | |
| | PS 203 5101 Avenue M | | | | |
| | IS 395 / PS 109 10001 East 54 Street | | (1) AD Comment "BMD was broken. Was tried to be fixed. Couldn't or wasn't." (BOE 369) | | |
| | Howard Apartments 1655 Flatbush Ave | | | | |
| | PS 119 3829 Avenue K | | | | |
| | Early Childhood Ctr 3920 Flatlands Ave | | | | |
| | PS 193 2515 Avenue L | | | | |
| | PS 197 1599 East 22 Street | | (1) No signage posted outside (AD Monitors had to do it)<br><br>(2) Ramp not properly set up.<br><br>(3) No door clerk (BOE 535-536) | | |
| | J Madison HS 3787 Bedford Ave | | (1) "Due to construction, 2nd floor doorways too narrow for wheelchairs – they have to take a complicate route between several rooms." (BOE 356) | | |
| | Kings Bay YM-YWHA 3495 Nostrand Ave | | | | |
| | PS 206 2200 Gravesend Neck Road | | | | |
| | PS 277 2529 Gerritsen Ave | | | | |
| | PS 194 3093 Avenue W | | | | |

| | | | | | |
|---|---|---|---|---|---|
| , | IS 14<br>2424 Batchelder Street | | (1) BMD broken (missing parts). No indication it was fixed.  (BOE 387) | | |
| | PS 286<br>2525 Haring Street | | | | |
| | PS 52<br>2675 East 29 Street | | | | |
| | Crown NH<br>2457 Nostrand Ave | | (1) BMD became jammed and continued to have problems. (BOE 384) | | |
| | Apt Hse Lobby<br>1641 Ocean Ave | | | | |
| | Ed R Murrow HS<br>1600 Avenue L | | | | |
| | Midwood Branch Library<br>975 East 16th Street | | | | |
| | Plaza Comm Rm<br>920 East 17 Street | | 1) Not compliant with pre-cleared accessible schematic. "Floor plan for this site is incorrect. Cannot set up as indicated. Water (some sort of leakage) on the floor, dripping, by accessibility entrance."<br><br>2)"Accessibility entrance: must go over speed bump, raised portion of sidewalk, downward slope" (BOE 1269) | | |
| | PS 152 / PS 315<br>725 East 23 Street | | | | |
| | Marlborough Grdns<br>386 Marlborough Rd | | | | |
| | PS 139<br>330 Rugby Road | | (1)AD Comment: "Site is definitely | | |

|  |  |  | not in compliance with regulations consistent with HAVA. Voters are walking from stage (sign up) up a hill/ aisle to privacy booths. After marking ballot, back down to vote on scanner. After voting, back up hill/ aisle to exit (BOE 1124) |  |  |
|--|--|--|--|--|--|
|  | PS 6<br>43 Snyder Ave |  | (1)BMD machine out of order as of 540 pm. Would not power up. (BOE 1173) |  |  |
|  | PS 249<br>18 Marlborough Road |  |  |  |  |
|  | PS 269<br>1957 Nostrand Ave |  |  |  |  |
|  | PS 181<br>1023 New York Ave |  | (1)Keys for BMD not delivered. Open as of 4:50pm (BOE 1176) |  |  |
|  | IS 246<br>72 Veronica Place |  |  |  |  |
|  | Stuy-Park Houses<br>77 New York Ave |  |  |  |  |
|  | Friends of Crown Hts<br>671 Prospect Place |  |  |  |  |
|  | PS 289<br>900 St Marks Ave |  |  |  |  |
|  | PS 138<br>760 Prospect Place |  |  |  |  |
|  | Crown Heights Apts<br>1055 St Johns Place |  |  |  |  |
|  | David Chavis Apts<br>230 Kingston Ave |  |  |  |  |
|  | Crown Grdns Comm Ctr<br>1185 Carrol Street |  |  |  |  |
|  | PS 161 |  |  |  |  |

| | | | | |
|---|---|---|---|---|
| | 330 Crown Street | | | |
| | St Marks Day School 1346 President Street | | | |
| | PS 167 1025 Eastern Parkway | | | |
| | PS 91 532 Albany Ave | | | |
| | PS 221 Mini School 900 Montgomery Street | | | |
| | PS 61 IS 400 Empire Boulevard | | | |
| | Reid Comm Rm 728 East New York Ave | | | |
| | Silver Hses 810 Midwood Street | | (1)Not visited (no time noted and no survey boxes checked) (BOE 499) | |
| | PS 397 490 Fenimore Street | | | |
| | PS 235 525 Lenox Road | | | |
| | PS 135 684 Linden Boulevard | | (1)"Wheel chair ramp is being assembled at 10:30am" (BOE 1164) | |
| | God's Battalion CH 661 Linden Boulevard | | | |
| | PS 92 601 Parkside Ave | | | |
| | Middle School 2 655 Parkside Ave | | | |
| | Dr. Susan McKinney 594 Albany Ave | | | |
| | John Jay HS 237 7 Ave | | (1) Not compliant with pre-cleared accessible schematic. AD Comment is that Poll workers set up | |

| | | | | | |
|---|---|---|---|---|---|
| | | | poll room as they saw fit because the floor plan didn't work for the space provided. (BOE 90)<br><br>(2)Later: AD Commented with regard to persons who are handicapped "Need more door clerks because poll site room was moved to the 1st floor." (BOE 1114) | | |
| | MS 51<br>350 5 Ave | | (1) BMD keys did not arrive until 8:30am. (BOE 105) | | |
| | Hall<br>339 8 Street | | (1)Ramp is missing hand rails.<br><br>(2)BMD keys not delivered (BOE 1108) | | |
| | PS 107<br>1301 8 Ave | | | | |
| | Park Slope YMCA<br>361 15 Street | | | | |
| | Bishop Boardman Apartments<br>1615 8 Ave | | | | |
| | PS 10<br>511 7 Ave | | (1)Ramp not set up properly (BOE 1117) | | |
| | IS 88<br>544 7 Ave | | (1) Wrong key for BMD. Problem not remedied until 2pm.<br>(2) No evidence of properly posted directional signs to accessible polling place entrance. (BOE 07-08 and | | |

|  |  |  | BOE 102) |  |  |
|---|---|---|---|---|---|
|  | PS 154<br>1625 11 Ave |  | (1)Door clerk walked out at 9am (BOE 1111) |  |  |
|  | Rose Gardens Assoc<br>829 Greenwood Ave |  |  |  |  |
|  | PS 130<br>70 Ocean Parkway |  | (1)AD Comments: "Need more wheelchair signs"<br><br>(2)"BMD machine non-functional"<br><br>(BOE 1131-1133) |  |  |
|  | PS 230<br>1 Albemarle Road |  | (1)AD Comment: "Accessible entrance is FAR from poll site"<br><br>(2)Accessible entrance interior doors are obstructed.<br><br>(BOE 1129) |  |  |
|  | PS 164<br>4211 14 Ave |  |  |  |  |
|  | PS 131<br>4305 Ft Hamilton Parkway |  |  |  |  |
|  | PS 179<br>480 East 3rd Street |  | (1)"This site needs more wheelchair signs" (BOE 1137) |  |  |
|  | PS 62 JHS<br>700 Cortelyou Road |  | (1)No door clerk. (1126) |  |  |
|  | Marien Heim Ctr<br>870 Ocean Parkway |  |  |  |  |
|  | Agudath Sr Ctr<br>817 Ave H |  | (1)Exterior accessible entrance closed, not easily opened from outside.<br><br>(2)Interior doors obstructed (BOE |  |  |

| | | | | | |
|---|---|---|---|---|---|
| | | | 1151) | | |
| | PS 217<br>1100 Newkirk Ave | | | | |
| | PS 99<br>1120 East 10 Street | | | | |
| | Cortelyou Br Library<br>1305 Cortelyou Road | | | | |
| | JHS 62<br>700 Cortelyou Road | | | | |
| | Palm Gardens<br>615 Ave C | | | | |
| | PS 195<br>131 Irwin Street | | | | |
| | Bay Academy – IS 98<br>1401 Emmons Ave | | | | |
| | JASA Comm Ctr<br>161 Corbin Place | | | | |
| | Rec Room<br>1311 Brightwater Ave | | (1)No signs at the alternate accessible entrance. (BOE 520) | | |
| | PS 209<br>2609 East 7 Street | | | | |
| | St Marks School<br>2602 East 19 Street | | | | |
| | PS 254<br>1801 Ave Y | | (1)No Key for the BMD. Two telephone calls made. No indication of remedy. (BOE 564) | | |
| | PS 216<br>350 Ave X | | | | |
| | PS 153<br>1970 Homecrest Ave | | (1)"There was not enough room for all of the privacy booths and very little room for anything else." (BOE 555) | | |
| | PS 234 IS<br>1875 East 17 Street | | | | |
| | Sephardic Comm Ctr<br>1901 Ocean | | | | |

| | | | | |
|---|---|---|---|---|
| | Parkway | | | |
| | PS 238<br>1633 East 8 Street | | | |
| | St Brendans House<br>1215 Avenue O | | (1)BMD not functional. (BOE 546) | |
| | PS 177<br>346 Avenue P | | (1) Not visited except to drop off closing materials, not surveyed during election day. (BOE 214) | |
| | PS 185<br>8601 Ridge Boulevard | | (1) AD Comment "Entrance is through lunch room and aisle may be too narrow for wheelchair." (BOE 329) | |
| | PS 104<br>9115 5 Ave | | (1) No door clerk.<br><br>(2) AD comment: "Space too small." (BOE 341-342) | |
| | Apt House<br>28 Marine Ave | | (1) Signage not properly posted outside main entrance.<br><br>(2) Accessible entrance doors closed.<br><br>(3) No door clerk present. AD Comment: "A door clerk would help" (BOE 334-335) | |
| | Apt House<br>9000 Shore Road | | | |
| | St John's Ch & Sr Ctr<br>461 99 Street | | (1) No door clerk. (BOE 338) | |
| | Downstate SUNY Med Ctr<br>691 92 Street | | | |
| | Our Savior's Church | | (1) No door clerk at | |

| | | | | |
|---|---|---|---|---|
| ` | 414 80 Street | | alternative accessible entrance. (BOE 413) | | |
| | PS 201 JHS 8010 12 Ave | | | | |
| | PS 204 8101 15 Ave | | (1) AD Comment "This site needs more handicap signs due to an inconvenient handicap accessible location. (at least 8 requested in AM)." (BOE 145) <br><br> (2) Later in the day: No sign for alternative accessible entrance. AD Comment "Not enough signs." <br><br> (3) AD comment "2 people wheel away." (BOE 322) | | |
| | PS 229 1400 Benson Ave | | | | |
| | Co-Op 2475 West 16 Street | | | | |
| | Marlboro Comm Ctr 2298 West 8 Street | | | | |
| | Youth Center 2735 Harway Ave | | (1) No door clerk at this site. (BOE 182) | | |
| | Co-Op Bldg 5C 545 Neptune Ave | | | | |
| | Co-Op 2770 West 5 Street | | | | |
| | Co-Op 425 Neptune Ave | | | | |
| | W Grady Voc HS 25 Brighton 4 Road | | | | |
| | YWHA | | | | |

| | | | | |
|---|---|---|---|---|
| | 3300 Coney Island Ave | | | | |
| | Brightwater Comm Rm 501A Surf Ave | | | | |
| | Trump Village Bldg 2 3000 Ocean Parkway | | (1) AD Comment "Accessible ramp/ entrance is through the tenant area and a key is needed for the door."<br><br>(2) "There were not enough poll workers for a door clerk."<br><br>(3) No sign marking the alternative handicapped entrance or the directions to the alternative accessible entrance. (BOE 259-260) | | |
| | Co-Op 458 Neptune Ave | | | | |
| | Co-Op 2935 West 5 Street | | | | |
| | Co-Op 444 Neptune Ave | | | | |
| | Trump Village Bldg 1 2940 Ocean Parkway | | | | |
| | Co-Op 2820 Ocean Parkway | | | | |
| | Co-Op 2785 West 5 Street | | (1) AD Comment "Room too cluttered for a wheelchair."<br><br>(2) "Every year the inspectors and voters complain about the therapy | | |

Case 1:10-cv-05655-DAB-HBP Document 116 Filed 08/30/12 Page 99 of 348

| | | | | | |
|---|---|---|---|---|---|
| | | | room. It is never emptied out and the space inappropriate for its use!" (BOE 308) | | |
| | Co-Op Bldg 7<br>2942 West 5 Street | | | | |
| | Co-Op<br>2928 West 5 Street | | | | |
| | PS 90<br>2840 West 12 Street | | | | |
| | Liberation High School<br>2865 West 19 Street | | | | |
| | PS 288<br>2950 West 25 Street | | | | |
| | Haber House<br>3024 West 24 Street | | | | |
| | PS 329<br>2929 West 30 Street | | | | |
| | Comm Rm Bld #2<br>3030 Surf Ave | | (1) No door clerk. (BOE 266) | | |
| | NYCHA Project<br>2945 West 33 Street | | | | |
| | Chapel<br>3715 Surf Ave | | | | |
| | Sea Rise Apts<br>2750 West 33 Street | | (1) No signage posted, or delivered.<br><br>(2) No BMD delivered in the morning.<br><br>(3) No record of either issue being fixed. (BOE 277) | | |
| | PS 95<br>345 van Sicklen Street | | | | |
| | Shore View NH<br>2865 Brighton 3 St | | | | |
| | Youth Ctr<br>2735 Harway Ave | | | | |
| | Contello Towers #2<br>2740 Cropsey Ave | | (1) AD Comment "Door clerk needed | | |

| | | | | | |
|---|---|---|---|---|---|
| ` | | | for accessible entrance doors." (BOE 188). | | |
| | Bldg 1 Comm Rm 2630 Cropsey Ave | | | | |
| | Regina Pacis 2424 Cropsey Ave | | | | |
| | PS 97 1855 Stillwell Ave | | | | |
| | Beach Haven Ctr 675 Ave Z | | (1) "No door clerk assigned" (BOE 194) | | |
| | IS 228 228 Ave S & W 4 St | | (1) Accessible entrance signs not properly posted.<br><br>(2) AD Comment "Handicapped entrance not changed – requires an elevator."<br><br>(3) No Door clerk at accessible entrance.<br><br>(4) Accessible entrance appears shut for some of the day from AD Comment: "Door clerk cannot be at place assigned during recess when children are in the school yard. Must go back to original space. This doesn't work." (BOE 223-225) | | |
| | PS 281 JHS 8787 24 Ave | | | | |
| | Apt Bldg 8869 20 Ave | | (1) AD Comment "Dark, dingy, inadequate lighting, and | | |

| | | | | | |
|---|---|---|---|---|---|
| ' | | | bathrooms unsanitary – voting area confined, pipes exposed." (2) Key for BMD machine missing. (BOE 197) | | |
| | IS 281 8787 24 Ave | | | | |
| | PS 128 8310 21 Ave | | | | |
| | PS 682 50 Ave P | | | | |
| | PS 247 7000 21 Ave | | | | |
| | IS 96 99 Ave P | | (1)Only visited to drop off closing materials, not surveyed during election day. (BOE 229) | | |
| | PS 205 6701 20 Ave | | | | |
| | PS 226 6006 23 Ave | | (1)Only visited except to drop off closing materials, not surveyed during election day. (BOE 217) | | |
| | PS 121 5301 20 Ave | | | | |
| | Haym Salomon Home 2340 Cropsey Ave | | (1) Signage was not properly posted outside. AD monitor reported they were not able to locate a sign to post outside. (2) No directional arrows to the accessible entrance. (3) No signs | | |

| | | | | | |
|---|---|---|---|---|---|
| `` | | | posted.<br><br>(4) No door clerk. (BOE 211) | | |
| | Friends Field<br>1310 East 4 Street | | | | |
| | PS 192<br>4715 18 Ave | | | | |
| | PS 223 IS<br>4200 16 Ave | | | | |
| | PS 180<br>5601 16 Ave | | | | |
| | PS 105<br>1031 59 Street | | | | |
| | PS 160<br>5105 Ft Hamilton Parkway | | | | |
| | PS 220 JHS<br>4812 9 Ave | | | | |
| | PS 176<br>1225 Bay Ridge Ave | | | | |
| | IS 259<br>7301 Ft Hamilton Parkway | | 1)Signage not posted outside "Wind blew off"<br><br>2)Signage marking accessible entrance inadequate<br><br>3)Directional signage to accessible entrance inadequate<br><br>AD Comment: "People little lazy about making sure sing don't fly away"<br><br>4) Not compliant with pre-cleared accessible schematic. "School used space for their own use, set up chairs where | | |

| | | | | | |
|---|---|---|---|---|---|
| ， | | | there were supposed to be privacy booths." (BOE 957 – 958) | | |
| | PS 127 7805 7 Ave | | | | |
| | PS 69 6302 9 Ave | | (1)"Door person Marie Laurusso is unable to properly do her job." (BOE 962) | | |
| | St Agatha 736 48 Street | | | | |
| | PS 170 7109 6 Ave | | (1) Not compliant with pre-cleared accessible schematic. "Site was not according to schematic. . . . Site seemed too crowded and confusing" (BOE 483) | | |
| | PS 506 / 503 / 314 343 60 Street | | (1) Handicapped signage missing. (BOE 49) | | |
| | Telecommunications HS 350 67 Street | | | | |
| | IS 187 1171 65 Street | | | | |
| | PS/IS 180 5601 16 Ave | | | | |
| | PS 227 JHS 6500 16 Ave | | (1) AD Comment "The set-up could be a problem for a handicap person.  If elevator is not working they cannot vote in basement" (BOE 165) | | |
| | PS 163 1664 Benson Ave | | | | |
| | New Utrecht HS 1601 80 Street | | (1) Not compliant with pre-cleared accessible | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | schematic: AD Comment "I was informed that the poll site location was wrong and the school hasn't complied for the last 15 years. The lobby is no place for the poll site." (BOE 138) | | |
| | PS 186<br>7601 19 Ave | | | | |
| | PS 48<br>6015 18 Ave | | | | |
| | PS 200<br>1940 Benson Ave | | | | |
| | Kingsview Comm Hall<br>130 St Edwards Street | | | | |
| | PS 46<br>100 Clermont Ave | | (1)Ramp not set up properly. AD Comment: "Ramp has not hand rails then steep incline inside building and raised section between two sections" (BOE 931) | | |
| | PS 20<br>225 Adelphi Street | | (1)"Main entrance has broken asphalt and steep slope before you reach the ramp" (BOE 928) | | |
| | PS 67<br>51 St Edwards Street | | 1) "Ramp has no hand rails. Very difficult to locate around building. Ramp location needs improvement at this school"<br><br>2) "Ramp for | | |

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  | handicapped not marked well enough with signs" (BOE 934) |  |
|  | PS 270<br>241 Emerson Pl |  |  |  |
|  | PS 157<br>850 Kent Ave |  |  |  |
|  | PS 380<br>370 Marcy Ave |  | (1)AD Comment "Site too small for not only public but poll workers as well" (BOE 920) |  |
|  | PS 307<br>209 York Street |  |  |  |
|  | IS 71<br>215 Heyward Street |  |  |  |
|  | PS 16<br>157 Wilson Street |  |  |  |
|  | Towers Sr Ctr<br>114 Taylor Street |  |  |  |
|  | Williams Ctr<br>323 Roebling Street |  |  |  |
|  | PS 250<br>108 Montrose Ave |  |  |  |
|  | PS 19<br>325 South 3 Street |  |  |  |
|  | Village Comm Room<br>60 Division Ave |  | (1)No door clerk. (BOE 910) |  |
|  | JHS 50<br>183 South 3 Street |  |  |  |
|  | PS 84<br>250 Berry Street |  | (1)No door clerk (BOE 904) |  |
|  | PS 17<br>208 North 5 Street |  |  |  |
|  | JHS 126<br>424 Leonard Street |  |  |  |
|  | McGuiness Sr Ctr<br>715 Leonard Street |  |  |  |
|  | PS 34<br>131 Norman Ave |  |  |  |
|  | PS 132<br>320 Manhattan Ave |  |  |  |
|  | St Francis Ch Hall<br>213 Woodpoint Road |  |  |  |

| | | | | |
|---|---|---|---|---|
| | St Cecelia<br>24 North Henry Street | | | | |
| | PS 110<br>124 Monitor Street | | | | |
| | Dupont Sr Hses<br>80 Dupont Street | | (1)Missing all BMD supplies (BOE 947) | | |
| | PS 15 New<br>71 Sullivan Street | | | | |
| | PS 27<br>27 Huntington Street | | (1) No hand rail on ramp.<br><br>(2) AD Comment: "Portable ramp was flimsy" . . . and "is not safe, too light, and should be replaced."<br><br>(3) No indication either problem was corrected (BOE 20-21) | | |
| | PS 142 JHS<br>610 Henry Street | | (1) No signage because signage not in the supply cart.<br><br>(2) No handicapped signage at the accessible entrance.<br><br>(3) No directional arrow signage.<br><br>(4) Signage problems couldn't be corrected.<br><br>(5) No door clerk for accessible entrance. (BOE 112) | | |
| | PS 172<br>825 4 Ave | | | | |
| | PS 24 | | | | |

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. Case 1:10-cv-05093-DAB-RBP Document 119 Filed 10/16/12 Page 107 of 348

INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

| | | | | |
|---|---|---|---|---|
| | 427 39 Street | | | |
| | PS 136 JHS<br>4004 4 Ave | | | |
| | PS 1<br>309 47 Street | | | |
| | PS 169<br>4305 7 Ave | | | |
| | West End Gardens<br>1006 44 Street | | | |
| | PS 94<br>5010 6 Ave | | | |
| | PS 971<br>6214 4 Ave | | | |
| | PS 314 / 503 / 506<br>343 60 Street | | | |
| | PS 58<br>330 Smith Street | | | |
| | PS 321<br>180 7 Ave | | (1) Site not compliant with pre-cleared accessible schematic. "Principal refused to let the coordinator set up at the designated site and moved the site from the gym to the auditorium." (BOE 99) | |
| | PS 282<br>180 6 Ave | | | |
| | PS 9 New<br>80 Underhilll Ave | | | |
| | Bethel Baptist Ch<br>265 Bergen Street | | (1)"Missing BMD book (not received)" (BOE 644) | | landing at top of the ramp blocked by placement of table – interfears with ability to turn (photo)<br><br>2 leaf innter door only one leaf open (opening |

| | | | | | |
|---|---|---|---|---|---|
| ` | | | | | 27"). Area at top of interior ramp has tiles removed (?) BMD set up against wall facing out (no privacy). No chain provided for measuring. |
| | Wyckoff Comm Ctr 280 Wyckoff Street | | | | |
| | PS 38 450 Pacific Street | | (1) No handicap signage at entrance. (2) No directional signage to the accessible entrance. (3) Not able to locate signage and rectify problem. No other indication problem was corrected. (BOE 79) | | |
| | PS 261 314 Pacific Street | | (1) Interior doors closed and/or obstructed. (BOE 77) | | |
| | Global Studies 284 Baltic Street | | | | |
| | PS 29 425 Henry Street | | AD Monitor Comments: (1) Accessible entrance door bell not working. (2) No door clerk at accessible entrance. | | |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  |  | (3) Accessible door closed/ Custodian keeps closing door.<br><br>(4) Portable ramp not set up properly." (BOE 130-132) |  |  |
|  | Bklyn Borough Hall 209 Joralemon Street |  | (1) Key for BMD missing. (BOE 120) |  |  |
|  | St Ann's & Holy Trinity 157 Montague Street |  | (1) No door clerk at accessible entrance. (BOE 134) |  |  |
|  | Cong Mt Sinai 250 Cadman Plaza West |  |  |  |  |
|  | Cadman Towers 101 Clark Street |  |  |  |  |
|  | First Unitarian Ch 119A Pierrepont Street |  |  |  |  |
|  | Cadman Plaza North 140 Cadman Plaza West |  |  |  |  |
|  | St James Pavilion 240 Jay Street |  | (1)"BMD missing foot pedal, head phones – everything in package voters sign . . . BMD light out." (638) |  |  |
|  | PS 32 317 Hoyt Street |  | (1) Ramp not set up properly. (BOE 74) |  |  |
|  | IS 291 231 Palmetto Street |  |  |  |  |
|  | Cooper Ctr 76 Kingsland Ave |  |  |  |  |
|  | Hope Gardens 195 Linden Street |  |  |  |  |
|  | Vetro Apts Ten Assoc 320 Devoe Street |  |  |  |  |
|  | Noll St Apts |  |  |  |  |

| | | | | |
|---|---|---|---|---|
| | 43 Central Ave | | | |
| | Swinging 60's Sr Ctr<br>211 Ainslie Street | | | |
| | JASA Senior Center<br>202 Graham Ave | | | |
| | Jennings Hall Sen Ctr<br>260 Powers Street | | | |
| | IS 50 JHS<br>183 South 3 Street | | | |
| | PS 18<br>101 Maujer Street | | | |
| | PS 196<br>207 Bushwick Ave | | | |
| | PS 257<br>60 Cook Street | | | |
| | Bushwick /Hylan Ctr<br>50 Humboldt Street | | | |
| | IS 162<br>1390 Willoughby Ave | | | |
| | IS 33<br>70 Tompkins Ave | | 1) Ramp not set up properly.<br><br>2) Not compliant with pre-cleared accessible schematic. "Principal moved polling site to auditorium stage" (BOE 853-854) | |
| | Rheingold Gardens<br>555 Bushwick Ave | | | |
| | Evergreen Troutman<br>78 Troutman Street | | | |
| | Penny Yates Apts<br>63 Central Ave | | | |
| | RBSCC Sr Ctr<br>143 Himrod Street | | | |
| | Plaza Senior Center<br>297 Wilson Ave | | | |
| | Ridgewood Sr Ctr<br>319 Stanhope Street | | | |
| | Sister Lucian Sr Housing<br>415 Bleeker Street | | (1)No door clerk (BOE 1325) | |

| | | | | | |
|---|---|---|---|---|---|
| | Buena Vida Residence 48 Cedar Street | | | | |
| | PS 120 18 Beaver Street | | | | |
| | PS 23 545 Willoughby Ave | | | | |
| | PS 59 211 Throop Ave | | | | |
| | PS 256 114 Kosciusko Street | | 1) "Need more Handicap Missing" "Missing most of the signs" 2) Signs not properly posted at exterior.  (BOE 681) | | |
| | PS 304 280 Hart Street | | | | |
| | PS 274 800 Bushwick Ave | | | | |
| | PS 81 990 De Kalb Ave | | (1)Insufficient accessibility signage. AD Comment: "Inspectors didn't realize that more signs should have been hung." (BOE 840) | | |
| | PS 26 New 1014 Lafayette Ave | | | | |
| | PS 299 88 Woodbine Street | | (1)Ramp at accessible entrance not set up properly. No indication it was fixed. (2) Not compliant with pre-cleared accessible schematic. "Set up had to be | | |

| | | | | | |
|---|---|---|---|---|---|
| ` | | | reconfigured for smaller available space" (BOE 844-845) | | |
| | PS 377 200 Woodbine Street | | | | |
| | PS 296 JHS 125 Covert Street | | (1)Handicap signage missing. (BOE 819) | | |
| | PS 151 763 Knickerbocker Ave | | | | |
| | PS 384 242 Cooper Street | | | | |
| | St Thomas Sr Ctr 725 Evergreen Ave | | | | |
| | PS 73 241 MacDougal Street | | (1)AD Comment: "The space for the poll workers and the public is too small. The lighting is terrible. It is dark even in the day light."(BOE 797) | | |
| | PS 290 135 Schenck Ave | | | | |
| | PS 108 200 Linwood Street | | (1)No door clerk (BOE 835) | | |
| | IS 302 332 Linwood Street | | | | |
| | PS 65 700 Jamaica Ave | | | | |
| | Cypress Hill Sr Center 3208 Fulton Street | | | | |
| | PS 345 111 Berriman Street | | | | |
| | IS 171 528 Ridgewood Ave | | | | |
| | Transit Tech HS 1 Wells Street | | | | |
| | PS 59 211 Throop Ave | | (1) Ramp has no hand rails AD Comment re hand | | |

| | | | | | |
|---|---|---|---|---|---|
| ‚ | | | rails is "none for 5 years." (BOE 847) | | |
| | PS 5 New 820 Hancock Street | | | | |
| | PS 21 180 Chauncey Street | | | | |
| | PS 137 121 Saratoga Ave | | (1) Handicap sign improperly placed. (BOE 759) | | |
| | Senior Citizen Center 930 Halsey Street | | | | |
| | Ocean Hill Comm Ctr 305 MacDougal Street | | | | |
| | PS 28 1001 Herkimer Street | | | | |
| | PS 155 1355 Herkimer Street | | | | |
| | PS 178 2163 Dean Street | | (1) "Door to wheelchair entrance still locked. Was contacted by custodian." (8:15am) (BOE 770) | | |
| | Atlantic Towers 216 Rockaway Ave | | | | |
| | Wayside Comm Ctr 1630 St Marks Ave | | | | |
| | PS 332 51 Christopher Ave | | (1) No indication it was visited (blank evaluation sheet) (BOE 738) | | |
| | WM Maxwell HS 145 Pennsylvania Ave | | (1) No indication it was visited (blank evaluation sheet) (BOE 747) | | |
| | Mr. Lucky's 533 Liberty Ave | | | | |
| | PS 292 300 Wyona Street | | (1)No indication it was visited (blank evaluation sheet) | | |

|  |  |  | (BOE 750) |  |  |
|---|---|---|---|---|---|
|  | PS 298<br>85 Watkins Street |  | (1)No indication it was visited (blank evaluation sheet) (BOE 741) |  |  |
|  | Hugh Gilroy Sr Ctr<br>447 Kingsborough 4 Walk |  |  |  |  |
|  | PS 335<br>130 Rochester Ave |  |  |  |  |
|  | Albany Center<br>164 Troy Ave |  |  |  |  |
|  | MS 394<br>188 Rochester Ave |  |  |  |  |
|  | PS/IS 156<br>104 Sutter Ave |  |  |  |  |
|  | PS 327<br>111 Bristol Street |  |  |  |  |
|  | PS 189<br>1100 East New York Ave |  |  |  |  |
|  | Elliot Graham Houses<br>663 Howard Ave |  |  |  |  |
|  | PS 323<br>210 Chester Street |  | (1)Ramp not set up properly.  (BOE 808) |  |  |
|  | PS 150<br>364 Sackman Street |  | (1)No indication it was visited (blank evaluation sheet) (BOE 753) |  |  |
|  | PS 252 JHS<br>1064 Lenox Road |  | (1)Not compliant with pre-cleared accessible schematic. "The play room floor was still wet from being waxed so all poll equipment and personnel was moved to the auditorium" (BOE 1377) |  |  |
|  | Sr Citizens Club<br>430 Dumont Ave |  | (1)No indication it was visited (blank evaluation sheet) (BOE 732) |  |  |

| | | | | |
|---|---|---|---|---|
| | MS 334 / MS 354<br>1224 Park Place | | | | |
| | Senior Center<br>196 Albany Ave | | | | |
| | PS 243<br>1580 Dean Street | | (1)"Missing supply bag for BMD & Handicap supplies" (BOE 731) | | |
| | PS 93<br>31 New York Ave | | | | |
| | Stuy-Park Houses<br>77 New York Ave | | | | |
| | PS 54 New<br>195 Sandford Street | | | | |
| | PS 258 JHS<br>141 Macon Street | | | | |
| | Risley Dent Apts<br>1595 Fulton Street | | | | |
| | PS 262<br>500 Macon Street | | (1) Missing supplies for BMD including gloves, headset, paddle. (BOE 725) | | |
| | Old Boys High School<br>832 Marcy Ave | | | | |
| | PS 305<br>344 Monroe Street | | | | |
| | PS 44<br>432 Monroe Street | | (1)BMD does not have headphones. (BOE 662) | | |
| | PS 308<br>616 Quincy Street | | | | |
| | Stuyvesant Grdns II<br>150 Malcolm X Blvd | | | | |
| | PS 309<br>794 Monroe Street | | | | |
| | Goodwin Sr Ctr<br>55 Goodwin Place | | 1) Signs not properly posted<br><br>AD Comment: "What outside signage was missing? *Everything*."<br><br>2) No directional arrows to | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | alternative accessible entrance.<br><br>3) No signs posted at accessible entrance.<br>4) No BMD.<br>(BOE 684) | | |
| | Cornerstone Sr Housing<br>550 Greene Ave | | 1) Signage not properly posted outside.<br><br>2) Signage for accessible entrance not properly posted.<br><br>3) Directional signage to the accessible entrance not posted.<br><br>4) Alternate entrance signs not filled out.<br><br>5) Accessible door closed.<br><br>6) No door clerk<br><br>(BOE 654-655) | | |
| | PS 25<br>787 Lafayette Ave | | | | |
| | PS 320 / PS 375<br>46 McKeever Place | | | | |
| | Clara Barton Voc HS<br>901 Classon Ave | | | | |
| | PS 316<br>750 Classon Ave | | | | |
| | PS 11 New<br>419 Waverly Ave | | | | |
| | PS 22<br>443 St Marks Ave | | | | |

| | | | | |
|---|---|---|---|---|
| | Brooklyn Museum<br>200 Eastern<br>Parkway | | | |
| | Bklyn Tech HS<br>2 South Elliott Place | | | |
| | Sterling HS<br>510 Clermont Ave | | | |
| | Edmonds Ctr (IS<br>113)<br>300 Adelphi Street | | | |
| | PS 56 New<br>170 Gates Ave | | | |
| | Bedford Vlg Sch (PS<br>3)<br>50 Jefferson Ave | | | |
| | Mt Sinai Church<br>84 Quincy Street | | (1) "No door clerk<br>assigned per Board<br>of Elections" (BOE<br>604) | |
| | PS 287<br>50 Navy Street | | | |
| | Willoughby Walk<br>Co-Op<br>195 Willoughby Ave | | | |
| | PS 198<br>4105 Farragut Road | | | |
| | St Augustines Parish<br>Hall<br>4301A Avenue D | | | |
| | St Therese Church<br>1281 Troy Ave | | | |
| | St Augustines Comm<br>Rm<br>4301 Ave D | | | |
| | PS 244<br>5404 Tilden Ave | | (1) Alternate<br>accessible entrance<br>signs not posted<br>(BOE 503) | |
| | PS 219<br>1060 Clarkson Ave | | | |
| | PS 233<br>9301 Ave B | | | |
| | Gorman Hses<br>1381 Linden<br>Boulevard | | | |

| | | | | |
|---|---|---|---|---|
| . | Jimerson Hses<br>1411 Linden<br>Boulevard | | (1) No door clerk. AD Comments "It was sad that the board did not send a door clerk" at the accessible entrance" (BOE 476) | |
| | PS 242<br>100-01 Flatlands Ave | | | |
| | PS 211 JHS<br>1001 East 100 Street | | | |
| | PS 114<br>1077 Remsen Ave | | | |
| | PS 66 IS<br>845 East 96 Street | | (1)No BMD Key (BOE 480) | |
| | PS 272<br>101-24 Seaview Ave | | | |
| | PS 115<br>1500 East 92 Street | | | |
| | PS 276<br>1070 East 83 Street | | | |
| | Canarsie HS<br>1600 Rockaway Parkway | | | |
| | PS 207 Annex Early Childhd Ctr<br>3920 Flatlands Ave | | (1) No signage at accessible entrance. AD Comment "Need handicap sing at alternate entrance." (BOE 347) | |
| | PS 312<br>7103 Ave T | | (1) Accessible entrance signs not posted properly.<br><br>(2) Directional arrows to accessible entrance not posted.  (BOE 463) | |
| | PS 236<br>6302 Ave U | | | |
| | St. Columba's | | | |

| | | | | |
|---|---|---|---|---|
| | Church<br>2245 Kimball Street | | | | |
| | Hall<br>43 Seba Ave | | | | |
| | PS 207<br>4011 Fillmore Ave | | (1) Insufficient exterior signage. AD Comment: "Not enough disability signs for space." No indication problem was rectified.<br><br>(2) Ramp not in place and set up properly.<br><br>(BOE 442-444) | | |
| | Vet Post<br>5601 Ave N | | | | |
| | PS 222<br>3301 Quentin Road | | | | |
| | Palm Beach NH<br>2900 Bragg St | | | | |
| | Bay Ridge Air Rights<br>350 65 Street | | (1) Interior doors to the poll room not open and clear of obstructions. No indication problem was fixed. (BOE 410) | | |
| | Bay Ridge Air Rights<br>260 65 Street | | | | |
| | PS 102<br>211 72 Street | | | | |
| | Ft Hamilton HS<br>8301 Shore Road | | (1) Not compliant with pre-cleared accessible schematic.<br><br>AD Comment: "There was a problem setting up the site, the schematic had to be amended. | | |

|  |  |  | There seems to be a problem with student crowd control. Voters complained they ere unable to pass easily to get to their voting site. Teachers took a while to get students to the side of the cafeteria to make a passage for voters." BOE 417 |  |  |
|---|---|---|---|---|---|
|  | Apt House 7502 Ridge Boulevard |  | (1) No door clerk at alternative accessible entrance. (BOE 398) |  |  |
|  | Apt House 9000 Shore Road |  |  |  |  |
| **Manhattan** | ████████████████████████████████████████ |  |  |  |  |
|  | Coler Hospital 900 Main Street |  |  |  |  |
|  | Goldwater Hospital 1 Main Stret |  |  |  |  |
|  | PS 751 113 East 4th Street |  |  |  |  |
|  | The Hermitage 1295 5th Ave |  | (1) Interior access barriers (CIDNY survey) |  |  |
|  | Bard H.S.E.C. – 97 525 East Houston Street | (1) Exterior signage barriers (CIDNY survey)<br><br>(2) Entry / pathway barriers (CIDNY survey)<br><br>(3) Interior signage barriers (CIDNY survey) |  |  |  |
|  | Westbeth Housing 155 Bank Street |  |  |  |  |
|  | JASA Community Ctr |  | (1) Exterior Signage |  |  |

| | 200 East 5th Street | | barriers (CIDNY Survey) | | |
|---|---|---|---|---|---|
| | Manhattan North 2036 Amsterdam Ave | | | | |
| | Los Tres Unidos 22 East 112 Street | | (1) entry / pathway barriers (CIDNY Survey)<br><br>(2) Interior signage barriers (CIDNY survey)<br><br>(3) Interior Access barriers (CIDNY survey) | | |
| | HS Fashion Industry 225 West 24th Street | | | | |
| | PS 92 222 West 134 Street | | | | |
| | PS 84 32 West 92nd Street | | | | |
| | PS 206 508 East 120th Street | | | | |
| | PS 52 650 Academy Street | | | | |
| | Washington Sq SE Ap 505 Laguardia Place | | | | |
| | Bayard Rustin HS 351 West 18th Street | | | | |
| | The Door 555 Broome Street | | | | |
| | Lesbian and Gay Ctr 208 West 13th Street | | | | |
| | Hayden Hall 33 Washington Square West | | | | |
| | Prospect Tower 45 Tudor City Place | | (1) Exterior signage barriers (CIDNY | | |

| | | | (Survey) | | |
|---|---|---|---|---|---|
| | | | (2) entryway barriers (CIDNY Survey) | | |
| | Sirovich Senior Center 331 East 12th Street | (1) Entry / pathway barriers (CIDNY survey) (2) Interior signage barriers (CIDNY survey) | | | |
| | Brachetti Plaza 296 East 4th Street | | | | |
| | Compos Community Ctr 611 East 13th Street | (1) Interior access barriers (CIDNY survey) | | | |
| | UTACPT 125 West 109th Street | | | | |
| | Pelham Fritz Rec Center 18 Mt Morris Park West | (1) Entry / pathway barriers (CIDNY Survey) | (1) Exterior signage barriers (CIDNY survey) | | |
| | Windsor Tower 5 Tudor City Place | (1) Exterior signage barriers (CIDNY survey) (2) entry / pathway barriers (CIDNY survey) (3) Interior signage barriers (CIDNY survey) | | | |
| | PS 234 (Independence) 292 Greenwich Street | (1) Interior signage barriers (CIDNY Survey) (2) Interior access barriers (CIDNY survey) | | | |
| | Sutton Place Synagogue 225 East 51st Street | | | | |
| | Peter Cooper Village 360 1 Ave | | | | |

| | | | | |
|---|---|---|---|---|
| | East Harlem Council<br>413 East 120 Street | | (1) Inaccessible Ramp (CIDNY survey) | | |
| | Tiemann Apts (Columbia Univ)<br>549 Riverside Drive | | (1) Exterior signage barriers (CIDNY survey)<br><br>(2) Entry / pathway barriers (CIDNY survey)<br><br>(3) Interior signage barriers (CIDNY survey)<br><br>(4) Interior access barriers (CIDNY survey) | | |
| | YM & YWHA (Nagle Ave)<br>54 Nagle Ave | | | | |
| | Hunter College<br>128 East 68th Street | | | | |
| | IS 218<br>4600 Broadway | | | | |
| | Barrier Free Living<br>270 East 2nd Street | (1) Inaccessible Ramp (CIDNY survey)<br><br>(2) Entry / pathway barriers (CIDNY survey)<br><br>(3) Interior access barriers (CIDNY survey) | | | |
| | Inwood Towers<br>11 Fort George Hill | | (1) Interior access barriers (CIDNY survey) | | |
| | Local 802<br>322 West 48th Street | | | | |
| | Seward Park I<br>266 East Broadway | | | | |
| | Rena Day Care Ctr<br>639 Edgecombe Ave | | | | |
| | Seward Park II | | | (1) Exterior | |

| | 210 East Broadway | | | signage barriers (CIDNY survey)

(2) Entry / pathway barriers (CIDNY Survey)

(3) Interior access barriers (CIDNY survey) | |
|---|---|---|---|---|---|
| | Seward Park III 415 Grand Street | | | | |
| | East River Housing I 570 Grand Street | | | | |
| | East River Housing II 575 Grand Street | | | | |
| | 2nd Canaan Baptist 10 Lenox Ave | | | | |
| | Tweemill House 145 East 126th Street | | | | |
| | Inwood Terrace 99 Hillside Ave | | | | |
| | Asser Levy Recreation Center 501 East 23rd Street | | | | |
| | Promenade 150 West 225 Street | | | | |
| | Time Square Hotel 255 West 43rd Street | | | | |
| | Carver Houses 1481 Madison Ave | | | | |
| | Dorchester Towers 155 West 68th Street | | | | |
| | Central Harlem Senior Coalit. 120 West 140th Street | (1) Entry/pathway barriers (CIDNY survey)

(2) Interior access barriers | | | |

|  |  | (CIDNY survey) |  |  |  |
|---|---|---|---|---|---|
|  | One Lincoln Plaza<br>20 West 64th Street |  |  |  |  |
|  | Rutgers House<br>200 Madison Street |  |  |  |  |
|  | Normandie Court<br>225 East 95th Street |  |  | (1) Inaccessible ramp (CIDNY survey)<br><br>(2) Exterior Signage barriers (CIDNY Survey)<br><br>(3) Interior signage barriers (CIDNY survey)<br><br>(4) Interior access barriers (CIDNY survey) |  |
|  | Metro Community Church<br>446 West 36th Street |  |  |  |  |
|  | Lenox Hill Senior Center<br>343 East 70th Street |  |  |  |  |
|  | Clinton Community Center<br>456 West 37th Street |  |  |  |  |
|  | Wadleigh HS<br>215 West 114th Street |  |  |  |  |
|  | Henry Brooks Senior House<br>304 West 154 Street |  |  | (1) entry / pathway barriers (CIDNY |  |
|  | Euclid Hall Senior Center<br>2345 Broadway |  |  | (1) Exterior signage barriers |  |

| | | | | (CIDNY Survey) (2) Interior access barriers (CIDNY survey) | |
|---|---|---|---|---|---|
| | Theater for New City<br>155 1st Ave | (1) Entry / pathway barriers (CIDNY survey) | | | |
| | Coliseum Park Apts<br>345 West 58th street | | | | |
| | Mayfair Tower<br>15 West 72nd Street | | | | |
| | NYCJW- Council Sr Ct<br>241 West 72nd Street | (1) Interior access barriers (CIDNY survey) | | | |
| | Bridge Apts<br>1370 St Nicholas Ave | | | | |
| | CUNY HQ<br>535 East 80th Street | | | | |
| | Church of St. Paul & St Andrew<br>263 West 86th Street | | (1) Exterior signage barriers (CIDNY survey) (2) Entry / pathway barriers (CIDNY Survey) | | |
| | Max Meltzer Community Ctr<br>94 East 1st Street | | | | |
| | J K Onassis HS<br>120 West 46th St | | | | |
| | Marseilles Senior Center<br>230 West 103rd Street | (1) Entry/ Pathway barriers (CIDNY Survey) (2) Interior Signage barriers (CIDNY survey) | (1) Interior signage barriers (CIDNY survey) | | |
| | Oberia Dempsey Ctr<br>127 West 127th St | (1) Exterior signage barriers (CIDNY survey) | | | |

| | | (2) Entry / pathway barriers (CIDNY survey) | | | |
|---|---|---|---|---|---|
| | Northern Man. Nur Hm<br>116 East 125 St | | (1) Exterior signage barriers (CIDNY Survey)<br><br>(2) Interior access barriers (CIDNY survey) | | |
| | Ter Card Cookie Ctr<br>1249 5 Ave | | | | |
| | PS 176<br>4862 Broadway | | | | |
| | 390 Riverside Drive<br>390 Riverside Drive | | | | |
| | Baruch College Campus HS<br>55 East 25th Street | | (1) Entry / pathway barriers (CIDNY Survey)<br><br>(2) Interior access barriers (CIDNY survey) | (1) Interior access barriers (CIDNY survey) | |
| | Tiano Towers<br>2253 3 Ave | | | | |
| | Fash Institute Tech<br>298 7th Ave | | | | |
| | HS Environment Studies<br>444 West 56th Street | | | | |
| | Park East Synagogue<br>164 East 68th St | | | | |
| | St Anthony's Church<br>155 Sullivan St | | | | |
| | PS 217<br>645 Main Street | | | | |
| | Dewitt Clinton Ctr<br>120 East 110 Street | | (1) Entry / pathway barriers (CIDNY survey) | | |
| | Gen Grant Houses<br>75 La Salle Street | | | | |
| | Gen Grant Houses II<br>1295 Amsterdam Ave | | | | |
| | Yeshiva U – Cardozo Sch Law | | | | |

| | 55 5th Ave | | | | |
|---|---|---|---|---|---|
| | Carlyle Court 25 Union Square West | | (1) Entry / pathway barriers (CIDNY survey)  (2) Interior access barriers (CIDNY Survey) | | |
| | Andrew Heiskell Library 40 West 20th Street | | | | |
| | New York Law School 47 Worth Street | (1) Interior access barriers (CIDNY survey) | | | |
| | Liberty High School 250 West 18th Street | | | | |
| | The 467 Condominium 467 Central Park West | | (1) Interior access barriers (CIDNY survey) | | |
| | Wash Square Village 2 2 Washington Square Village | | | | |
| | Wash Square Village 3 3 Washington Square Village | | | | |
| | Renwick Gardens 332 East 29th Street | | | | |
| | Trump Place 180 Riverside Boulevard | | | | |
| | Ft. George Center 1525 St Nicholas Ave | | | | |
| | University Hall 110 East 14th Street | | | | |
| | West Side High School 140 West 102 Street | | | | |
| | Kurt & Leah Apts 11 West 102 Street | | | | |
| | PS 89 201 Warren Street | (1) Exterior signage barriers (CIDNY survey) | | | |

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO.
RECEIVED NYSCEF: 08/28/2017

| | | (2) Entry / pathway barriers (CIDNY survey)<br><br>(3) Interior access barriers (CIDNY survey) | | | |
|---|---|---|---|---|---|
| | Master Apartments<br>310 Riverside Drive | | | | |
| | Prince George Hotel<br>14 East 28th Street | | | | |
| | HS for Leadership<br>90 Trinity Place | | | | |
| | Confucius Plaza<br>33 Bowery | | | | |
| | Metro Council on Jewish Pov.<br>351 East 61 Street | | | | |
| | PS 4<br>500 West 160 Street | | | | |
| | Nagle House<br>240 Nagle Ave | | | | |
| | Residential Building<br>45 Wall Street | | | | |
| | The Regatta<br>21 South End Ave | | | | |
| | Union Baptist Church<br>240 West 145th St | | | | |
| | Red Oak Apartments<br>135 West 106th St | (1) Interior access barriers (CIDNY survey) | | | |
| | CWA – 1180<br>97 Hudson St | | | | |
| | River Place 1<br>650 West 42nd St | | | | |
| | YMCA (McBurney)<br>125 West 14th St | | | | |
| | School of Co-op Education<br>321 East 96th St | | | (1) Inaccessible ramp (CIDNY Survey)<br><br>(2) Interior access barriers | |

| | | | | (CIDNY survey) | |
|---|---|---|---|---|---|
| | PS 48<br>4360 Broadway | | | | |
| | Rutgers Presbyterian<br>236 West 73rd St | | | | |
| | Armenian Church<br>630 2nd Ave | | | | |
| | St Nicholas Sr Ctr<br>210 West 131 St | | | | |
| | The Churchill<br>300 East 40th St | (1) Interior access barriers (CIDNY survey) | | | |
| | Samuels Community Center<br>669 Malcolm X Boulevard | | | | |
| | Halidon Court<br>3681 Broadway | | | | |
| | Seward Park High School<br>350 Grand Street | (1) Inaccessible ramp (CIDNY Survey)<br><br>(2) Exterior signage barriers (CIDNY survey)<br><br>(3) entry / pathway barriers (CIDNY survey)<br><br>(4) Interior signage barriers (CIDNY Survey)<br><br>(5) Interior access barriers (CIDNY survey) | | | |
| | CUNY<br>365 5th Ave | | | | |
| | Marymount Manhattan College<br>221 East 71st Street | | (1) Interior Signage Barriers (CIDNY Survey)<br>(2) No exterior signage (BOE 3341) | | |
| | Holy Trinity | | | | |

| | | | | |
|---|---|---|---|---|
| | Cathedral 337 East 74th Street | | | | |
| | Lighthouse International 110 East 60th Street | | | | |
| | Emanuel Church 2184 8th Ave | | | | |
| | Antler Apartments 2079 8th Ave | | | | |
| | Boricua College 3755 Broadway | | | | |
| | Covenant House 460 West 41st St | | | | |
| | Baruch College Vertical Campus 55 Lexington Ave | | | | |
| | 250 West 94th St 250 West 94th St | | | | |
| | Continental East 353 East 83rd St | | | | |
| | Central Syn Pavilion 652 Lexington Ave | | | (1) Exterior signage barriers (CIDNY Survey) (2) Interior access barriers (CIDNY survey) | |
| | Kateri Residence 150 Riverside Drive | | | | |
| | Columbia Housing 2700 Broadway | (1) Interior access barriers (CIDNY Survey) | | | |
| | Wein Hall 411 West 116th St | | | | |
| | The Riverside Church 91 Claremont Ave | | | | |
| | Highbridge Rec CTR 231 Amsterdam Ave | | | | |
| | Church of Jesus Christ LDS 221 East 87th St | | | | |
| | Eleanor Roosevelt | | | | |

| | | | | |
|---|---|---|---|---|
| | HS<br>411 East 76th St | | | |
| | Adam Clayton Powell Jr St. Bldg<br>163 West 125th St | | (1) Interior access barriers (CIDNY survey) | |
| | UPACA 6 Senior Center<br>1940 Lexington Ave | | | |
| | Clinton Senior Center<br>530 West 55th St | | (1) Exterior signage barriers (CIDNY Survey)<br><br>(2) Entry / Pathway Barriers (CIDNY survey)<br><br>(3) Interior access barriers (CIDNY survey) | |
| | Cathedral HS<br>350 East 56th St | | | |
| | Stuyvesant Town VI<br>525 East 14th St | | | |
| | Stuyvesant Town VII<br>3 Stuyvesant Oval | | | |
| | PS 98<br>530 West 212th St | | | |
| | Martin Luther King Comm Ctr<br>2 West 115th St | | | |
| | Unity Center<br>213 West 58th St | | | |
| | St. Luke's Episcopal Center<br>435 West 141 St | | | |
| | Alumni Hall<br>33 3rd Ave | | | |
| | MS 114<br>331 East 91st St | | | |
| | City Planning<br>22 Reade St | | | |
| | Boys & Girls Republic<br>888 East 6th St | | | |
| | Holy Family Church<br>315 East 47th St | | | |

Case 1:10-cv-05093-DAB-RBP Document 119 Filed 10/16/12 Page 133 of 348

| | Location | | | | |
|---|---|---|---|---|---|
| | Park West High School 525 West 50th St | | | | |
| | PS 276 55 Battery Place | | | | |
| | UASBYW 81 New Street | | | | |
| | St Stephen of Hungary Parish 414 East 82nd St | | | | |
| | PS 184 M 327 Cherry St | | | | |
| | Metro North / River Crossing 1956 1st Ave | | | | |
| | Cascades High School 198 Forsyth St | | | | |
| | The Palladium 133 East 13th St | | | | |
| | Stuyvesant Town II 10 Stuyvesant Oval | | | | |
| | PS 9 100 West 84th St | | | | |
| | 1775 Houss 107 East 126th St | | (1) Exterior signage barriers (CIDNY survey) (2) Interior access barriers (CIDNY survey) | | |
| | Schwab House 11 Riverside Drive | | | | |
| | Good Shepherd Church 104 Cooper St | | (1) Inaccessible ramp (CIDNY survey) (2) Entry / pathway barriers (CIDNY survey) (3) Interior access barriers (CIDNY survey) | | |
| | Civil Court 111 Centre St | | | | |

INDEX NO. 157686/2017
NYSCEF DOC. NO. 119

RECEIVED NYSCEF: 08/28/2017

| | | | | |
|---|---|---|---|---|
| | N Thomas HS<br>111 East 33rd St | | | |
| | Find Aid for Aged (Hargrave)<br>111 West 71st St | | (1) Entry / pathway barriers (CIDNY Survey)<br><br>(2) Interior access barriers (CIDNY survey) | |
| | Triangle House<br>112 East 128th St | | | |
| | PS 169<br>110 East 88th St | | | (1) Exterior Signage barriers (CIDNY Survey) |
| | PS 41<br>116 West 11th St | | | |
| | Jewish Home & Hosp<br>120 West 106th St | | | |
| | PS 63<br>121 East 3 Street | | | |
| | PS 2 (Meyer London)<br>122 Henry St | | | |
| | PS 36<br>123 Morningside Drive | | | |
| | PS 140<br>123 Ridge Street | | | |
| | Esplanade Gardens<br>129 West 147th St | | | |
| | PS 72<br>131 East 104th St | | | |
| | PS 166<br>132 West 89th St | (1) Exterior signage barriers (CIDNY survey)<br><br>(2) Entry / pathway barriers (CIDNY survey)<br><br>(3) Interior Access barriers (CIDNY survey) | | |
| | PS 144 (M242) | (1) Exterior | | |

| | | | | | |
|---|---|---|---|---|---|
| | 134 West 122nd St | signage barriers (CIDNY survey) | | | |
| | Associated Blind 135 West 23rd St | | | | |
| | Baruch College Newman Hall 137 East 22nd St | (1) Interior access barriers (CIDNY) survey | | | |
| | YM & YWHA (Lex. Ave) 1395 Lexington Ave | | | | |
| | Lincoln Towers 140 West End Ave | | | | |
| | Find Aid for Aged (Hamilton) 141 West 73rd Street | | | | |
| | PS 87 160 West 78th St | | | | |
| | PS 130 143 Baxter St | | | | |
| | IS 44 100 West 77nd St | | | | |
| | PS 158 1458 York Ave | | | | |
| | PS 133 2121 5 Ave | | | | |
| | Jewish Guild 15 West 65th St | | | | |
| | Waterside Plaza 15 Waterside Plaza | | | | |
| | PS 145 150 West 105th St | (1) Inaccessible Ramp (CIDNY survey)  (2) Exterior Signage barriers (CIDNY Survey)  (3) Entry / Pathway barriers (CIDNY survey) | | (1) Entry / pathway barriers (CIDNY Survey)  (2) Interior Access barriers (CIDNY Survey) | |
| | Lincoln Towers II 150 West End Ave | | | | |
| | 158 St. Riverside Houses 156-20 Riverside Drive West | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | Jackie Robinson Complex<br>1573 Madison Ave | | | | |
| | City As School<br>16 Clarkson Street | | | | |
| | PS 7<br>160 East 120th St | | | | |
| | Lincoln Towers III<br>160 West End Ave | | | | |
| | PS 108<br>1615 Madison Ave | | | | |
| | Ruppert Yorkville Tower Condo<br>1619 3rd Ave | | | (1) Inaccessible ramp (CIDNY Survey)<br><br>(2) Exterior signage barriers (CIDNY survey)<br><br>(3) Interior signage barriers (CIDNY survey)<br><br>(4) Interior access barriers (CIDNY survey) | |
| | PS 163<br>163 West 97th St | | | | |
| | PS 20<br>166 Essex St | | | | |
| | PS 198<br>1700 3rd Ave | | (1) Entry / pathway barriers (CIDNY survey)<br>(2) Interior Access barriers (CIDNY survey) | | |
| | United Methodist Church<br>1723 Madison Ave | | | | |

Case 1:10-cv-05093-DAB-RBP Document 119 Filed 10/16/12 Page 137 of 348

| | | | | |
|---|---|---|---|---|
| | Village View Housing 175 East 4th St | | | (1) Entry / pathway barriers (CIDNY survey) | |
| | PS 175 175 West 134th St | (1) Interior access barriers (CIDNY survey) | | | |
| | PS 153 1750 Amsterdam Ave | | | | |
| | PS 57 176 East 115 Street | | | | |
| | Stanley Isaacs Ctr 415 East 93rd St | | (1) Inaccessible ramp (CIDNY survey) | | |
| | Mott Street Sr Ctr 180 Mott Street | | | | |
| | Hamilton Heights Terrace 1833 Amsterdam Ave | | (1) Inaccessible ramp (CIDNY Survey) (2) Interior access barriers (CIDNY survey) | | |
| | PS 132 185 Wadsworth Ave | | | | |
| | Lincoln Towers V 185 West End Ave | | | | |
| | PS 171 19 East 103rd St | | | | |
| | Dunwell Plaza 1920 Amsterdam Ave | | | (1) exterior signage barriers (CIDNY Survey) (2) Interior access barriers (CIDNY survey) | |
| | Church Heavenly Rest 2 East 90th St | | | | |
| | Manhattan House 200 East 66th Street | | | | |

| | | | | |
|---|---|---|---|---|
| | University Neighborhood 200 Monroe Street | (1) entry /pathway barriers (CIDNY survey) | | |
| | Harlem Renaissance HS 22 East 128th St | | | |
| | 1199 Housing 2070 1st Ave | | | (1) Entry/Pathway barriers (CIDNY Survey)  (2) Interior signage barriers (CIDNY survey)  (3) Interior access barriers (CIDNY survey) |
| | Lincoln Towers VI 205 West End Ave | | | |
| | PS 116 210 East 33rd St | (1) Exterior signage barriers (CIDNY Survey) | (1) Exterior signage barriers (CIDNY Survey)  (2) Entry / pathway barriers (CIDNY survey)  (3) Interior Signage barriers (CIDNY survey)  (4) Interior access barriers (CIDNY survey) | |
| | Dewitt Nursing Home 211 East 79th St | | | |
| | Drew Hamilton Houses 220 West 143rd St | | | |

| | Riverton Apts 2200 Madison Ave | | | | |
|---|---|---|---|---|---|
| | Ruppert House 222 East 93rd St | | | | |
| | PS 47 (Sch for Hearing Impaired) 225 East 23rd St | | | | |
| | PS 167 22 East 76th St | | | | |
| | Savoy Park Owner LLC 2300 5th Ave | (1) Inaccessible ramp (CIDNY survey)<br><br>(2) Exterior signage barriers (CIDNY survey)<br><br>(3) entry / pathway barriers (CIDNY survey)<br><br>(4) Interior signage barriers (CIDNY survey)<br><br>(5) Interior access barriers (CIDNY survey) | | | |
| | Riverbend Housing 2301 5th Ave | (1) Exterior signage barriers (CIDNY survey)<br><br>(2) Entry / pathway barriers (CIDNY survey)<br><br>(3) Interior signage barriers (CIDNY survey)<br><br>(4) Interior access barriers (CIDNY survey) | | | |
| | PS 38 or 121 232 East 103 St | | | | |
| | PS 165 234 West 109th St | | (1) Entry / Pathway | | |

| | | | | |
|---|---|---|---|---|
| | | | barriers (CIDNY Survey) (2) Interior access barriers (CIDNY Survey) | |
| | PS 117 JHS 240 East 109th St | | | |
| | PS 194 244 West 144th St | | | |
| | PS 154 250 West 127th St | (1) Exterior signage barriers (CIDNY Survey) (2) Entry / Pathway barriers (CIDNY survey) (3) Interior access barriers (CIDNY survey) | | |
| | Lincoln Square Neighborhood Ctr 250 West 65th St | | | |
| | PS 189 2580 Amsterdam Ave | | | |
| | Harlem River Houses 231 W 151st St | | | |
| | PS 199 270 West 70th St | | | |
| | Stuyvesant Town III 272 1 Ave | | | |
| | PS 33 281 9th Ave | | | |
| | Stuyvesant Town IV 283 Ave C | | | |
| | Polo Ground Sr Ctr 2965 8th Ave | | | |
| | PS 46 2987 8th Ave | | | |
| | Lincoln Guild Housing | | | |

| | | | | |
|---|---|---|---|---|
| | 303 West 66th St | | | |
| | LaGuardia Memor House 307 116th St | | | |
| | PS 173 306 Ft Washington Ave | | | |
| | PS 290 (Manh New School) 311 East 82nd St | | | |
| | PS 134 293 East Broadway | | | |
| | PS 102 315 East 113th St | | | |
| | Gen Grant Houses IV 3150 Broadway | | (1) Exterior signage barriers (CIDNY survey) (2) Interior access barriers (CIDNY survey) | |
| | Manhattan Inter. HS 317 East 67th St | | | |
| | East Midtown Plaza 319 East 24th St | | | |
| | PS 58 / Manhattan High School 317 West 52nd St | | | |
| | PS 40 320 East 20th St | | | |
| | Tweed Court 52 Chambers St | | | |
| | IS 70 333 West 17th St | | | |
| | PS 187 349 Cabrini Boulevard | | | |
| | PS 180 370 West 120th St | | | |
| | Dyckman Comm Ctr 3782 10th Ave | | (1) Exterior signage barriers (CIDNY survey) | |
| | Seward Park IV 383 Grand St | | | |
| | Manhattan Plaza L.P. 400 West 43rd St | | | |

| | | | | |
|---|---|---|---|---|
| | PS 149<br>41 West 117th St | | | | |
| | Columbia University Houses<br>410 Riverside Drive | | | (1) Interior access barriers (CIDNY Survey) | |
| | PS 183<br>419 East 66th St | | | | |
| | PS 146<br>421 East 106th St | | | | |
| | Yorkville Community School<br>421 East 88th St | | | | |
| | PS 125<br>425 West 123rd St | | | | |
| | PS 129<br>425 West 130th St | | | | |
| | PS 111<br>440 West 53rd St | | | | |
| | PS 188 or 196<br>442 East Houston Street | (1) Exterior Signage barriers (CIDNY Survey)<br><br>(2) Entry / pathway barriers (CIDNY Survey) | | (1) Exterior signage barriers (CIDNY survey)<br><br>(2) Interior signage barriers (CIDNY Survey)<br><br>(3) Interior access barriers (CIDNY survey) | |
| | John Jay College 4<br>45 West 59th St | | | | |
| | PS 6<br>45 East 81st St | | | | |
| | Inwood Gardens<br>45 Fairview Ave | | | | |
| | East River Housing III<br>457 FDR Drive | | | | |
| | PS 53 or 811 | | | | |

|   | | | | |
|---|---|---|---|---|
| | 466 West End Ave | | | | |
| | PS 28<br>475 West 155th St | | | | |
| | East River Housing IV<br>477 FDR Drive | | | | |
| | St Margaret's House<br>49 Fulton St | | | | |
| | PS 3<br>490 Hudson St | | | | |
| | YMCA<br>5 West 63rd St | | | | |
| | PS 192<br>500 West 138 St | | | | |
| | Amalamated Dwelling<br>504A Grand Street | | | | |
| | PS 43/PS 172<br>509 West 129th St | | (1) Exterior signage barriers (CIDNY survey)<br><br>(2) Interior access barriers (CIDNY survey) | | |
| | Isabella Geriatric<br>515 Audubon Av | | | | |
| | PS 143<br>515 West 182nd St | | | | |
| | PS 51<br>520 West 45th St | | | | |
| | Marble Hill Comm Ctr<br>5465 Broadway | | | | |
| | NYU Brittany Hall<br>55 East 10th St | | (1) Exterior signage barriers (CIDNY Survey)<br><br>(2) Interior signage barriers (CIDNY survey)<br><br>(3) Accessible door locked and no door clerk present (BOE 3348) | (1) entry / pathway barriers (CIDNY survey)<br><br>(2) Interior access barriers (CIDNY survey) | |
| | PS 79 or 811<br>55 East 120th St | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | PS 128<br>560 West 169th St | | | | |
| | Hudson Piers #1<br>596 Riverside Drive | | | | |
| | Abraham Lincoln House<br>60 East 135th St | | | | |
| | Riverview Tower<br>626 Riverside Drive | | | | |
| | LaGuardia High School<br>100 Amsterdam Ave | | | | |
| | Southbridge Tower<br>66 Frankfort Street | | | | |
| | Stewart Tenant Corp<br>70 East 10th St | | | | |
| | PS 131<br>100 Hester St | | | | |
| | Holy Rood Church<br>717 West 179th St | | | | |
| | PS 34<br>730 East 12th St | | | (1) Entry / pathway barriers (CIDNY survey)<br><br>(2) Interior signage barriers (CIDNY survey) | |
| | PS 75<br>735 West End Ave | | | | |
| | Masaryk Towers<br>77 Columbia Street | (1) Inaccessible Ramp (CIDNY Survey)<br><br>(2) entry / pathway barriers (CIDNY survey) | | | |
| | PS 1<br>8 Henry St | | | | |
| | PS 126<br>80 Catherine St | | | | |
| | Morningside Hgts Hous | | | | |

| | | | | |
|---|---|---|---|---|
| | 100 Lasalle St | | | |
| | 870 Riverside Housing 870 Riverside Drive | | | |
| | K'Hal Adath Jeshurun 90 Bennett Ave | | | |
| | PS 152 93 Nagle Ave | | | |
| | Ft Wash Serv for Eld 99 Ft Washington Ave | | | |
| | Int'l Pre-School 330 East 45th St | | | |
| | Dunlap Building 1 Wards Island | | | |
| | Charles Hill Tower 2050 8th Ave | | | |
| | Ralph Hernandez 189 Allen St | | (1) Entry / pathway barriers (CIDNY Survey) | |
| | Canaan Tower IV 95 Lenox Ave | | | |
| | Riverside 3333A Broadway | | (1) Exterior Signage barriers (CIDNY Survey) (2) Interior Signage barriers (CIDNY survey) (3) Interior access barriers (CIDNY survey) | |
| | JHS 118 154 West 93rd St | | | |
| | Goddard Riverside 593 Columbus Ave | | (1) entry / pathway barriers (CIDNY Survey) (2) Interior signage barriers (CIDNY survey) | |
| | Village East Towers 170 Avenue C | | (1) Entry / pathway barriers (CIDNY Survey) | |

| | | | | | |
|---|---|---|---|---|---|
| | | | (2) Interior access barriers (CIDNY survey) | | |
| **Queens** | | | | | |
| | PS 303 108-55 69 Ave | | (1) No door clerk (BOE 1652) Second AD team: "No door clerk assigned to this site." (BOE 2284) | | |
| | PS 16 41-15 104 St | | (1) Improper exterior signage. (BOE 2013) | | |
| | Forest Hills HS 67-01 110 St | | | | |
| | PS 196 71-25 113 St | | (1) Exterior signage barriers (CIDNY Survey) (2) Entry / pathway barriers (CIDNY survey) AD Comment: Not visited. "No time sorry." (BOE 1660) | | |
| | PS 47 9 Power Road | | (1) Inaccessible ramp (CIDNY Survey) (2) Exterior signage barriers (CIDNY Survey) (3) Entry / pathway barriers (CIDNY Survey) (4) Interior Access barriers (CIDNY Survey) | | |
| | PS 29 125-10 23 Ave | | | | |
| | Kew Gardens Hills Library | | | | |

Case 1:10-cv-05809-DAB-RBP Document 119 Filed 10/18/12 Page 147 of 348

| | | | | |
|---|---|---|---|---|
| | 72-33 Vleigh Place | | | |
| | CWV Post 870<br>39-48 61 St | | | |
| | Lefferts Library<br>103-34 Lefferts<br>Boulevard | | (1) Not compliant with pre-cleared accessible poll site layout: "Due to limited space and electricity we had to deviate from the schematic." (BOE 2755) | |
| | Flushing House Resident Adult<br>38-20 Bowne St | | | (1) Interior access barriers (CIDNY survey) |
| | Florence E Smith Comm Ctr<br>102-19 34 Ave | | (1) Accessible door closed. (BOE 1877) | |
| | St Clares School<br>137-25 Brookville Boulevard | | | (1) Exterior signage barriers (CIDNY Survey)<br><br>(2) Entry / pathway barriers (CIDNY survey)<br><br>(3) Interior access barriers (CIDNY survey) |
| | St. Sebastions School<br>39-76 58 St | | | |
| | St Nicholas of Tolentine<br>150-75 Goethals Ave | | | |
| | Thomas Edison HS<br>165-65 84 Ave | | | |
| | ▮▮▮▮▮▮▮ | | (1) Exterior signage | |

| | | | | |
|---|---|---|---|---|
| | ████████ | | barriers (CIDNY Survey)<br><br>(2) Entry / pathway barriers (CIDNY survey)<br><br>(3) Interior access barriers (CIDNY survey) | | |
| | PS 223<br>125-20 Sutphin Boulevard | | | (1) Interior access barriers (CIDNY survey) | |
| | Hillcrest HS<br>160-05 Highland Ave | | (1) Exterior signage barriers (CIDNY Survey)<br><br>(2) Entry / pathway barriers (CIDNY Survey)<br><br>(3) Interior Access barriers (CIDNY survey) | | |
| | Young Israel<br>716 Beach 9 St | | (1) Entry / pathway barriers (CIDNY survey)<br><br>(2) Interior Access barriers (CIDNY survey) | | |
| | Boulevard Gardens<br>51-42 30 Ave | | (1) Exterior signage barriers (CIDNY Survey)<br><br>(2) Entry / pathway barriers (CIDNY survey)<br><br>(3) Interior access barriers (CIDNY survey) | | |
| | PS 7<br>80-55 Cornish Ave | | | | |
| | PS 15 | | (1) AD Comment | | |

| | | | | |
|---|---|---|---|---|
| | 121-15 Lucas St | | "very poor lighting" and no indication this was fixed. (BOE 30) | |
| | PS 79 147-27 15 Drive | | | |
| | PS 78 48-09 Center Boulevard | | | (1) Entry / pathway barriers (CIDNY Survey) (2) Interior Access barriers (CIDNY survey) |
| | IS 5 50-40 Jacobus St | | | |
| | Allen AME Senior Center 112-04 167 St | | | |
| | IS 230 73-10 34th Ave | | | BMD not private. Placed near only outlet at main entrance (photo) |
| | Christ Lutheran Church 188-12 73 Ave | | (1) Entry / pathway barriers (CIDNY Survey) | |
| | PS 222 86-17 37th Ave | | (1) Entry / pathway barriers (CIDNY survey) | |
| | PS 58 72-50 Grand Ave | | (1) Improperly places access signage: "had to change handicap sign" (BOE 2956) | |
| | PS 92 99-01 34 Ave | | | |
| | IS 137 109-15 98th St | | | |
| | PS 161 101-33 124 St | | (1) "Assigned door clerk is absent." | |

| | | | (BOE 2446) | | |
|---|---|---|---|---|---|
| ` | The Young Womens Leadership 150-91 87 Road | | (1) Alternate accessible entrance not available, and accessible entrance is not used for all voters (BOE 1444)<br><br>(2) Second AD Group:  Not compliant with pre-cleared accessible room set up: "Room was overcrowded with school supplies, children, TVs etc. . . Schematic could not be followed." (BOE 2767) | | |
| | Taiwan Center 137-44 Northern Boulevard | (1) Inaccessible ramp (CIDNY Survey)<br><br>(2) Exterior signage barriers (CIDNY Survey)<br><br>(3) Interior signage barriers (CIDNY survey)<br><br>(4) Interior access barriers (CIDNY Survey) | (1) "No handrail on Ramp." (BOE 1556) | (1) Interior access barriers (CIDNY Survey) | |
| | Saint Albans Cong Church 172-17 Linden Boulevard | | (1) Exterior signage barriers (CIDNY survey)<br><br>(2) Interior access barriers (CIDNY survey) | | |
| | Samaritan Village 138-02 Queens Boulevard | | | | |
| | VFW Post 150 51-11 108th St | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | Grace Houses<br>155-02 90 Ave | | | | |
| | Forest Hills Library<br>108-19 71 Ave | | (1) Not visited "Sorry no time." (BOE 1657) | | |
| | Hillcrest Jewish Center<br>183-02 Union Turnpike | | | | |
| | PS 270<br>233-15 Merrick Boulevard | | | | |
| | PS 238<br>17-15 Weirfield St | | | | BMD turning space was less than 5'. Electracal outlet and cord did not allow poll worders to set up BMD for privacy. (only extension cord there used for scanners) |
| | PS 234<br>30-15 29 St | | | | |
| | Merrick Park Baptist Church<br>120-02 Marsden St | | | | |
| | PS 254<br>84-40 101 St | | | | |
| | VFW Post 885<br>120-19 14 Road | | (1) Exterior signage barriers (CIDNY survey)<br><br>(2) Entry / pathway barriers (CIDNY survey)<br><br>(3) Interior access barriers (CIDNY survey) | | |
| | Le Havre Club<br>168-68 9 Ave | | (1) BOE Form is untouched. Likely | | |

| | | | | |
|---|---|---|---|---|
| ` | | | not visited. (BOE 2830) | | |
| | Israel Senior Housing 1925 Seagirt Boulevard | | | | |
| | Mary's Nativity Church 46-02 Parsons Boulevard | | | | |
| | IS 59 132-55 Ridgedale Street | | (1) No indication it was visited by BOE. (BOE 1696) | (1) Interior access barriers (CIDNY survey) | |
| | Immaculate Conception Church 86-45 Edgerton Boulevard | | (1) Exterior signage barriers (CIDNY Survey) (2) Interior signage barriers (CIDNY survey) (3) Interior access barriers (CIDNY Survey) | | |
| | Services for the Underserved 318 Beach 85 Street | | | | |
| | Information Tech High School 21-16 44 Road | | | | |
| | Sherwood Village "C" 99-30 59 Ave | | | | |
| | PS 244 137-20 Franklin Ave | (1) Entry / pathway barriers (CIDNY survey) | | | |
| | Richmond Hill Library 118-14 Hillside Ave | | | | |
| | PS 305 378 Seneca Ave | | (1) Alternate accessible entrance doors closed. (2) No indication there is a door | | |

| | | clerk. (BOE 1951) | | |
|---|---|---|---|---|
| | PS 306<br>95-16 89 Ave | | | |
| | Elmhurst Campus HS<br>45-10 94 St | | (1) BOE Form untouched. No indication it was visited. (BOE 2031) | |
| | Christ Tabernacle Church<br>64-36 Myrtle Ave | | | No ADA privacy booth |
| | Woodside Library<br>53-22 Skillman Ave | | | |
| | Beach Channel HS<br>100-00 Beach Channel Drive | | | |
| | Ridgewood Presbyterian Church<br>59-14 70 Ave | | | Ramp was 35' 5" too steep and too long. Ratio was 23/8:24.<br><br>The BMD had 48" clearance. |
| | St Margarets RC Church<br>66-05 79 Place | | | |
| | Arverne Pilgrim Church<br>74-16 Beach Channel Drive | | | |
| | The Vallone Family Snr Res<br>21-05 30 Drive | | | |
| | First Baptist Church of Corona<br>100-10 Astoria Boulevard | | | |
| | The Korean Church of Queens<br>23-37 89 St | | | |
| | Seaside Library<br>116-15 Rockaway Beach BLvd | | | |
| | PS 113<br>78-23 87 St | | | |
| | Grace Lutheran | | (1) Ramp in use | |

| | | | | |
|---|---|---|---|---|
| | School<br>100-05 Springfield Boulevard | | and not set up properly. (BOE 2449) | |
| | Dayton Towers West<br>102-00 Shore Front Parkway | | | |
| | PS 34<br>104-12 Springfield Boulevard | | | |
| | St Leo School<br>104-19 49 Ave | | (1) Accessible entrance signs not properly posted.<br><br>(2) Accessible door was closed.<br>(BOE 2016-2017) | |
| | IS 53<br>10-45 Nameoke St | | | |
| | PS 14<br>107-01 Otis Ave | | | |
| | PS 108<br>108-10 109 Ave | | (1) Insufficient access signage. "Handcap signs short." (BOE 1964) | |
| | IS 8<br>108-35 167 St | | (1) Interior access barriers (CIDNY survey) | |
| | PS 40<br>109-20 Union Hall St | | | |
| | PS 160<br>109-59 Inwood St | | | |
| | IS 192 JHS<br>109-89 204 St | | | |
| | PS 100<br>111-11 118 St | | (1) Exterior signage barriers (CIDNY survey)<br><br>(2) Entry / pathway barriers (CIDNY survey)<br><br>(3) Interior signage barriers (CIDNY survey) | |

| | | | (4) Interior Access barriers (CIDNY survey)<br><br>BOE Survey:<br>(1) Accessible entrance interior doors to the poll room are not open and clear of obstructions. (BOE 2410) | | |
|---|---|---|---|---|---|
| | PS 140<br>166-11 116 Ave | | | | |
| | Ocean Park Apartments<br>120 Beach 19 St | | | | |
| | PS 226 JHS<br>121-10 Rockaway Boulevard | | (1) Interior access barriers (CIDNY Survey) | | |
| | PS 121<br>126-10 109 Ave | | | | |
| | PS 30<br>126-10 Bedell St | | | | |
| | PS 129<br>128-02 7 Ave | | (1) Interior Access barriers (CIDNY survey)<br><br>(2) BOE says Not compliant with pre-cleared accessible site set up: "Site was not set up according to schematic" (BOE 1506) | | |
| | PS 124<br>129-15 150 Ave | | 1) Exterior Signage barriers (CIDNY survey) | | |
| | Brookdale Village Senior Ctr<br>131 Beach 19th St | | (1) Exterior signage barriers (CIDNY Survey)<br><br>(2) entry / pathway barriers (CIDNY survey) | | |

| | | | | |
|---|---|---|---|---|
| | | | (3) interior access barriers (CIDNY survey) | |
| | PS 55 131-10 97 Ave | | | (1) Inaccessible ramp (CIDNY Survey) (2) Exterior signage barriers (CIDNY survey) (3) Entry / pathway barriers (CIDNY survey) (4) Interior access barriers (CIDNY survey) |
| | IS 72 133-25 Guy R Brewer Blvd | | (1) Signage improperly posted when AD monitors arrived. (2) "not enough lights over the BMD and where the workers work." (BOE 2423) | |
| | Bland Community Center 133-36 Roosevelt Ave | | | |
| | PS 202 JHS 138-30 Lafayette St | | (1) BOE Says Not visited "We were unable to get to." (BOE 1600) "We did not inspect" (1602) | |
| | PS 171 14-14 29 Ave | | | |
| | IS 142 | | | |

| | | | | |
|---|---|---|---|---|
| . | 142-10 Linden Boulevard | | | |
| | PS 20 142-30 Barclay Ave | (1) Inaccessible ramp (CIDNY Survey) (2) Entry / pathway barriers (CIDNY Survey) (3) Interior access barriers (CIDNY survey) | (1) Exterior signage barriers (CIDNY Survey) No indication site was ever visited by BOE (blank AD inspection form) (BOE 1564) | | |
| | Springfield Gardens HS 143-10 Springfield Blvd | | (1) "Missing signs for both inside and outside poll site" (BOE 2928) (2) "No door clerks" (BOE 2931) | | |
| | PS 50 143-26 101 Ave | | | | |
| | PS 219 144-39 Gravett Road | | (1) Interior access barriers (CIDNY survey) | | |
| | PS 189 JHS 144-80 Barclay Ave | | (1) No indication site was ever visited by BOE (blank AD inspection form) (BOE 1567) | | |
| | PS 231 JHS 145-00 Springfield Boulevard | | (1) exterior signage barriers (CIDNY survey) (2) Entry / pathway barriers (CIDNY survey) (3) Interior access barriers (CIDNY survey) | | |
| | PS 185 JHS 147-26 25 Drive | | (1) Access signage missing. (2) Directional signage to the | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | alternative accessible entrance not properly posted. (BOE 2818) | | |
| | PS 181 148-15 230 St | | | | |
| | PS 193 152-20 11 Ave | | Form is untouched. Likely not visited. (BOE 2827) | | |
| | PS 22 153-33 Sanford Ave | | | | |
| | PS 232 153-23 83 St | | "Did not visit" (BOE 1603) | | |
| | August Martin HS 156-10 Baisley Boulevard | | | | |
| | Aguilar Gardens 156-11 Aguilar Ave | | (1) Inaccessible ramp (CIDNY survey)<br><br>(2) Exterior signage barriers (CIDNY survey) | | |
| | PS 163 159-01 59 Ave | | | | |
| | Ps 207 159-15 88 Street | | "Did not visit." (BOE 1609)<br><br>Other AD Monitor Comment "Door clerk a no show." (BOE 2106) | | |
| | PS 209 16-10 Utopia Parkway | | | | |
| | PS 184 163-15 21 Road | | | | |
| | PS 107 167-02 45 Ave | | (1) At 8:40 pm: alternate accessible entrance door closed. Not easily opened from outside. (BOE 2190)<br><br>(2) Signage | | |

|  |  |  | barriers. AD Comment "No internal signs. Handicap signs not marked as to location." (BOE 2190) |  |  |
|--|--|--|--|--|--|
|  | PS 131 170-35 84 Ave |  | AD Comment: "Secured windblown handicap sign." (BOE 2171) |  |  |
|  | PS 80 171-05 137 Ave |  |  |  |  |
|  | PS 32 171-11 35 Ave |  | (1) Entry / pathway barriers (CIDNY survey) |  |  |
|  | Ps 173 174-10 67 Ave |  | (1) At 5:02pm Accessible "door closed – corrected by locking it open" (BOE 2181) | (1) Entry / Pathways barriers (CIDNY Survey) |  |
|  | PS 52 178-37 146 Terrace |  |  | (1) Interior access barriers (CIDNY survey) |  |
|  | PS 95 179-01 90 Ave |  |  |  |  |
|  | PS 37 179-37 137 Ave |  |  |  |  |
|  | PS 169 18-25 212 St |  | (1) entry / pathway barriers (CIDNY Survey) |  |  |
|  | PS 36 187-01 Foch Boulevard |  |  |  |  |
|  | PS 178 189-10 Radnor Road |  |  |  |  |
|  | PS 118 190-20 109 Road |  | (1) Exterior signage barriers (CIDNY survey)<br><br>(2) Entry / pathway barriers (CIDNY Survey) |  |  |

| | | | | |
|---|---|---|---|---|
| | | | (3) Interior signage barriers (CIDNY Survey)<br><br>(4) Interior access barriers (CIDNY survey) | |
| | PS 35<br>191-02 90 Ave | | | |
| | PS 26<br>195-02 69 Ave | | (1) Signage missing at the alternate accessible entrance. Directional signage missing for alternate accessible entrance. (BOE 2630) | |
| | PS 101<br>2 Russell Place | | (1) Inaccessible ramp (CIDNY survey)<br><br>(2) Entry / pathway barriers (CIDNY survey)<br><br>(3) Interior access barriers (CIDNY Survey) | |
| | PS 130<br>200-01 42 Ave | | "BMD not working. Called – no repair as yet" (4:20pm) (BOE 1503) | |
| | PS 162<br>201-02 53 Ave | | Signs for alternate handicap entrance missing. Directional arrows to alternate handicap entrance not posted properly. (BOE 2624) | (1) Interior access barriers (CIDNY survey) |
| | PS 134<br>203-06 109 Ave | | | |
| | Blessed Trinity Church<br>204-25 Rockaway | | "Did not visit" (BOE 1630). | |

Case 1:10-cv-05655-DAB-HBP Document 116 Filed 10/18/12 Page 161 of 348

| | | | | |
|---|---|---|---|---|
| | Point Blvd | | No door clerk present. (BOE 2086) | | |
| | PS 159<br>205-01 33 Ave | | 1) Accessible entrance doors closed and locked. "Handicap not guarded – door locked – short inspectors."<br><br>2) "No poll worker/ door monitor."<br>(BOE 1496- 1497)<br><br>Second AD Team "No door clerk" (BOE 2211) | | |
| | Andrew Jackson HS<br>207-01 116 Ave | | | | |
| | PS 135<br>207-11 89 Ave | | | | |
| | Scheuer House of Bayside<br>208-11 26 Ave | | | (1) Exterior signage barriers (CIDNY survey)<br>(2) Interior access barriers (CIDNY survey) | |
| | Queensview Inc<br>21-15 34 Ave | | | | |
| | PS 122<br>21-21 Ditmars Boulevard | | | | |
| | Grover Cleveland HS<br>21-27 Himrod St | | (1) AD Comment"BMD broken, repair called in, service could not fix, would go to warehouse and try to replace. Was not able to come back." (BOE 1955) | | |

| | | | | |
|---|---|---|---|---|
| . | PS 31<br>211-45 46 Road | | (1) No signage for accessible entrance (BOE 3461) | |
| | PS 109 JHS<br>213-10 92 Ave | | (1) No door clerk. (BOE 1820) | |
| | PS 41<br>214-43 35 Ave | | | |
| | PS 147<br>218-01 116 Ave | | | |
| | PS 188<br>218-12 Hartland Ave | | | |
| | PS 84<br>22-45 41 St | (1) Inaccessible Ramp (CIDNY Survey)<br><br>(2) Exterior signage barriers (CIDNY survey)<br><br>(3) Entry / pathway barriers (CIDNY survey) | | |
| | PS 85<br>23-70 31 St | | | |
| | M Vanburen HS<br>230-17 Hillside Ave | | | |
| | PS 213<br>231-02 67 Ave | | | (1) Interior access barriers (CIDNY survey) |
| | PS 112<br>25-05 37 Ave | | (1) At 6:40 AD monitors wrote: "Poll site in auditorium, not gym. The whole place was a mess. BMD not set up properly." (BOE 2384) | |
| | PS 186<br>252-12 72 Ave | | | |
| | PS 138<br>251-11 Weller Ave | | | |
| | PS 195<br>253-50 149 Ave | | | |
| | PS 104 | | | |

| | | | | |
|---|---|---|---|---|
| | 26-01 Mott Ave | | | | |
| | Lexington School<br>25-26 75 Street | | | | |
| | North Shore Towers<br>272-40 Grand<br>Central Parkway | | | | |
| | Newcomers HS<br>28-01 41 Ave | | | | |
| | St. Joseph School<br>43-19 30th Ave | | | | |
| | PS 70<br>30-45 42 Street | | (1) Entry / pathway barriers (CIDNY survey)<br><br>BOE Comment<br>(2) Door clerk is a "No show" (BOE 2555) | (1) Entry / Pathway barriers (CIDNY Survey)<br><br>(2) Interior access barriers (CIDNY survey) | |
| | PS 214<br>31-15 140 Street | | | | |
| | Bayside HS<br>32-24 Corporal Kennedy St | | | | |
| | PS 166<br>33-09 35 Ave | | | | |
| | Southridge Co-Op #3<br>33-24 91 St | | | | |
| | IS 145<br>33-34 80 St | | | | |
| | PS 152<br>33-52 62 St | | (1) Exterior accessible entrance door closed.<br><br>(2) No door clerk. AD Comment: "The doors for the Accessible entrance were CLOSED. We had to tell coordinator to place someone there." (BOE 1851) | | Inside ramp slope exceeds ADA guidelines. 3" 10 24" (photo)<br><br>Due to students in school for primary day privacy booths were not ADA |

| | | | | | compliant (photo) |
|---|---|---|---|---|---|
| | IS 25 34-65 192 St | | | | |
| | PS 143 34-74 113 St | | | | |
| | St Andrews School 35-60 158th St | | | | |
| | PS 76 36-36 10 St | | (1) No door clerk at alternate accessible entrance. (BOE 1936)<br><br>(2) exterior signage (CIDNY Survey)<br><br>(3) Entry / pathway barriers (CIDNY survey) | | |
| | MS 333 365 Beach 57 Street | | | | |
| | PS 199 39-20 48 Ave | (1) Inaccessible Ramp (CIDNY survey) | (1) AD Monitor Comments "There is no light at the entrance/ exit door. It is very dangerous as darkness set in. The coordinator looked for maintenance and none could be found." (BOE 2575) | | |
| | PS 150 40-01 43 Ave | | | | |
| | PS 98 40-20 235 St | | (1) Outside signage not posted properly "Front of school problem."<br><br>(2) Directional signage to alternative accessible entrance not posted properly. (BOE | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | 2800)<br><br>(3) Accessible entrance doors not open. No door clerk present. Comments indicate that school required accessible entrance to be closed if children were in the school yard. (BOE 2801) | | |
| | Astoria Community Center<br>4-05 Astoria Boulevard | | | | |
| | PS 94<br>41-77 Little Neck Parkway | | | | |
| | PS 12<br>42-00 72 St | | (1) Signs for the alternative accessible entrance not posted. (BOE 1840) | | |
| | PS 105<br>420 Beach 51 St | | (1) Improper Signage: "Some signs taken off" No door clerk BOE 1759 - 1760 | | |
| | Goodwill Apartments<br>4-21 27 Ave | | | | |
| | Beach 41st St Comm Ctr<br>426 Beach 40 Street | | | | |
| | Queen of Angels Parish Center<br>43-18 Skillman Ave | | (1) interior access barriers (CIDNY Survey) | | |
| | Queens Botanical Gardens<br>43-50 Main St | | | | |
| | Rosenthal Senior Center<br>45-25 Kissena Boulevard | | | | |
| | PS 125 JHS | | | | |

| | | | | |
|---|---|---|---|---|
| | 46-02 47 Ave | | | |
| | IS 237<br>46-21 Colden St | | (1) Accessible entrance closed and not easy to open from outside. (BOE 2071) | |
| | Newtown HS<br>48-01 90 Street | | | |
| | IS 61<br>98-50 50 Ave | | (1) Both BOE forms untouched. No indication it was visited. (BOE 2019 and 2046) | |
| | PS 67 JHS<br>51-60 Marathon Parkway | | | |
| | PS 215<br>5-35 Briar Place | | (1) Interior door to poll room closed. Not easy to open from the outside. No interior door clerk. (BOE 1765) | |
| | PS 11<br>54-25 Skillman Ave | | | |
| | PS 13<br>55-01 94 St | | (1) Exterior signage barriers (CIDNY survey)<br><br>(2) Entry / pathway barriers (CIDNY survey)<br><br>(3) Interior Signage barriers (CIDNY survey)<br><br>(4) Interior Access barriers (CIDNY Survey) | |
| | PS 102<br>55-24 Van Horn St | | | |
| | PS 177<br>56-37 188 St | | (1) Signage for alternate accessible entrance and (2) directional arrows to alternate | |

| | | | | | |
|---|---|---|---|---|---|
| | | | accessible entrance not posted/ missing. (3)Door initially closed. Door monitor opened. (BOE 2627 - 2628) | | |
| | Benjamin Cardozo HS 57-00 223 St | | | | |
| | Ocean Village 57-07 Shore Front Parkway | | BOE Found: (1) Directional arrows not properly posted. "At ocean village site, outside signs were taken down by the kids in the complex." (BOE 1753-1755) (2) Exterior signage barriers (CIDNY Survey) (3) Entry / pathwyay barriers (CIDNY Survey) (4) Interior access barriers (CIDNY Survey) | | |
| | PS 120 58-01 136 Street | | (1) Interior accessible door to the poll room closed and/or obstructed.  (BOE 2652) | | |
| | Francis Lewis HS 58-20 Utopia Parkway | | (1) At 6:30pm. accessible entrance doors closed and not easily opened from outside. (2)No door clerk. (BOE 2184) | | |

| | | | | |
|---|---|---|---|---|
| | Big Six Towers<br>59-15 47 Ave | | | |
| | PS 81<br>599 Cypress Ave | | (1) Exterior signage barriers (CIDNY survey)<br><br>(2) Interior Access barriers (CIDNY survey) | |
| | PS 153<br>60-02 60 Lane | | | |
| | PS 88<br>60-85 Catalpa Ave | | | BMD had a 46 and ½ clearance and the ADA privacy booth 56 and 3/4ths<br><br>front slope greater than 30ft with no landing (ask Monica) |
| | Fairview Apartments<br>61-20 Grand Central Parkway | | (1) Not compliant with pre-cleared accessible schematic: 3:30pm "Room was not set up according to lay out but was changed to sufficiently demonstrate 1,2,3 process. . . Signage leading to poll site was insufficient and changed." BOE 2875 | |
| | PS 206<br>61-21 97 Place | | | |
| | PS 187/811 Q<br>61-25 Marathon | | | |

| | | | | |
|---|---|---|---|---|
| | Parkway | | | |
| | PS 220<br>62-10 108 St | | (1) Site uses a portable ramp but "there was no ramp installed" (BOE 1891) | |
| | PS 157 JHS<br>63-55 102 Street | | | |
| | PS 175<br>64-35 102 St | | (1) Interior doors to poll room obstructed "lunch tables were close to door." (BOE 2865)<br><br>(2) Exterior signage barriers (CIDNY Survey) | (1) interior Access barriers (CIDNY Survey) |
| | PS 46<br>64-45 218 St | | | |
| | PS 174<br>65-10 Dieterie Crescent | | | (1) Inaccessible ramp (CIDNY Survey)<br><br>(2) Interior access barriers (CIDNY Survey) |
| | PS 93 JHS<br>66-56 Forest Ave | | | |
| | PS 229<br>67-25 51 Road | | (1) Not compliant with pre-cleared accessible schematic: "Room did not follow exact floor plan." (BOE 2964). | |
| | PS 87<br>67-54 80 St | | | |
| | PS 190 JHS<br>68-17 Austin St | | (1) First AD Team: "Room is DARK, Dark." (BOE 1656)<br><br>(2) No door clerk. | (1) Entry / pathway barriers (CIDNY survey) |

| | | | | | |
|---|---|---|---|---|---|
| | | | (BOE 1654)<br><br>Second AD Team: "No door clerk." (BOE 2287) | (2) Interior access barriers (CIDNY survey) | |
| | PS 128<br>69-10 65 Drive | | (1) All signage missing. No directional arrows.<br><br>(2)No signs posted at accessible entrance. (BOE 1632)<br><br>(3)"Gold key for BMD missing. BMD was left unopen until told coord it must be opened." (BOE 1635)<br><br>Second AD Team: Improper directional signage comment: "Hard to find, place is in the basement." (BOE 2896)<br><br>(3) Not compliant with pre-cleared accessible schematic: "extremely noisy and crowded. A teacher constantly on the loud-speaker. They only had half the available space." (BOE 2989) | | |
| | PS 73 JHS<br>70-02 54 Ave | | (1) Improper access signage: "Had to move handicap sign." (BOE 2959) | | |

|  |  |  | (2) "Not a good room for the election due to the sharing of the lunch room with the students. Students were loud, hard to understand what's going on, or where to go even with all the signs hung properly, if weren't for door clerk people may not know where to go." (BOE 2961) |  |  |
|  | PS 200 70-10 164 St |  | (1) "Bell from BOE did not work." (BOE 1538) |  |  |
|  | PS 165 70-35 150 St |  |  |  |  |
|  | Sand Castle 7-11 Seagirt Ave |  |  |  |  |
|  | Immaculate Conception Center 72-00 Douglaston Parkway |  | (1) "One handicapped sign by street handing by a string, blowing in the wind." (BOE 2147) |  |  |
|  | Dayton Towers East 7400 7400 Shore Front Parkway |  |  |  |  |
|  | PS 154 75-02 162 Street |  | (1) AD Comment "Handicap entrance far away from main entrance. Should have more arrows." (BOE 2177) |  |  |
|  | PS 205 75-25 Bell Boulevard |  |  |  |  |
|  | PS 69 77-02 37 Ave |  | (1) Form untouched. No |  |  |

| | | | | |
|---|---|---|---|---|
| | | | indication it was visited. (BOE 2025) | |
| | Meadowbrook Apartments 77-15 113 St | | | |
| | PS 49 79-15 Penelope Ave | | | |
| | Creedmoor Hospital 79-25 Winchester Boulevard | | | |
| | PS 115 80-51 261 St | | | |
| | Dayton Beach Park 8200 8200 Shore Front Parkway | | | |
| | Hammel Comm Center 81-14 Rockaway Beach Blvd | | | |
| | PS 64 82-01 101 Ave | | | |
| | PS 99 82-37 Kew Gardens Road | | | (1) Interior access barriers (CIDNY survey) |
| | Forest Park Co-op 83-55 Woodhaven Boulevard | | (1) entry / pathway barriers (CIDNY survey)  (2) Interior access barriers (CIDNY survey) | |
| | VFW Post 551 84-02 60 Ave | | (1) No hand rails on ramp. "Never had hand rails, was the same ramp / rail the place uses."  (2) Door clerk not present. (BOE 2954) | |
| | PS 217 JHS 85-144 Street | | | |
| | Briarwood Library 85-12 Main St | | | |

| | | | | |
|---|---|---|---|---|
| | PS 191<br>85-15 258 St | | | |
| | PS 89<br>85-28 Britton Ave | | (1) entry / pathway barriers (CIDNY survey)<br><br>(2) Interior access barriers (CIDNY survey)<br><br>BOE Form untouched. No indication it was visited. (BOE 2028) | Entrance under heavy construction (photo) |
| | PS 97<br>85-52 85 Street | | | |
| | Dayton Beach Park 8600<br>8600 Shore Front Parkway | | | |
| | PS 54<br>86-02 127 St | | (1) Not compliant with pre-cleared accessible schematic. "Room needed to be changed due to needs of the school.  Lunch room was in original site layout." (BOE 2854) | |
| | PS 56<br>86-10 114 St | | (1) BMD not accessible when AD Monitors arrived: "Rotated BMD and set up properly. Placed 5 feet from wall." (BOE 2835) | |
| | PS 18<br>86-35 235 Court | | (1) "Custodian would not allow entrance" to be opened.  Accessible entrance doors were closed (possibly locked) | |

| | | | (BOE 1811) | | |
|---|---|---|---|---|---|
| ` | PS 90<br>86-50 109 St | | (1) Handicap signage initially improper. (BOE 2839)<br><br>(2) Exterior accessible entrance doors obstructed by "card board box which was blocking entrance." (BOE 2840)<br><br>(3) Not compliant with pre-cleared accessible schematic. "Room was not set up to fit the layout but was changes as best as possible. Room had vending machines and televisions which affected the way the room could be set up." (BOE 2842) | | |
| | Hilltop Village Co-op<br>87-15 204 Street | | | | |
| | PS 113<br>78-23 87 Street | | | | |
| | PS 82<br>88-02 144 St | | (1) Directional Signage insufficient: "More directional arrows needed" (BOE 2759) | | |
| | IS 238<br>88-15 182 Street | | | | |
| | Central Library<br>89-11 Merrick Boulevard | | (1) Accessible entrance door not open. Not easily opened from outside. "Doors are computerized not to open." Interior | | |

| | | | | | |
|---|---|---|---|---|---|
| ` | | | "doors are on timer." Problem not corrected. (BOE 1667) | | |
| | PS 63 90-15 Sutter Ave | | | | |
| | PS 60 91-02 88 Ave | | (1) Exterior signage barriers (CIDNY Survey)<br><br>(2) Entry / Pathway barriers (CIDNY survey)<br><br>(3) Interior access barriers (CIDNY survey) | | |
| | PS 33 91-37 222 Street | | (1) No door clerk available. (BOE 1814) | | |
| | Peninsula Library 92-25 Rockaway Beach Blvd | | | | |
| | PS 144 93-02 69 Ave | | | (1) Entry / pathway barriers (CIDNY survey) | |
| | PS 139 93-06 63 Drive | | | | |
| | PS 210 JHS 93-11 101 Ave | | (1) Not compliant with pre-cleared accessible site set up: "Site was not arranged according to plan." BOE 1590 | | |
| | PS 149 93-11 34 Ave | | (1)Alternate accessible entrance signs not posted.<br><br>(2) Directional arrows to alternate accessible entrance not posted. (BOE 1861)<br><br>(3)Accessible door | | |

|  | | | closed. (BOE 1862) | | |
|---|---|---|---|---|---|
|  | Lefrack City Apartments 96-10 57 Ave | | | | |
|  | PS 62 97-25 108 Street | | | | |
|  | PS 146 98-01 159 Ave | | (1) First BOE team: Not compliant with pre-cleared accessible schematic. "The poll room is not laid out as to the schematic because classes are held in the same room which necessitates an accommodating reformation of equipment." (2) "Due to room use and congestion, the BMD could not be positioned properly . . . as to assure proper access." (BOE 2110) Second BOE team: "Did not visit" (BOE 1606) (3) Inaccessible ramp (CIDNY Survey) (4) Entry / pathway barriers (CIDNY survey) (5) Interior Signage barriers (CIDNY Survey) (6) Interior access barriers (CIDNY | | |

| | | | Survey) | | |
|---|---|---|---|---|---|
| | Forest Park Library 98-27 Metropolitan Ave | | | | |
| | PS 19 40-32 99 Street | | (1) No door clerks. (BOE 2008) | (1) Exterior signage barriers (CIDNY survey) (2) Entry / pathway barriers (CIDNY survey) (3) Interior Access barriers (CIDNY survey) | |
| | Far Rockaway HS 821 Bay 25 St | | (1) Ramp not set up or not properly set up by custodian. (BOE 2682) | | |
| | PS 91 68-10 Central Ave | | | | |
| | PS 114 134-09 Cronston Ave | | First AD Team "Did not visit." (BOE 1627) Second AD team: (1) No door clerk present at accessible entrance. (2) Accessible entrance closed. AD Comments: "Call made to bd of E for additional people. School office insisted that the emergency | | |

|  |  |  | [accessible] entrance must remain closed until bd of e personal can cover it." (BOE 2091 - 2092) |  |  |
|---|---|---|---|---|---|
|  | Queensbridge North Comm Ctr 10-25 41 Ave |  |  |  |  |
|  | Redfern Community Center 15-44 Hassock Street |  |  |  |  |
| **Staten Island** | ███████████████████████████████████████████████████ |  |  |  |  |
|  | IS 61 445 Castleton Ave |  | (1) Exterior signage missing on front gate (BOE 3431)<br><br>(2) Portable ramp was not accessible / not set up properly (BOE 3432) |  |  |
|  | Staten Island Tech HS 485 Clawson St |  |  |  |  |
|  | IS 75 455 Huguenot Ave |  |  |  |  |
|  | PS 37 15 Fairfield St |  |  |  |  |
|  | Curtis HS 105 Hamilton Ave |  |  |  |  |
|  | New Dorp HS 465 New Dorp Lane |  | (1) Signage not properly posted outside (BOE 3566) |  |  |
|  | Saint Christophers 136 Midland Ave |  | (1) Signage not properly posted outside (BOE 3467)<br><br>(2) Portable ramp unsafe (BOE 3644) |  |  |
|  | Saint Paul's Meth Ch 7557 Amboy Road |  |  |  |  |
|  | IS 2 333 Midland Ave |  | (1) Signage not properly posted outside, directional |  |  |

Case 1:10-cv-09659-DAB-HBP Document 116 Filed 10/18/12 Page 179 of 348

| | | | | |
|---|---|---|---|---|
| · | | | arrows (BOE 3623)<br><br>(2) Portable ramp unsafe (BOE 3624) | | |
| | PS 42<br>380 Genesee Ave | | | | |
| | Tennis Club<br>42 Revere Street | | | | |
| | IS 72<br>33 Ferndale Ave | | | | |
| | Olivet Presby Church<br>97 Myrtle Ave | | | | |
| | Central Family Life Center<br>59 Wright Street | | | | |
| | Gold Star American Legion<br>17 Cannon Ave | | | | |
| | Holy Rosary Par Ctr<br>85 Jerome Ave | | | | |
| | The Elks<br>3250 Richmond Ave | | | | |
| | PS 20<br>161 Park Ave | | | | |
| | PS 56<br>250 Kramer Ave | | (1) No signage for accessible entrance (BOE 3443)<br><br>(2) No door clerk present (BOE 3444) | | |
| | PS 5<br>348 Deisius Street | | | | |
| | PS 6<br>555 Page Ave | | | | |
| | PS 22<br>1860 Forest Ave | | | | |
| | Petrides School<br>715 Ocean Terrace | | (1) Ramp not set up properly (BOE 3414)<br><br>(2) No door clerk at accessible entrance (BOE 3414) | | |
| | Christian Pentecostal Church | | (1) Signage: directional signs | | |

| | 910 Richmond Road | | missing (BOE 3434) (2) No door clerk present (BOE 3435) | | |
|---|---|---|---|---|---|
| | PS 58 77 Marsh Ave | | (1) Accessible entrance not open, no door clerk present (BOE 3366) | | |
| | Summerfield UMC 104 Harbor Road | | | | |
| | South Beach Community 155 Norway Ave | | | | |
| | The Tides at Charleston 15 Tides Lane | | | | |
| | PS 65 98 Grant Street | | | | |
| | Castleton Hill Moravian Church 1657 Victory Boulevard | | | | |
| | PS 14 100 Tompkins Ave | | | | |
| | Castleton Park Apartments 185 St Marks Place | | | | |
| | Richmond Terrace Comm Ctr 71 Jersey St | | | | |
| | All Saints Church 2329 Victory Boulevard | | | | |
| | PS 57 140 Palma Drive | | (1) Exterior signage not posted properly, AD monitor had to post signage (BOE 3362) | | |
| | PS 48 1055 Targee Street | | | | |
| | PS 54 1060 Willowbrook Road | | | | |
| | Concord HS 109 Rhine Ave | | (1) Maintenance had to remove interior blockage | | |

| | | | (BOE 3554) | | |
|---|---|---|---|---|---|
| | IS 27<br>11 Clove Lakes Place | | | | |
| | Cassidy/Lafayette<br>Senior Center<br>125 Cassidy Place | | (1) Signage not<br>properly posted<br>outside (BOE 3578) | | |
| | Ps 69<br>144 Keating Place | | | | |
| | PS 29<br>1581 Victory<br>Boulevard | | | | |
| | Cichon Post<br>100 Innis Street | | | | |
| | Stapleton<br>Community Center<br>189 Gordon Street | | | | |
| | PS 13<br>191 Vermont Ave | | | | |
| | IS 51<br>20 Houston Street | | | | |
| | PS 36 Annex<br>200 Jefferson<br>Boulevard | | | | |
| | Berry Community<br>Center<br>211 Jefferson St | | | | |
| | IS 24<br>225 Cleveland Ave | | (1) Signage not<br>properly posted<br>outside (BOE 3664) | | |
| | PS 36<br>255 Ionia Ave | | | | |
| | Todt Hill Community<br>Center<br>255 Westwood Ave | | (1) Signage not<br>posted at time of<br>inspection (BOE<br>3485) | | |
| | Elizabeth Connelly<br>Campus<br>280 Regis Drive | | (1) No door clerk<br>present (BOE 3354) | | |
| | PS 23<br>30 Natick St | | | | |
| | PS 32<br>32 Elverton Ave | | | | |
| | PS 53<br>330 Durant Ave | | (1) Signage not<br>properly posted<br>outside (BOE 3620) | | |
| | PS 52 | | | | |

| | | | | |
|---|---|---|---|---|
| | 450 Buel Avenue | | | |
| | Susan Wagner HS<br>50 Brielle Ave | | | |
| | Walker Park Club<br>50 Delafield Place | | (1) "Ramp too small for wheelchairs" (BOE 3495) | |
| | PS 11<br>50 Jefferson St | | | |
| | PS 55<br>54 Osborne Street | | | |
| | PS 31<br>55 Layton Ave | | | |
| | PS 35<br>60 Foote Ave | | | |
| | New Lane Senior center<br>70 New Lane | | | |
| | Staten Island Academy<br>715 Todt Hill Road | | | |
| | PS 19<br>780 Post Ave | | (1) Portable ramp not set up properly "planted walkway" (BOE 3447) | |
| | PS 44<br>80 Maple Parkway | | | |
| | PS 16<br>80 Monroe Ave | | | |
| | PS 3<br>80 South Goff Ave | | | |
| | PS 40<br>91 Henderson Ave | | | |
| | PS 50<br>200 Adelaide Ave | | (1) Exterior signage not posted properly (BOE 3374)<br>(2) Unsafe Ramp (BOE 3375, 3594) | |
| | PS 18<br>220 Broadway | | | |
| | IS 7<br>1270 Huguenot Ave | | | |
| | PS 8<br>100 Lindenwood Road | | (1) Signage not properly posted outside (BOE 3509) | |

|  |  |  | (2) Ramp not properly set up, "handrails didn't fit" (BOE 3510) |  |  |
|---|---|---|---|---|---|
|  | PS 60 55 Merrill Ave |  |  |  |  |
|  | PS 4 200 Nedra Lane |  | (1) No signage for accessible entrance (BOE 3500) |  |  |
|  | PS 39 71 Sand Lane |  |  |  |  |
|  | PS 30 200 Wardwell Ave |  |  |  |  |
|  | Parkview Apartments 700 Victory Boulevard |  |  |  |  |

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 119
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

Case 1:10-cv-06005-DAB-HBP Document 116 Filed 10/18/12 Page 184 of 348

**EXHIBIT B**

**AD MONITOR SAMPLE REPORT**

| Poll Site (Name and Address) | Temporary Modifications Needed to Ensure Accessibility on Election Day | Barriers Found/Temporary Modifications Not Implemented |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Poll Site (Name and Address) | Temporary Modifications Needed to Ensure Accessibility on Election Day | Barriers Found/Temporary Modifications Not Implemented |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Case 1:10-cv-05654-DAB-HBP Document 116 Filed 10/18/12 Page 187 of 348

**EXHIBIT C**

**DEPARTMENT OF JUSTICE POLLING PLACE ACCESSIBILITY CHECKLIST**

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM

NYSCEF DOC. NO. 3

INDEX NO. 157686/2017

RECEIVED NYSCEF: 08/28/2017

**U.S. Department of Justice**
Civil Rights Division
*Disability Rights Section*



**Americans with Disabilities Act**

# ADA Checklist for Polling Places



February 2004

Case 1:10-cv-05653-DAB-HBP   Document 119-1   Filed 10/18/12   Page 1 of 29

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM

NYSCEF DOC. NO. 3

INDEX NO. 157686/2017

RECEIVED NYSCEF: 08/28/2017

**Reproduction**

Reproduction of this document is encouraged.

Additional copies of this publication may be obtained, viewed or downloaded from the Publications section of the ADA Website (www.ada.gov) or by calling the ADA Information Line at 800-514-0301 (voice), 800-514-0383 (TTY).

**Disclaimer**

The ADA authorizes the Department of Justice to provide technical assistance to individuals and entities that have rights or responsibilities under the Act. This document provides informal guidance to assist you in understanding the ADA and the Department's regulation. However, this technical assistance does not constitute a legal interpretation of the statute.

February 2004

Case 1:10-cv-05653-DAB-HBP   Document 119-1   Filed 10/18/12   Page 3 of 29

# Table of Contents

## Evaluating the Physical Accessibility of Polling Places ———— 1

**Getting Started** ............................................................. 2
    Using the Polling Place Checklist ... 2
    Taking Measurements ... 3
    Completing the Checklist ... 4
    After Completing the Survey ... 4

## Getting to the Polling Place ———— 5

**A. Parking** ............................................................. 5
    Typical Issues ... 5
    Parking Checklist ... 6
    Temporary Solutions for Election Day ... 8

**B. Passenger Drop-Off Areas** ................................... 9
    Typical Issues ... 9
    Passenger Drop-Off Areas Checklist ... 10
    Temporary Solutions for Election Day ... 11

**C. Sidewalks and Walkways** ................................... 12
**Part 1. Typical Issues for Voters Who Use Wheelchairs, Scooters, or Other Mobility Aids** ... 12
    Sidewalks and Walkways Checklist ... 13
    Temporary Solutions for Election Day ... 15

**Part 2. Typical Issues for Voters Who Are Blind or Have Low Vision** ... 16
    Sidewalks and Walkways Checklist ... 17
    Temporary Solutions for Election Day ... 18

## Entering the Polling Place ———— 19

**D. Building Entrance** ............................................... 19
    Typical Issues ... 19
    Building Entrance Checklist ... 20
    Temporary Solutions for Election Day ... 22

**E. Hallways and Corridors** ..................................... 23
**Part 1. Typical Issues for Voters Who Use Wheelchairs, Scooters, or Other Mobility Devices** ... 23
    Halls and Corridors Checklist - Voters with Mobility Disabilities ... 24
    Temporary Solutions for Election Day ... 28

**Part 2. Typical Issues for Voters who are Blind or Who Have Low Vision** ... 29
    Halls and Corridors Checklist - Voters who are Blind or Who Have Low Vision ... 30
    Temporary Solutions for Election Day ... 31

## Using the Polling Place ———— 32

**F. Voting Area** ......................................................... 32
    Typical Issues ... 32
    Voting Area Checklist ... 33

## Appendix ———————— A-1

Case 1:10-cv-05653-DAB-HBP   Document 119-1   Filed 10/18/12   Page 4 of 29

ADA Polling Place Checklist

# Evaluating the Physical Accessibility of Polling Places

When choosing a new site for a polling place, elections officials should select a facility that is accessible to voters who use wheelchairs or scooters or who have difficulty walking. Planning for an upcoming election also gives elections officials the opportunity to improve existing polling places that are not accessible by using temporary elements, such as portable ramps, on election day or by working with building owners to make permanent alterations that improve the accessibility of the polling place.

The following checklist is designed to help voting officials determine whether a polling place has basic accessible features needed by most voters with disabilities.  It may be used when evaluating the accessibility of potential new polling places and when identifying physical barriers in existing polling places before temporary or permanent modifications are made to improve accessibility for elections.

Individuals completing the checklist do not necessarily need to be experienced in evaluating buildings and facilities for accessibility.  The checklist is designed to prompt the user to check key features by asking questions about sizes, sloped surfaces, and availability of accessible features, and in some areas it suggests alternatives if a physical barrier is identified.  By following the directions provided for filling out the checklist, voting staff and volunteers can identify accessible polling places and develop information used for implementing temporary and permanent modifications.



**A voter enters an accessible polling place.**

ADA Polling Place Checklist  Checklist Instructions

# Getting Started

An evaluation of polling place accessibility should focus on those areas of a facility that are important to voting. These often include parking for voters, a drop off or loading area, the entrance to the polling place, and the pedestrian routes (both exterior and interior) that voters use to get to the voter check-in and voting area.

Before a polling place is evaluated, it is useful for staff or volunteers to review the instructions for using the checklist and become familiar with the questions. It is also helpful to practice taking measurements and recording information before beginning the evaluation.

When staff arrive at a polling place, it is best to first determine the location of parking, including accessible parking (if any is provided), the entrance that will be used on election day, and the location of the voting area. If the survey is being done to determine the accessibility of a new location for a polling place, then the walk-through should look for areas that provide the best accessibility, where simple modifications may provide accessibility, or where it may be easiest to improve accessibility by adding temporary features.

## Using the Polling Place Checklist

### Tools and Documentation
A few simple tools may be used to measure the sizes and the slope of specific elements and spaces:

- A metal tape measure at least 15-feet long

- A level with a bubble measure or a digital measure at least twenty-four inches long for measuring slope, and

- A clipboard, copy of the checklist (one copy per polling place), and pens or pencils.

It is also a good idea to have a film or digital camera to document important areas that may need to be reviewed later. Any camera may be used to shoot photographs but one with a flash is most useful, particularly when indoor photos are needed.

### Use the Checklist to Record Data
The checklist is designed to prompt the users on what to look at and where to measure. All answers and notes should be recorded on the checklist for use later in the planning process. When completed, the checklist should provide an indication of the level of accessibility at the polling place. If photographs are taken during the survey, it is helpful to note on the checklist that a photo was taken for later review of particular elements, spaces, or conditions.

### Completing Measurements and Recording Information
One person can complete a survey of a polling place but it is often quicker and easier for two people to work together. One can be responsible for taking the measurements and the other for recording the information and taking any photographs.

2

ADA Polling Place Checklist | Checklist Instructions

# Taking Measurements

## Sloped Surfaces

One way to measure slope is to use a 24-inch level with leveling bubble and a tape measure. Place the level on the incline in the direction you wish to measure. Rest one end of the level at the highest point of the sloped surface and lift the other end (as shown in the illustration) until the bubble is in the middle of the tube. This is the "level" position. While the level is in this position, measure the distance between the end of the level and the sloped surface below. If the distance is 2 inches or less, then the slope is 1:12 or less. When the distance is greater than 2 inches, record the distance on the checklist so the exact slope may be calculated later if needed.

Slopes may also be measured using a digital level. The digital display replaces the bubble and typically gives a reading that may be shown as a digital bubble, degrees, or a percent. Before using a digital level make sure to familiarize yourself with the directions. Many digital levels need to be calibrated each time they are used. If you can set the digital display to percent or degrees, the maximum slope generally allowed is 8.33% or 4.76 degrees (for a 1:12 slope).



**Measuring slope using a 24-inch level and tape measure**

## Using the Tape Measure

When measuring the width of a parking space or access aisle, the width of an accessible route or the height of an object above the floor, for example, try to keep the tape from sagging or bending. If the tape is not straight, try to support the tape in the middle or pull it tight and take the measurement again.



**Using a tape measure to measure the width of a parking space**

## Measuring Door Openings

Measuring the clear opening of an accessible door requires special care. To measure the opening of a standard hinged door, open the door to 90 degrees. Place the end of the tape measure on the side of the door frame next to the clear opening (as shown in the drawing). Stretch the tape across the door opening to the face of the door. This measurement equals the clear open width of the door, which is typically less than the width of the door.



**Measuring the clear opening from the face of the doorstop on the frame to the face of the open door**

3

ADA Polling Place Checklist   Checklist Instructions

## Completing the Checklist

For each checklist item, check either "yes" or "no." If the measurement or number falls short of that required for accessibility, write the measurement or number to the right of the question in the area under "Comments." Add notes or comments as needed. For some questions when "no" is the answer, the checklist will include a prompt to check for an alternate solution. Information on alternate access can be used later as voting officials decide how to provide accessible voting.

When completing the survey, it is important to try to answer every question in each section, unless, of course, the element is not present at the particular site under review. For example, if there is no parking provided on-site at the polling place, or only on-street parking is provided, there is no need to try to measure the size of the parking spaces or to count the number of parking spaces.

The checklist is based on requirements from the ADA Standards for Accessible Design (Standards). Each item includes a reference to the technical requirements in the Standards from 28 C.F.R. Part 36, Appendix A. This reference is provided to assist users in looking up the requirement or related requirements when necessary. An electronic copy of the Standards is available on the ADA Website at www.ada.gov. Printed copies are also available from the ADA Information Line at 800-514-0301 (voice) or 800-514-0383 (TTY).

## After Completing the Survey

Completed polling place surveys will provide the information needed to determine which sites are accessible and which may become accessible with permanent or temporary modifications. Checklists where most answers are "yes" will usually indicate an accessible polling place. Others, where some answers are "no," may become accessible if permanent or temporary modifications are done to remove barriers. Polling places in older buildings may have few accessible features but some of these voting facilities may be able to be made accessible with temporary modifications, such as portable ramps at the entrance and accessible parking spaces marked off by traffic cones. There may also be some sites that cannot be made accessible so plans will be needed to offer accessible voting in some other way.

For more information about temporary modifications, see **Temporary Solutions for Election Day** at the end of each section of this document.

### Alterations

When State and local governments make permanent modifications or alterations to facilities that serve as polling places these alterations must comply with the ADA Standards. For more information visit the **ADA Website** to view or download the ADA Standards, technical assistance materials, and general ADA information.

**www.ada.gov**

For specific questions about the ADA, call the Department of Justice **ADA Information Line**.

**800-514-0301** (voice)
**800-514-0383** (TTY)

4

Polling Place Checklist

# Getting to the Polling Place

## A. Parking

**Typical Issues**

When parking is provided for voters, staff and volunteers, accessible parking must be provided for people with disabilities. Voters with disabilities who arrive by car need a parking space close to an accessible entrance. The accessible parking space has an adjacent access aisle that provides needed room for a person to open the car door fully and then stand with the aid of a walker, to transfer to a wheelchair, or to lower a wheelchair lift. The access aisle connects directly to an accessible route that leads to an accessible building entrance. In order to be usable, the access aisle must be relatively level, clear of gravel or mud, and the surface must be in good condition without wide cracks or broken pavement.

An accessible route connects the access aisle of each accessible parking space with the accessible entrance to the polling place. When an accessible route crosses a curb, a curb ramp must be provided. If the accessible route connects the access aisle to the accessible entrance using the parking lot surface, a marked crosswalk should be provided on the vehicular route.



**Van-accessible parking spaces serve both cars and vans. A wide access aisle is needed so a wheelchair lift may be lowered from the van onto the level surface.**



5

Polling Place Checklist | Parking Spaces

## Parking Spaces Checklist

**A1.** If parking is available, count the total number of parking spaces provided for the polling place. Are the minimum number of accessible parking spaces provided, based on the total number of available parking spaces (see table below)?

Yes _____ No _____

| Total Spaces for Polling Place | Required Minimum Number of Accessible Spaces |
|---|---|
| 1-25 . . . . . . . . . . . . . . . | 1 van-accessible space w/ min. 96 inch wide access aisle |
| 26-50 . . . . . . . . . . . . . . | 1 space w/ min. 60 inch wide access aisle + 1 van-accessible space |
| 51-75 . . . . . . . . . . . . . . | 2 spaces w/ min. 60 inch wide access aisle + 1 van-accessible space |

If more than 75, see the ADA Standards for Accessible Design, section 4.1.2, for the number of accessible parking spaces.

**A2.** Does each accessible parking space have its own, or share an adjacent access aisle that is least 60 inches (5 feet) wide? [ADA Stds 4.6.3]

Yes _____ No _____

**A3.** Is there at least one van-accessible parking space provided with an access aisle that is at least 96 inches (8 feet) wide or are universal parking spaces provided with a 132 inches (11feet) wide vehicle space and a 60 inch (5 feet) wide access aisle? [ADA Stds 4.1.2(5), A4.6]

Yes _____ No _____

**A4.** For van-accessible spaces, is there vertical clearance of at least 98 inches (8 feet - 2 inches) for the vehicle route to the parking space, the parking space, the access aisle and along the vehicle route to the exit? [ADA Stds 4.6.5]
*If No: Can the route be cleared by removing or raising low objects or can each van-accessible parking space be relocated?*

Yes _____ No _____




accessible route          accessible route          accessible route

access aisle

| 96" min | 60" min | 96" min | 96" min | 96" min | 96" min | 132" min | 60" min | 132" min |

Accessible Spaces for Cars      Van-Accessible Spaces      Universal Parking Spaces

**Plan Views of Accessible Parking Spaces Showing Minimum Width of Vehicle Space and Access Aisle.**

Comments

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM

NYSCEF DOC. NO. 3

INDEX NO. 157686/2017

RECEIVED NYSCEF: 08/28/2017

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 197 of 348

Case 1:10-cv-05653-DAB-HBP   Document 119-1   Filed 10/18/12   Page 10 of 29

**Polling Place Checklist**   Parking Spaces

|  | Comments |
|--|--|

**A5.** Are all accessible parking spaces, including the access aisle, relatively level (1:50 or 2%) in all directions? [ADA Stds 4.6.3]     Yes _____ No _____

*If No:  Look for a nearby area that is relatively level which could serve as an accessible parking space with an accessible route to the accessible entrance to voting.*

**A6.** Does each accessible parking space have a sign with the symbol of accessibility that is visible when a vehicle is parked in the space? [ADA Stds 4.6.4]     Yes _____ No _____

**A7.** If there is a curb between the access aisle and the accessible route to the building, is there a curb ramp that meets the following requirements:  [ADA Stds 4.7]     Yes _____ No _____



**Curb ramp showing minimum 36 inch width for ramp section and 1:12 slope on ramp section.**

**a.** Is the ramp surface at least 36" wide, excluding flared sides? [ADA Stds 4.7.3]     Yes _____ No _____

**b.** Is the slope (up or down the ramp) no more than 1:12? [ADA Stds 4.7.2]     Yes _____ No _____

*Note:  1:12 is one inch of vertical height for each 12 inches in length.*

**A8.** Are the accessible parking spaces serving the voting area on the shortest accessible route to the accessible entrance? [ADA Stds 4.6.2]     Yes _____ No _____

**A9.** Does each access aisle connect to an accessible route from the parking area to the accessible building entrance?  [ADA Stds 4.6.2]     Yes _____ No _____

## Temporary Solutions for Election Day

### Parking

**Problem One:**
Parking is available, but no accessible parking is provided or there are not enough accessible parking or van-accessible spaces.
   **Suggestion:** Find a relatively level parking area near the accessible entrance and then designate the area for accessible parking spaces and adjacent access aisles. Use three parking spaces to make two accessible parking spaces with an access aisle. Traffic cones or other temporary elements may be used to mark the spaces and access aisles. Provide a sign designating each accessible parking space and make sure the access aisle of each space is connected to the accessible route to the accessible entrance.

**Problem Two:**
Accessible parking is provided, but it does not have a marked access aisle next to each accessible space.
   **Suggestion:** Restripe the accessible parking spaces to provide an access aisle. As a temporary solution for election day, use traffic cones to mark off the access aisle and curb ramp area. The first accessible parking space provided should be a van-accessible parking space with an access aisle that is at least 96 inches wide.

**Problem Three:**
Accessible parking spaces or access aisles are on a sloped surface.
   **Suggestion:** Find a parking area that is close to the accessible entrance and more level. Provide accessible parking spaces and access aisles in that area. Make sure the accessible parking spaces connect to an accessible route to the entrance. Provide a sign designating each accessible parking space.

**Problem Four:**
No sign with the international symbol of accessibility is installed at each accessible parking space.
   **Suggestion:** Provide a temporary sign in front of each accessible parking space.



**Three standard parking spaces are converted into an accessible parking space with an access aisle. Cones mark the access aisle and a temporary curb ramp with edge protection connects to an accessible route to the polling place.**

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM

NYSCEF DOC. NO. 3

INDEX NO. 157686/2017

RECEIVED NYSCEF: 08/28/2017

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 199 of 348

Case 1:10-cv-05653-DAB-HBP   Document 119-1   Filed 10/18/12   Page 12 of 29

Polling Place Checklist

## B. Passenger Drop-Off Areas

### Typical Issues

Some voters with disabilities will be driven to the polling place and dropped off near an entrance in a passenger drop-off area. If the polling place is served by passenger drop-off areas, then at least one drop-off area must be accessible. An accessible drop-off area, also known as an accessible passenger loading zone, must have a level access aisle, adjacent and parallel to the vehicle space. Where a curb separates the vehicle space from the access aisle or the access aisle from an accessible route, a curb ramp must be provided so people with disabilities can get to the accessible route leading to the accessible entrance.



**Accessible Passenger Drop-off and Loading Area**

**Notes:**

1. Access aisle depth is at least 5 feet.

2. Access aisle length is at least 20 feet.

3. Curb ramp connects access aisle to the accessible route to the accessible entrance of the polling place.

**The access aisle may be at the street level or at sidewalk level. If it is at the sidewalk level, a curb ramp is provided between the street and the sidewalk. If the access aisle is at the street level, the curb ramp is provided between the access aisle and the sidewalk (as shown).**

9

Case 1:10-cv-05653-DAB-HBP   Document 119-1   Filed 10/18/12   Page 13 of 29

| Polling Place Checklist | Passenger Drop-Off Areas | **Comments** |

## Passenger Drop-Off Areas Checklist

If a passenger loading area is provided, you should answer the following questions.



**B1.** Is a relatively level (1:50 or 2% maximum slope in all directions) access aisle provided adjacent and parallel to the side of the vehicle pull-up area? [ADA Stds 4.6.6]   Yes _____ No _____

*If No, look for another relatively level location that is on an accessible route.*

**B2.** Is the vehicle space relatively level (2% maximum slope in all directions)?   Yes _____ No _____

**B3.** Is the area for the access aisle at least 5-feet wide and 20-feet long? [ADA Stds 4.6.6]   Yes _____ No _____

*Note: Unlike an accessible parking space, the surface for the access aisle does not have to be marked or striped.*

**B4.** Is the vertical height for the vehicle route to the loading zone, the drop off area, and the exit at least 114 inches (9 feet 6 inches) in height? [ADA Stds 4.6.5]   Yes _____ No _____

**B5.** Is a curb ramp provided between the vehicle pull up area and the access aisle (see figure above) or the access aisle and the accessible route (see figure on page 9) to the accessible entrance? [ADA Stds 4.6.6]   Yes _____ No _____

*If No, is there another area with a curb ramp connected to an accessible route that could serve as the drop-off area?*



**B6.** If a curb ramp is provided, is the slope of the ramp surface (not counting the side flares) no more than 1:12? [ADA Stds 4.7.2]   Yes _____ No _____

**B7.** Is the width of the curb ramp surface at least 36 inches? [ADA Stds 4.7.3]   Yes _____ No _____

**B8.** Does an accessible route connect the curb ramp to the accessible entrance? [ADA Stds 4.1.2(1)]   Yes _____ No _____

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 3

INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

**Polling Place Checklist** | Passenger Drop-Off Areas

## Temporary Solutions for Election Day

### Passenger Drop-Off Areas

**Problem:**
A passenger drop-off and loading zone is provided but there is no curb ramp between the vehicle area and the sidewalk leading to the accessible polling place entrance.

> **Suggestion:** Provide a portable ramp with edge protection in an area where the vehicle area and the sidewalk are relatively level. The curb ramp must connect to an accessible route to the accessible polling place entrance.
>
> If the drop-off and loading zone is not relatively level, consider relocating the accessible drop-off area and using one parking space next to the area where accessible parking is located to provide an accessible drop-off and loading zone. Cones or another temporary barrier may be needed to keep the parking space clear.



**A portable ramp with edge protection is used to provide an accessible route from the drop-off and loading area to the accessible polling place entrance.**

Case 1:10-cv-05653-DAB-HBP   Document 119-1   Filed 10/18/12   Page 15 of 29

Polling Place Checklist

## C. Sidewalks and Walkways

### Part 1.  Typical Issues for Voters Who Use Wheelchairs, Scooters or Other Mobility Aids

There must be at least one exterior accessible route that connects accessible passenger drop-off areas, accessible parking spaces, and other accessible elements, for example a route from a bus stop to an accessible building entrance. The accessible route is essential for people who have difficulty walking or who use wheelchairs or other mobility aids to get to the accessible entrance of the polling place.

An accessible route is at least 36 inches wide and may narrow briefly to 32 inches wide where utility poles, post-mounted signs, furniture, and doorways are located along an accessible route.  Abrupt level changes, steps, or steeply sloped sidewalks cannot be part of an accessible route.  Where ramps are used, they cannot be steeper than 1:12.  Ramps with a vertical rise of more than 6 inches must have handrails on both sides.  Ramps must also have edge protection to stop wheelchairs from falling off the sides, and level landings at the top and bottom of each segment and where a ramp changes direction.



Notes:

1  Accessible route.

2  Accessible drop-off area.

3  Accessible parking with van-accessible parking space.

4  Accessible entrance to polling place.

**An accessible entrance
to a polling place with accessible parking
and an accessible drop-off area.**

12

| Polling Place Checklist | Sidewalks and Walkways - Part 1 | Comments |

**Sidewalks and Walkways Checklist - Voters with Mobility Disabilities**



C1-1.  Is an accessible route provided from accessible parking spaces to the accessible entrance of the building?   [ADA Stds 4.1.2(1), 4.3]
   *Note:  If the accessible route crosses a vehicular route, a marked crosswalk should be used.*

Yes _____ No _____

C1-2.  Is an accessible route provided from public sidewalks and public transportation stops on the polling site (if provided) to the accessible entrance of the building?   [ADA Stds 4.1.2(1)]

Yes _____ No _____

C1-3.  Is the accessible route at least 36 inches wide?
   *If No, the accessible route may narrow to 32 inches wide for up to 2 feet in length.*

Yes _____ No _____

C1-4.  Is the accessible route free of steps and abrupt level changes over 1/2 inch?
   *Note:  Level changes between 1/4 inch and 1/2 inch should be beveled.*

Yes _____ No _____

C1-5.  Where an accessible route crosses a curb is a curb ramp provided?  If yes,

Yes _____ No _____

5a.  Is the ramp surface at least 36 inches wide, excluding flared sides?
[ADA Stds 4.7.3]

Yes _____ No _____

5b.  Is the slope (up or down the ramp) no more than 1:12?  [ADA Stds 4.7.2]
   *Note: 1:12 is one inch of vertical height for 12 inches of horizontal distance.*

Yes _____ No _____

C1-6.  If the slope of part of the accessible route is greater than 1:20, does this part meet the following requirements for an accessible ramp?

Yes _____ No _____

6a.  Is the ramp slope no greater than 1:12? [ADA Stds 4.8.2]
   *Note:  For existing ramps, the slope may be 1:10 for a 6 inch rise and 1:8 for a 3 inch rise in special circumstances (see ADA Stds 4.1.6(3)).*

Yes _____ No _____

6b.  Is the ramp width, measured between handrails, at least 36 inches?
[ADA Stds 4.8.3]

Yes _____ No _____

13

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 3

INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 204 of 348

Case 1:10-cv-05653-DAB-HBP   Document 119-1   Filed 10/18/12   Page 17 of 29

**Polling Place Checklist**  Sidewalks and Walkways - Part 1

**6c.** Does the ramp have a level landing at the top and bottom of each ramp section that is at least 60 inches long? [ADA Stds 4.8.4]
*Note: The level landing may be part of the sidewalk or walking surface.*

Yes _____ No _____

**6d.** If a ramp is more than 30 feet long, is a level landing at least 60 inches long provided every 30 feet of horizontal length? [ADA Stds 4.8.4]
*Note: When the running slope is less than 1:16 and more than 1:20, each ramp segment may be up to 40 feet long followed by a level landing.*

Yes _____ No _____

**6e.** Is a level landing, at least 60 inches by 60 inches, provided where a ramp changes direction? [ADA Stds 4.8.4]

Yes _____ No _____

**6f.** Are the handrails mounted between 34 and 38 inches above the ramp surface? [ADA Stds 4.8.5]

Yes _____ No _____

**6g.** If the ramp or landing has a vertical drop-off on either side of the ramp, is edge protection provided? [ADA Stds 4.8.7]

Yes _____ No _____

**Comments**



**Accessible Ramp Features**

**Notes:**

1. At least 36 inches between handrails
2. Top landing part of walk
3. Bottom landing part of walk
4. Handrail height 34 to 38 inches
5. Edge protection

14

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 3

INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

## Temporary Solutions for Election Day

### Sidewalks and Walkways - Voters with Mobility Disabilities

**Problem One:**
The sidewalk connecting parking to the polling place entrance is too steep to be accessible.
   **Suggestion:** Check to see if there is another sidewalk that provides an accessible route to the accessible entrance.  Sometimes there is a less direct route that can serve as the accessible route.

**Problem Two:**
The accessible route crosses a curb and no curb ramp is provided.
   **Suggestion:** Install a portable ramp with edge protection.

**Problem Three:**
One or two steps are part of the walkway leading to the accessible entrance.
   **Suggestion:** Install a portable ramp no steeper than 1:12 slope with edge protection and handrails.



**A portable ramp with edge protection is installed over a curb to provide an accessible route.**

15

Polling Place Checklist

## C. Sidewalks and Walkways

### Part 2. Typical Issues for Voters Who Are Blind or Have Low Vision

Objects that are wall-mounted, that project into a pedestrian route from the side, or that are overhead must be located so that people who are blind or who have low vision will either detect the objects before they run into them or safely pass under them. Examples include handrail extensions on stairs and ramps, post or wall-mounted signs, outdoor drinking fountains, and tree limbs that are lower than 80 inches above the walk. Pedestrian routes open to voters, such as sidewalks, courtyards, and plazas, must be free of overhanging objects that are less than 80 inches above the route. Objects more than 27 inches and less than 80 inches above the route that protrude from the side more than 4 inches are also a hazard. Because people can walk on any sidewalk, not just the accessible routes, all exterior pedestrian routes serving or leading to the voting area must be checked. The following checklist applies to sidewalks and walkways leading to the polling place and voting area.



Notes:

1. The bottom of the handrail extensions turn down so a person who is blind or has low vision can detect the hazard before running into it.

2. Signs or other objects in the pedestrian route can be a hazard if the bottom is more than 27 inches but less than 80 inches above the route.

3. Objects that overhang the pedestrian route must be at least 80 inches above the route.

**Common objects along pedestrian routes to a polling place that can be hazards to people who are blind or have low vision.**

16

Case 1:10-cv-05653-DAB-HBP   Document 119-1   Filed 10/18/12   Page 20 of 29

**Polling Place Checklist**  Sidewalks and Walkways - Part 2

**Comments**

### Sidewalks and Walkways Checklist - Voters Who are Blind or Who Have Low Vision



**This wall-mounted box is mounted too high to be detectable by a person who is blind. Placing an object, like this sign, under the box provides a way to warn the person before they walk into the side of the box.**

**C2-1.** Are all sidewalks and walkways to the voting area free of any objects (e.g., wall-mounted boxes, signs, handrail extensions, trees) with bottom edges that are higher than 27 inches but less than 80 inches above the walkway and that extend more than 4 inches into the sidewalk or walkway?
[ADA Stds 4.4, 4.2.1(3), 4.1.3(2)]

*If No, can the object be lowered, removed, or modified or can the route be changed to avoid the object?*

Yes _____ No _____



**C2-2.** Are the undersides of exterior stairs enclosed or protected with a cane-detectable barrier so that people who are blind or have low vision will not hit their heads on the underside?
[ADA Stds 4.4.2]

*If No, can a barrier or enclosure be added below the stair or can the route be relocated away from the stair?*

Yes _____ No _____

**When the underside of a stair is open, it is a hazard to people who are blind or have low vision. Enclosing the area below the stair or installing a cane-detectable barrier helps the person to stop before hitting her head.**

17

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 3
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

**Polling Place Checklist** Sidewalks and Walkways - Part 2

C2-3.  Are all objects that hang over the pedestrian routes 80 inches or more above the route?

Yes _____  No _____

*If No,  can the objects be removed or relocated, or can a detectable object be added below?*



At least 80 inches above walk

| Comments |
| --- |
| |

## Temporary Solutions for Election Day

### Sidewalks and Walkway Hazards

**Problem One:**  Branches or other objects over a walkway or pedestrian route are lower than 80 inches above the walk.

**Suggestion:**  Prune the branches or remove the items that are hanging below 80 inches.

Another approach is to install a detectable barrier under the item that is too low. The detectable barrier or object must be within the detectable range of 27 inches or less above the route.

**Problem Two:**  One or more objects protrude too far from the side into the circulation path causing a hazard for people who are blind or who have low vision.

**Suggestion:**  When people who are blind or who have low vision use a cane to detect hazards, objects located at 27 inches or lower are detectable.  When an object is located more than 27 inches off the ground it is a hazard if the object protrudes more than 4 inches into the circulation path. To make a protruding object detectable:

Place an object or a barrier below the protruding object in the cane-detectable area not more than 27 inches above the floor.

If the protruding object can be moved, lower the object so its bottom is within the cane-detectable area (not more than 27 inches above the floor).

Prune or alter the protruding object so it does not protrude over the path.

18

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM

NYSCEF DOC. NO. 3

INDEX NO. 157686/2017

RECEIVED NYSCEF: 08/28/2017

# Entering the Polling Place

## D. Building Entrance

**Typical Issues**

An accessible polling place must have at least one accessible entrance. The accessible entrance must be connected to an accessible route. An accessible entrance must provide at least one accessible door with maneuvering space, accessible door hardware, and enough clear width to allow people who use crutches, a cane, walker, scooter or wheelchair to use it.

If the accessible entrance is not the main entrance to the polling place, then signs must be located at inaccessible entrances to the polling place to direct voters to the accessible entrance. The accessible entrance must remain open when the polling place is open.





**Examples of signs for inaccessible polling place entrances directing a voter to the accessible entrance.**

**Notes:**

1. Accessible entrance to the polling place.

2. Accessible route connecting accessible parking and drop-off area (if provided) to the accessible entrance.

19

Case 1:10-cv-05653-DAB-HBP   Document 119-1   Filed 10/18/12   Page 22 of 29

Case 1:10-cv-05653-DAB-HBP   Document 119-1   Filed 10/18/12   Page 23 of 29

**Polling Place Checklist** Building Entrance

| | Comments |
| --- | --- |

### Building Entrance Checklist

**D1.  Is there at least one accessible entrance connected to an accessible route?**   Yes_____ No_____
[ADA Stds 4.1.3(1)]
> *Notes:  If this entrance is not the main entrance, it needs to be kept unlocked during voting hours.*
> *If there are inaccessible entrances serving the polling place, signs will be needed at inaccessible entrance(s) to direct voters to the nearest accessible entrance.*

**D2.  Does at least one door or one side of a double leaf door at the accessible entrance provide at least 32 inches clear passage width when the door is open 90 degrees?**   Yes_____ No_____
**[See figure 24 in the appendix at the back of the checklist]**
> *If No, does another entrance have an accessible door or can both doors be propped open during voting?  Other possible solutions are to enlarge the door opening, use a swing clear hinge, or, if a double leaf door, use uneven width doors.*

**D3.  Is the door hardware (e.g., lever, pull, panic bar) usable with one hand without tight grasping, pinching, or twisting of the wrist?**  [ADA Stds 4.13.9]   Yes_____ No_____
> *If No, leave door propped open, add new accessible hardware, or adapt/replace hardware.*



**Examples of handles and door hardware that can be used without tight grasping, pinching, or twisting.**

20

**Polling Place Checklist** Building Entrance

**Comments**

**D4.** On the pull side of the door, is there at least 18 inches clearance provided to the side of the latch if the door is not automatic or power-operated? [ADA Stds 4.13.6, figure 25]

*Note: The maximum threshold height is 1/2 inch for new construction.*
*If No, leave the door propped open, install a power operator, or look for another accessible entrance.*

Yes _____ No _____

**D5.** If there is a raised threshold, is it no higher than 3/4 inch at the door and beveled on both sides? [ADA Stds 4.1.6(3)(d)(ii), 4.13.8]

*If No, replace threshold with one with beveled sides or add sloped insert to threshold.*

Yes _____ No _____

**D6.** If an entry has a vestibule, is there a 30-inch by 48-inch clear floor space inside the vestibule where a wheelchair or scooter user can be outside the swing of a hinged door?  [ADA Stds 4.13.7]

*If No, leave the inner door open or remove inner door, add power operators to both doors so they open at the same time or, modify the vestibule.*

Yes _____ No _____



**Insufficient space between doors**
**makes the alcove inaccessible.**



48 inches + door width

48 inches min.

48 inches min.

**Minimum alcove depth if**
**both doors open out**

**Minimum alcove depth when**
**door swings into alcove**

21

Case 1:10-cv-05653-DAB-HBP  Document 119-1  Filed 10/18/12  Page 25 of 29

**Polling Place Checklist** | Building Entrance

**Comments**

# Temporary Solutions for Election Day

## Accessible Entrance to Polling Place

**Problem One:**
One or two steps at the entrance prevent access.
**Suggestion:** If another entrance is accessible and on an accessible route from accessible parking, designate it as the accessible entrance and install a directional sign at the main entrance directing voters to the accessible entrance. Keep the accessible entrance unlocked during voting hours.

If another accessible entrance is not available, install a temporary ramp with edge protection and handrails.



**Problem Two:**
There is a small step at the entrance.
**Suggestion:** Install a short temporary ramp to provide a smooth transition.

**Problem Three:**
Entrance door threshold has an abrupt change in level of more than 1/4 inch and no beveled sides.
**Suggestion:** If the threshold is not more than 3/4 inches high, add beveled surfaces to both sides of the threshold or replace with a new threshold that is no more than 1/2 inch high and that has beveled sides.

**Problem Four:**
Entrance door to the building is heavy and difficult to open.
**Suggestion:** Keep the door propped open or station volunteers near the door to open it for voters.

**Problem Five:**
Door handle and/or latch at the entry door is not accessible.
**Suggestion:** These are three typical solutions: add an accessible pull or handle to the outside of the door and leave the door unlatched, or install an accessible door handle and hardware, or leave the door propped in an open position.

22

Case 1:10-cv-05653-DAB-HBP   Document 119-1   Filed 10/18/12   Page 26 of 29

Polling Place Checklist

# E. Hallways and Corridors

## Part 1.  Typical Issues for Voters Who Use Wheelchairs, Scooters, or Other Mobility Devices

The interior accessible route connects the accessible entrance with the voting area.  Typically made up of hallways, corridors, and interior rooms and spaces, the accessible route is essential for people who have difficulty walking or who use wheelchairs or other mobility aids to get to the voting area.

An accessible route is at least 36 inches wide and may narrow briefly to 32 inches wide where the route passes through doors or next to furniture and building elements.  High thresholds, abrupt level changes, steps, or steeply sloped hallways cannot be part of an accessible route.  Where ramps are used, they cannot be steeper than 1:12.  Ramps with a vertical rise of more than 6 inches must have handrails on both sides.  Ramps must also have edge protection to stop wheelchairs from falling off the sides, and level landings at the top and bottom of each segment and where a ramp changes direction.

Where an accessible route is different from the route used by most voters, signs will be needed at key decision points to direct voters with disabilities to the voting area.



**Notes:**

1  Accessible entrance

2  Accessible route connects the accessible entrance with the voting area.

3  Accessible door to the voting area

**Interior of a polling place showing the accessible route from the accessible entrance to the voting area.**

23

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM

NYSCEF DOC. NO. 3

INDEX NO. 157686/2017

RECEIVED NYSCEF: 08/28/2017

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 214 of 348

Case 1:10-cv-05653-DAB-HBP   Document 119-1   Filed 10/18/12   Page 27 of 29

**Polling Place Checklist**   Halls and Corridors - Part 1

| | Comments |
|---|---|

**Halls and Corridors Checklist - Voters with Mobility Disabilities**

E1-1.  Is there an accessible route, at least 36 inches wide that connects the accessible entrance to the voting area (the accessible route may narrow to 32 inches wide for up to 2 feet in length)?     Yes \_\_\_\_\_  No \_\_\_\_\_

E1-2.  Is the accessible route free of steps and abrupt level changes over 1/2 inch (level changes between 1/4 inch and 1/2 inch should be beveled)?  [ADA Stds 4.1.3(1), 4.3.8]     Yes \_\_\_\_\_  No \_\_\_\_\_

E1-3.  Does the route from the accessible entrance to the voting area change levels using a ramp, lift or elevator?
　　　　If no, go to question E1-7.     Yes \_\_\_\_\_  No \_\_\_\_\_

　　3a.  If yes, is a ramp or sloped hallway provided?
　　　　　If yes, go to question E1-4.
　　　　　　*Note: A ramp, lift, or elevator can be used to provide access to floor levels.*     Yes \_\_\_\_\_  No \_\_\_\_\_

　　3b.  Is an elevator provided or lift provided?
　　　　　If an elevator is provided, go to question E1-5.  If a lift is provided, go to question E1-6.     Yes \_\_\_\_\_  No \_\_\_\_\_

E1-4.  Where the slope of the accessible route is greater than 1:20, does this part of the accessible route meet the following requirements for an accessible ramp?     Yes \_\_\_\_\_  No \_\_\_\_\_

　　4a.  Is the slope no greater than 1:12? [ADA Stds 4.8.2]
　　　　　*Note: For existing ramps, the slope may be 1:10 for a 6 inch rise and 1:8 for a 3 inch rise in special circumstances, see ADA Standards 4.1.6(3).*     Yes \_\_\_\_\_  No \_\_\_\_\_

　　4b.  Is the ramp width, measured between handrails, at least 36 inches?
　　　　　[ADA Stds 4.8.3]     Yes \_\_\_\_\_  No \_\_\_\_\_

　　4c.  Are the handrails mounted between 34 and 38 inches above the ramp surface?
　　　　　[ADA Stds 4.8.5]     Yes \_\_\_\_\_  No \_\_\_\_\_

　　4d.  If a ramp is more than 30 feet long, is a level landing at least 60 inches long provided every 30 feet of horizontal length? [ADA Stds 4.8.4]
　　　　　*Note: When the running slope is less than 1:16 and more than 1:20, each ramp segment may be up to 40 feet long followed by a level landing.*     Yes \_\_\_\_\_  No \_\_\_\_\_

24

Case 1:10-cv-05653-DAB-HBP   Document 119-1   Filed 10/18/12   Page 28 of 29

**Polling Place Checklist**   Halls and Corridors - Part 1

| | Comments |
|---|---|

**Question E1-4 (continued)**

4e.  Does the ramp have a level landing at the top and bottom of each ramp section that is at least 60 inches long? [ADA Stds 4.8.4]     Yes _____ No _____
   *Note: The level landing may be part of the sidewalk or walking surface.*

4f.  Is a level landing, at least 60 inches by 60 inches, provided where a ramp changes direction? [ADA Stds 4.8.4]     Yes _____ No _____

4g.  If the ramp or landing has a vertical drop-off on either side of the ramp, is edge protection provided? [ADA Stds 4.8.7]     Yes _____ No _____

**E1-5.  Is an elevator provided to access the voting area level?**     Yes _____ No _____

5a.  Are the elevator call buttons mounted in an accessible location with the centerlines at 42 inches above the floor? [ADA Stds 4.10.3]     Yes _____ No _____

5b.  Does the floor area of the elevator car provide space for wheelchair users to enter, reach the controls, and exit the car? [ADA Stds 4.10.9]     Yes _____ No _____
   *Note:  See Figure 22 for acceptable floor and opening dimensions.  Floor dimensions of at least 48 inches by 48 inches may be allowed in existing facilities built before the ADA went into effect.*



**Fig. 22**
**Minimum Dimensions of Elevator Cars**

25

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 3

INDEX NO. 157686/2017

RECEIVED NYSCEF: 08/28/2017

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 216 of 348

Case 1:10-cv-05653-DAB-HBP   Document 119-1   Filed 10/18/12   Page 29 of 29

**Polling Place Checklist**   Halls and Corridors - Part 1

| | Comments |

**Question E1-5 (continued)**

5c.  Are the highest floor control buttons in the elevator cab mounted no more than 54 inches above the floor for a side reach or 48 inches for forward reach?      Yes _____ No _____

5d.  Are raised letters and Braille characters used to identify each floor button and each control? [ADA Stds 4.10.12]      Yes _____ No _____

5e.  Are signs mounted on both sides of the elevator hoistway door opening that designate the floor with 2-inch minimum-height raised letters and Braille characters centered at 60 inches above the floor? [ADA Stds 4.10.5]      Yes _____ No _____

5f.  Is the elevator equipped with audible tones or bells or verbal annunciators that announce each floor as it is passed? [ADA Stds 4.10.13]      Yes _____ No _____

E1-6.  If a wheelchair lift is provided, does it meet the following requirements:

6a.  Is the lift operational at the time of the survey?      Yes _____ No _____

6b.  Is the change in level from the floor to the lift surface ramped or beveled?      Yes _____ No _____

6c.  Is there at least a 30-inch by 48-inch clear floor space on the wheelchair lift?      Yes _____ No _____

6d.  Does the lift allow a wheelchair user unassisted entry, operation, and exit?      Yes _____ No _____

6e.  Are the controls and operating mechanisms mounted no more than 54 inches above the floor for a side reach or 48 inches for a forward reach?      Yes _____ No _____

6f.  Are the controls and operating mechanisms usable with one hand without tight grasping, pinching, or twisting?      Yes _____ No _____

**Polling Place Checklist**   Halls and Corridors - Part 1

**Comments**

**E1-7.** At each location on the way to the voting area where the accessible route passes through a door or doors, does at least one door meet the following requirements?

Yes _____ No _____

**7a.** Is the clear width for the door opening at least 32 inches measured when the door is open 90 degrees? [ADA Stds 4.1.3(7), 4.13.5]

Yes _____ No _____

**7b.** Is the door hardware (e.g., lever, pull, push, panic bar) usable with one hand, without tight grasping, pinching, or twisting of the wrist, to allow people who may not be able to easily use one or both hands to fully operate the hardware? [ADA Stds 4.13.9]

Yes _____ No _____



**A clear floor space on the latch side of the door (pull side) allows a person using a wheelchair or scooter to pull the door open and then enter. The size of the clear floor space varies depending on the direction of approach (shown by the arrows) and the door swing.**

**7c.** Is there clear maneuvering floor space in front of each accessible door (see Figure 25 in the appendix for measurements) and on the pull side, is there at least 18 inches clear floor space beyond the latch side of the door (see space configurations in Figure 25)? [ADA Stds 4.13.6]

Yes _____ No _____

**7d.** Is no more than 5 pounds force needed to push or pull open the accessible door?
*Note: Fire doors are still considered to be accessible if they have the minimum opening force allowable by the appropriate administrative authority.*

Yes _____ No _____

**7e.** If the answers to questions (b) thru (d) are no, can the door be propped open to provide an accessible route on election day?

Yes _____ No _____

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 3
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

## Temporary Solutions for Election Day

### Interior Hallways and Corridors to Voting Area

**Problem 1:**
One or more steps along hallway to voting area block access.
  **Suggestion:** Install a portable ramp with edge protection and handrails as shown in the figure or relocate the accessible voting to another area that is on an accessible route.



**A portable ramp with edge protection and handrails is placed over stairs to provide an accessible route on Election Day.**

**Problem 2:**
Voting area is not on an accessible route and cannot be made accessible.
  **Suggestion:** Look for another area where accessible voting may be provided. For example, if the living room of a private home used for voting is up several steps, perhaps the garage may be accessible when entered from the driveway. Or, if a church's basement is used as a polling place and it is not accessible, perhaps one of the ground floor rooms could be used as the accessible voting area.



**An accessible voting station is provided on an accessible level in a facility where voting occurs downstairs.**

28

Case 1:10-cv-05653-DAB-HBP Document 119-2 Filed 10/18/12 Page 3 of 10

Polling Place Checklist

# E. Hallways and Corridors

## Part 2. Typical Issues for Voters Who are Blind or Who Have Low Vision

People who are blind or have low vision may walk along any route to access the voting area, not just the accessible routes. That means pedestrian routes **open to voters** serving or leading to the voting area, such as hallways, corridors and the voting space, must be free of objects that cannot be detected by a person who is blind or visually impaired. Objects that are wall-mounted, that project into a pedestrian route from the side, or that are overhead must be located so that voters who are blind or who have a visual impairment will either detect the objects before they run into them or safely pass under them. These routes must be free of overhanging objects that are less than 80 inches above the floor and side objects that protrude into the route more than 4 inches when the bottom of the object is more than 27 inches above the floor. Items to watch for include wall-mounted fire extinguishers and wall-mounted display cases when the bottom is more than 27 inches above the floor, wall sconces and light fixtures that protrude more than 4 inches off the wall, and open staircases, exit signs, overhead signs, banners, and arched doorways that are lower than 80 inches above the floor.

The following checklist applies to pedestrian routes serving or leading to the voting area.

**Notes:**

1. Wall-mounted drinking fountains are a hazard when the front projects more than 4 inches beyond the wall and the bottom is more than 27 inches above the floor.

2. Wall-mounted objects cannot project more than 4 inches beyond the wall if the bottom is not in the cane-detectable area below 27 inches off the floor.

3. Overhead objects must be at least 80 inches off the floor.



**Overhead and wall-mounted objects that may be hazards along a pedestrian route.**

29

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 3

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 220 of 348

INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

Case 1:10-cv-05653-DAB-HBP   Document 119-2   Filed 10/18/12   Page 4 of 10

**Polling Place Checklist**   Hallways and Corridors - Part 2

**Comments**

## Halls and Corridors Checklist - Voters who are Blind or Who Have Low Vision

**E2-1.**   Are pedestrian routes leading to or serving the voting area free of objects that protrude from the side more than 4 inches into the route with the bottom of the object more than 27 inches above the floor? [ADA Stds. 4.4]    Yes _____  No _____

*Note: These objects may be wall mounted or free standing. Items to check include wall-mounted fire extinguishers, light fixtures, coat hooks, shelves, drinking fountains, and display cases.*

*If No, list the objects that are a hazard and their location. Placing a detectable object on the floor below each object may remove the hazard for election day.*



**If the bottom of an object is not more than 27 above the floor, it may extend an unlimited amount from the wall.**

**E2-2.**   Are pedestrian routes leading to or serving the voting area free of overhead objects with the bottom edge lower than 80 inches above the floor?    Yes _____  No _____

*If No, list the objects that are a hazard and their location. Placing a detectable object on the floor below each object may remove the hazard for election day.*

**E2-3.**   If provided, are the interior stairs along these routes built so that people who are blind or visually impaired cannot hit their heads on the underside (i.e., protected with a cane-detectable warning or a barrier that prevents travel into the area with less than an 80-inch-high head clearance)? [ADA Stds 4.4.2]    Yes _____  No _____

30

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 3
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

## Temporary Solutions for Election Day

### Hallways and Corridors - Voters Who are Blind or Who Have Low Vision

**Problem One:**
Wall-mounted display case is a protruding object hazard because it is more than 4 inches from the wall and the bottom of the case is more than 27 inches above the floor.
   **Suggestion:** Place a detectable object or skirting below the case. The bottom of the skirting or detectable object must be no higher than 27 inches above the floor.

**Problem Two:**
Ceiling or wall-mounted television monitor has less than 80 inches of clearance between the floor and the bottom of the unit.
   **Suggestion:** Place a detectable object below the unit (no more than 27 inches above the floor) so a voter who is blind will not walk into the television.

**Problem Three:**
The bottom of a stair is open and voters who are blind or who have low vision can hit their heads on the underside of the stair.
   **Suggestion:** Provide a detectable fence or other object so voters cannot walk under the stair.



**A detectable fence placed under this stair keeps people from running into the bottom of the open stair.**

31

Polling Place Checklist

# Using the Polling Place

## F. Voting Area

**Typical Issues**
The accessible voting area must be on an accessible route and have an accessible entrance and adequate circulation and maneuvering space for voters who use wheelchairs or scooters or who walk with mobility aids.

An accessible route must connect the accessible building entrance to the accessible voting area, which includes voter check-in and the location of the accessible voting machines. The survey should also identify any protruding objects (wall-mounted or overhead) along the circulation route to voter check-in and the voting area.



**Notes:**

1. Accessible route connects the building entrance with the voting area, including voter check-in and accessible voting machine.

2. Accessible door or doorway to voting area

3. Turning space at accessible voting machine

4. Blinds closed on windows behind check-in so voters who read lips can communicate with the voting staff.

32

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM

NYSCEF DOC. NO. 3

INDEX NO. 157686/2017

RECEIVED NYSCEF: 08/28/2017

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 223 of 348

Case 1:10-cv-05653-DAB-HBP   Document 119-2   Filed 10/18/12   Page 7 of 10

**Polling Place Checklist**  Voting Area

**Comments**

## Voting Area Checklist

1.  Is there an accessible entrance to the voting area?          Yes _____ No _____

2.  Within the voting area, is adequate space available on the accessible level for check-in tables, a voting demonstration area (if provided), and at least one accessible voting station?          Yes _____ No _____

3.  Is the voting area free of objects that protrude from the side more than 4 inches into the route with the bottom of the object more than 27 inches above the floor?          Yes _____ No _____
[ADA Stds. 4.4]
  *Note: These objects may be wall mounted or free standing.  Items to check include wall-mounted fire extinguishers, light fixtures, coat hooks, shelves, and display cases.*

4   Is the voting area free of overhead objects that voters may pass under with the bottom edge lower than 80 inches above the floor?          Yes _____ No _____

33

A-1

Polling Place Checklist

# Appendix

A-2

Polling Place Checklist



**(a)**
**Front Approaches — Swinging Doors**



**(b)**
**Hinge Side Approaches — Swinging Doors**



**(c)**
**Latch Side Approaches — Swinging Doors**

NOTE: All doors in alcoves shall comply with the clearances for front approaches.

**Fig. 25**
**Maneuvering Clearances at Doors**



(d)
**Front Approach — Sliding Doors
and Folding Doors**

(e)
**Slide Side Approach — Sliding Doors
and Folding Doors**

(f)
**Latch Side Approach — Sliding Doors and Folding Doors**

NOTE: All doors in alcoves shall comply with the clearances for front approaches.

**Fig. 25
Maneuvering Clearances at Doors (Continued)**

Polling Place Checklist  Appendix  A-3



**Fig. 26
Two Hinged Doors in Series**

EXHIBIT C

752 F.3d 189
United States Court of Appeals,
Second Circuit.

DISABLED IN ACTION, a nonprofit
organization, United Spinal Association, a
nonprofit organization, Plaintiffs–Appellees,

v.

BOARD OF ELECTIONS IN THE CITY OF
NEW YORK, Frederic M. Umane, in his official
capacity as President of the Board of Elections
in the City of New York, Defendants–Appellants.

No. 12–4412–cv.
|
Argued: Dec. 12, 2013.
|
Decided: May 14, 2014.

**Synopsis**
**Background:** Non-profit organizations representing people with mobility or vision disabilities brought action alleging that city board of elections discriminated against individuals with disabilities in violation of Americans with Disabilities Act (ADA) and Rehabilitation Act by operating polling places with barriers to access. The United States District Court for the Southern District of New York, Batts, J., 882 F.Supp.2d 615, entered summary judgment in plaintiffs' favor, and board appealed.

**Holdings:** The Court of Appeals, Chin, Circuit Judge, held that:

[1] board denied people with mobility or vision disabilities meaningful access to its voting program;

[2] fact that there were no existing facilities that were accessible, available, and met requirements for serving as poll site did not relieve board of its obligation to provide accessible facilities; and

[3] district court did not abuse its discretion in entering remedial order.

Affirmed.

West Headnotes (8)

**[1]    Civil Rights**
    Discrimination by reason of handicap, disability, or illness
    To establish violation of Rehabilitation Act or Title II of ADA, plaintiff must demonstrate that: (1) he is qualified individual with a disability; (2) defendant is subject to one Act; and (3) he was denied opportunity to participate in or benefit from defendant's services, programs, or activities, or was otherwise discriminated against by defendant because of his disability. Rehabilitation Act of 1973, § 504(a), 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132.

    29 Cases that cite this headnote

**[2]    Civil Rights**
    Discrimination by reason of handicap, disability, or illness
    Public entity does not need to employ any and all means to make services accessible, and Rehabilitation Act and Title II of ADA require only reasonable modifications that would not fundamentally alter nature of service provided, or impose undue financial or administrative burden. Rehabilitation Act of 1973, § 504(a), 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132.

    3 Cases that cite this headnote

**[3]    Action**
    Statutory Remedies
    Absent clear direction to contrary by Congress, federal courts have power to award any appropriate relief in cognizable cause of action brought pursuant to federal statute.

    Cases that cite this headnote

**[4]    Federal Courts**

Equity jurisdiction in general

If local authorities fail in their affirmative obligations under federal law, scope of district court's equitable powers is broad, for breadth and flexibility are inherent in equitable remedies.

Cases that cite this headnote

[5]   **Civil Rights**
   Discrimination by reason of handicap, disability, or illness

Plaintiffs need not prove that they have been disenfranchised or otherwise completely prevented from enjoying service, program, or activity to establish discrimination under Rehabilitation Act or Title II of ADA; rather, plaintiffs must show that public entity has failed to provide them with meaningful access to benefit that it offers. Rehabilitation Act of 1973, § 504(a), 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132.

21 Cases that cite this headnote

[6]   **Civil Rights**
   Physical access and mobility;carriers

City board of elections denied people with mobility or vision disabilities meaningful access to its voting program, in violation of Rehabilitation Act and Title II of ADA, by designating inaccessible poll sites and failing to assure their accessibility through temporary equipment, procedures, and policies on election days, even though there were no alternative, accessible facilities to serve as poll sites, board permitted individuals with disabilities to transfer from inaccessible to accessible polling sites or to cast absentee ballots, and board remedied barriers to access as they were made aware of them on election days, where more than 80% of poll sites that were inspected contained at least one barrier that had potential to prevent person with disability from accessing his or her assigned polling place and casting private ballot on election days, board did not respond to

many accessibility issues even after they were brought to its attention, and board failed to show that proposed accommodations would be unreasonable to implement. Rehabilitation Act of 1973, § 504(a), 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132; 28 C.F.R. § 35.150; N.Y.McKinney's Election Law § 5–601.

2 Cases that cite this headnote

[7]   **Civil Rights**
   Physical access and mobility;carriers

Fact that there were no existing facilities that were accessible, available, and met requirements for serving as poll site did not relieve city board of elections of its obligation under Rehabilitation Act and Title II of ADA to provide individuals with disabilities with accessible facilities. Rehabilitation Act of 1973, § 504(a), 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132; 28 C.F.R. § 35.150.

21 Cases that cite this headnote

[8]   **Civil Rights**
   Judgment and relief in general

District court did not abuse its discretion in entering remedial order for city board of elections' violations of Rehabilitation Act and Title II of ADA arising from its inadequate operation of poll sites on election days and its failure to properly plan to make facilities accessible to individuals with disabilities, where barriers to access were pervasive, board's current procedures and policies were inadequate, order outlined policies and procedures for on-site accessibility coordinators and monitors, created process by which third party expert would survey facilities and make suggestions to board as to how to improve accessibility, and provided accountability mechanisms, and district court gave board multiple opportunities to submit written plan, to offer suggestions, to test its proposed accommodations, and to modify proposal, but board failed to provide written

Disabled in Action v. Board of Elections in City of New York, 752 F.3d 189 (2014)
49 NDLR P 120

suggestions or demonstrate efficacy of its accommodations. Rehabilitation Act of 1973, § 504(a), 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*191** Stuart Seaborn, Disability Rights Advocates, Berkeley, CA (Sid Wolinsky and Christine Chuang, Disability Rights Advocates, Berkeley, CA, Julia Miriam Pinover, Disability Rights Advocates, New York, NY, Kevin Mintzer, The Law Office of Kevin Mintzer, P.C., New York, NY, and Mariann Meier Wang, Cuti Hecker Wang LLP, New York, NY, on the brief), for Plaintiffs–Appellees.

Drake A. Colley (Edward F.X. Hart, on the brief), for Michael A. Cardozo, Corporation Counsel of the City of New York, New York, NY, for Defendants–Appellants.

Alicia M. Simmons, Assistant U.S. Attorney (Benjamin H. Torrance, Assistant U.S. Attorney, on the brief), for Preet Bharara, United States Attorney of the Southern District of New York, New York, NY, and Jocelyn Samuels, Acting Assistant Attorney General (Dennis J. Dimsey and Sasha Samberg-Champion, Attorneys), Civil Rights Division, U.S. Department of Justice, for Amicus Curiae United States of America.

Before: CABRANES, HALL, and CHIN, Circuit Judges.

**Opinion**

CHIN, Circuit Judge:

The Board of Elections in the City of New York (the "BOE") is responsible for identifying and designating poll sites that are accessible to voters with disabilities in New York City. In this case, plaintiffs-appellees, non-profit organizations representing people with mobility or vision disabilities (collectively "plaintiffs"), allege that BOE is failing to provide them with meaningful access to its voting program, in violation of Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794(a), and Title II of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12132.

The district court (Batts, *J.*) concluded that pervasive and recurring barriers to access exist at poll sites operated by BOE and granted plaintiffs' motion for summary judgment. After giving the parties the opportunity to develop and propose a joint plan for relief, the district court ordered a remedial plan to address BOE's violations of federal law. We conclude that the district court properly granted plaintiffs' motion for summary judgment. Moreover, we find that the district court did not abuse its discretion in ordering the remedial plan. Accordingly, we affirm.

### STATEMENT OF THE CASE

**A. The Facts**
As the district court noted, the facts set forth below are not in substantial dispute. *See United Spinal Ass'n v. Bd. of Elections in the City of New York,* 882 F.Supp.2d 615, 617 (S.D.N.Y.2012). [1]

**\*192 1. *New York Voting Laws***
BOE is responsible for identifying and designating polling places that are accessible to voters with disabilities, and ensuring compliance with accessibility standards. N.Y. Elec. Law § 4–104(1). Under New York law, an individual with a disability may vote (1) in person on election day at her assigned polling place; (2) in person on election day at an alternative, accessible polling place, provided that the candidates and ballot proposals on the ballot at the alternative location are the same as those on the ballot at the assigned polling place; or (3) by absentee ballot if she is unable to appear at the assigned polling place. *Id.* §§ 5–601, 8–400(1)(b).

To vote at an alternative, accessible polling location, an individual must submit a written application to transfer her registration at least fourteen days before the election. *Id.* § 5–601(2). Ten days before the election, BOE must provide the voter with information as to the location of the election district to which her records have been transferred, or inform the voter that there is no alternative, accessible polling place. *Id.* § 5–601(7). If there is no alternative polling place available, BOE must treat the voter's application as an application for an absentee ballot for the election. *Id.* § 5–601(8).

Disabled in Action v. Board of Elections in City of New York, 752 F.3d 189 (2014)

49 NDLR P 120

To apply for an absentee ballot, a voter must submit an application by mail at least seven days or by hand at least one day before the election, stating, in part, that she is "unable to appear at a polling place because of ... physical disability." *Id.* §§ 8–400(2)(c), 8–400(3)(c)(ii). Such an individual may also apply for the "right to receive an absentee ballot for each election thereafter ... without further application." *Id.* § 8–400(4).

### 2. *BOE's Designation and Operation of Poll Sites*

BOE does not own any facilities that serve as poll sites. Instead, it designates as poll sites facilities owned either by a private entity or by another governmental agency. Prior to election days, at least 30% of the locations in New York City that BOE designates as poll sites are structurally inaccessible to individuals with disabilities. BOE is currently in the process of surveying each poll site to determine its accessibility.

In an effort to address barriers to access on election days, BOE attempts to use temporary measures to make these locations accessible. Moreover, BOE includes a section in its Poll Worker's Manual to inform poll workers about accessibility issues. BOE also employs teams of Assembly District ("AD") monitors, trained in disability issues and charged with ensuring that poll sites are operated in accordance with all applicable standards, to visit poll sites at least twice on election days.

### 3. *Barriers to Access at New York City Polling Places*

Since 2003, the Center for Independence of the Disabled, New York ("CIDNY"), an entity designated by the State of New York to train and certify poll site surveyors in accessibility issues, has conducted inspections of a random sample of BOE's poll sites on election days. CIDNY trains its staff and volunteer surveyors to use a checklist consistent with the United States Department of Justice's ADA Checklist for Polling Places. According to survey data from election days in 2008 to 2011, 80% or more of the polling sites surveyed contained at least one physical barrier to access.[2] These barriers include those relating **\*193** to ramps, entryways, pathways, interior spaces at poll sites, and missing or misplaced signage.

The deposition testimony of surveyors and individuals with disabilities confirms that barriers to access exist on election days that make it difficult for disabled voters to cast their ballots in person. For example, in 2010 Rima

McCoy, the Voting Rights Director for CIDNY from July 2008 to December 2011, inspected, among others sites, the poll site located at P.S. 13 in Queens. When she arrived at P.S. 13 there was no sign at the inaccessible main entrance to direct disabled voters to the accessible entrance. After she located the accessible entrance on her own, she found that the door was locked and the bell did not work. Once inside, McCoy observed that there was no signage from the accessible entrance to direct voters to the voting area or to inform them on which floor the voting area was located. Further, the placement of the ADA privacy booth in the voting area made the booth inaccessible to wheelchair users.

Denise McQuade, a registered voter who uses a wheelchair for mobility, encountered barriers to access during the September 2010 election at P.S. 102 in Bay Ridge. The ramp at P.S. 102 was "extremely steep—like a ski slope." J.A. 728. McQuade was "very frightened to use [it] because there was no landing at the top of the ramp," and this made it impossible for her to exit the building safely without assistance. *Id.* Although she was able to vote with the help of her husband and a police officer, she was afraid to go back to vote in subsequent elections. Accordingly, she used an absentee ballot in the November 2011 election.

Voters with vision impairments also encountered barriers to access. For example, Paula Wolff, an individual who is legally blind, was unable to privately cast her vote in the November 2011 election. Some 90% of residents at her polling place, Selis Manor, are blind. Though Selis Manor is required to have two Ballot Marking Device ("BMD") machines for voters with disabilities, there was only one BMD machine during the November 2011 election and it was not working. Despite calls by poll workers to BOE regarding the malfunctioning machine, the machine was never repaired. Accordingly, visually disabled voters needed poll workers to read and mark their ballots for them.

As its own information reflects, many of BOE's poll sites are inaccessible on election days. BOE acknowledges that at least two of its poll sites are fully inaccessible. Further, its call incident logs and reports from election days indicate that other sites were missing ramps and other accessibility equipment. Despite being notified of accessibility issues, BOE consistently did not respond to or remedy the problems of which it was made aware. Although BOE plans for AD monitors to visit all poll sites,

its own documentation shows that many AD monitors did not visit their planned sites on election days.

BOE does not have an ADA coordinator or someone designated as primarily responsible for ensuring compliance with the ADA, as required by federal regulations. *See* 28 C.F.R. § 35.107(a). Nor does BOE have an accessibility transition plan for the poll sites that it designates. *See id.* § 35.150.

*\*194 B. Proceedings Below*
On July 26, 2010, plaintiffs filed a complaint against BOE alleging that it discriminated against individuals with disabilities in violation of the ADA and Section 504 by operating polling places with barriers to access. The district court denied plaintiffs' motion for a preliminary injunction. After the parties completed discovery, plaintiffs moved for summary judgment seeking declaratory relief.

In a memorandum and order dated August 8, 2012, the district court granted plaintiffs' motion for summary judgment. *United Spinal Ass'n,* 882 F.Supp.2d at 627. As an initial matter, the district court rejected BOE's argument that plaintiffs' claims fail because there was no evidence that any voter had been deprived of the right to participate in an election. *Id.* at 623. The district court found that there was "no genuine dispute of material fact as to the existence of pervasive and recurring barriers to accessibility on election days at poll sites designated by the BOE." *Id.* at 624. Moreover, the district court rejected BOE's argument that it accommodates voters with disabilities by (1) offering those assigned to inaccessible poll sites an opportunity to transfer their registration and (2) addressing barriers as they are made aware of them on election days. *Id.* at 627.

Shortly after granting plaintiffs' motion for summary judgment, the district court ordered the parties to confer and develop potential remedies. Accordingly, plaintiffs met with BOE and proposed a framework for remedial relief. BOE did not respond with feedback or propose a plan of its own. At the hearing on August 27, 2012, BOE offered information about how it was trying to address accessibility issues for the upcoming elections in September and November 2012, including assigning poll site coordinators to each poll site, attempting to survey every poll site in New York City, and providing additional signage at poll sites. BOE also expressed concerns about

its ability to hire additional staff and CIDNY's potential oversight in any remedial plan. The district court again ordered parties to discuss a possible remedial plan and scheduled another hearing.

At the hearing on September 10, 2012, BOE described changes that it planned to make for the upcoming primary election that week. Specifically, BOE planned to provide poll site coordinators with special instructions regarding poll site accessibility, a survey instrument to assess whether the site was ADA compliant throughout the day, and an ADA journal to record their observations. Further, each poll site would receive a five-foot chain to measure areas and ensure that wheelchairs users had adequate space. Teams of AD monitors would also visit poll sites throughout the day. Plaintiffs opined that the proposed changes were not sufficient to remedy the systemic violations. After listening to and reviewing BOE's proposals, the district court determined that it wanted to assess their effectiveness at a sample of poll sites in the upcoming September 2012 Primary Election (the "September 2012 Election"). Accordingly, the district court asked the parties to confer and generate a list of 37 to 40 poll sites that had had an accessibility problem for more than one year. The district court requested that the accessibility data from these poll sites be available by the next conference.

On October 11, 2012, the Department of Justice ("DOJ") appeared, pursuant to 28 U.S.C. § 517,[3] and submitted a proposed *\*195 order for a remedial plan, modeled after a settlement agreement the DOJ had entered into with the City of Philadelphia (the "DOJ proposed order").

At a third hearing on October 15, 2012, BOE discussed the data related to accessibility issues that it collected during the September 2012 Election. Out of the 35 poll sites the parties agreed to monitor, BOE reported that 22 of them had at least one barrier to access. BOE was unable to address many of the problems that were reported throughout the day, and it was unable to determine whether the problems had been rectified from the data that it collected.

A representative of DOJ described the DOJ proposed order. After hearing BOE's concerns, the district court stated its intent to sign an order similar to the DOJ proposed order. It gave BOE the opportunity to confer with DOJ and plaintiffs to suggest changes to the DOJ

Disabled in Action v. Board of Elections in City of New York, 752 F.3d 189 (2014)

49 NDLR P 120

proposed order, and asked the parties to submit a new proposed remedial order based on BOE's requests. The record does not indicate that another plan was submitted.

In an order dated October 18, 2012 (the "remedial order"), the district court issued a remedial plan. The district court referred oversight of the implementation of the remedial order to Magistrate Judge Pitman.

The remedial order, based on the DOJ proposed order, provides for the following: BOE is to designate one of its existing poll site workers at every poll site as the on-site Americans with Disabilities Act Coordinator, to be trained by CIDNY for the November 6, 2012 General Election and a third-party mutually agreed upon by the parties for elections thereafter. BOE is to contract with CIDNY to develop a poll-site accessibility checklist. The on-site accessibility coordinators shall use the checklist to document any accessibility complaints received on election days and, based on this data, BOE is to submit a report 45 days after an election day.

Further, the remedial order mandates that AD monitors visit each polling site twice on election days to assess the accessibility of the poll site, take steps to assist on-site poll workers to remedy any access barriers at the site, and document the results.

To improve poll site accessibility over the long term, the remedial order also mandates that BOE contract with an independent third-party with expertise in voting accessibility (the "Third Party Expert"). The remedial order provides that the parties are to confer to select the Third Party Expert, and in the event they disagree, the parties are to submit their recommendations to Magistrate Judge Pitman, who will then make the selection.[4] The Third Party Expert is responsible for surveying the poll sites in New York City and providing a report on poll site accessibility to the parties and Magistrate Judge Pitman. The Third–Party Expert report is to include recommendations as to how specific poll sites may be temporarily modified to make them accessible. If the Third Party Expert concludes that a poll site cannot be reasonably modified, BOE must report to plaintiffs and the Third Party Expert whether the polling site can *196 be relocated or made temporarily accessible.

The remedial order mandates that BOE implement the Third Party Expert's recommendations unless BOE concludes "it cannot reasonably implement a recommendation," "relocation of the polling site to an alternate location is a more appropriate response to the recommendation," or "a polling site cannot be relocated." Order, October 18, 2012, ECF No. 119, at 11. If BOE so concludes, it is to confer with the Third Party Expert and plaintiffs about alternative measures to address accessibility. If BOE, plaintiffs, and the Third Party Expert are unable to agree as to the implementation of a recommendation, BOE may petition Judge Pitman for relief pursuant to Federal Rule of Civil Procedure 60, subject to appeal in the normal course. The Third Party Expert is to train BOE employees to determine whether a poll site is accessible.

The remedial order provides that parties may petition the district court to modify it at any time.[5] Moreover, it provides that the district court shall maintain jurisdiction over the implementation of the remedial order through December 16, 2016.

This appeal followed.

## DISCUSSION

### A. *Applicable Law*

"We review an order granting summary judgment *de novo* and resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lederman v. New York City Dep't of Parks & Recreation,* 731 F.3d 199, 202 (2d Cir.2013) (internal quotation marks and alterations omitted).

We review a district court's decision to award injunctive relief for abuse of discretion. *See Henrietta D. v. Bloomberg,* 331 F.3d 261, 290 (2d Cir.2003).

### 1. *Section 504 of the Rehabilitation Act and Title II of the ADA*

Section 504 of the Rehabilitation Act "prohibits programs and activities receiving federal financial assistance from excluding, denying benefits to, or discriminating against 'otherwise qualified' " individuals with a disability. *McElwee v. Cnty. of Orange,* 700 F.3d 635, 640 (2d Cir.2012) (quoting 29 U.S.C. § 794(a)). Title II of the ADA likewise provides that "no qualified individual with

a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. As the "standards adopted by the two statutes are nearly identical, we consider the merits of these claims together." *McElwee,* 700 F.3d at 640.

[1] To establish a violation under Section 504 or Title II, a plaintiff must demonstrate that "(1) he is a qualified individual with a disability;[6] (2) the defendant is subject to one of the Acts; and (3) he was denied the opportunity to participate in or *197 benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of his disability." *Id.*

A public entity discriminates against a qualified individual with a disability when it fails to provide "meaningful access" to its benefits, programs, or services. *Id.* at 641; *accord Henrietta D.,* 331 F.3d at 273. Individuals may be deprived of meaningful access to public programs due to architectural barriers or a public entity's failure to modify existing facilities and practices. Indeed, "elimination of architectural barriers was one of the central aims of the [Rehabilitation] Act." *Alexander v. Choate,* 469 U.S. 287, 297, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). The purpose of Title II of the ADA reflects similar concerns.[7] Specifically, "[r]ecognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility." *Tennessee v. Lane,* 541 U.S. 509, 531, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004). DOJ's implementing regulations explicitly prohibit a public entity from denying individuals with disabilities access to its services because its "facilities are inaccessible to or unusable by [such individuals]." 28 C.F.R. § 35.149.[8] Accordingly, public entities "shall operate each service, program, or activity, so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." *Id.* § 35.150(a).

[2] To assure meaningful access, "reasonable accommodations in the grantee's program ... may have to be made." *Henrietta D.,* 331 F.3d at 273 (internal quotation marks omitted). Of course, a public entity does not need to "employ any and all means to make" services

accessible. *Lane,* 541 U.S. at 531–32, 124 S.Ct. 1978. Instead, the Acts "require[] only reasonable modifications that would not fundamentally alter the nature of the service provided," or "impose an undue financial or administrative burden." *Id.* at 532, 124 S.Ct. 1978 (internal quotation marks omitted); *see also Henrietta D.,* 331 F.3d at 281.

As the Supreme Court has recognized, Title II's implementing regulations provide a "number of ways" to satisfy the "reasonable modification requirement." *Lane,* 541 U.S. at 532, 124 S.Ct. 1978. For example, the regulations explain that "[a] public entity may comply with the [relevant] requirements ... through such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, or ... [and] alteration of existing facilities." 28 C.F.R. § 35.150(b)(1). Importantly, "[a] public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance" with its obligations. *Id.* Further, "[i]n choosing among available methods for meeting [accessibility] requirements, a public entity shall give priority to those methods that offer services, programs, and activities to qualified individuals *198 with disabilities in the most integrated setting appropriate." *Id.*

### 2. *Injunctive Relief*

[3] [4] "[A]bsent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin v. Gwinnett Cnty. Pub. Schs.,* 503 U.S. 60, 70–71, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). If local authorities "fail in their affirmative obligations" under federal law, "the scope of a district court's equitable powers ... is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Indeed, a "district court has 'not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.' " *United States v. Yonkers Bd. of Educ.,* 837 F.2d 1181, 1236 (2d Cir.1987) (quoting *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965)).

Although the " 'remedial powers of [a district court] must be adequate to the task, ... they are not unlimited.' "

Disabled in Action v. Board of Elections in City of New York, 752 F.3d 189 (2014)

49 NDLR P 120

*Missouri v. Jenkins,* 495 U.S. 33, 51, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990) (quoting *Whitcomb v. Chavis,* 403 U.S. 124, 161, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971)); *see also Yonkers,* 837 F.2d at 1235. A district court must "tailor [a] remedy to fit the nature and extent of the violation." *Yonkers,* 837 F.2d at 1235. Moreover, in accordance with principles of federalism, "one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *Jenkins,* 495 U.S. at 51, 110 S.Ct. 1651.

### B. *Application*

First, we consider whether BOE is liable under Section 504 and Title II for the systemic failure to provide meaningful access to individuals with disabilities. Second, we consider whether the remedial order was a proper exercise of the district court's discretion to grant equitable relief.

### 1. *Violations of Section 504 and Title II*

BOE does not dispute that the voters plaintiffs represent are qualified individuals with disabilities or that it is a public entity that receives federal funding. It challenges only the district court's holding with respect to the third element of a violation, whether plaintiffs were denied benefits or otherwise discriminated against because of their disabilities. Two inquiries are presented: First, whether BOE denies voters with mobility and vision disabilities meaningful access to its program and services; and second, whether BOE has failed to provide plaintiffs with a reasonable accommodation.

### a. *Barriers to Meaningful Access*

[5]  As an initial matter, BOE contends that "[b]ecause plaintiffs cannot show that any voter has been deprived of the right to participate in an election as a result of barriers to accessibility at a poll site, plaintiffs' claims fail." Appellant's Br. at 30. Plaintiffs need not, however, prove that they have been disenfranchised or otherwise "completely prevented from enjoying a service, program, or activity" to establish discrimination under Section 504 or Title II. *Shotz v. Cates,* 256 F.3d 1077, 1080 (11th Cir.2001).[9] Rather, plaintiffs must **\*199** show that BOE has failed to "provide[ ] [them] with meaningful access to the benefit that [it] offers." *Choate,* 469 U.S. at 301, 105 S.Ct. 712; *see also Henrietta D.,* 331 F.3d at 273 (explaining that the relevant inquiry is "whether those

with disabilities are as a practical matter able to access benefits to which they are legally entitled").

Here, the relevant benefit is the opportunity to fully participate in BOE's voting program. This includes the option to cast a private ballot on election days. *See* N.Y. Elec. Law § 5–601. Indeed, to assume the benefit is anything less—such as merely the opportunity to vote at some time and in some way—would render meaningless the mandate that public entities may not "afford [ ] persons with disabilities services that are not equal to that afforded others." *Henrietta D.,* 331 F.3d at 274 (internal quotation and citation omitted); *see also Choate,* 469 U.S. at 304, 105 S.Ct. 712 ("Section 504 seeks to assure evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance.").

[6]  By designating inaccessible poll sites and failing to assure their accessibility through temporary equipment, procedures, and policies on election days, BOE denies plaintiffs meaningful access to its voting program. The surveys plaintiffs submitted show that year after year more than 80% of poll sites that are inspected contain at least one barrier that may prevent a person with a disability from accessing his or her assigned polling place.[10] As discussed above, these barriers include dangerous ramps at entrances deemed "accessible," inadequate signage directing voters with disabilities to accessible entrances or voting areas, blocked entryways or pathways, and inaccessible interior spaces inside voting areas.

Deposition testimony confirms that barriers exist, as documented in the surveys, and explains the practical effects that the barriers have on individuals with disabilities. For example, as discussed above, McQuade, a voter who uses a wheelchair for mobility, was unable to enter and exit her polling site without assistance from **\*200** her husband because of a non-compliant ADA ramp, among other things. After this experience, McQuade testified that she was "afraid to go back to try and vote [at her assigned polling place] during subsequent elections," and therefore "decided it would be safer for [her] to use an absentee ballot" even though she would "prefer to vote alongside [her] neighbors and with [her] community." J.A. at 729. Similarly, Wolff, an individual who is legally blind, could not read and mark her ballot independently because her polling site failed to maintain workable BMD machines. These voters' experiences, as

Disabled in Action v. Board of Elections in City of New York, 752 F.3d 189 (2014)

49 NDLR P 120

well as others, demonstrate that barriers at poll sites effectively preclude or deter individuals with disabilities from casting a private ballot on election days.

Although McQuade and Wolff were ultimately able to cast their vote with the fortuitous assistance of others, the purpose of the Rehabilitation Act is "to empower individuals with disabilities to maximize employment, economic self-sufficiency, *independence*, and inclusion and integration into society." 29 U.S.C. § 701(b)(1) (emphasis added). Indeed, as we have noted, "[i]t is not enough to open the door for the handicapped ...; a ramp must be built so that the door can be reached." *Dopico v. Goldschmidt*, 687 F.2d 644, 652 (2d Cir.1982) (internal quotation marks omitted). The right to vote should not be contingent on the happenstance that others are available to help. BOE's services were not "readily accessible" to McQuade and Wolff, and, moreover, McQuade was deterred from appearing at her poll site in subsequent elections. As we have held, "deterrence constitutes an injury under the ADA." *Kreisler v. Second Ave. Diner Corp.,* 731 F.3d 184, 188 (2d Cir.2013).

BOE does not offer evidence to create a genuine issue of material fact as to whether barriers to access exist. To the contrary, its own call incident logs and reports confirm the existence of these barriers.

### b. *Reasonable Accommodations*

Nevertheless, BOE argues that it is not liable under the Acts because (1) there are no alternative, accessible facilities to serve as poll sites; (2) it already offers individuals with disabilities reasonable accommodation by transferring individuals from inaccessible to accessible polling sites; and (3) plaintiffs have not demonstrated that other reasonable accommodations exist. At their core, these arguments misunderstand BOE's affirmative obligations under the statutes and the nature of the accommodations that plaintiffs seek. Accordingly, they fail.

[7]    BOE claims that because "no alternative facility exists to serve as a poll site, there is no reasonable accommodation that can be made that would afford a qualified individual the ability to vote at his or her regularly assigned poll site." [11] Appellant's Br. at 38. Even assuming, however, that "there is no existing facility that is accessible, available, and meets the requirements to

serve as a poll site," *id.* at 34, DOJ's regulations make clear that the inaccessibility of existing facilities is not an excuse, but rather, a circumstance that requires a public entity to take reasonable active steps to ensure compliance with its *201 obligations under Section 504 and Title II. Indeed, to find that BOE's responsibilities end where the very discriminatory effects of architectural and other barriers to access begin would not only frustrate the "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," *Henrietta D.,* 331 F.3d at 272 (quoting 42 U.S.C. § 12101(b)(1)), but directly contradict the purpose of the Acts. While we agree that BOE is not expected to "create poll sites out of whole cloth," Appellant's Br. at 34, it is required to operate its voting program so that "when viewed in its entirety, [the program] is readily accessible to ... individuals with disabilities." 28 C.F.R. § 35.150(a).

The steps required by the Acts include the very accommodations that plaintiffs propose—providing accessibility equipment and ramps, assigning individuals to assist those with disabilities, and relocating services to accessible locations. *Id.* at § 35.150(b). Moreover, the barriers that plaintiffs' evidence documents—for example, missing or improperly placed accessibility equipment and locked doors at otherwise accessible entrances— reflect systemic problems with BOE's preparation and operation of poll sites that are distinct from BOE's obligation to designate readily-accessible facilities prior to an election day. Accordingly, the fact that BOE cannot find alternative, accessible facilities to serve as poll sites is the start, not the end, of our inquiry as to whether BOE is liable under the Acts. [12]

BOE next argues that it already provides reasonable accommodations for voters with disabilities by (1) reassigning these voters from inaccessible to accessible poll sites and (2) remedying barriers to access as they are made aware of them on election days. While we recognize that reassigning voters may constitute a reasonable accommodation under some circumstances, *see* 28 C.F.R. § 35.150(b), there is nothing in the record to show that this accommodation provides meaningful access in the circumstances here. [13] Moreover, plaintiffs' evidence and BOE's own records confirm that BOE's *ad hoc* policy of remedying barriers to access as they occur is inadequate, especially as BOE does not respond to many accessibility issues even after they are brought to its attention.

Disabled in Action v. Board of Elections in City of New York, 752 F.3d 189 (2014)

49 NDLR P 120

**\*202** Finally, BOE contends that plaintiffs' claims fail because they have not demonstrated that reasonable accommodations exist. Plaintiffs have, however, made a *prima facie* showing that the relief they obtained—the district court's remedial order, which was fashioned after BOE had multiple opportunities to be heard—"represents an attempt at reasonable accommodation" that "at its core orders [BOE] to perform its statutory [obligations], and imposes some procedural mechanisms designed to effectuate this goal," *Henrietta D.,* 331 F.3d at 280, as discussed below. [14]

It is BOE's responsibility, then, to show that the accommodations plaintiffs propose would be unreasonable to implement. *See Henrietta D.,* 331 F.3d at 280 ("[I]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits," and once this is done "the risk of nonpersuasion falls on the defendant.") (internal quotation marks omitted). In particular, BOE must demonstrate that a proposed accommodation would "fundamentally alter the nature of [its voting program]" or "impose an undue financial or administrative burden" on its operation. *Lane,* 541 U.S. at 532, 124 S.Ct. 1978. [15] For the reasons discussed below, BOE has not made this showing.

In sum, we agree with the district court that the undisputed facts demonstrate that BOE fails to provide individuals with meaningful access to its voting program and that the proposed accommodations, as set forth in the remedial order discussed below, are reasonable and do not fundamentally alter BOE's voting program or impose an undue burden on its operation. Accordingly, we hold that the district court did not err in granting plaintiffs' motion for summary judgment.

### 2. Injunctive Relief

**[8]** We turn to the issue of relief, and conclude that the district court did not abuse its discretion in awarding plaintiffs injunctive relief.

As Congress did not express any intent to limit the remedies available under Title II or Section 504, equitable relief was proper for the district court to consider. *See Franklin,* 503 U.S. at 70–71, 112 S.Ct. 1028; *cf. Henrietta D.,* 331 F.3d at 280–84. Nevertheless, the district court's "remedial powers ... are not unlimited." *Jenkins,* 495 U.S.

at 51, 110 S.Ct. 1651 (internal quotation marks omitted). Accordingly, while equitable relief under the Acts is possible, this threshold determination is only part of the inquiry. We must consider whether the remedial order is "tailor[ed] to fit the nature and extent of the violation," *Yonkers,* 837 F.2d at 1235, and whether the "exercise of equitable power [reflects] a proper respect for the integrity and function of local government institutions," *Jenkins,* 495 U.S. at 51, 110 S.Ct. 1651. We address these considerations in turn.

#### a. *Tailored to Fit the Nature and Extent of BOE's Violations*

First, we find that the remedial order is "tailor[ed] ... to fit the nature and extent **\*203** of [BOE's] violation[s]." *Yonkers,* 837 F.2d at 1235. Plaintiffs' evidence shows that barriers to access are pervasive and stem both from BOE's inadequate operation of poll sites on election days and its failure to properly plan to make facilities temporarily accessible. BOE's evidence and arguments, in turn, reveal that although it has some procedures and policies in place to accommodate individuals with disabilities, these accommodations consistently fall short. Moreover, the record suggests that in practice these mechanisms may not receive high priority or, in any event, have proven difficult for BOE to implement. [16]

The remedial order addresses these issues. Specifically, to remedy violations that likely arise from BOE's operation of poll sites, the first part of the order outlines policies and procedures for on-site accessibility coordinators and AD monitors (the "Operation Provisions"). The second part attempts to remedy barriers to access or ineffective accommodations that likely stem from BOE's failure to identify accessible facilities or determine how sites may be temporarily modified (the "Facilities Provisions"). The Facilities Provisions create a process by which the Third Party Expert surveys facilities and makes suggestions to BOE as to how to improve accessibility. BOE then adopts the suggestions or confers with the Third Party Expert to find alternative measures.

Further, the remedial order provides accountability mechanisms to ensure that BOE is focusing on its statutory obligations to provide meaningful access to individuals with disabilities. In particular, it requires (1) on-site accessibility coordinators and AD monitors to document barriers on election days and indicate how, if at

all, these barriers were addressed; (2) BOE to compile and write a report from the on-site data; and (3) BOE to work with the Third Party Expert to find ways to make facilities accessible. In other words, the processes in the remedial order force BOE to move beyond its claim that it is doing all that it can to provide reasonable accommodations, and to begin to proactively identify barriers, document its efforts, reflect on its challenges and successes to provide meaningful access, and use this information to improve the accessibility of its voting program over time.

BOE argues that "certain sections of the order exceed the requirements of the applicable statutes." Appellant's Letter Br. at 5. We disagree. Title II and Section 504 mandate that BOE provide individuals with disabilities meaningful access to its voting program by making reasonable modifications. This meaningful access standard is "responsive to two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep [the Acts] within manageable bounds." *Choate,* 469 U.S. at 299, 105 S.Ct. 712. We find that the remedial order reflects this standard. Its provisions balance BOE's obligations to modify facilities, policies, and procedures with its practical resource constraints. In particular, the Operations Provisions build on personnel, policies, and procedures that BOE already has in place. The Facilities Provisions provide that BOE need not adopt a recommendation if, among other things, it concludes that it "cannot reasonably implement a recommendation." Order, October 18, 2012, ECF No. 119, at 11. *204 This determination then triggers an iterative process between BOE and the Third Party Expert to confer about alternative, more feasible measures to provide accommodation.

Finally, BOE argues that the remedial order contains "excesses" that "generally fall into the categories of reporting and the expense associated with compliance with the order." Appellant's Letter Br. at 5. As an initial matter, we emphasize that despite its opportunity to address the concerns it had with the remedial order before the district court, BOE did not argue below that any of its components were unreasonable. Nor did BOE make this claim in its opening or reply brief on appeal. Only after we ordered BOE to submit a "letter brief addressing in further detail its objections to the [d]istrict [c]ourt's order on remedies" did BOE argue, *for the first time* on appeal,

that complying with certain provisions of the order would "place[ ] an undue burden" on its voting program. *Id.* at 7.

In particular, BOE claims that (1) a worker at each poll site will not be able to serve as an on-site accessibility coordinator because of other responsibilities; (2) BOE will have difficulty collecting data from its poll sites; (3) and, depending on how many poll sites the Third Party Expert concludes cannot be modified temporarily, BOE may have difficulty suggesting alternative sites or modifications. Without more than conclusory claims that complying with the remedial order may be challenging, we are not persuaded that the accommodations will fundamentally alter BOE's voting program or impose an undue burden on its operation.

To the extent that complying with the remedial order becomes unreasonable, the remedial order provides mechanisms through which BOE may petition the district court, and if necessary this Court, for relief. Moreover, we note that at the time of this appeal, BOE has already proceeded to implement the remedial order and has not pointed to any actual undue burden from its efforts to comply with it thus far. In the one instance where BOE raised a concern, the remedial order was modified to address the concern.

Accordingly, we conclude that the remedial order is tailored to respond to and remedy BOE's violations of Section 504 and Title II.

### b. *Respect for the Integrity and Function of BOE*
Second, we find that both the process through which the district court provided injunctive relief and the remedial order itself reflect "a proper respect for the integrity and function of local government institutions." *Jenkins,* 495 U.S. at 51, 110 S.Ct. 1651.

We emphasize that "[a]s public servants, the officials of the State [or City] must be presumed to have a high degree of competence in deciding how best to discharge their governmental responsibilities." *Frew v. Hawkins,* 540 U.S. 431, 442, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004). Indeed, State and local officials are elected, in part, "to bring new insights and solutions to problems of allocating revenues and resources." *Id.* Hence, "[r]estraint and initial deference to state institutional authorities in curing [unlawful] conditions are ... advisable as a matter of realism; federal courts lack the facilities or expertise

Disabled in Action v. Board of Elections in City of New York, 752 F.3d 189 (2014)
49 NDLR P 120

[to administer] plans designed to assure that a state will provide ... acceptable ... services." *Dean v. Coughlin,* 804 F.2d 207, 213–214 (2d Cir.1986). Accordingly, we review both the process that led the district court to issue the remedial order and its substantive provisions with these important federalism and institutional capacity principles in mind.

**\*205** BOE argues that the district court "erred in adopting its own detailed remedial plan instead of directing [BOE] to formulate a plan for curing any perceived constitutional deficiencies in the existing system." Appellant's Br. at 41. The district court, however, gave BOE multiple opportunities to submit a written plan, to offer suggestions, to test its proposed accommodations, and to modify DOJ's proposal based on its concerns.[17] The district court issued a plan only after BOE failed to provide written suggestions or demonstrate the efficacy of its accommodations for the September 2012 Election. Accordingly, the district court did not ignore the notion that it is appropriate, if not preferable, to give a local entity an opportunity to propose ways to remedy statutory deficiencies.[18] Rather, in light of its extensive efforts to consider BOE's proposals and input, we conclude that the district court demonstrated proper "[r]estraint and initial deference" to BOE in "curing [the relevant] conditions." *Coughlin,* 804 F.2d at 213.

The substance of the remedial order also reflects proper respect for BOE. First, the remedial order addresses the concerns BOE voiced at hearings before the district court: its inability to hire additional poll workers[19] and that CIDNY would have a controlling role in any plan.[20]

Second, the remedial order reflects the awareness that courts often do not have the expertise or the institutional capacity "needed for formulation and day-to-day administration of detailed plans designed to assure that [a public entity] will provide ... acceptable ... services." *Id.* at 213–14. As an initial matter, we note that the remedial order is substantially based on the DOJ's proposed order. The DOJ's proposed order, in turn, is modeled after a settlement agreement that the DOJ entered into with Philadelphia, a city with similar accessibility challenges. The district court did not, therefore, depend on its own ideas of how to improve BOE's program, but rather relied on a tested remedial plan proposed by the DOJ, the federal agency tasked with

overseeing the implementation of the Acts, whose views about the Acts "warrant respect." *Olmstead,* 527 U.S. at 598, 119 S.Ct. 2176.

Further, as noted above, the remedial order is largely procedural in nature. In other words, it does not mandate particular changes or modifications, but rather creates a framework for BOE to cooperate with experts and plaintiffs to confront accessibility challenges and develop feasible accommodations over time. The district court's role, exercised through Magistrate **\*206** Judge Pitman, is to oversee this process and mediate conflict among the parties and experts, rather than effectively run or take over the BOE. Importantly, the remedial order does not contemplate the district court's oversight indefinitely; instead it sets December 31, 2016 as a clear end date for the district court's jurisdiction.

Third, the remedial order implicitly recognizes BOE's central role in managing its voting program and the need for BOE to build capacity to identify and address barriers to access on its own. Indeed, many of its provisions provide opportunities for BOE to decide what is in its best interest or to propose alternatives to the Third Party Expert's suggestions to reach the same accessibility goals. The remedial order also stresses that the Third Party Expert "shall train employees of the BOE on using the survey instrument and determining whether a polling site location is or can be made accessible." Order, October 18, 2012, ECF No. 119, at 12–13.

For the foregoing reasons, we determine that the district court did not abuse its discretion in granting plaintiffs injunctive relief and fashioning the remedial plan here.

We emphasize that while the remedial order, on its face, respects BOE's responsibilities and recognizes the limited capacity of the district court to suggest ways in which BOE should "discharge [those] responsibilities," *Frew,* 540 U.S. at 442, 124 S.Ct. 899, the district court must, in practice, exercise prudent oversight. We recognize— and the process that the remedial order creates reflects —that providing meaningful access to individuals with disabilities in a large, crowded city with inaccessible facilities is not an easy task that lends itself to simple or singular solutions. Hence, the district court's supervision should recognize that there are many ways BOE may meet its statutory obligations and focus on building and strengthening BOE's capacity to identify and address the

Disabled in Action v. Board of Elections in City of New York, 752 F.3d 189 (2014)

49 NDLR P 120

accessibility issues its program confronts. Indeed, the very success of the remedial order depends, in part, on BOE's ability by December 31, 2016 to develop and implement its own plan to work towards providing meaningful access to all of the voters that its serves. We are confident the district court will exercise its oversight with this goal in mind.

We conclude that the district court correctly held that BOE has failed to grant voters with disabilities meaningful access to its voting program. We also find that the remedial order is a proper exercise of the district court's authority to grant equitable relief. Accordingly, the order is AFFIRMED.

**All Citations**

752 F.3d 189, 49 NDLR P 120

*CONCLUSION*

Footnotes

1    At oral argument, BOE confirmed that the facts are undisputed. Oral Argument at 2:54:27–2:55:17. Rather, defendants contest the inferences and conclusions the district court drew from these facts.

2    Specifically, in 2008, 54 of the 65 poll sites surveyed, or 83%, contained at least one barrier to access; in 2009, 43 of the 51 polling sites surveyed, or 84%, contained at least one barrier to access; in 2010, 42 of the 53 inspected sites, or 79%, contained at least one barrier to access; and 46 of the 55 polling places inspected in 2011, or 84%, contained at least one barrier to access.

3    28 U.S.C. § 517 provides that "any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, ... or to attend to any other interest of the United States."

4    On January 28, 2013, after noting that the parties were unable to agree on an expert and considering both parties' recommendations, Magistrate Judge Pitman issued an order designating Evan Terry Associates, P.C. as the Third Party Expert.

5    In fact, at one point BOE did raise a substantive concern. The remedial order was modified on May 13, 2012, after this appeal was filed, to address this concern. The parties' briefs on appeal address the original order entered on October 18, 2012.

6    Individuals with a disability are "qualified" if "with or without reasonable modifications to rules, policies, or practices, the removal of architectural ... barriers, or the provision of auxiliary aids and services," they "meet[ ] the essential eligibility requirements for" participation in public programs or activities. 42 U.S.C. § 12131.

7    *See* 42 U.S.C. § 12101(a)(5) ("[I]ndividuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural ... barriers, ... failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities.").

8    "In interpreting the statutory terms we look to the views of the Justice Department, which was charged by Congress with issuing regulations implementing both the ADA and Section 504." *Henrietta D.*, 331 F.3d at 273–74.

9    *See Lane*, 541 U.S. at 514, 124 S.Ct. 1978 (successful Title II plaintiff alleged he was able to attend court proceedings only by crawling up two flights of stairs or allowing officers to carry him); *see also Am. Council of the Blind v. Paulson*, 463 F.Supp.2d 51, 59 (D.D.C.2006), *aff'd and remanded*, 525 F.3d 1256 (D.C.Cir.2008) ( "[P]laintiffs do not need to prove 'no access' to prevail" on a Section 504 claim.).

10   BOE claims that the surveys plaintiffs submitted are unreliable. We reject this argument. First, BOE conceded at oral argument that there were no disputed facts on which the district court's August 8, 2012 order granting summary judgment was based. Oral Argument at 2:54:27–2:55:17. Second, the record does not indicate that BOE argued this point before the district court. Finally, BOE's arguments are purely conclusory and it has presented no evidence—such as contrary survey results or specific errors or problems in the surveys submitted by plaintiffs—to call the validity of plaintiffs' surveys into question. Although BOE contends that the individuals and groups completing the relevant surveys are less experienced than BOE surveyors, nothing in the record supports this claim. In fact, CIDNY is the same entity that trains the surveyors BOE employs. Even assuming that the individuals and groups unaffiliated with BOE are less experienced than BOE surveyors, this fact alone does not support the unreliability of the surveys. Moreover, we note that many courts have relied on surveys conducted by similar surveyors to find poll sites inaccessible. *See Westchester Disabled on the Move, Inc. v. Cnty. of Westchester*, 346 F.Supp.2d 473, 476–77 (S.D.N.Y.2004) (relying on poll site accessibility surveys aligned

with ADA guidelines to grant preliminary injunction against defendant based on violations of ADA); *New York v. Cnty. of Delaware*, 82 F.Supp.2d 12, 14–18 (N.D.N.Y.2000) (same); *New York ex rel. Spitzer v. Cnty. of Schoharie*, 82 F.Supp.2d 19, 21–25 (N.D.N.Y.2000) (same).

11    We recognize that Title II does not require a public entity to "make structural changes in existing facilities where other methods are effective in achieving compliance" with its statutory obligations. 28 C.F.R. § 35.150(b)(1). This provision is particularly relevant to an entity like BOE that does not own or operate any of the facilities that it designates as poll sites, but instead uses facilities operated by others. Indeed, 30% of the facilities BOE designates as poll sites are not compliant with the ADA prior to election days.

12    For similar reasons, we reject BOE's argument that "plaintiffs have the burden of production to demonstrate the existence of alternative, available facilities to serve as replacement poll sites." Appellant's Br. at 35. Plaintiffs, like BOE, are certainly not required to identify facilities that are accessible prior to election days. We note that, in any event, plaintiffs did suggest alternative facilities to BOE to serve as poll sites.

13    In particular, BOE offers no evidence that it has transferred voters from inaccessible to accessible sites or otherwise notified individuals of the possibility of such a transfer. This lack of evidence is problematic. First, it is unclear how BOE, let alone an individual voter, would know ten days prior to an election that a particular poll site is inaccessible. Indeed, BOE concedes that several sites do not meet accessibility standards, but it has only officially identified two inaccessible polling places. Further, most of the barriers that plaintiffs report are impossible for voters to perceive until they appear at polling sites on an election day. Second, plaintiffs' undisputed evidence demonstrates that 80% or more of the poll sites surveyed on election days have one or more significant barriers to access. As a practical matter, then, it would seem nearly impossible that this accommodation would provide meaningful access for many individuals with disabilities. Accordingly, while the policy of reassigning voters to accessible polling sites could theoretically constitute a reasonable accommodation, there is nothing in the record to support that it provides meaningful access to individuals with disabilities.

14    We need not decide whether plaintiffs or defendants bear the initial burden regarding reasonable accommodation because, even if we accept defendants' argument that plaintiffs bear the initial burden, there is no question that plaintiffs have met that burden here.

15    *See also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603–04, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (Ginsburg, *J.,* plurality opinion) (discussing the reasonable modification regulation as the State's "fundamental-alteration defense"); *id.* at 607, 119 S.Ct. 2176 (Stevens, *J.,* concurring) (explaining that a "state may assert, as an affirmative defense, that the requested modification would cause a fundamental alteration of a State's services and programs").

16    By way of example, while BOE maintains that it has attempted to survey poll sites over the past several years, it presented no evidence of these surveys. Indeed, the fact that it has only labeled two of 1,300 sites inaccessible, but also concedes that prior to election days 30% of facilities it uses for poll sites are inaccessible, suggests that BOE has much work to do.

17    *See* Order, Aug. 15, 2012, ECF No. 107, at 1 (parties required to "meet, at least once, and develop potential remedies as a basis for the ... hearing before the Court"); Tr. of Hearing on Aug. 27, 2012, 14:10–11, 45:22–25, 46:1–4, Oct. 19, 2012, ECF No. 120 (noting that BOE "has not had an opportunity to reduce [its suggestions] to writing" and giving parties additional time "to get together and talk and work out things that are helpful, with open minds ... so that when you appear before me [at the next hearing], I will be in a better position to know whether or not some more formal relationship imposed by the Court is the only alternative."); Tr. of Hearing on Oct. 15, 2012, 2:20–24, 3:1–19 (noting submissions from parties, including a status report from BOE, but no proposed plan from BOE).

18    *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 547–48, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Dean*, 804 F.2d at 213–14.

19    Order, Oct. 18, 2012, ECF No. 119, at 3 ("This paragraph does not require the BOE to hire any additional staff at its poll sites.").

20    *Id.* at 2–3 (providing after the November 6, 2012 General Election "BOE may contract with a third-party, mutually agreed upon by the parties, to develop training").

---

# EXHIBIT D

Americans with Disabilities Act

# ADA Checklist for Polling Places
# ADA Survey Summary FINAL Report
by
Evan Terry Associates, LLC
for
# New York City Board of Elections
## QUEENS - Q0303
## LEFRAK CITY APTS
Private





## Site Accessible using Temporary Measures, but number of ED's will need to be reduced to accommodate all equipment needed:



(C)2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 1 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

**LEFRAK CITY APTS**
9610 57 Ave
Queens,   NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

## Polling Site Space Calculation

| | | | |
|---|---|---|---|
| Borough: | QUEENS | Zone: | 14 |
| Site Type: | Apartment Building | Building Type: | Private |
| ED Count: | 4 | Total Voters: | 4,575 |
| Useable Sq Ft: | 1,476 | Number of Translators: | 0 |
| Privacy Stations: | 19 | BMDs: | 1 |
| Scanners: | 4 | | |
| Privacy Booths (ADA): | 1 | Privacy Booths: | 18 |
| ED Tables: | 4 | Card Tables: | 1 |
| Info Tables: | 0 | | |
| # of Infomation Clerks: | 1 | # of Coordinators: | 1 |
| # of People for non-ED Tables: | 2 | Storage Containers: | 4 |
| Voters in Site at Once: | 91 | Voters Sq Ft: | 546 |
| SQ FT Needed: | 855 | Difference: | 621 |
| SQ FT Needed with Voters: | 1,401 | Difference with Voters: | 75 |

## ED/AD Info:

**Home ED:**          015 / 35
Included ED/AD:      015 / 35;  025 / 35;  016 / 35;  017 / 35

Excluded ED/AD:      018 / 35
Excluded # of Voters:  1,122
  [Not included in "Total Voters" indicated above]

## Equipment Needed for Accessibility:

**Cane Detectable Element(s)**
**Door Prop(s) and/or Accessibility Clerk(s)**
**Portable Handrails**

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

Case 1:17-cv-06637-VSB Document 1-1 Filed 08/31/17 Page 245 of 348

LEFRAK CITY APTS
9610 57 Ave
Queens, NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Site Plan:



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 3 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5

**LEFRAK CITY APTS**
9610 57 Ave
Queens,   NY  11368

## NYC BOE ADA FINAL REPORT

QUEENS
Q0303

### Voting Area Equipment Drawing:



Required items at this Poll site:
1 Card Table
4 ED/AD Tables w/< ED/AD Supply Carts
18 Privacy Booths
1 ADA Privacy Booth
1 BMD
4 Scanners

**Q0303 - Voting Area**
Existing Poll Room - Dimension Plan
Gross SF:   1802 SF
Usable SF:  1476 SF

©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 4 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
9610 57 Ave
Queens,   NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303

## Voting Area Room Dimension Drawing:



Q0303- Lefrak City Apts.
Existing Poll Room - Dimension Plan
Gross SF:   1802 SF
Usable SF:  1476 SF

©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 5 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
9610 57 Ave
Queens, NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
00303

## Surveyor's General Description:

This polling site is located on 57 Avenue at Junction Blvd. and is located within an apartment building. The polling site contains 1 public entrance of which 1 is or may be made accessible using temporary measures as outlined in this report. The accessible entrance is the same as the main entrance. There is no public parking available. The actual polling area is located in the Recreation Room of the building.

General Conditions
- All electrical outlets in the polling area tested satisfactorily.
- The main entrance and the accessible entrance are identical. No directional signage needed.
- The main entrance is located on the second floor and is accessed off of the walk following the active vehicular drive from the public right-of-way to the main entrance. The voting room is located on the first floor and is accessed from the second floor entrance by elevator. The main/voter entrance vestibule door has a controlled entry security device. There are 8 public metered parking spaces on the site with two designated accessible spaces.

Status of Accessibility
- Accessible with accessibility clerks.
- The voting area has protruding objects which can be resolved with cane detectable elements.
- The voting room door maneuvering clearance does not provide the required width.
- The accessible parking spaces do not provide accessible aisles and have excessive slope. No van accessible parking is provided.

## Surveyor's Summary of Barriers:

The numbers used in assigning barrier locations are based on the 1991 ADA codes and are created by the surveyors. The following categories, based on DOJ's ADA Checklist for Polling Sites, are included only if a barrier is identified for that respective category (Items preceded by *** are not part of the DOJ Polling Places Checklist):

Ramps
- Ramp handrails are missing on one or both sides of the ramp and/or are not continuous
- The slope of a ramp section exceeds 8.33% (1:12) - an existing ramp is allowed to have a slope of 10% (1:10) for a maximum rise of 6" and 12% (1:8) for a maximum rise of 3"

Doors
- The door is heavy and difficult to open
- The door maneuvering clearance is not compliant
- The main/voter entrance vestibule door has a controlled entry security device that will need to remain open or have security/accessibility clerk to open the door during voting hours.

Voting Area (including clear floor space and turning radius issues)
- There are protruding objects and/or headroom issues in the voting area

©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

**Privileged & Confidential**
**1991 DOJ Polling Places Checklist**
***FINAL***

Page 6 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

**LEFRAK CITY APTS**
9610 57 Ave
Queens,    NY 11368

## NYC BOE ADA FINAL REPORT

QUEENS
Q0303

---

## HOW TO READ THE REPORT:

### The following is a description of fields in the NYC BOE ADA Reports:

| | |
|---|---|
| Facility Number: | NYC BOE Site Number is used as the Facility Number in the reports. |
| Facility | Name of the NYC BOE facility that was surveyed. |
| Item Number | A unique computer-assigned number that identifies each item in the database. |
| Surveyor Name | Name(s) of the surveyors. |
| Photo Number(s) | The numbers assigned to the photos that document the barrier. |
| USE Code | A code that identifies the primary users or control of the area where the barrier is located (COLOR indicates the outlined color used on the floor and/or site plans). |

            EXT     Exterior areas
            GP      General Public
            G       Government-controlled exterior elements

DOJ Code — The DOJ codes parallel those listed in Section 36.304 of the Title III regulations. The Department of Justice gives suggested priorities for barrier removal where private entities have no other method of setting priorities.

The DOJ Code values are as follows:

1   Provide access to a place of public accommodation from public sidewalks, parking, passenger loading areas, and public transportation (exterior issues)
2   Provide access to those areas where goods and services are made available to the public (interior issues)
3   Provide access to restroom facilities
4   Other measures necessary to provide access to goods, services, facilities, etc. (such as telephones and drinking fountains)
5   Duplicate element (not required to be accessible) - used to provide program access - NOT used in this survey
X   Not applicable

| | |
|---|---|
| Location Code | The floor number and room number where a barrier was found. The location code is in three parts, such as 01-05-1234. The "01" refers to the floor number of the building; the "05" refers to the form used in the ETA system, in this case "05" refers to "Interior Route"; the "1234" is a unique number to identify the barrier location on the floor plans and/or the site plan. |
| Location Description | Name of the room or area where the barrier was located. The location description is also in three parts, which expand on the meaning of the location codes, as in the example above, 01-05-1234. In this case the description would be stated as follows: FIRST FLOOR-INTERIOR ROUTE-MAIN ENTRANCE. |
| Access Code Reference | The ADA Standard that makes the barrier noncompliant. |
| Access Code Figure | An illustration from the ADA that supports or is part of the code reference. |
| Barrier Text | Description of how an element does not meet the requirement. |
| Existing Condition | The surveyor's measurements and/or description identifying a noncompliant element. |
| Subtitle Text | If applicable, a further definition or category of the barrier text. |
| Possible Solution Code | An alpha-numeric code used by the database to indicate the possible solution for the barrier. |
| Possible Solution Text | The surveyor's option for removing the barrier to the level required in an alteration project, or an instruction to refer to a related barrier's solution. |
| Surveyor Notes | Other descriptive or explanatory information from the surveyor. |

---

©2016 Evan Terry Associates, LLC.
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

**Privileged & Confidential**
**1991 DOJ Polling Places Checklist**
***FINAL***

Page 7 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
9610 57 Ave
Queens,    NY 11368

## NYC BOE ADA FINAL REPORT

QUEENS
Q0303

| Lead Surveyor Name | USE DOJ | Location Code & Description | Reference & Figure(s) # | Item Text<br>Existing Condition<br>Possible Solution Code<br>Possible Solution Text<br>Surveyor Notes (if applicable) |
|---|---|---|---|---|
| Philip Duffield | EXT 1 | E-00-00<br>EXTERIOR<br>SITE PHOTOS<br>TO VOTER ENTRANCE | | PHOTOS<br>PHOTOS OF SITE, ALSO SHOWING COMPLIANT ITEMS<br>*THIS IS INFORMATIONAL ONLY:*<br>SOLUTION Code 1:      S3SA01q    Each  1      Estimated Cost:      $0.00<br>Possible Solution: S02 SITE PHOTOS |

Q0303-0137



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 8 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
9610 57 Ave
Queens, NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0136



Q0303-0122



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 9 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

**LEFRAK CITY APTS**
9610 57 Ave
Queens,   NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0105



Q0303-0107



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Cicsielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 10 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
9610 57 Ave
Queens,    NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0108



Q0303-0098



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 11 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
9610 57 Ave
Queens,  NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0097



Q0303-0096



(C)2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1993 DOJ Polling Places Checklist
*** FINAL ***

Page 12 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017
Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 255 of 348

LEFRAK CITY APTS
9610 57 Ave
Queens,    NY 11368

## NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0093



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 13 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

Case 1:17-cv-06637-VSB  Document 1-1  Filed 08/31/17  Page 256 of 348

LEFRAK CITY APTS
9610 57 Ave
Queens,   NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303

| Lead Surveyor: Name | USE DOJ | Location Code & Description | Reference & Figure(s) # | Item Text / Existing Condition / Possible Solution Code / Possible Solution Text / Surveyor Notes (if applicable) |
|---|---|---|---|---|
| Philip Duffield | EXT 1 | E-01-01 EXTERIOR PARKING PUBLIC | 4.1.2(5)(a) Table 4.1.2(5)(a) | DRAWINGS and Photos **PARKING DRAWING & PHOTOS** *THIS IS INFORMATIONAL ONLY:* SOLUTION Code 1:   S38A01d  Each  1   Estimated Cost:   $0.00 Possible Solution: S01 PARKING DRAWINGS and photos |

**Notes from Surveyor:** There are 10 metered parking spaces lining this active vehicular drive. 2 of them are marked as accessible with pole mounted and ground signage, 1 is required. This is the space adjacent to the accessible route to the main/voter entrance.

Q0303 E-01-01 Parking A



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 14 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

LEFRAK CITY APTS
9610 57 Ave
Queens,   NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0107



Q0303-0108



©2016 Evan Terry Associates, LLC.
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 15 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
9610 57 Ave
Queens,   NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303

Q0303 E-01-02 Parking B



Q0303-0122



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 16 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/72/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

Case 1:17-cv-06637-VSB Document 1-1 Filed 08/31/17 Page 259 of 348

LEFRAK CITY APTS
9610 57 Ave
Queens,  NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0123



Q0303-0124



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1993 DOJ Polling Places Checklist
***FINAL***

Page 17 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/27/2016

**LEFRAK CITY APTS**
9610 57 Ave
Queens,   NY 11368

NYC BOF ADA FINAL REPORT

QUEENS
Q0303

| Lead Surveyor Name | USE DOJ | Location Code & Description | Reference & Figure(s) # | Item Text / Existing Condition / Possible Solution Code / Possible Solution Text / Surveyor Notes (if applicable) |
|---|---|---|---|---|
| Philip Duffield | EXT 1 | E-03-01 EXTERIOR PARKING PUBLIC | 4.1.2(5)(b) | Parking does not provide at least one van accessible parking space. **NO VAN ACCESSIBLE PARKING IS PROVIDED** |

**SOLUTION Code 1:**   S38A3b   Each 1   Estimated Cost:   $2,500.00

**Possible Solution: Re-stripe existing accessible and/or inaccessible parking spaces to provide the required number of van accessible parking spaces. Coordinate all accessible parking requirements: located on an accessible route , signage (ISA and VAN), compliant slope and cross slope, surface, etc. (also coordinate with state and local requirements). If re-striping reduces the total number of parking spaces, check zoning ordinance or other regulations for compliance with minimum requirements.**

**Notes from Surveyor: There are 10 metered parking spaces lining this active vehicular drive. 2 of them are marked as accessible with pole mounted and ground signage, 1 is required. The spaces marked as accessible do not provide the required width to be van accessible. Neither space provides an access aisle and both have excessive slope.**

Q0303-0107



Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

LEFRAK CITY APTS
9610 57 Ave
Queens,    NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303

Q0303-0108

Q0303-0109



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesicski

Privileged & Confidential
1993 BOI Polling Places Checklist
*** FINAL ***

Page 19 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
0010 57 Ave
Queens, NY 11368

NYC ROE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0110



Q0303-0111



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 BOJ Polling Places Checklist
***FINAL***

Page 20 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017
Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 263 of 348

LEFRAK CITY APTS
9610 57 Ave
Queens,    NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0112



Q0303-0113



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 21 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017
Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 264 of 348

LEFRAK CITY APTS
9610 57 Ave
Queens,    NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0123



Q0303-0124



©2016 Evan Terry Associates, LLC.
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 22 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
9610 57 Ave
Queens,   NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0125



Q0303-0126



©2016 Evan Terry Associates, LLC.
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1993 DOJ Polling Places Checklist
***FINAL***

Page 23 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM INDEX NO. 157686/2017
NYSCEF DOC. NO. 5 Case 1:17-cv-06637-VSB Document 1-1 Filed 08/31/17 Page 266 of 348 RECEIVED NYSCEF: 08/28/2017

LEFRAK CITY APTS
9610 57 Ave
Queens,   NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0127



Q0303-0128



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 24 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM INDEX NO. 157686/2017
NYSCEF DOC. NO. 5 Case 1:17-cv-06637-VSB Document 1-1 Filed 08/31/17 Page 267 of 348 RECEIVED NYSCEF: 08/28/2017

LEFRAK CITY APTS
9610 57 Ave
Queens, NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303

Q0303-0129



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

**Privileged & Confidential**
**1991 DOJ Polling Places Checklist**
\*\*\*FINAL\*\*\*

Page 25 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
9610 57 Ave
Queens,   NY 11368

## NYC BOE ADA FINAL REPORT

QUEENS
Q0303

| Lead Surveyor Name | USE DOJ | Location Code & Description | Reference & Figure(s) # | Item Text<br>Existing Condition<br>Possible Solution Code<br>Possible Solution Text<br>Surveyor Notes (if applicable) |
|---|---|---|---|---|
| Philip Duffield | EXT 1 | E-03-02<br>EXTERIOR<br>CURB RAMP<br>TO SIDEWALK | 4.7.1<br>Curb Ramp Types | **DRAWINGS and Photos**<br>**CURB RAMP DRAWINGS & PHOTOS**<br>*THIS IS INFORMATIONAL ONLY:*<br>**SOLUTION Code 1:**   S36A01e   Each 1   Estimated Cost:   $0.00<br>Possible Solution: S01 CURB RAMP DRAWINGS and photos |

**Notes from Surveyor:** This is the curb ramp from the active vehicular drive and accessible parking up to sidewalk on the route to the main/voter entrance.

---

Q0303 E-03-01 Curb Ramp



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

**Privileged & Confidential**
**1991 DOJ Polling Places Checklist**
***FINAL***

Page 26 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
9610 57 Ave
Queens, NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0116



Q0303-0117



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 27 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM          INDEX NO. 157086/2017
NYSCEF DOC. NO. 5    Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 270 of 348    RECEIVED NYSCEF: 08/28/2017

LEFRAK CITY APTS
9610 57 Ave
Queens,  NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303

| Lead Surveyor Name | USE DOJ | Location Code & Description | Reference & Figure(s) # | Item Text / Existing Condition / Possible Solution Code / Possible Solution Text / Surveyor Notes (if applicable) |
|---|---|---|---|---|
| Philip Duffield | EXT 1 | E-04-01 EXTERIOR RAMP TO MAIN ENTRANCE | 4.8.2 16 | **DRAWINGS and Photos** **RAMP DRAWING & PHOTOS** *THIS IS INFORMATIONAL ONLY:* SOLUTION Code 1:   S38A01f   Each 1   Estimated Cost:   $0.00 Possible Solution: S01 RAMP DRAWINGS and photos |

**Notes from Surveyor: This is the ramp from the level of the public sidewalk up to the drive sidewalk leading to the main/voter entrance.**

Q0303 E-04-01 Ramp



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 28 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5
Case 1:17-cv-06637-VSB Document 1-1 Filed 08/31/17 Page 271 of 348
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

LEFRAK CITY APTS
9610 57 Ave
Queens, NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303

Q0303-0099



Q0303-0100



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
*** FINAL ***

Page 29 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
9610 57 Ave
Queens,   NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0101



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 30 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

**LEFRAK CITY APTS**
9610 57 Ave
Queens,   NY 11368

## NYC BOE ADA FINAL REPORT

QUEENS
Q0303
EWLEPTS-6191

| Item #<br>Lead Surveyor Name | USE<br>DOJ | Location Code &<br>Description | Reference &<br>Figure(s) # | Item Text<br>Existing Condition<br>Possible Solution Code<br>Possible Solution Text<br>Surveyor Notes (if applicable) |
|---|---|---|---|---|
| EWLEPTS-6191<br>Philip Duffield | EXT<br>3 | E-04-01<br>EXTERIOR<br>RAMP<br>TO MAIN ENTRANCE | 4.8.5 | Ramp with a rise greater than 6" requires handrails on both sides of ramp.<br>**HANDRAILS REQUIRED BUT ARE NOT PROVIDED**<br><br>SOLUTION Code 1:    S38FF2c   Lin. Ft.    11   Estimated Cost:    $16,442.14<br>**Possible Solution: Provide portable ramp to be placed over existing ramp surface. Coordinate handrails, edge protection and protruding object requirements.**<br><br>SOLUTION Code 2:    S38FOe   Lin. Ft.    11   Estimated Cost 2:    $16,442.14<br>**Possible Solution 2: Remove existing ramp and install compliant ramp with slope no greater than 1:12 (8.33%). Coordinate with requirements for cross slope, landings, handrails, and edge protection except if slope becomes ≤ 5%, ramp requirements do not apply.** |

**Notes from Surveyor:** This is the section of walk along the active vehicular drive in the egress direction where it meets the public sidewalk. The ramped portion has 7" of rise lacks edge protection and does not provide handrails. There appears to be room to install a compliant ramp at this location.

Q0303 DCS 1



(HASNO#) Q0303  BOE DIMENSIONED CONCEPTUAL SOLUTION    Sheet 1 of 2

©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 31 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

**LEFRAK CITY APTS**
9610 57 Ave
Queens,   NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303
EWLEPTS-6191

Q0303 DCS 2

TEMPORARY RAMPS
1.The maximum running slope of a ramp must be 1:12 (8.33%) at every point along the ramp run. The maximum cross slope of a ramp at every point must be no more than 1:50 (2%).
2.The maximum rise of a ramp run must be 30 inches.
3.If existing space limitations of the site prohibit the use of a 1:12 slope or less, a ramp may have a maximum slope of 1:10 for a maximum rise of 6 inches or a maximum slope of 1:8 for a maximum rise of 3 inches.
4.The minimum clear width of a ramp must be 36 inches measured between handrails and edge protection.
5.The surface of the ramp must be slip-resistant.
6.The ramp must have a level landing (2% slope maximum in all directions) at the top and bottom of each run.
7.The landing must be at least as wide as the widest ramp run leading to it. The landing length must be 60 inches clear or more.
8.If the ramp changes direction at a landing, the minimum landing size must be 60 inches by 60 inches clear of all obstructions, including handrail extensions.
9.If the ramp rises more than 6 inches, it must have handrails on each side of the ramp.
10.If the handrails are not continuous, the horizontal surface at the top of the handrail must extend at least 12 inches beyond the top and bottom of the ramp run. Handrail extensions must be returned to a wall, guard, or the landing surface, or shall be continuous to the handrail of an adjacent ramp run.
11.Handrails must be parallel with the ramp surface.
12.The top of the handrail gripping surface shall be 34 inches minimum and 38 inches maximum above the ramp surface.
13.Handrails and any surfaces adjacent to them shall be free of sharp or abrasive elements. Handrail edges shall be rounded.
14.The ramp shall be located so that there is at least 1-1/2 inches of clear space between a handrail and a wall.
15.Handrail gripping surfaces shall be continuous along their length and shall not be obstructed along their tops or sides. The bottoms of handrail gripping surfaces shall not be obstructed for more than 20 percent of their length. Where provided, horizontal projections shall occur 1½ inches minimum below the bottom of the handrail gripping surface.
16.The outside diameter of a circular handrail must be between 1-1/2 and 2 inches. Handrails with equivalent graspability may be used if the maximum cross section dimension in any direction does not exceed 2.25" and the circumference is between 4" and 6.25".
17.Ramps and landings that have vertical drop offs exceeding ½" within 10" horizontally of the ramp or landing surface must have a curb or barrier for edge protection that prevents the passage of a 4" diameter sphere, where any portion of the sphere is within 4 inches of the finish floor or ground surface.
18.Landings subject to wet conditions shall prevent the accumulation of water.

Lefrak City Apartments
96-10 57 Avenue
Brooklyn, NY 11368

ADDRESS  96-10 57 AVENUE
PHONE  (718)592-3110
FAX  35440

SITE NAME  LEFRAK CITY APTS
SURVEYOR  Philip Duffield, Tom Ciesielski

DATE  9 / 25/2015

BOROUGH  Bronx, Brooklyn, Manhattan, Queens, Staten Island

HASNO#  Q0303

See attached Keynote Sheet(s).

(HASNO#) Q0303     BOE DIMENSIONED CONCEPTUAL SOLUTION     Sheet 2 of 2

Q0303-0098



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 32 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
0010 57 Ave
Queens,    NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303
EWLEPTS-6191

Q0303-0099



Q0303-0100



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 33 of 57
Survey Date: 9/25/2015
FINAL Report First Date: 9/22/2016

**LEFRAK CITY APTS**
9610 57 Ave
Queens,    NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303

| Lead Surveyor Name | USE DOJ | Location Code & Description | Reference & Figure(s) # | Item Text / Existing Condition / Possible Solution Code / Possible Solution Text / Surveyor Notes (if applicable) |
|---|---|---|---|---|
| Philip Duffield | GP 2 | 01-05-38 1ST FLOOR INTERIOR ROUTE VOTING AREA | | **PHOTOS** *VOTING AREA PHOTOS* *THIS IS INFORMATIONAL ONLY:* **SOLUTION Code 1:**  S38A01b  Each 1   Estimated Cost:   $0.00 **Possible Solution: S05 VOTING AREA PHOTOS** |

Q0303-0019



©2016 Evan Terry Associates, LLC.
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

**Privileged & Confidential**
**1991 DOJ Polling Places Checklist**
***FINAL***

Page 34 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017
Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 277 of 348

LEFRAK CITY APTS
9610 57 Ave
Queens,   NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0020



Q0303-0021



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1993 DOJ Polling Places Checklist
***FINAL***

Page 35 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 278 of 348

LEFRAK CITY APTS
9010 57 Ave
Queens,   NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303

Q0303-0022



Q0303-0023



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 36 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5
Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 279 of 348
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

LEFRAK CITY APTS
9610 57 Ave
Queens,   NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303
EWLEPTS-6180

| Item #<br>Lead Surveyor Name | USE<br>DOJ | Location Code &<br>Description | Reference &<br>Figure(s) # | Item Text<br>Existing Condition<br>Possible Solution Code<br>Possible Solution Text<br>Surveyor Notes (if applicable) |
|---|---|---|---|---|
| EWLEPTS-6180<br>Philip Duffield | GP<br>2 | 01-05-38<br>1ST FLOOR<br>INTERIOR ROUTE:<br>VOTING AREA | 4.4.1<br>8(a-e) | Protruding object with leading edge between 27" and 80" AFF projects more than 4" from wall or 12" from post:<br>**WALL BOX PROJECTS 11.5" AND 21.5" AT 45.75" AFF**<br><br>SOLUTION Code 1:     538E0g    Each 1    Estimated Cost:      $10.40<br>Possible Solution: Place a detectable object on the floor below each object which may remove the hazard for election day.<br><br>SOLUTION Code 2:     538F0a    Each 1    Estimated Cost 2:     $780.00<br>Possible Solution 2: Relocate, remove OR construct or add a one-detectable feature with lowest edge < 27" AFF under protruding object to direct blind or vision-impaired individuals around protruding object. If item is required to be accessible, comply with reach ranges, clear floor space, etc. |

Notes from Surveyor: This box is located in a corner with a leading edge 25.75" from the wall. It is a protruding object in both directions of travel. It is protected by stored tables at the time of the survey. Ensure that the table or another detectable element is in place if this corner is on a path of travel on voting day.

Q0303-0048



©2016 Evan Terry Associates, LLC.
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

**Privileged & Confidential**
1991 DOJ Polling Places Checklist
***FINAL***

Page 37 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
INDEX NO. 157686/2017
NYSCEF DOC. NO. 5
Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 280 of 348
RECEIVED NYSCEF: 08/28/2017

**LEFRAK CITY APTS**
9610 57 Ave
Queens,   NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303
EWLEPTS-6180

Q0303-0049



Q0303-0050



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Dufficia, Thomas Ciesielski

Privileged & Confidential
1991 BOE Polling Places Checklist
***FINAL***

Page 38 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
9610 57 Ave
Queens,  NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303
CWLEPTS-6180

Q0303-0051



Q0303-0052



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski
Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***
Page 39 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

**LEFRAK CITY APTS**
9610 57 Ave
Queens,   NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303
RWLEPTS-6180

Q0303-0053



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 40 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

## LEFRAK CITY APTS
9610 57 Ave
Queens,   NY 11368

**NYC BOE ADA FINAL REPORT**

## QUEENS
Q0303
EWLEPTS-6179

| Item #<br>Lead Surveyor Name | USE<br>DOJ | Location Code &<br>Description | Reference &<br>Figure(s) # | Item Text<br>Existing Condition<br>Possible Solution Code<br>Possible Solution Text<br>Surveyor Notes (if applicable) |
|---|---|---|---|---|
| EWLEPTS-6179<br>Philip Duffield | GP<br>2 | 01-05-38<br>1ST FLOOR<br>INTERIOR ROUTE<br>VOTING AREA | 4.4.1<br>8(a-e) | Protruding object with leading edge between 27" and 80" AFF projects more than 4" from wall or 12" from post:<br>**FIRE EXTINGUISHER PROJECTS 6.5" AT 46.25" AFF**<br><br>**SOLUTION Code 1:**    S38E0g    Each 1    Estimated Cost:    $10.40<br>**Possible Solution:** Place a detectable object on the floor below each object which may remove the hazard for election day.<br><br>**SOLUTION Code 2:**    S38E0c    Each 1    Estimated Cost 2:    $468.00<br>**Possible Solution 2:** Lower existing item into the range of cane detection OR place a fixed cane detectable element below it. Repair/refinish as needed. If item is required to be accessible, comply with reach ranges, clear floor space, etc. |

**Notes from Surveyor: The box edge is 18" from the corner.**

Q0303-0056



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

**Privileged & Confidential**
**1991 DOJ Polling Places Checklist**
***FINAL***

**Page 41 of 57**
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
0610 57 Ave
Queens,   NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303
EWLEPTS-6179

Q0303-0055



Q0303-0057



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 42 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

**LEFRAK CITY APTS**
9610 57 Ave
Queens,    NY 11368

**NYC BOE ADA FINAL REPORT**

**QUEENS**
**Q0303**
**EWLEPTS-6179**

Q0303-0054



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

**Privileged & Confidential**
**1991 DOJ Polling Places Checklist**
***FINAL***

Page 43 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

**LEFRAK CITY APTS**
9610 57 Ave
Queens,   NY 11368

## NYC BOE ADA FINAL REPORT

QUEENS
Q0303
CWLEPTS-6181

| Item #<br>Lead Surveyor Name | USE<br>DOJ | Location Code &<br>Description | Reference &<br>Figure(s) # | Item Text<br>Existing Condition<br>Possible Solution Code<br>Possible Solution Text<br>Surveyor Notes (if applicable) |
|---|---|---|---|---|
| CWLEPTS-6181<br>Philip Duffield | GP<br>2 | 01-05-38<br>1ST FLOOR<br>INTERIOR ROUTE<br>VOTING AREA | 4.13.6<br>25 | Floor surface within required area for door maneuvering clearance is not level:<br>**PULL/FRONT/REQUIRED WIDTH 18"/EXISTING WIDTH 9"/REQUIRED DEPTH 60"/EXISTING DEPTH 60"** |

SOLUTION Code 1:     S38G55e   N/A   1     Estimated Cost.     $0.00

**Possible Solution: Provide an accessibility clerk near the door to open it for voters during all voting hours.**

SOLUTION Code 2:     S38G55b   Each 1     Estimated Cost 2:     $13,000.00
**Possible Solution 2: Install compliant automatic opening device.**

**Notes from Surveyor: The push side required maneuvering clearance is 12" with an existing clearance of 9". This is the door from the voting room into the 1st floor elevator lobby corridor.**

Q0303-0025



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 44 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017
Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 287 of 348

**LEFRAK CITY APTS**
9510 57 Ave
Queens,   NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303
#WLEPTS-6181

Q0303-0061



Q0303-0062



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
*** FINAL ***

Page 45 of 57
Survey Date: 9/25/2015
FINAL Report Prnt Date: 9/22/2016

**LEFRAK CITY APTS**
9610 57 Ave
Queens,   NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303
EWLEPTS-6181

Q0303-0063



Q0303-0064



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 46 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM    INDEX NO. 157686/2017
NYSCEF DOC. NO. 5    Case 1:17-cv-06637-VSB    Document 1-1    Filed 08/31/17    Page 289 of 348    RECEIVED NYSCEF: 08/28/2017

**LEFRAK CITY APTS**
9610 57 Ave
Queens,    NY 11368

## NYC BOE ADA FINAL REPORT

QUEENS
Q0303
EWLEPTS-6181

Q0303-0024



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 47 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
9610 57 Ave
Queens,    NY 11368

## NYC BOE ADA FINAL REPORT

QUEENS
Q0303

| Lead Surveyor Name | USE<br>DOJ | Location Code &<br>Description | Reference &<br>Figure(s) # | Item Text<br>Existing Condition<br>Possible Solution Code<br>Possible Solution Text<br>Surveyor Notes (if applicable) |
|---|---|---|---|---|
| Philip Duffield | GP<br>2 | 03-05-38<br>1ST FLOOR<br>INTERIOR ROUTE<br>VOTING AREA | | Average Light Level at the time of the survey:<br>**LIGHT LEVEL IS 270 TO 440 LUX**<br>*THIS IS INFORMATIONAL ONLY:*<br>**SOLUTION Code 1:**    S38P1a    N/A  1    Estimated Cost:    $0.00<br>**Possible Solution: The existing condition indicates the light level in the voting area at the time of the survey.** |

Q0303-0019



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1993 DOJ Polling Places Checklist
***FINAL***

Page 48 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
INDEX NO. 157686/2017
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 08/28/2017

LEFRAK CITY APTS
9610 57 Ave
Queens,   NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303

Q0303-0022



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 49 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

**LEFRAK CITY APTS**
9610 57 Ave
Queens,    NY 11368

## NYC BOE ADA FINAL REPORT

QUEENS
Q0303

| Lead Surveyor Name | USE DOJ | Location Code & Description | Reference & Figure(s) # | Item Text / Existing Condition / Possible Solution Code / Possible Solution Text / Surveyor Notes (if applicable) |
|---|---|---|---|---|
| Philip Duffield | GP 2 | 02-05-04 2ND FLOOR INTERIOR ROUTE HALLWAY/CORRIDOR | 4.8.2 16 | **DRAWINGS and Photos** **RAMP DRAWING & PHOTOS** *THIS IS INFORMATIONAL ONLY:* SOLUTION Code 1:    S38A01f   Each 1   Estimated Cost:   $0.00 **Possible Solution: S01 RAMP DRAWINGS and photos** |

Q0303 01-04-01 Ramp



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

**Privileged & Confidential**
**1991 DOJ Polling Places Checklist**
***FINAL***

Page 50 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

**LEFRAK CITY APTS**
9610 57 Ave
Queens,    NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303

Q0303-0079



Q0303-0081



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 51 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

**LEFRAK CITY APTS**
9910 57 Ave
Queens,    NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303

Q0303-0082



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Dufrield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 52 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017

**LEFRAK CITY APTS**
9610 57 Ave
Queens,   NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303
EWLEPTS-6184

| Item #<br>Lead Surveyor Name | USE<br>DOJ | Location Code &<br>Description | Reference &<br>Figure(s) # | Item Text<br>Existing Condition<br>Possible Solution Code<br>Possible Solution Text<br>Surveyor Notes (if applicable) |
|---|---|---|---|---|
| EWLEPTS-6184<br>Philip Duffield | GP<br>2 | 02-05-05<br>2ND FLOOR<br>INTERIOR ROUTE<br>VESTIBULE | 4.13.9 | Existing door hardware cannot be grasped easily with one hand or requires tight grasping, pinching, or twisting of the wrist to operate:<br>**DOOR HAS A CONTROLLED ENTRY SECURITY DEVICE**<br>*Controlled Entry Security System:*<br>**SOLUTION Code 1:**   S38G4g   N/A !   Estimated Cost;   $0.00<br>**Possible Solution: Door requires a code, buzzer, button control or key card to open the door. Station volunteer at door to allow entry or arrange to have security personnel present to open door(s) for voters.** |

**Notes from Surveyor: This is the door from the main/voter entrance located on the second floor. Coordinate with provision for a door clerk covered under another barrier for door force.**

Q0303-0088



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 53 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 5
INDEX NO. 157686/2017
RECEIVED NYSCEF: 08/28/2017
Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 296 of 348

LEFRAK CITY APTS
9918 57 Ave
Queens,   NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303
PWLEPTS-6184

Q0303-0089



Q0303-0085



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 54 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

**LEFRAK CITY APTS**
9610 57 Ave
Queens,   NY 11368

## NYC BOE ADA FINAL REPORT

**QUEENS**
**Q0303**
**EWLEPTS-8185**

| Item #<br>Lead Surveyor Name | USE<br>DOJ | Location Code &<br>Description | Reference &<br>Figure(s) # | Item Text<br>**Existing Condition**<br>Possible Solution Code<br>**Possible Solution Text**<br>Surveyor Notes (if applicable) |
|---|---|---|---|---|
| EWLEPTS-8185<br>Philip Duffield | GP<br>2 | 02-05-05<br>2ND FLOOR<br>INTERIOR ROUTE<br>VESTIBULE | 4.13.6 | More than 5# is required to push or pull open an accessible interior door:<br>**11# DOOR OPENING FORCE** |

|  |  |  |  |  |
|---|---|---|---|---|
| SOLUTION Code 1: | S38G8a | N/A | 1 | Estimated Cost: | $0.00 |

**Possible Solution:** If door is a fire door, station volunteers near the door to open it for voters; otherwise either leave the door propped open during voting hours or use accessibility clerks.  If doors are propped open, maintain 36" clear width accessible route except for 32" clear width at door opening.

| SOLUTION Code 2: | S38G9b | Each | 1 | Estimated Cost 2: | $780.00 |
|---|---|---|---|---|---|

**Possible Solution 2:** Adjust closer to provide compliant speed and force. (May inhibit proper latching. If so, replace existing closer with compliant model which allows door to operate as intended).

**Notes from Surveyor: This is the door from the main/voter entrance located on the second floor. Coordinate with provision for a door clerk covered under another barrier at the controlled entry security device.**

Q0303-0085



©2016 Evan Terry Associates, LLC.
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 55 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
9610 57 Ave
Queens,    NY 11368

NYC BOE ADA FINAL REPORT

QUEENS
Q0303
LWLEPTS-6185

Q0303-0087



Q0303-0088



©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 56 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

LEFRAK CITY APTS
9610 57 Ave
Queens,   NY 11368

**NYC BOE ADA FINAL REPORT**

QUEENS
Q0303

## ANALYSIS by Codes for Facility: LEFRAK CITY APTS

### SUMMARY by DOJ Code

|  | # | 1st Option Cost | 2nd Option Cost |
|---|---|---|---|
| DOJ Code: 1 | 2 | $18,942.14 | $16,442.14 |
| DOJ Code: 2 | 5 | $20.80 | $15,028.00 |
| INFO ONLY | 7 | $0.00 | $0.00 |
| Total | 14 | $18,962.94 | $31,470.14 |

### SUMMARY by Location

|  | # | 1st Option Cost | 2nd Option Cost |
|---|---|---|---|
| Interior | 5 | 20.80 | $15,028.00 |
| Exterior | 2 | 18,942.14 | $16,442.14 |
| INFO ONLY | 7 | 0.00 | $0.00 |
| Total | 14 | $18,962.94 | $31,470.14 |





©2016 Evan Terry Associates, LLC
(205) 972-9100
Surveyor Names: Philip Duffield, Thomas Ciesielski

Privileged & Confidential
1991 DOJ Polling Places Checklist
***FINAL***

Page 57 of 57
Survey Date: 9/25/2015
FINAL Report Print Date: 9/22/2016

SITE PLAN

sloped walk

ramp

lobby

Vestibule

Open
Garden
area

sloped walk

Stage

Voting Room

voting room
entrance

Second Floor
(Main Entrance)

First Floor
(Lower Level)

Kitchen

| | | | | | |
|---|---|---|---|---|---|
| Support column | Elevator | Accessible | Outlet | P. Duffield 9/21/2015 | QB303 LeFrak Apartments 56 – 10 57th Ave. Queens, N.Y. 11368 |

LEGEND

Privacy Booth

ADA Privacy Booth

BMD

Scanner

ED/AD Table

ED/AD Supply Cart

Info/Interp. Table

36" Accessible Route

5x5 Clear Space

Elevator

Electrical Outlet

Non-Working Electrical Outlet

**Q0303- Lefrak City Apts.**
**Existing Poll Room - Dimension Plan**
**Gross SF:   1802 SF**
**Usable SF:  1476 SF**

LEGEND

Privacy Booth

ADA Privacy Booth

BMD

Scanner

ED/AD Table

ED/AD Supply Cart

Card Table

36" Accessible Route

5x5 Clear Space

Elevator

Electrical Outlet

Non-Working Electrical Outlet

Required items at this Poll site:
1 Card Table
4 ED/AD Tables w/4 ED/AD Supply Carts
18 Privacy Booths
1 ADA Privacy Booth
1 BMD
4 Scanners

**Q0303 - Voting Area**
**Existing Poll Room - Dimension Plan**
**Gross SF:    1802 SF**
**Usable SF:  1476 SF**

## S04 - Ramp Form - NYC - ETA 3640

### ADA Checklist for Polling Places (DOJ)

Date Surveyed: _____

HASNO # _____   Borough: _____

Facility Name: _____

Surveyor Name: _____

Location of Ramp: _____

### Notes:

_____
_____
_____



(A)   (B)   (C)      (D)   (E)

(F) (OTHER)

Ramp Configuration Types
Select one _____

---

### USE ONE FORM
### PER RAMP SEGMENT



Ramp Segment ___ of ___

---

**(300) RAMPS**

(300a) RAMP Drawings & Photo
Drawings Name (HASNO #) _____ Rama
Photos _____

**RAMP**

(301) Max Slope 8.33% _____ % Slope
Greater than 6" rise / greater than 10' run - 9.3%
Greater than 6" rise / less than or = to10' run - 9.5%
6" Max rise - 11% (existing site w/ space limitation)
3" Max rise - 13.5% (existing site w/ space limitation)

(302) Slope 10% to 8.33% Max up to 6" Max height
12.5% to 10% Max up to 3" Max ht. if space limitations
prevent 8.33% or less
Slope ____ % ____ " rise

(309) Ramp Length 30' Max [slope 6.25% to 8.33%) Length ____ Slope ____
(309) Ramp length 40' Max [slope 6.25% to 5%) Length ____ Slope ____
(309a) 30" Max rise (for each run) Length ____ Slope ____
(315) Edge protection at drop-offs (If this is a barrier, Lin. Ft.) Y - N - NA ____ LF
(316) Curb (2" h. min.)(If this is a barrier, Lin. Ft. of curb) Y - N - NA ____ LF

**LEVEL CHANGE**

(318) Vertical transition Y - N ____ LF
(Vert. 1/4" AFF Max; 1/4" to 1/2" AFF beveled Max slope 1:2)
Vert 1/4" to 1/2" and not beveled
Vertical transition > 1/2"

**HANDRAILS**

(303) Handrails required both sides of ramp if > 6" rise ____ " Rise
(303) Handrails required? Y - N
(303) Handrails provided on both sides? Y - N
(303) Handrails on one side only? Y - N
(304) Clear width between handrails - 36" min req'd ____ " Clear Width
(305) Top of handrail 34" to 38" AFF ____ AFF
(HRs 30" to 34" AFF are safe harbored)
If there is a HR barrier, provide Lin. Ft. of handrails Lin. Ft. ____

**LANDINGS**

(306) TOP LANDING Y - N - NA
(307) 60" minimum long ____ " Long
(308) 2% Max slope (any direction) ____ % Slope
(316) Curb (2" high min.) ____ " High   Y - N - NA
(315) Edge protection at drop-offs Y - N - NA

INTERMEDIATE LANDING
(Ramp continues in the same direction) Y - N - NA
(310) 60" minimum long ____ " Long
(311) 2% Max slope (any direction) ____ % Slope
(316) Curb (2" high min.) ____ " High   Y - N - NA
(315) Edge protection at drop-offs Y - N - NA

LANDING AT CHANGE OF DIRECTION
(313) 60" x 60" ____ " x ____
(314) 2% Max slope (any direction) ____ % Slope
(316) Curb (2" high min.) ____ " High   Y - N - NA
(315) Edge protection at drop-offs Y - N - NA

BOTTOM LANDING Y - N - NA
(310) 60" minimum long ____ " Long
(311) 2% Max slope (any direction) ____ % Slope
(316) Curb (2" high min.) ____ " High   Y - N - NA
(315) Edge protection at drop-offs Y - N - NA

© 2014 Evan Terry Associates, P.C., One Perimeter Park South, Suite 200S, Birmingham, AL 35243 (205)974-9100

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM

## S01 - Parking Form - NYC - ETA 3640
## ADA Checklist for Polling Places (DOJ)

Date Surveyed: _____

HASNO #_____ Borough: _____

Facility Name: _____

Surveyor Name: _____

Location of Parking: _____
_____

| Total Parking in Lot | Required Minimum Number of Accessible Spaces |
|---|---|
| 1 to 25 | 1 |
| 16 to 50 | 2 |
| 51 to 75 | 3 |
| 76 to 100 | 4 |
| 101 to 150 | 5 |
| 151 to 200 | 6 |
| 201 to 300 | 7 |
| 301 to 400 | 8 |
| 401 to 500 | 9 |
| 501 to 1000 | 2 percent of total |
| 1001 and over | 20, plus 1 for each 100 over 1000 |



WIDTH        WIDTH

SLOPE

SLOPE

PHOTO # _____        PHOTO # _____

Space ___A___    Standard Space [X]    Van Space [ ]

(001Aa) **PARKING** Drawing Name (HASNO#) _____ Space ___

**Overall Photos (Parking with Building)** _____

Accessible parking photos
(Accessible parking & access aisle) _____

Overall Sign Photos _____

Detail Sign Photos _____

(002) **PARKING**
_____ Total spaces,
_____ Accessible required,
_____ Accessible marked, (including Van)
_____ Additional spaces req.

(003) **ACCESS AISLE** provided        Y (N)

(004) 60" Minimum Wide        ____ " Wide access aisle

(005) **VAN SPACE**        ___ # Van accessible provided

(006) **Access Aisle** 96" (8') min. wide or 60" (5') min. wide (If parking space 132" (11') min. wide)        ____ " Wide access aisle

**Parking space** width (8'-0" min.) ____ (7'-10-1/2" or more allowed) ____" Wide parking space

(007) **Clear height** 98" min. parking/vehicular route        ____" AFG/AFF

(008) **SLOPE**, 2% max in spaces/ access aisles (Less than 3.25% allowed)        range from _5.6_ % to _5.5_ %

Caused by __SLOPE TO THE__ (if appropriate)

(009) **SIGNAGE**, Is (ISA provided)        (Y) N

(010) Is ISA visible when vehicle is parked in the space        Y - N
(60" min. AFF)

(011) **ROUTE**, located on the shortest route to the entrance        Y - N

(012) Access aisle connect to an accessible route        Y - N -

Notes:
_____
_____
_____

© 2014 Evan Terry Associates, P.C., One Perimeter Park South, Suite 200S, Birmingham, AL 35243 (205)974-9100

## S01 - Parking Form - NYC - ETA 3640
## ADA Checklist for Polling Places (DOJ)

Date Surveyed: _____

HASNO # _____ Borough: _____

Facility Name: _____

Surveyor Name: _____

Location of Parking: _____

| Total Parking in Lot | Required Minimum Number of Accessible Spaces |
|---|---|
| 1 to 25 | 1 |
| 16 to 50 | 2 |
| 51 to 75 | 3 |
| 76 to 100 | 4 |
| 101 to 150 | 5 |
| 151 to 200 | 6 |
| 201 to 300 | 7 |
| 301 to 400 | 8 |
| 401 to 500 | 9 |
| 501 to 1000 | 2 percent of total |
| 1001 and over | 20, plus 1 for each 100 over 1000 |

**(001Aa) PARKING** Drawing Name (HASNO#) _____ Space _____

**Overall Photos** (Parking with Building) _____

Accessible parking photos
(Accessible parking & access aisle) _____

Overall Sign Photos _____

Detail Sign Photos _____

**(002) PARKING** _____ Total spaces.

_____ Accessible required,

_____ Accessible marked, (including Van)

_____ Additional spaces req.

**(003) ACCESS AISLE** provided   Y - N

**(004)** 60" Minimum Wide   _____ " Wide access aisle

**(005) VAN SPACE**   _____ # Van accessible provided

**(006)** **Access Aisle** 96" (8') min.   _____ " Wide access aisle
wide or 60" (5') min. wide
(If parking space 132" (11') min. wide)

**Parking space** width (8'-0" min.)
(7'-10-1/2" or more allowed)   _____ " Wide parking space

**(007)** **Clear height** 98" min,
parking/vehicular route   _____ " AFG/AFF

**(008) SLOPE,** 2% max in spaces/   range from _____ % to _____ %
access aisles (less than 3.25% allowed)

Caused by _____ (if appropriate)

**(009) SIGNAGE,** is (ISA provided)   Y - N

**(010)** Is ISA visible when vehicle
is parked in the space   Y - N
(60" min. AFF)

**(011) ROUTE,** located on the shortest
route to the entrance   Y - N

**(012)** Access aisle connect to an
accessible route   Y - NA

## Notes:

_____
_____
_____



WIDTH     WIDTH

SLOPE

SLOPE

PHOTO # _____     PHOTO # _____

Space _____     Standard Space [X]     Van Space [ ]

© 2014 Evan Terry Associates, P.C., One Perimeter Park South, Suite 200S, Birmingham, AL 35243 (205)974-9100



Notes:

Check List

PROJECT INTO TRAFFIC                          Y / N
OBSTRUCTED BY VEHICLES                        Y / N
RAMP WITHIN MARKED
        CROSSING                              Y / N

Diagonal

RETURN CURB PARALLEL TO
        PEDESTRIAN FLOW                       Y / N
48" CLEAR AT BOTTOM
        WITHIN MARKINGS _____ "
24" STRAIGHT CURB _____ "

Raised Islands

RAMPS WITH 48" m LEVEL AREA     Y / N
        OR CUT THROUGH           Y / N

Surface

TRANSITION?                      ___ " HIGH
LANDINGS DESIGNED TO PREVENT
        WATER ACCUMULATION       Y / N
JOINT / CRACK WIDTH ___ " WIDE
                    ___ " DEEP

Detectable Warnings

PROVIDED                         Y / N
FULL WIDTH AND DEPTH             Y / N
CONTRAST                         Y / N

Rise

___ "

Sides

FLARED                           Y / N
RETURNED                         Y / N
PROTECTED                        Y / N

Landing

LANDING LENGTH 48" MINIMUM
        AT TOP                   ___ "

S03 - Curb Ramp Form - NYC - ETA 3640

1991 ADA Standards

Date Surveyed:
HASNO #:          Borough:
Facility Name:
Surveyor Name: P DUFFIELD
Location of Ramp:

WIDTH OF CURB RAMP

TOP LANDING LENGTH / SIDEWALK WIDTH

BUILT-UP C. RAMP        BUILT-UP C. RAMP
LEFT FLARE              RIGHT FLARE

LENGTH OF CURB RAMP     RAMP UP

LEFT FLARE              RIGHT FLARE

OVERALL PHOTO NUMBERS

FLARED SIDES            RETURNED CURB
UP                      UP
(A)                     (B)

BUILT-UP                DIAGONAL
UP                      UP
(C)                     (D)

IN SIDEWALK
UP      UP
(E)

(F) (OTHER - SKETCH)

Curb Ramp Configuration
Types - select one

(SKETCH LOCATION OF
DETECTABLE WARNINGS, IF ANY)

©2014 Evan Terry Associates, P.C. (205) 972-9100

Case 1:17-cv-06637-VSB   Document 1-1   Filed 08/31/17   Page 307 of 348

**S04 - Ramp Form - NYC - ETA 3640**
**A.D.A. Checklist for Polling Places (DOJ)**

Date Surveyed: _____
HASNO #: _____ Borough: _____
Facility Name: _____
Surveyor Name: _____
Location of Ramp: _____
_____

Notes:
_____
_____



(A) (B) (C) (D) (E)

(F) (OTHER)

Ramp Configuration Types
Select one

USE ONE FORM
PER RAMP SEGMENT

WIDTH OF LANDING
WIDTH OF RAMP
(between handrails)



Ramp Segment ___ of ___

**(300) RAMPS**

(300a) RAMP Drawings & Photo
Drawings Name (HASNO #) _____ Ramp
Photos _____

**RAMP**
(301) Max Slope 8.33% _____% Slope
Greater than 6" rise / greater than 10' run - 9.3%
Greater than 6" rise / less than or = to 10' run - 9.5%
6" Max rise - 11% (existing site w/ space limitation)
3" Max rise - 13.5% (existing site w/ space limitation)
(302) Slope 10% to 8.33% Max up to 6" Max height
12.5% to 10% Max up to 3" Max ht, if space limitations
prevent 8.33% or less    Slope ___% ___ rise
(309) Ramp length 30' Max (slope 6.25% to 8.33%)    Length ___ Slope ___
(309) Ramp length 40' Max (slope 6.25% to 6%)    Length ___ Slope ___
(309a) 30" Max rise (for each run)    Length ___ Slope ___
(315) Edge protection at drop-offs (if this is a barrier, Lin. Ft.)    Y - N - NA ___ LF
(316) Curb (2" h. min.)(If this is a barrier, Lin. Ft. of curb)    Y - N - NA ___ LF

**LEVEL CHANGE**
(318) Vertical transition    Y - N ___ LF
(Vert. 1/4" AFF Max; 1/4" to 1/2" AFF beveled Max slope 1:2)
Vert. 1/4" to 1/2" and not beveled
Vertical transition > 1/2"

**HANDRAILS**
(303) Handrails required both sides of ramp if > 6" rise    ___" Rise
(303) Handrails required?    Y - N
(303) Handrails provided on both sides?    Y - N
(303) Handrails on one side only?    Y - N
(304) Clear width between handrails - 36" min req'd    ___" Clear Width
(305) Top of handrail 34" to 38" AFF    ___" AFF
(HRs 30" to 34" AFF are safe harbored)
If there is a HR barrier, provide Lin. Ft. of handrails    Lin. Ft. ___

**LANDINGS**
(306) **TOP LANDING**    Y - N - NA
(307) 60" minimum long    ___" Long
(308) 2% Max slope (any direction)    ___% Slope
(316) Curb (2" high min.)    ___" High   Y - N - NA
(315) Edge protection at drop-offs    Y - N - NA
**INTERMEDIATE LANDING**
(Ramp continues in the same direction)    Y - N - NA
(310) 60" minimum long    ___" Long
(311) 2% Max slope (any direction)    ___% Slope
(316) Curb (2" high min.)    ___" High   Y - N - NA
(315) Edge protection at drop-offs    Y - N - NA
**LANDING AT CHANGE OF DIRECTION**
(313) 60" x 60"    ___"x ___
(314) 2% Max slope (any direction)    ___% Slope
(316) Curb (2" high min.)    ___" High   Y - N - NA
(315) Edge protection at drop-offs    Y - N - NA
**BOTTOM LANDING**    Y - N - NA
(310) 60" minimum long    ___" Long
(311) 2% Max slope (any direction)    ___% Slope
(316) Curb (2" high min.)    ___" High   Y/N/NA
(315) Edge protection at drop-offs    Y/N/NA

© 2014 Evan Terry Associates, P.C., One Perimeter Park South, Suite 200S, Birmingham, AL 35243 (205)974-9100

(HASNO#) _____ BOE DIMENSIONED CONCEPTUAL SOLUTION _____ Sheet ___ of ___

Site attached
Key Note Sheet(s) _____

| HASNO # | BOROUGH | DATE | SITE NAME | ADDRESS |
|---|---|---|---|---|
| | Bronx, Brooklyn, Manhattan(Queens), Staten Island | 9/15/2015 | LE FRAK CITY APTS | 96/C 57 AVE. |
| | | | SURVEYORS | PHONE | ETA# | Evan Terry Associates |
| | | | TOM GIESELSKI, PHIL DUFFIELD | (773)577-731C | 3640 | Birmingham, AL 35243 |

**TEMPORARY RAMPS**

1.The maximum running slope of a ramp must be 1:12 (8.33%) at every point along the ramp run. The maximum cross slope of a ramp at every point must be no more than 1:50 (2%).

2.The maximum rise of a ramp run must be 30 inches.

3.If existing space limitations of the site prohibit the use of a 1:12 slope or less, a ramp may have a maximum slope of 1:10 for a maximum rise of 6 inches or a maximum slope of 1:8 for a maximum rise of 3 inches.

4.The minimum clear width of a ramp must be 36 inches measured between handrails and edge protection.

5.The surface of the ramp must be slip-resistant.

6.The ramp must have a level landing (2% slope maximum in all directions) at the top and bottom of each run.

7.The landing must be at least as wide as the widest ramp run leading to it. The landing length must be 60 inches clear or more.

8.If the ramp changes direction at a landing, the minimum landing size must be 60 inches by 60 inches clear of all obstructions, including handrail extensions.

9.If the ramp rises more than 6 inches, it must have handrails on each side of the ramp.

10.If the handrails are not continuous, the horizontal surface at the top of the handrail must extend at least 12 inches beyond the top and bottom of the ramp run.  Handrail extensions must be returned to a wall, guard, or the landing surface, or shall be continuous to the handrail of an adjacent ramp run.

11.Handrails must be parallel with the ramp surface.

12.The top of the handrail gripping surface shall be 34 inches minimum and 38 inches maximum above the ramp surface.

13.Handrails and any surfaces adjacent to them shall be free of sharp or abrasive elements. Handrail edges shall be rounded.

14.The ramp shall be located so that there is at least 1-1/2 inches of clear space between a handrail and a wall.

15.Handrail gripping surfaces shall be continuous along their length and shall not be obstructed along their tops or sides. The bottoms of handrail gripping surfaces shall not be obstructed for more than 20 percent of their length. Where provided, horizontal projections shall occur 1½ inches minimum below the bottom of the handrail gripping surface.

16.The outside diameter of a circular handrail must be between 1-1/2 and 2 inches.  Handrails with equivalent graspability may be used if the maximum cross section dimension in any direction does not exceed 2.25" and the circumference is between 4" and 6.25".

17.Ramps and landings that have vertical drop-offs exceeding ½" within 10" horizontally of the ramp or landing surface must have a curb or barrier for edge protection that prevents the passage of a 4" diameter sphere, where any portion of the sphere is within 4 inches of the finish floor or ground surface.

18.Landings subject to wet conditions shall prevent the accumulation of water.

| | |
|---|---|
| ADDRESS | Evan Terry Associates |
| 9610 57 AVENUE | Birmingham, AL 35243 |
| | ET A# |
| | 3640 |
| PHONE | |
| (773)517-7310 | |

| | |
|---|---|
| SITE NAME | SURVEYOR |
| LEFRAK CITY APTS | Phillip Duffield, Tom Cresleski |

**DATE**
9 / 25 /2015

**BOROUGH**
Bronx,  Brooklyn,
Manhattan, Queens,
Staten Island

**HASNO #**
Q0303

See attached
Key Note Sheet(s) _____

(HASNO#) _Q0303____    BOE DIMENSIONED CONCEPTUAL SOLUTION ___   **Sheet 2 of 2**

# EXHIBIT E

| Issues | Photos of Site | Possible Solutions |
|---|---|---|
| No van accessible parking is provided. | 0107 0108 0109 0110 0111 0112 0123 0124 0125 0126 0127 0128 0129 | Re-stripe existing accessible and/or inaccessible parking spaces to provide the required number of van accessible spaces. Coordinate all accessible parking requirements: located on an accessible route, signage (ISA and VAN), compliant slope and cross slope, surface, etc. Also coordinate with state/local requirements. I re-striping reduces the total number of parking spaces, check zoning ordinance or other regulations with minimum requirements. Solution Code: S38A3b |
| Ramp with a rise greater than 6 in. requires handrails on both sides of the ramp. Handrails required but are not provided. | 098 099 0100 | 1. Provide portable ramp to be placed over existing ramp surface. Coordinate handrails, edge protection, and protruding object requirements. Solution Code: S38FF2a 2. Remove existing ramp and install compliant ramp with slope no greater than 1:1 (8.33%). Coordinate with requirements for cross slope, landings, handrails, and ed protection, except if slope becomes 0.5% ramp requirements do not apply. Solution Code: S38F0e |
| Protruding object (wall box) with leading edge between 27 in. and 80 in. AFF projects more than 4 in. from wall or 12 in. from post. Wall box projects 11.5 in. and 21.5 in. at 45.75 in. AFF. | 048 049 050 051 052 053 | 1. Place a detectable object on the floor below wall box which may remove the hazard for election day. Solution Code: S38E0g 2. Relocate, remove, or construct or add a cane-detectable feature with lowest edge .27 in. AFF under protruding object to direct blind or vision-impaired individuals around protruding objects. If item is required to be accessible, comply with reach ranges, clear floor space, etc. Solution Code: S38E0a |

| | | |
|---|---|---|
| Protruding object (fire extinguisher) between 27 in. and 80 in. AFF projects 6.5 in. at 46.25 in. AFF. | 054 055 056 057 | 1. Refer to solution 1 above (solution code S38E0g).<br><br>2. Lower existing item into the range of cane detection or place a fixed cane detectable element below it.<br>Solution Code: S38E0c |
| Floor surface within required area for door maneuvering clearance is not level.<br>Required width: 18 in.<br>Existing width: 9 in. | 025 061 062 063 064 | 1. Provide an accessibility clerk near the door to open it for voters during all voting hours.<br>Solution Code: S38G55e<br><br>2. Install compliant automatic opening device.<br>Solution Code: S38G4g |
| Existing door hardware cannot be grasped easily with one hand or requires tight grasping, pinching, or twisting of the wrist to operate.<br>Door has a controlled entry security device. | 085 088 089 | Door requires a code, buzzer, button control, or key card for entry. Station volunteer at door to allow entry or arrange to have security personnel present to open doors f voters.<br>Solution Code: S38G4g |
| More than 5# is required to pull open an accessible interior door—11# door opening force. | 085 087 088 | 1. If the door is a fire door, station volunteers nearby to open it for voters; otherwis either leave the door propped open during voting hours or use accessibility clerks. doors are propped open, maintain 36 in. clear width accessible route except for 32 width at door opening,<br>Solution Code: S38G8a<br><br>2. Adjust closer to provide compliant speed and force.<br>Solution Code: S38G8b |

# EXHIBIT F

Political contributions by owners of polling places are strictly prohibited. A person who, being the owner of premises, contracted for or used as a place of registration or as a polling place for any election, or official primary, who makes, offers or promises to make political contributions to any party committee, candidate or person, or any person who makes, promises or offers to make any such political contribution as inducement for the hiring of premises owned by him or for use as a place of registration or polling place for any election or official primary, shall be guilty of misdemeanor (Election Law 17-164). No polling place shall be located on premises owned or leased by a person holding public office or who is a candidate for public office at primary or general election. [Election Law 4-104 (7)].

## BOARD OF ELECTIONS IN THE CITY OF NEW YORK ("Licensee")

### BOROUGH OF QUEENS
Rome Leasing Limited Partnership ("Licensor")
LICENSE AGREEMENT
Primary Election(s), General Election, and Special Elections

July 01, 2016 - June 30, 2017

I, Marsilia A. Boyle, the undersigned, do hereby certify that I am the Agent for the owner of the building identified below, and having the legal authority to enter into this License, do hereby grant to Licensee a license to use the Licensed Premises at the times and for the purpose below:

| | |
|---|---|
| 1st | As a place for holding the PRIMARY ELECTION(S) – on the 13th of September, 2016, from 5:00 A.M. and until the canvass is complete. Notification by mail will be given of any other date(s) and hours. |
| 2nd | As a place for holding the GENERAL ELECTION- on the 8th day of November, 2016, from 5:00 A.M. and until the canvass is complete. Notification by mail will be given of any other date(s) and hours |
| 3rd | As a place for holding any SPECIAL ELECTION (if necessary) from 5:00 A.M. and until the canvass is complete. - Notification by mail will give date(s) and hours. |

In and for the following ELECTION DISTRICTS of the following ASSEMBLY DISTRICTS, County of QUEENS, City of New York:

| ASSEMBLY DISTRICT | ELECTION DISTRICT(S) |
|---|---|
| 35 | 015, 016, 017, 018, 025 |

The following premises, to wit:

Write in Streets or Avenues, between which above is located

| | |
|---|---|
| Address of Polling Place: | The Continental Room at 96-10 57th Avenue (the "Licensed Premises") |
| City/State/Zip Code: | Corona, NY 11368 |
| Polling Place Telephone Number: | 718-271-5000 Ext.115 |
| Voting systems delivery address: | 96-10 57th Avenue |
| City/State/Zip Code: | Corona, NY 11368 |
| Accessible Entrance Located at: | 96-10 57th Avenue |
| Designated Poll Room(s): | The Continental Room |
| Available Floor Space: | Approximately 1,739 Square Feet |
| Name of Owner: | Rome Leasing Limited Partnership |
| Residence Address: | 40 West 57th Street |
| City/State/Zip Code: | New York, NY 10019 |
| Telephone Number: | 212-708-6600 |
| E-Mail Address: | mboyle@lefrak.com |
| Licensor Representative | Marsilia A. Boyle |
| Residence Address: | 40 West 57th Street, NY, NY 10019 |
| Telephone Number: | (212) 708-6652 |
| REQUIRED EMERGENCY CONTACT: | |
| Name: | Randi Koch Nir, Esq., Mid City Security, 97-20 57th Avenue, LL, Corona, NY 11368 |
| Telephone Number: | (718) 575-4744 |
| E-Mail Address: | RKochnir@midcitysecurity.com |

Rev. March 2013 (revisions requested by Lefrak City Apartments)   Page 1                                    Q0303

The said Board of Elections to have uninterrupted possession and reasonable control of said Licensed Premises during any and all of the days and times required by law for the purposes aforesaid, and until the completion of the canvass on the day(s) of said PRIMARY ELECTION(S) viz., date(s) to be determined, said GENERAL ELECTION viz., November 8, 2016, and any necessary SPECIAL ELECTIONS viz. date(s) to be determined. The polling place is to remain open prior to and after the election (as specified by the Board of Elections) for pick up and delivery of voting systems including all related equipment and supplies. In the event of an emergency or a rerun of an election, the Licensor will be notified by the Licensee whether or not additional hours of access will be required and this License shall be extended to such additional dates/times.

The dates set forth for the above elections are the current statutorily mandated dates. These dates are subject to change by State Legislation or court order. The Licensee will notify the Licensor of any such change(s).

License fee for the within License to be SEVENTY DOLLARS ($70.00) for each event for each ELECTION DISTRICT for which the premises are used for any of the said elections. In accordance with Section 4-104 of the Election Law, any person or entity which controls a building which has a tax exemption, tax abatement, subsidy, grant or loan for construction, renovation, rehabilitation or operation provided by any agency of the state or any political subdivision thereof shall not receive said payment. Any person or entity conducting any program, activity, or service for which a loan, grant, contract, subsidy or reimbursement provided by any agency of the state or any political subdivision thereof shall not receive said payment for the use of space under the control of such person or entity.

In consideration of which the undersigned agrees to *provide the necessary electrical power and outlets to accommodate the voting system as well as* light, heat and its normal Building security for the Licensed Premises for each of the aforesaid days of the election.

If required by the Licensee, the Licensor shall also furnish six chairs and one table per Election District (and one table and two chairs for a coordinator and/or information clerk) on said days. Licensee agrees that the Licensed Premises shall be accessed from the entrance on 57th Avenue at the corner of 96th Street. In the event that the Licensee determines that in order for said premises to be fully accessible to all persons as required by Section 4-104(1) of the Election Law, the Licensor agrees to direct persons needing ADA access to the lobby entrance of the building where they will be escorted to the elevator to the basement corridor leading to the Continental Room. If such premises are accessible to physically disabled voters by means of an alternate accessible entrance doors which must remain available for access; elevators which must be operational and usable by said voters; additional polling place room/space; or any other reasonable accommodations including by a means of a combination of such said accommodations for such voters, the undersigned agrees to provide such said accommodations as determined and agreed by the Licensee.

The License fee above mentioned is to be payable only if said Licensed premises are actually occupied and uninterruptedly used by the Board of Elections for the purposes above expressed, for such elections districts that are actually represented on election day and for such days as said premises are so used. Attached to this License is a schematic that shows the designated poll room in the premises where the elections will be held. This room cannot be changed without the written approval of the Commissioners of Elections in the City of New York.

See Rider Attached Hereto and made a part Hereof.

IN WITNESS WHEREOF, the parties hereto, by their duly authorized representatives, have executed this Lease Agreement this........................day of..................................................201_____

Lessee: The Board of Elections in the City of New York

By: _Barbara Connacchio_    8/31/16
      Print Name             Signature

Title:   Barbara Connacchio, Chief Clerk

By: _Bart J. Haggerty_
      Print Name           Signature

Title:   Bart Haggerty, Deputy Chief Clerk

Owner/Licensor:

By:   Marsilia A. Boyle
      Print Name           Signature

Title:   Agent/Authorized Signatory

Make Check Payable to:   Rome Leasing Limited Partnership

Address:   40 West 57th Street

City/State/Zip Code:   New York, NY 10019

| TABLES AND CHAIRS REQUIRED |
| --- |
| __ YES __ NO |
| REQUIRED: TABLE__ CHAIRS__ |

<u>NOTE:</u> All costs in connection with the above-described premises and activities are contained in this lease.

The said Board of Elections to have uninterrupted possession and reasonable control of said Licensed Premises during any and all of the days and times required by law for the purposes aforesaid, and until the completion of the canvass on the day(s) of said PRIMARY ELECTION(S) viz., date(s) to be determined, said GENERAL ELECTION viz., November 8, 2016, and any necessary SPECIAL ELECTIONS viz. date(s) to be determined. The polling place is to remain open prior to and after the election (as specified by the Board of Elections) for pick up and delivery of voting systems including all related equipment and supplies. In the event of an emergency or a rerun of an election, the Licensor will be notified by the Licensee whether or not additional hours of access will be required and this License shall be extended to such additional dates/times.

The dates set forth for the above elections are the current statutorily mandated dates. These dates are subject to change by State Legislation or court order. The Licensee will notify the Licensor of any such change(s).

License fee for the within License to be SEVENTY DOLLARS ($70.00) for each event for each ELECTION DISTRICT for which the premises are used for any of the said elections. In accordance with Section 4-104 of the Election Law, any person or entity which controls a building which has a tax exemption, tax abatement, subsidy, grant or loan for construction, renovation, rehabilitation or operation provided by any agency of the state or any political subdivision thereof shall not receive said payment. Any person or entity conducting any program, activity, or service for which a loan, grant, contract, subsidy or reimbursement provided by any agency of the state or any political subdivision thereof shall not receive said payment for the use of space under the control of such person or entity.

In consideration of which the undersigned agrees to *provide the necessary electrical power and outlets to accommodate the voting system as well as* light, heat and its normal Building security for the Licensed Premises for each of the aforesaid days of the election.

If required by the Licensee, the Licensor shall also furnish six chairs and one table per Election District (and one table and two chairs for a coordinator and/or information clerk) on said days. Licensee agrees that the Licensed Premises shall be accessed from the entrance on 57th Avenue at the corner of 96th Street. In the event that the Licensee determines that in order for said premises to be fully accessible to all persons as required by Section 4-104(1) of the Election Law, the Licensor agrees to direct persons needing ADA access to the lobby entrance of the building where they will be escorted to the elevator to the basement corridor leading to the Continental Room. If such premises are accessible to physically disabled voters by means of an alternate accessible entrance doors which must remain available for access; elevators which must be operational and usable by said voters; additional polling place room/space; or any other reasonable accommodations including by a means of a combination of such said accommodations for such voters, the undersigned agrees to provide such said accommodations as determined and agreed by the Licensee.

The License fee above mentioned is to be payable only if said Licensed premises are actually occupied and uninterruptedly used by the Board of Elections for the purposes above expressed, for such elections districts that are actually represented on election day and for such days as said premises are so used. Attached to this License is a schematic that shows the designated poll room in the premises where the elections will be held. This room cannot be changed without the written approval of the Commissioners of Elections in the City of New York.

See Rider Attached Hereto and made a part Hereof.

IN WITNESS WHEREOF, the parties hereto, by their duly authorized representatives, have executed this Lease Agreement this......................day of.................................................................201_____

Lessee: The Board of Elections in the City of New York

By: _____
          Print Name                              Signature
Title: _____    Barbara Connacchio, Chief Clerk

By: _____
          Print Name                              Signature
Title: _____    Bart Haggerty, Deputy Chief Clerk

| TABLES AND CHAIRS REQUIRED |
| __ YES   __ NO |
| REQUIRED: TABLE__   CHAIRS__ |

Owner/Licensor:
By: _____
          Marsilia A. Boyle
          Print Name                              Signature
Title: _____    Agent/Authorized Signatory
Make Check Payable to:    Rome Leasing Limited Partnership
Address:    40 West 57th Street
City/State/Zip Code:    New York, NY 10019

<u>NOTE:</u> All costs in connection with the above-described premises and activities are contained in this lease.



MICHAEL MICHEL
PRESIDENT

BIANKA PEREZ
SECRETARY

JOSE MIGUEL ARAUJO,
RONALD CASTORINA, JR.
JOHN FLATEAU
MARIA GUASTELLA
MICHAEL A. RENDINO
ALAN SCHULKIN
SIMON SHAMOUN
FREDERIC M. UMANE

COMMISSIONERS

**BOARD OF ELECTIONS**
IN
THE CITY OF NEW YORK
EXECUTIVE OFFICE, 32 BROADWAY
NEW YORK, NY 10004-1609
(212) 487-5300
www.vote.nyc.ny.us

MICHAEL J. RYAN
EXECUTIVE DIRECTOR

DAWN SANDOW
DEPUTY EXECUTIVE DIRECTOR

PAMELA GREEN PERKINS
ADMINISTRATIVE MANAGER

GEORGEA KONTZAMANIS
OPERATIONS MANAGER

STEVEN H. RICHMAN
GENERAL COUNSEL
Tel: (212) 487-5338
Fax: (212) 487-5342
E-Mail:
srichman@boe.nyc.ny.us

## INDEMNIFICATION AGREEMENT

The annexed "Poll Site Lease Agreement" is hereby amended to add the following:

The Board shall represent, defend, hold harmless and indemnify the lessor against any claims for personal injury or property damage arising out of the use of the premises by the Board, provided however that this obligation of the Board shall not extend to any injury or damage caused by the negligence of the lessor, its officers, employees or agents. The lessor shall provide the Board with written notice of the filing of any claim that is subject to this Agreement within fifteen (15) days of receipt of such claim, and shall cooperate and assist the Board in the defense of the claim. Failure by the lessor to provide such written notice and cooperation shall relieve the Board of its obligation to represent, defend, hold harmless and indemnify lessor under this Agreement.

THE BOARD OF ELECTIONS
IN THE CITY OF NEW YORK

By:_____

Name:_____

Title:_____

Date:_____

Approved as to form until 12/31/16:

_Sharon Cantor_
**Acting Corporation Counsel**

MAR 17 2015

NAME OF LESSOR:
_ROME LEASING LIMITED PARTNERSHIP_

By: MARSILIA A. BOYLE

Name: _Marsilia Boyle_

Title: _AUTHORIZED SIGNATORY_

Date: 8/31/16

2015-009879



MICHAEL MICHEL
President

BIANKA PEREZ
Secretary

JOSE MIGUEL ARAUJO,
RONALD CASTORINA, JR.
JOHN FLATEAU
MARIA GUASTELLA
MICHAEL A. RENDINO
ALAN SCHULKIN
SIMON SHAMOUN
FREDERIC M. UMANE

Commissioners

**BOARD OF ELECTIONS**
IN
THE CITY OF NEW YORK
EXECUTIVE OFFICE, 32 BROADWAY
NEW YORK, NY 10004–1609
(212) 487–5300
www.vote.nyc.ny.us

MICHAEL J. RYAN
Executive Director

DAWN SANDOW
Deputy Executive Director

PAMELA GREEN PERKINS
Administrative Manager

GEORGEA KONTZAMANIS
Operations Manager

STEVEN H. RICHMAN
General Counsel
Tel: (212) 487-5338
Fax: (212) 487-5342
E-Mail:
srichman@boe.nyc.ny.us

## INDEMNIFICATION AGREEMENT

The annexed "Poll Site Lease Agreement" is hereby amended to add the following:

The Board shall represent, defend, hold harmless and indemnify the lessor against any claims for personal injury or property damage arising out of the use of the premises by the Board, provided however that this obligation of the Board shall not extend to any injury or damage caused by the negligence of the lessor, its officers, employees or agents. The lessor shall provide the Board with written notice of the filing of any claim that is subject to this Agreement within fifteen (15) days of receipt of such claim, and shall cooperate and assist the Board in the defense of the claim. Failure by the lessor to provide such written notice and cooperation shall relieve the Board of its obligation to represent, defend, hold harmless and indemnify lessor under this Agreement.

THE BOARD OF ELECTIONS
IN THE CITY OF NEW YORK

By: _Barbara Concealin_

Name: _Barbara Concealin_

Title: _Chief Clerk_

Date: _8 - 31 - 16_

NAME OF LESSOR:
_____

By: _____

Name: _____

Title: _____

Date: _____

*Approved as to form until 12/31/16:*

_Sharon Cantor_

**Acting Corporation Counsel**

MAR 17 2015

_2015 - 009819_

# EXHIBIT G

KCoughlin@boe.nyc.ny.us

BOARD OF ELECTIONS IN THE CITY OF NEW YORK QUEENS COUNTY OFFICE
118-35 QUEENS BOULEVARD, 11th FLOOR
FOREST HILLS, NEW YORK 11375
-------------------------------------------

BOARD OF ELECTIONS in the CITY OF NEW YORK For more information call 866-VOTE-NYC, TTY 212-487-5496 or visit our website at vote.nyc.ny.us Be sure to sign up for our email updates to stay connected with the Board of Elections in the City of New York.
Please follow us on:
facebook.com/VoteTheNewWayNY
twitter.com/#!/BOENYC
instagram.com/boenyc
youtube.com/user/VotetheNewWayNYC
-------------------------------------------

This message is intended for the exclusive use of the recipient(s) named above and may contain information that is privileged and confidential. If you are not an intended recipient, you are hereby notified that any disclosure, dissemination, distribution or copying of this communication or its contents is strictly prohibited. If you have received this communication in error, please delete this message and any attachments and notify me immediately by replying to this message. Thank you.
-----Original Message-----
From: MBOYLE@lefrak.com [mailto:MBOYLE@lefrak.com]
Sent: Monday, May 08, 2017 11:28 AM
To: Kenneth Coughlin
Cc: mjackness@lefrak.com; SLewis@LeFrak.com; ebenudis@lefrak.com; DBernhardt@lefrakcity.com; RKochNir@midcitysecurity.com
Subject: BOE Lease Agreement

Dear Ken

We received the notice for renewal of the polling place agreement at LeFrak City in the mail. As per usual it does not contain the necessary modifications to the form that we have used each year for the renewal. I have copied you on the existing agreement. Please provide a revised form, either filled out or as a Word document where we can make the necessary changes.
Please also include the indemnification executed by the City.

Thank you

Marcy Boyle

Marsilia A. Boyle
Senior Vice President
The LeFrak Organization
40 West 57th Street
23rd Floor
New York, NY 10019
Phone:  212 708 - 6652
Fax:     212 708 - 6653


Legal Disclaimer:

# EXHIBIT H



40 WEST 57TH STREET          T: +1 212 708 6600
23RD FLOOR                   LEFRAK.COM
NEW YORK, NEW YORK 10019

August 18, 2017

Michael Kelly, Executive Director
New York City Board of Elections
32-42 Broadway, 7 Fl.
New York, NY 10004

Dear Mr. Kelly:

I'm writing regarding the removal of the poll location at 96-10 57th Avenue in LeFrak City. As you may be aware, this poll location (known as the "Continental Room") has been in use for decades. LeFrak City has been proud to host a poll location and grateful that its ease and proximity encourage all of our residents to vote.

On May 8, 2017 we received from the Board of Elections ("BOE") a renewal form for the use of the Continental Room as a poll location for the period ending June 30, 2017. Because the form we received was not the most current one, I immediately contacted you and provided you with the updated form of agreement that we had used together over the last several years. Suddenly and to our great surprise, on May 15 Mr. Kenneth Coughlin of the BOE wrote to advise that LeFrak City would no longer be used as a poll site.

In an effort to retain the poll site at LeFrak City, our representatives contacted the BOE General Counsel's office and on May 30 and spoke at length with BOE staff regarding the use of the Continental Room. Our representatives were told that the Continental Room did not meet the minimum ADA requirements to operate as a poll location. Our representatives requested, should it be feasible to rectify the ADA issues, that the BOE reconsider and locate the poll site back to LeFrak City in 2017 at either the Continental Room or another suitable location. BOE staff responded that it would be unable return the poll location to LeFrak City for 2017 under any circumstances. However, BOE staff did suggest that they would consider the site in 2018 or future elections if the ADA issues could be resolved. The BOE General Counsel's office forwarded their independent consultant's ADA report to us for review in order to understand the issues which would need to be addressed for the future.

Nevertheless, we attempted to find alternate locations for the poll site for 2017. On June 14, our representatives identified another location in LeFrak City and emailed the address for consideration to the BOE. Our representatives were informed via telephone that the registered voters at LeFrak

City had already been reassigned to a poll site at a nearby school and declined further consideration of our suggested alternative.

Attached are copies of all the above referenced correspondence.

More recently, on August 10, without prior notice to us, you personally appeared at LeFrak City and took detailed measurements of the Continental Room and other locations including the building's lobby. It appears that you found the locations unsuitable for your needs. We would welcome the opportunity to offer the Continental Room or additional alternative locations in LeFrak City for use as poll locations in 2017, 2018 or beyond. We surely can imagine many other potential locations and we are willing to work hard on the operational details.

Please feel free to contact me should you wish to pursue this. The LeFrak family and staff remain committed to the best interests of our residents and we believe that maintaining a polling place at LeFrak City is not merely a great convenience to our more than 20,000 residents but the best way to facilitate and encourage their active participation in the democratic process.

Sincerely

Marsilia A Boyle
Senior Vice President


Cc : George Fontas

# EXHIBIT I



**BLACK LEADERSHIP
ACTION COALITION**

July 26, 2017

Mr. Frederic M. Umane
President
New York City Board of Elections
Executive Office
32-42 Broadway, 7th Floor
New York, NY 10004

RE: Request for Restoration of Voting Stations at LeFrak City

Dear President Umane,

I am writing to request that the New York City Board of Elections (NYCBE) <u>immediately</u> restore the District 21 voting stations at LeFrak City – and that it maintain those stations there at least through the end of the 2017 election cycle. Therefore, I am requesting that the NYCBE conduct community meetings throughout Council District 21 to allow the residents to voice their preference as to where their voting stations will be located.

Forcing the residents of LeFrak City to go elsewhere to vote is nothing more than a blatant attempt to discourage them from voting at all. As such, it amounts to a new form of voter suppression.

Making it harder for people to vote is a political tactic that we normally associate with Southern states and ultra-conservative politics. Unfortunately, in this case, it's the Queens Board of Elections that is utilizing this unsavory tactic in order to make it harder for voters to voice their support and exercise their constitutional right.

In the past, minority voters have been held back by things like polling taxes and literacy tests. Now, they're being disenfranchised by moving the very place where they can cast their vote and have cast their vote for years.

Via a separate letter, I have requested that the New York State Board of Elections and the Voting Section of the U.S. Department of Justice's Civil Rights Division conduct a joint investigation concerning the decision to remove the voting stations from LeFrak City. In this regard, I would ask that you and your staff fully cooperate with all aspects of that investigation.



Sincerely,



Bertha Lewis
Founder and President

cc:     Mr. Michael J. Ryan, Executive Director, New York City Board of Elections
        Jose M. Araujo, Commissioner, Queens County Board of Elections
        Michael Michel, Commissioner, Queens County Board of Elections
        Barbara Conacchio, Chief Clerk, Queens County Board of Elections
        Eric T. Schneiderman, New York State Attorney General
        Bridget Rohde, Acting U.S. Attorney, New York State Eastern District

# EXHIBIT J



**BLACK LEADERSHIP
ACTION COALITION**

July 26, 2017

Todd D. Valentine, Co-Executive Director
Robert A. Brehm, Co-Executive Director
New York State Board of Elections
40 North Pearl Street
5th Floor
Albany, NY 12207

RE: Investigation

Dear Mr. Valentine and Mr. Brehm,

I am writing to request that your agencies immediately undertake an investigation to determine why the voting stations at LeFrak City were recently moved to a new, and much less convenient, location. In this regard, some of the facts behind my request are as follows:

- There are more than 20,000 residents in LeFrak City, which includes twenty 15-story towers that are spread out over 40 acres.
- A large percentage of LeFrak City's residents are minorities – and many of them are elderly or disabled.
- LeFrak City is part of Queens Community Board 4.
- LeFrak City has served as the site of the City Council District 21 polling location for at least thirty-five years.
- The decision to relocate the City Council District 21 voting stations was made by the Queens County Board of Elections.
- The new location for the City Council District 21 voting stations is approximately a half a mile from LeFrak City.

Forcing the residents of LeFrak City to go elsewhere to vote is nothing more than a blatant attempt to discourage them from voting at all. As such, it amounts to a new form of voter suppression.

Making it harder for people to vote is a political tactic that we normally associate with Southern states and ultra-conservative politics. Unfortunately, in this case, it's the Queens County Board of Elections that is utilizing this unsavory tactic in order to make it harder for voters to voice their support.

In the past, minority voters have been held back by things like polling taxes and literacy tests. Now, they're being disenfranchised by moving the very place where they can cast their vote.



Via a separate letter, I have requested that the New York City Board of Elections restore LeFrak City as the location for the District 21 voting stations at least through the end of the 2017 election cycle. Thereafter, I have requested that they conduct community meetings throughout District 21 to allow the residents to voice their preference as to where their voting stations will be located.

Sincerely,

Bertha Lewis
Founder and President

cc:     Mr. Michael J. Ryan, Executive Director, New York City Board of Elections
        Jose M. Araujo, Commissioner, Queens County Board of Elections
        Michael Michel, Commissioner, Queens County Board of Elections
        Barbara Conacchio, Chief Clerk, Queens County Board of Elections
        Eric T. Schneiderman, New York State Attorney General
Bridget Rohde, Acting U.S. Attorney, New York State Eastern District

# EXHIBIT K

**BLACK LEADERSHIP
ACTION COALITION**

August 7, 2017

Mr. Michael J. Ryan
Executive Director
New York City Board of Elections
Executive Office
32-42 Broadway – 7th Floor
New York, NY 10004

RE: Request For Restoration Of Voting Stations In LeFrak City

Dear Executive Director Ryan:

I am writing as a follow-up to my July 26, 2017 letter to Mr. Frederic M. Umane, the President of the New York City Board of Elections (NYCBOE), concerning the relocation of the District 21 voting stations at LeFrak City – and in response to the recent decision to cancel the meeting had previously been scheduled for today between The Black Institute (TBI) and the Queens County Board of Elections (QCBOE) to discuss that matter in more detail. In this regard, I am hereby requesting that, per the applicable sections of New York State's Freedom Of Law (Public Officer Law, Article 6), you provide me with the following information and materials:

- Copies of the "Minutes" of all meetings of the NYCBOE during the past twelve (12) months, both formal and informal, in which the topic of the possible relocation of the District 21 voting stations at LeFrak City was discussed;
- Copies of any resolutions that were proposed by any member of the NYCBOE during the past twelve (12) months regarding the possible relocation of the District 21 voting stations at LeFrak City;
- Copies of the records regarding any formal votes that were taken by the NYCBOE during the past twelve (12) months regarding the possible relocation of the District 21 voting stations at LeFrak City;
- Copies of any correspondence, in any format, that any member of the NYCBOE has received or sent during the past twelve (12) months regarding the possible relocation of the District 21 voting stations at LeFrak City;
- Copies of any notices, in any format, that the NYCBOE has issued during the past twelve (12) months regarding the possible relocation of the District 21 voting stations at LeFrak City;
- Copies of the notices regarding any public meetings that the NYCBOE has held during the past twelve (12) months regarding the possible relocation of the District 21 voting stations at LeFrak City;
- Copies of the "Minutes" of any public meetings that the NYCBOE has held during the past twelve (12) months regarding the possible relocation of the District 21 voting stations at LeFrak City;
- A list of all the polling site visits that were made by the NYCBOE's Assembly District Monitors during the period from 2008 through 2016 – and copies of any reports that they filed after those visits;

**Page 1 of 3**



**BLACK LEADERSHIP
ACTION COALITION**

- A list of all the polling site visits that were made by the NYCBOE's Polling Site Coordinators during the September 2012 Primary Elections – and copies of any reports that they filed after those visits;
- A list of the individuals and entities to whom the NYCBOE sent a copy of the "Remedial Order" that was issued by the U.S. District Court in the *Disabled In Action v. Board of Elections In The City Of New York* case on October 18, 2012;
- The name of the "Third Party Expert" who examined all the voting stations in Queens County following the issuance of the "Remedial Order" that was issued by the U.S. District Court in the *Disabled In Action v. Board of Elections In The City Of New York* case on October 18, 2012;
- A copy of any reports that were created by the "Third Party Expert" with respect to the voting stations in Queens County;
- A list of the criteria that were used by the NYCBOE to create the schedule for replacing voting stations within Queens County that were deemed to be out-of-compliance with the *Americans with Disabilities Act (ADA)* requirements – and a list of any other criteria that were also considered for that purpose;
- A list of all the other voting stations in Queens County that are out-of-compliance with the *ADA* requirements – and a copy of the schedule as to when they will be replaced; and
- Copies of any other documents, recordings and/or records that are in the possession of the NYCBOE concerning its decision to relocate the District 21 voting stations at LeFrak City.

In addition to the above, I am hereby requesting that the NYCBOE provide me with answers to the following questions on or before <u>August 14, 2017</u>:

- Who actually made the decision to move the voting stations from LeFrak City for the 2017 elections?
- When was the decision made to move the voting stations from LeFrak City for the 2017 elections?
- Given that many of the voting stations in New York City have been out-of-compliance with the *ADA* requirements since at least 2008 – and given that the decision in the *Disabled In Action v. Board of Elections In The City Of New York* case was rendered in May 2014 – why was the decision to move the LeFrak City voting stations made now and without any lead-time to find a suitable alternative?
- Why were the LeFrak City voting stations selected for replacement now versus all of the other voting stations in Queens County that are out-of-compliance with the *ADA* requirements: i.e., are the LeFrak City voting stations the worst in Queens County?
- Who was informed by the NYCBOE about the decision to move the voting stations from LeFrak City for the 2017 elections – and when did that occur?
- Why were other community groups not informed about the determination to move the voting stations from LeFrak City for the 2017 elections?
- Can the former voting stations in LeFrak City be used for the 2017 elections – and then replacement sites be identified on or before March 31, 2018? If not, why not?
- Who made the decision as to the specific replacement locations for the former voting stations in LeFrak City?
- When was the decision made as to the specific replacement locations for the former voting stations in LeFrak City?

**Page 2 of 3**



BLACK LEADERSHIP
ACTION COALITION

- What other sites, if any, were considered as possible replacement locations for the former voting stations in LeFrak City?
- What criteria were used to select the specific replacement locations for the former voting stations in LeFrak City?
- Did the NYCBOE confer with any candidates and/or their campaigns prior to making – and announcing – the decision to replace the former LeFrak voting stations?
- Can the number of people assigned to the LeFrak voting stations be temporarily reduced in order to make them acceptable polling locations for the 2017 elections? If not, why not?
- Can the number of people assigned to the LeFrak City polling locations be permanently reduced in order to make them acceptable polling locations for future elections? If not, why not?
- Could one or more *ADA* -compliant portable office trailers be installed at agreed upon locations in LeFrak City – and used as voting stations for the upcoming elections?  If so, how large would these units have to be?
- Could one or more *ADA* -compliant portable office trailers be installed at agreed upon locations in LeFrak City – and used as voting stations for all future elections?  If so, how large would these units have to be?
- If a mutually acceptable solution to the current problem can not be reached, will the NYCBOE voluntarily agree to bring this matter back to the U.S. District Court – and request an expedited decision?
- Will the NYCBOE agree to adopt a policy that will, henceforth, require it to publicly announce, on its website and via an appropriate "Press Release", any proposed change in the location of a polling site at least one hundred twenty (120) days prior to the implementation date of the change – and to hold at least three (3) open public meetings before any such change is implemented?

As you know, I have already requested that the New York State Board of Elections and the Voting Section of the U.S. Department of Justice's Civil Rights Division conduct a joint investigation concerning the decision to remove the voting stations from LeFrak City. In this regard, I continue to request that you and your staff fully cooperate with all aspects of that investigation.

Sincerely,

Bertha Lewis
Founder and President


cc:     New York State Board of Elections
        Queens County Board of Elections
        U.S. Department of Justice's Civil Rights Division – Voting Section

**Page 3 of 3**

# EXHIBIT L



BLACK LEADERSHIP
ACTION COALITION

August 7, 2017

Jose M. Araujo, Commissioner                    **FAXED & MAILED ON SAME DATE**
Michael Michel, Commissioner                    **FAX NUMBER: (718) 459-3384**
Barbara Conacchio, Chief Clerk
Bart Haggarty, Deputy Chief Clerk
Queens County Board of Elections
118-35 Queens Boulevard
Forest Hills, NY 11375

RE: Request For Restoration Of Voting Stations In LeFrak City

Dear Mr. Araujo, Mr. Michel, Ms. Conacchio and Mr. Haggarty:

I am writing as a follow-up to the recent decision to cancel the meeting that we had previously scheduled for today to discuss the above-referenced matter in more detail. In this regard, I am hereby requesting that, per the applicable sections of New York State's Freedom Of Law (Public Officer Law, Article 6), you provide me with the following information and materials:

- Copies of the "Minutes" of all meetings of the Queens County Board of Elections (QCBOE) during the past twelve (12) months, both formal and informal, in which the topic of the possible relocation of the District 21 voting stations at LeFrak City was discussed;
- Copies of any resolutions that were proposed by any member of the QCBOE during the past twelve (12) months regarding the possible relocation of the District 21 voting stations at LeFrak City;
- Copies of the records regarding any formal votes that were taken by the QCBOE during the past twelve (12) months regarding the possible relocation of the District 21 voting stations at LeFrak City;
- Copies of any correspondence, in any format, that any member of the QCBOE has received or sent during the past twelve (12) months regarding the possible relocation of the District 21 voting stations at LeFrak City;
- Copies of any notices, in any format, that the QCBOE has issued during the past twelve (12) months regarding the possible relocation of the District 21 voting stations at LeFrak City;
- Copies of the notices regarding any public meetings that the QCBOE has held during the past twelve (12) months regarding the possible relocation of the District 21 voting stations at LeFrak City;
- Copies of the "Minutes" of any public meetings that the QCBOE has held during the past twelve (12) months regarding the possible relocation of the District 21 voting stations at LeFrak City;
- A list of all the polling site visits that were made by the QCBOE's Assembly District Monitors during the period from 2008 through 2016 – and copies of any reports that they filed after those visits;
- A list of the polling site visits that were made by the QCBOE's Polling Site Coordinators during the September 2012 Primary Elections – and copies of any reports that they filed after those visits;
- A list of the individuals and entities to whom the QCBOE sent a copy of the "Remedial Order" that was issued by the U.S. District Court in the *Disabled In Action v. Board of Elections In The City Of New York* case on October 18, 2012;



- The name of the "Third Party Expert" who examined all the voting stations in Queens County following the issuance of the "Remedial Order" that was issued by the U.S. District Court in the *Disabled In Action v. Board of Elections In The City Of New York* case on October 18, 2012;
- A copy of any reports that were created by the "Third Party Expert" with respect to the voting stations in Queens County;
- A list of the criteria were used by the QCBOE to create the schedule for replacing voting stations within Queens County that were deemed to be out-of-compliance with the *Americans with Disabilities Act (ADA)* requirements – and a list of any other criteria that were also considered for that purpose;
- A list of all the other voting stations in Queens County that are out-of-compliance with the *ADA* requirements – and a copy of the schedule as to when they will be replaced; and
- Copies of any other documents, recordings and/or records that are in the possession of the QCBOE concerning its decision to relocate the District 21 voting stations at LeFrak City.

In addition to the above, I am hereby requesting that the QCBOE provide me with answers to the following questions on or before <u>August 14, 2017</u>:

- Who actually made the decision to move the voting stations from LeFrak City for the 2017 elections?
- When was the decision made to move the voting stations from LeFrak City for the 2017 elections?
- Given that many of the voting stations in New York City have been out-of-compliance with the *ADA* requirements since at least 2008 – and given that the decision in the *Disabled In Action v. Board of Elections In The City Of New York* case was rendered in May 2014 – why was the decision to move the LeFrak City voting stations made now and without any lead-time to find a suitable alternative?
- Why were the LeFrak City voting stations selected for replacement now versus all of the other voting stations in Queens County that are out-of-compliance with the *ADA* requirements: i.e., are the LeFrak City voting stations the worst in Queens County?
- Who was informed by the QCBOE about the decision to move the voting stations from LeFrak City for the 2017 elections – and when did that occur?
- Why were other community groups not informed about the determination to move the voting stations from LeFrak City for the 2017 elections?
- Can the former voting stations in LeFrak City be used for the 2017 elections – and then replacement sites be identified on or before March 31, 2018? If not, why not?
- Who made the decision as to the specific replacement locations for the former voting stations in LeFrak City?
- When was the decision made as to the specific replacement locations for the former voting stations in LeFrak City?
- What other sites, if any, were considered as possible replacement locations for the former voting stations in LeFrak City?
- What criteria were used to select the specific replacement locations for the former voting stations in LeFrak City?
- Did the QCBOE confer with any candidates and/or their campaigns prior to making – and announcing – the decision to replace the former LeFrak voting stations?

Page 2 of 3



- Can the number of people assigned to the LeFrak voting stations be <u>temporarily</u> reduced in order to make them acceptable polling locations for the 2017 elections? If not, why not?
- Can the number of people assigned to the LeFrak City polling locations be <u>permanently</u> reduced in order to make them acceptable polling locations for future elections? If not, why not?
- Could one or more *ADA* -compliant portable office trailers be installed at agreed upon locations in LeFrak City – and used as voting stations for the upcoming elections?  If so, how large would these units have to be?
- Could one or more *ADA* -compliant portable office trailers be installed at agreed upon locations in LeFrak City – and used as voting stations for all future elections?  If so, how large would these units have to be?
- If a mutually acceptable solution to the current problem cannot be reached, will the QCBOE voluntarily agree to bring this matter back to the U.S. District Court – and request an expedited decision?
- Will the QCBOE agree to adopt a policy that will, henceforth, require it to publicly announce, on its website and via an appropriate "Press Release", any proposed change in the location of a polling site at least one hundred twenty (120) days prior to the implementation date of the change – and to hold at least three (3) open public meetings before any such change is implemented?

Forcing the residents of LeFrak City to go elsewhere to vote is nothing more than a blatant attempt to discourage them from voting at all. As such, it amounts to a new form of voter suppression.

Making it harder for people to vote is a political tactic that we normally associate with Southern states and ultra-conservative politics. Unfortunately, in this case, it's the QCBOE that is effectively disenfranchising hundreds of local voters.

Via a separate letter, I have requested that the New York State Board of Elections and the Voting Section of the U.S. Department of Justice's Civil Rights Division conduct a joint investigation concerning the decision to remove the voting stations from LeFrak City. In this regard, I would ask that you and your staff fully cooperate with all aspects of that investigation.

Sincerely,

Bertha Lewis
Founder and President

cc:     New York City Board of Elections
        New York State Board of Elections
        U.S. Department of Justice's Civil Rights Division – Voting Section

# EXHIBIT M



**BLACK LEADERSHIP
ACTION COALITION**

August 18, 2017

Jose M. Araujo, Commissioner                    <u>**FAXED & MAILED ON SAME DATE**</u>
Michael Michel, Commissioner                    **FAX NUMBER: (718) 459-3384**
Queens County Board of Elections
118-35 Queens Boulevard
Forest Hills, NY 11375

RE: Polling Sites In LeFrak City

Dear Commissioners:

I am writing, on behalf of the Black Leadership Action Coalition (BLAC), as a follow-up to my August 7, 2017 letter to the Queens County Board of Elections (QCBOE) regarding the relocation of the polling site at The Continental Room that has been used by the residents of LeFrak City for the past 50+ years. After doing some additional research on this matter – and after discussing the situation with representatives from the New York City Board of Elections (NYCBOE) and the Voting Section of the Department of Justice's (DOJ) Civil Rights Division – we now understand that the problem concerning The Continental Room is that it is simply not large enough, per the applicable standards of the *Americans With Disabilities Act* (*ADA*), to accommodate all the voters from LeFrak City who utilize it (<u>Note: There is also another minor *ADA*-related issue concerning the slope that leads to the entrance of the location but we have been advised that problem can be easily fixed</u>).

During the course of its meeting on August 15, 2017, the NYCBOE made it clear that it was up to the QCBOE as to how to solve the above-referenced problem concerning The Continental Room. In this regard, BLAC has now identified three potential solutions that would allow the residents of LeFrak City to vote in their own community in the upcoming Primary Elections on September 12, 2017 – and in all the ensuing elections after that:

- <u>Solution #1</u>: Identify one or two more locations within LeFrak City that can be used, <u>in addition to The Continental Room</u>, as polling sites for LeFrak City voters (<u>Note: I have been informed that there are several such locations that could be used as auxiliary polling sites</u>). Clearly, if you can utilize multiple polling sites *outside of* LeFrak City, you can utilize multiple polling sites *within* LeFrak City. The greatest feature of this solution is that it would cost virtually nothing to implement.

- <u>Solution #2</u>: Do a build-out of the area that is adjacent to The Continental Room – which would increase the size of the polling site there and make it *ADA*-compliant. Other than the minor cost of the build-out, this solution would also cost nothing – and it would have the added benefit of keeping all the voters in LeFrak City assigned to one polling site.

- <u>Solution #3</u>: Set up a temporary mobile trailer on an appropriate ADA-compliant location within LeFrak City – and assign enough voters to use that as their polling site so that The Continental Room also becomes *ADA*-compliant. In this regard, we have already spoken to several companies that can deliver a fully-compliant mobile unit in time for the September elections – and leave it there through the November elections.

**Page 1 of 3**



**BLACK LEADERSHIP
ACTION COALITION**

During the course of its meeting on August 15, 2017, the NYCBOE also indicated that the LeFrak Corporation was quite willing to do whatever it could to help ensure that the residents of LeFrak City are able to vote within their own community in all future elections. That willingness was further evidenced in the attached letter that you recently received from Marsilia A. Boyle, a Senior Vice President at LeFrak Corporation, wherein she indicated that *"The LeFrak family and staff remain committed to the best interests of our residents and we believe that maintaining a polling place at LeFrak City is not merely a great convenience to our more than 20,000 residents but the best way to facilitate and encourage their active participation in the democratic process"*.

I look forward to discussing the solutions that BLAC has identified – and to working with you to ensure that the voters in LeFrak City, especially the elderly and disabled, are not disrupted and/or disenfranchised by forcing them to travel to travel to new voting sites up to a half-mile away from their homes.


Sincerely,

Bertha Lewis
Founder and President

PS/BLAC, the LeFrak Tenants Association, and the LeFrak City Tenants League have already assured the NYCBOE that we will take appropriate steps to ensure that every voter in LeFrak City knows where to go to vote on September 12, 2017. In this regard, we will post an *electronic notice* on our respective websites – and deliver a *written notice* to each resident of LeFrak City – as to their specific polling site.


cc:     New York City Board of Elections
        New York State Board of Elections
        U.S. Department of Justice's Civil Rights Division – Voting Section
        Governor Andrew Cuomo
        Attorney General Eric Schneiderman
        Mayor Bill de Blasio
        NYC Comptroller Scott Stringer
        NYC Public Advocate Leticia James
        Queens Borough President Melinda Katz
        U.S. Congressman Joseph Crowley
        Councilwoman Julissa Ferreras-Copeland

## Shana Broyard-Fludd

| | |
|---|---|
| **From:** | Marcy Boyle |
| **Sent:** | Thursday, August 17, 2017 4:54 PM |
| **To:** | Shana Broyard-Fludd |
| **Subject:** | FW: BOE Lease Agreement |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

| | |
|---|---|
| **Categories:** | Marcy |

Marsilia A. Boyle
Senior Vice President
The LeFrak Organization
40 W. 57th Street, 23rd Fl.
New York, NY 10019
T: 212-708-6652

-----Original Message-----
From: Kenneth Coughlin [mailto:KCoughlin@boe.nyc.ny.us]
Sent: Monday, May 15, 2017 2:58 PM
To: Marcy Boyle
Cc: Meredith Jackness; Sean Lewis; Elissa Benudis; David Bernhardt; Randi Koch Nir; Heide Wilcox
Subject: RE: BOE Lease Agreement

Good afternoon Ms. Boyle

The Queens Board of Elections will not be using the Lefrak City Apartments this Election Cycle.

On behalf of the Queens Board of Election I would like to thank you for the years of accommodating us as an Election Day Polling Site.

The use of the Continental Room was a great help to us and the voting community.

Once again thank you for all your assistance and service.

Best Regards,

Ken Coughlin

Kenneth Coughlin
Administrative Associate
POLL WORKER
TEL:718-730-6769
FAX:718-459-2754

1



**BLACK LEADERSHIP ACTION COALITION**

August 21, 2017

<u>**FAXED & MAILED ON SAME DATE**</u>
FAX # (212) 487-5349

Michael J. Ryan
Executive Director
New York City Board of Elections
Executive Office
32-42 Broadway – 7th Floor
New York, NY 10004

RE: Follow-Up

Dear Executive Director Ryan:

We are writing as a follow-up to our discussions at the August 15, 2017, meeting of the New York City Board of Elections (NYCBOE) regarding the location of polling sites for residents of LeFrak City. In this regard, we want to state for the record that as soon as the NYCBOE selects a location to serve as a second polling site for LeFrak City residents and decides which Voting District(s) will be assigned to vote there, our three organizations – i.e., the Black Leadership Action Coalition, the LeFrak City Tenants Association, and the LeFrak City Tenants League – will work together to ensure that every resident of LeFrak City receives both an *electronic notice* and a *written notice* regarding the appropriate location for them to vote on Tuesday, September 12, 2017.

More specifically, we will post an *electronic notice* on all our organizations' websites regarding the locations that will serve as polling sites for residents of LeFrak City for the upcoming election – and indicate which specific residents have been assigned to each of those locations. In addition, we will also recruit a sufficient number of volunteers to hand-deliver a *written notice* regarding the assigned polling location to each of the residents of LeFrak City.

We appreciate the cooperation that the NYCBOE has shown in this manner – and hope that an ongoing dialogue among our respective organizations will allow us to avoid any similar problems in the future.

Sincerely,

_____
Bertha Lewis
Founder and President
Black Leadership Action Coalition

_____
Jim Galloway
Coordinator
LeFrak City Tenants League

_____
Malikah Shabazz
President
LeFrak City Tenants Association

cc:     New York State Board of Elections
        Queens County Board of Elections
        U.S. Department of Justice's Civil Rights Division – Voting Section

**Page 1 of 1**

# EXHIBIT N

# Google Maps

## Drive 0.7 mile, 3 min
## 105-25 Horace Harding Expy to 59-17 Junction Blvd, Flushing, NY 11373



Map data ©2017 Google        United States        200 ft

 via Horace Harding Expy                    3 min

Fastest route, lighter traffic than usual              0.7 mile

 3:56 PM—4:01 PM                    5 min

 Q88

 via Horace Harding Expy            13 min

0.7 mile

FILED: NEW YORK COUNTY CLERK 08/28/2017 04:59 PM
NYSCEF DOC. NO. 15

# Google Maps

**55-** Walk 0.3 mile, 7 min
**01 94th St, Flushing, NY 11373 to 59-17 Junction Blvd, Flushing, NY 11373**



Map data ©2017 Google     United States     200 ft



## via 56th Ave and Junction Blvd     7 min

Mostly flat                                                0.3 mile



## via 94th St and 59th Ave     7 min

0.3 mile



# VOTER GUIDE

YOUR NONPARTISAN GUIDE TO CITY ELECTIONS SINCE 1989

## GO VOTE
### SEPTEMBER 12, 2017

**Primary Election**
Queens Council Districts 19-32, 34

**Mayor**
page 6

**Public Advocate**
page 10

**Borough President**
page 12

**City Council**
page 14

**VOTE FOR THE CITY YOU WANT**

YOU VOTE HERE

**ESPAÑOL AL REVERSO >**

 NEW YORK CITY CAMPAIGN FINANCE BOARD

C0260322
996-5SDL
0014/6672
P0236
CORONA NY 11368-3567
9722 57TH AVE
APT 11C
DURRIYAH A HAKAM

*ᵗᵗᵗᵗᵗᵗᵗᵗᵗᵗᵗᵗᵗᵗᵗᵗᵗᵗᵗᵗᵗᵗᵗᵗ*ᴱᶜᴿᵂˢᴴ*ᴵᶜ-026

**COUNCIL DISTRICT:** 21
**ASSEMBLY DISTRICT:** 35
**ELECTION DISTRICT:** 025

**POLL SITE:**
PS 13-CLEMENT C. MOORE
55-01 94 STREET

PRSRT STD
POSTAGE & FEES PAID
NYC CFB
PERMIT NO. 246

New York City
Campaign Finance Board
100 Church Street
New York, NY 10007



**Board of Elections
in the City of New York**
Queens Office
118-35 Queens Boulevard, 11th Floor
Forest Hills, NY 11375
(718) 730-6730

<div style="border:1px solid">
PRESORTED
STANDARD
US POSTAGE **PAID**
BD OF ELECTIONS
CITY OF NEW YORK
</div>



OFFICIAL
ELECTION MAIL
Authorized by the U.S. Postal Service ®

**RETURN SERVICE REQUESTED**

Where to Vote: 
**Your Poll Site is:**
**Su Centro de Votación es:**

**VOTE 2017**


Q1154400

PS 13-Clement C. Moore
55-01 94 Street, Elmhurst
**Voter Entrance:**
55-01 94 Street
**Accessible Entrance:**
55-01 94 Street

 **ALERT!** 
Your Polling Place Has Been Changed.
Su Centro de Votación ha sido cambiado.

3892  0002685  T0008  0008

****************ECRWSH**C-021
James E Galloway Jr

*ADDRESS OMITTED*